XAVIER BECERRA, State Bar No. 118517
Attorney General of California
HARRISON POLLAK, State Bar No. 200879
Supervising Deputy Attorney General
JOHN EVERETT, State Bar No. 259481
Deputy Attorney General
JOSHUA R. PURTLE, State Bar No. 298215
Deputy Attorney General
 1515 Clay Street, 20th Floor
 P.O. Box 70550
 Oakland, CA 94612-0550
 Telephone:  (510) 879-0098
 Fax:  (510) 622-2270
 E-mail:  Joshua.Purtle@doj.ca.gov
*Attorneys for Xavier Becerra, in his Official
Capacity as Attorney General of the State of
California*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CALIFORNIA CHAMBER OF COMMERCE,**<br><br>Plaintiff,<br><br>v.<br><br>**XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,**<br><br>Defendant. | 2:19-CV-02019-KJM-EFB<br><br>**MEMORANDUM IN SUPPORT OF ATTORNEY GENERAL XAVIER BECERRA'S MOTION TO DISMISS**<br><br>Date:          December 20, 2019<br>Time:          10:00 am<br>Courtroom:  3 (15th Floor)<br>Judge:         The Honorable Kimberly J. Mueller<br>Trial Date:  None<br>Action Filed: October 7, 2019 |

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 2

    I.      ACRYLAMIDE ................................................................................. 2

    II.     PROPOSITION 65 .............................................................................. 5

    III.    THE CHAMBER'S LAWSUIT ............................................................ 8

ARGUMENT ............................................................................................................. 9

    I.      THE COURT SHOULD DISMISS THE COMPLAINT UNDER THE DECLARATORY
          JUDGMENT ACT ............................................................................. 9

          A.     Dismissal is Warranted to Discourage Improper Forum Shopping ........... 9

          B.     Dismissal is also Warranted to Avoid Duplicative Litigation and the
               Waste of Judicial Resources.................................................. 12

          C.     The Chamber's Request for Injunctive Relief Does Not Prevent
               Dismissal Under the Declaratory Judgment Act..................... 14

    II.     IN THE ALTERNATIVE, DISMISSAL IS WARRANTED UNDER COLORADO RIVER ...... 15

CONCLUSION ......................................................................................................... 17

# TABLE OF AUTHORITIES

### STATE AND FEDERAL CASES

AFL-CIO v. Deukmejian
   212 Cal. App. 3d 425 (1989)................................................................4, 10

Am. Bankers Mgmt. Co. v. Heryford
   885 F.3d 629 (9th Cir. 2018).................................................................14

Brillhart v. Excess Ins. Co. of Am.
   316 U.S. 491 (1942).............................................................................9

Chapman's Las Vegas Dodge, LLC v. Chrysler Grp., LLC
   No. 2:14-CV-00504-GMN-CWH, 2014 WL 12607723
   (D. Nev. May 29, 2014) ......................................................................15

Colo. River Water Conservation Dist. v. United States
   424 U.S. 800 (1976) ................................................................... passim

Cont'l Cas. Co. v. Robsac Indus.
   947 F.2d 1367 (9th Cir. 1991)..............................................................12

Emp'rs Reinsurance Corp. v. Karussos
   65 F.3d 796 (9th Cir. 1995).................................................................15

Exxon Mobil Corp. v. OEHHA
   169 Cal. App. 4th 1264 (2009) ............................................................11

Golden Eagle Ins. Co. v. Travelers Cos.
   103 F.3d 750 (9th Cir. 1996)............................................................9, 13

Gov't Emps. Ins. Co. v. Dizol
   133 F.3d 1220 (9th Cir. 1998) (en banc)............................................ passim

Huffman v. Pursue, Ltd.
   420 U.S. 592 (1975).............................................................................13

Lexington Ins. Co. v. Silva Trucking, Inc.
   No. 2:14-CV-0015-KJM-CKD, 2014 WL 1839076
   (E.D. Cal. May 7, 2014)..........................................................12, 13, 14

Md. Cas. Co. v. Knight
   96 F.3d 1284 (9th Cir. 1996)................................................................12

Montanore Minerals Corp. v. Bakie
   867 F.3d 1160 (9th Cir. 2017)...............................................10, 11, 15, 16, 17

## TABLE OF AUTHORITIES
### (continued)

Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.
    460 U.S. 1 (1983) .................................................................................................16

Nakash v. Marciano
    882 F.2d 1411 (9th Cir. 1989) ............................................................................11

Polido v. State Farm Mut. Auto. Ins. Co.
    110 F.3d 1418 (9th Cir. 1997) ............................................................................13

R.R. St. & Co. v. Transp. Ins. Co.
    656 F.3d 966 (9th Cir. 2011) .......................................................9, 11, 12, 13, 16

Scotts Co. LLC v. Seeds, Inc.
    688 F.3d 1154 (9th Cir. 2012) ......................................................................11, 14

Seneca Ins. Co. v. Strange Land, Inc.
    862 F.3d 835 (9th Cir. 2017) ..............................................................................16

Snodgrass v. Provident Life & Accident Ins. Co.,
    147 F.3d 1163 (9th Cir. 1998) ............................................................................14

Vasquez v. Rackauckas
    734 F.3d 1025 (9th Cir. 2013) ............................................................................14

W. Crop Prot. Ass'n v. Davis
    80 Cal. App. 4th 741 (2000) ...............................................................................11

Younger v. Harris,
    401 U.S. 37 (1971) ..............................................................................................13

### FEDERAL STATUTES

16 U.S.C. § 1540(g) ....................................................................................................7

28 U.S.C.
    § 2201 ..................................................................................................................14
    § 2201(a) ...............................................................................................................9

33 U.S.C. § 1365 .........................................................................................................7

42 U.S.C. § 1983 .......................................................................................................14

# TABLE OF AUTHORITIES
### (continued)

### STATE STATUTES

California Government Code
 § 11340.7 ................................................................................................................6

California Health & Safety Code
 § 25249.6 ................................................................................................................5
 § 25249.7(c) ...........................................................................................................7
 § 25249.7(d) ...........................................................................................................7
 § 25249.8 ................................................................................................................5
 § 25249.10(c) ......................................................................................................6, 7

### STATE REGULATIONS

California Code of Regulations, Title 27
 § 25102(s) ..............................................................................................................6
 § 25204 ..................................................................................................................6
 § 25701(a) ..............................................................................................................6
 § 25703(b)(1) .........................................................................................................6
 § 25704 ..................................................................................................................6
 § 25705(c)(2) ..........................................................................................................6
 § 27001(b) ..............................................................................................................5
 § 27001(c) ..............................................................................................................5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendant Xavier Becerra's Memorandum in Support of Motion to Dismiss (2:19-CV-02019-KJM-EFB)

1

**INTRODUCTION**

2      This matter concerns acrylamide, a chemical that the U.S. Environmental Protection

3   Agency ("EPA"), the International Agency for Research on Cancer ("IARC"), and the National

4   Toxicology Program—three agencies that the California Office of Environmental Health Hazard

5   Assessment ("OEHHA") considers "authoritative bodies" in cancer matters—have all identified

6   as a probable human carcinogen.  OEHHA, in accord with these expert agencies, has listed

7   acrylamide as a chemical known to cause cancer, and California businesses are therefore required

8   to provide cancer warnings for significant exposures to acrylamide pursuant to the California Safe

9   Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65").

10      Notwithstanding these expert agency findings, the California Chamber of Commerce

11   ("Chamber") asserts that acrylamide warnings for food and beverage products are "false,

12   misleading, and factually controversial" for First Amendment purposes, because the accepted

13   conclusion that acrylamide likely causes human cancer is based in part on experimental studies in

14   animals.  The Chamber also points to human epidemiological studies, which, according to the

15   Chamber, have not found a positive association between acrylamide exposure from food and

16   cancer.  The Chamber has accordingly sued the Attorney General of California ("Attorney

17   General") for a declaration and injunction to block ongoing and impending state enforcement

18   proceedings under Proposition 65, including by private parties who are currently litigating the

19   acrylamide warning requirement as applied to exposures from food in state court.

20      The Chamber is wrong on the science and the law.  If it becomes necessary in this case, the

21   Attorney General will show that requiring acrylamide cancer warnings based on repeated findings

22   of carcinogenicity in experimental animals, in addition to other toxicological evidence, is

23   consistent with settled scientific principles and does not violate the First Amendment.  The

24   Chamber's contention that such warnings are misleading and counterfactual is meritless.

25      However, the Court should not even reach the Chamber's arguments, but should instead

26   dismiss this matter pursuant to its discretion under the Declaratory Judgment Act, for two

27   reasons.  First, dismissal is warranted to discourage the Chamber's improper attempt to seize a

28   new, federal forum for a First Amendment claim that has not been successfully litigated in the

1  state courts over more than a decade of litigation concerning acrylamide exposures from food.

2  Second, the same issue—whether acrylamide warnings for food exposures violate the First

3  Amendment—has already been raised in multiple pending enforcement proceedings in California

4  state courts.  There is therefore no reason for this Court to waste limited judicial resources and

5  infringe on the comity between the state and federal court systems by addressing the Chamber's

6  claim in this duplicative lawsuit.  For these reasons, the Attorney General respectfully requests

7  that the Court dismiss the Chamber's Complaint.

8  **BACKGROUND**

9  **I.   ACRYLAMIDE**

10  Acrylamide is an odorless chemical that is used in the production of adhesives and grouts,

11  as well as in "agricultural sprays, papermaking, textile printing paste," and other consumer

12  products.  EPA, Toxicological Review of Acrylamide 266 (Mar. 2010) ("EPA Review") (Request

13  for Judicial Notice in Supp. of Mot. to Dismiss ("Request for Judicial Notice"), Ex. 7 at 24).

14  Most people, however, are exposed to acrylamide in cigarette smoke and in certain starchy food

15  products that have been cooked at high temperatures.  See id. at 6 (Ex. 7 at 5).  Among food

16  products, "French fries, potato chips, crackers, pretzel-like snacks, cereals, and browned breads

17  tend to have the highest levels of" acrylamide.  Id.  Significant levels of the chemical have also

18  been detected in canned black olives, prune juice, and other foods.  Id.

19  Acrylamide is generally found in foods that have been cooked at high temperatures or

20  processed in certain other ways.  In many cases it is feasible to reduce acrylamide levels in these

21  foods, either through the use of certain enzymes or through other methods that change how the

22  food is processed.  The U.S. Food and Drug Administration ("FDA") has therefore recently

23  issued guidance recommending that food producers take steps to reduce acrylamide in their foods

24  and identifying examples of such steps.  FDA, Guidance for Industry: Acrylamide in Foods 3

25  (Mar. 2016) (Request for Judicial Notice, Ex. 8 at 2).  The FDA's suggested acrylamide-reducing

26  measures include, for example, inexpensive and sensible practices such as washing foods before

27  frying or frying at lower temperatures.  Id. at 13-14 (Ex. 8 at 12-13) (listing recommendations for

28  potato-based foods).  Litigation by the Attorney General and private enforcers has also led many

1    major food producers to reduce the acrylamide content of their products as an alternative to

2    providing warnings, as discussed in more detail below.  See Request for Judicial Notice, Exs. 2-6.

3    The FDA recently published data that confirms acrylamide levels in certain food products,

4    including foods that have been the subject of Proposition 65 litigation, have fallen significantly.

5    See FDA, Acrylamide levels and dietary exposure from foods, Food Additives & Contaminants:

6    Part A (Mar. 13, 2019) (Request for Judicial Notice, Ex. 9).

7         Decades of research have produced strong evidence that acrylamide causes cancer in

8    laboratory animals, and that the same mechanisms that result in adverse effects from acrylamide

9    exposures in animals also exist in humans.  Studies in animals, including rats, have consistently

10   shown that chronic oral acrylamide exposure causes an increased rate of thyroid, genital, skin,

11   and lung cancers.  EPA Review at 166, 173 (Request for Judicial Notice, Ex. 7 at 6, 13).

12   Acrylamide has also been shown to induce gene mutations in live animals, as well as in human

13   cells in vitro—that is, cells isolated in laboratory conditions.  Id. at 168 (Ex. 7 at 8).  In particular,

14   glycidamide, a chemical that forms when acrylamide breaks down in the body, has been shown to

15   bind with DNA to form DNA adducts, or chemically-altered forms of DNA, in human cells.  Id.

16   Accumulated gene mutations, including the formation of DNA adducts, may induce healthy cells

17   to transform into cancer cells.  See id. at 174 (Ex. 7 at 14).  Indeed, one study of human bronchial

18   epithelial cells found that exposure to acrylamide and glycidamide caused the cells to "develop

19   mutations in a cancer-critical gene," in this case "the tumor suppressor p53 gene."  Id. at 183 (Ex.

20   7 at 23).  Based on these studies, EPA has concluded that scientific evidence "supports a

21   mutagenic [mode of action] for [acrylamide] that would be operational in both test animals and

22   humans."  Id.  In other words, there is scientific evidence that the same kind of cell mutations

23   acrylamide causes in laboratory animals also occurs in humans.

24        Many expert agencies—including the U.S. EPA and IARC—routinely rely on animal

25   studies like those cited above to evaluate the cancer risk posed by certain chemicals, in part

26   because experimental exposure studies in humans are generally unethical and "adequate human

27   epidemiological data" are rarely available.  Opinion of the Scientific Committee on a Request

28   from the European Food Safety Authority Related to a Harmonised Approach for Risk

3

1    Assessment 4 (Oct. 18, 2005) (Request for Judicial Notice, Ex. 10 at 4); IARC, Preamble,

2    Monographs on the Identification of Carcinogenic Hazards to Humans 23 (Jan. 2019) ("IARC

3    Preamble") (Request for Judicial Notice, Ex. 11 at 3) ("[I]n the absence of additional scientific

4    information, such as strong evidence that a given agent causes cancer in experimental animals

5    through a species-specific mechanism that does not operate in humans … these agents are

6    considered to pose a potential carcinogenic hazard to humans."); <u>AFL-CIO v. Deukmejian</u>, 212

7    Cal. App. 3d 425, 438 n.7 (1989) ("[T]he principle which supports qualitative animal to human

8    extrapolation from carcinogenesis 'has been accepted by all health and regulatory agencies and is

9    regarded widely by scientists in industry and academia as a justifiable and necessary inference.'")

10   (quoting report of federal Office of Science and Technology Policy).  Thus, many agency

11   decisions concerning whether chemicals pose a cancer risk to humans are based in large part on

12   studies in animals.  <u>See, e.g.</u>, IARC Preamble at 35 (Request for Judicial Notice, Ex. 11 at 6)

13   (noting that chemicals may be classified as probable human carcinogens on the basis of

14   "[s]ufficient evidence of carcinogenicity in experimental animals" and "[l]imited evidence of

15   carcinogenicity in humans").

16       Consistent with that practice, many scientific and government organizations have identified

17   acrylamide as a probable human carcinogen on the basis of the animal and human in vitro studies

18   cited above: EPA concluded in 2010 that acrylamide is "likely to be carcinogenic to humans,"

19   thus reaffirming its 1989 carcinogenicity finding, EPA Review at 167 (Request for Judicial

20   Notice, Ex. 7 at 7); <u>see</u> OEHHA, Meeting of the Carcinogen Identification Committee,

21   Acrylamide Briefing Binder, Tab 2 (Oct. 17, 2003) (Request for Judicial Notice, Ex. 12 at 4);

22   IARC has concluded that acrylamide "is probably carcinogenic to humans," IARC, Monographs

23   on the Evaluation of Carcinogenic Risks to Humans: Vol. 60, Some Industrial Chemicals 425

24   (1994) (Request for Judicial Notice, Ex. 13 at 2); and the National Toxicology Program—an

25   interagency program of the FDA, the National Institutes of Health, and the Centers for Disease

26   Control and Prevention—has concluded that acrylamide "is reasonably anticipated to be a human

27   carcinogen," National Toxicology Program, Acrylamide, 14th Report on Carcinogens (2016)

28   (Request for Judicial Notice, Ex. 14 at 2).  California's OEHHA likewise identified acrylamide as

4

1  a carcinogen in 1990, based on carcinogenicity findings by EPA and IARC.  See OEHHA,

2  Meeting of the Carcinogen Identification Committee, Acrylamide Briefing Binder, Tab 2 (Oct.

3  17, 2003) (Request for Judicial Notice, Ex. 12 at 4).

4       Human epidemiological studies of acrylamide do not refute these agency findings.

5  According to U.S. EPA, most epidemiological studies, which attempt to evaluate whether groups

6  of people exposed to a greater amount of acrylamide are more likely to develop cancer, have not

7  found "statistically significant associations" between consuming high-acrylamide foods and

8  increased cancer rates.  EPA Review at 167 (Request for Judicial Notice, Ex. 7 at 7).  "These

9  results are not very informative," however, in part "because of the difficulty in estimating dietary

10  intake of acrylamide … resulting in potential bias towards" a finding of no association between

11  acrylamide exposure and cancer.  IARC, Report of the Advisory Group to Recommend Priorities

12  for the IARC Monographs during 2020-2024, at 6 (Request for Judicial Notice, Ex. 15 at 3)

13  (discussing the epidemiological studies).  The absence of positive findings in these studies does

14  not, therefore, contradict the extensive body of research based on animal studies and human in

15  vitro studies cited above, which demonstrate that acrylamide poses a risk of cancer in humans.

16  Thus, EPA has evaluated the epidemiological studies of acrylamide exposure and nevertheless

17  concluded that acrylamide is "likely to be carcinogenic to humans."  EPA Review at 166

18  (Request for Judicial Notice, Ex. 7 at 6).

19  **II.**    **PROPOSITION 65**

20       The Safe Drinking Water and Toxic Enforcement Act of 1986, also known as Proposition

21  65, is a voter-enacted statute that protects the public's right to know about the potential threats of

22  cancer, birth defects, or other reproductive harm resulting from exposure to hazardous chemicals

23  such as acrylamide.  In this regard, Proposition 65 generally requires businesses to provide a

24  "clear and reasonable warning" on any product that causes an exposure to "a chemical known to

25  the state to cause cancer or reproductive toxicity."  Cal. Health & Safety Code § 25249.6.

26  OEHHA maintains a list of such chemicals.  See id. § 25249.8.  OEHHA added acrylamide to this

27  list in 1990, based on the chemical's formal identification by EPA and IARC as a carcinogen.

28  OEHHA, Meeting of the Carcinogen Identification Committee, Acrylamide Briefing Binder, Tab

1   2 (Oct. 17, 2003) (Request for Judicial Notice, Ex. 12 at 4); Cal. Code Regs. tit. 27, § 27001(b).

2   OEHHA also listed acrylamide as a reproductive toxicant in 2011.  Cal. Code Regs. tit. 27,

3   § 27001(c).

4       Businesses that do not believe Proposition 65 cancer warnings are warranted for their

5   products have state-law remedies they can pursue, several of which may be applicable to

6   acrylamide exposures from food.  For example, businesses can avoid providing warnings for

7   listed chemicals—and fend off enforcement actions—by demonstrating that an exposure caused

8   by the business's product "poses no significant risk" of cancer, "assuming lifetime exposure at the

9   [exposure] level in question."  Cal. Health & Safety Code § 25249.10(c).  In this regard, OEHHA

10  has adopted a "safe harbor" regulation finding that acrylamide exposures of less than 0.2

11  micrograms per day pose no significant risk of cancer.  Cal. Code Regs. tit. 27, § 25705(c)(2).

12  Companies can also establish that exposures above this regulatory safe harbor level do not require

13  a warning.  Id. § 25701(a).  In fact, the Proposition 65 regulations allow for a higher risk

14  threshold where a company can demonstrate that a listed chemical in a food is produced by

15  cooking that is "necessary to render the food palatable."  Id. § 25703(b)(1).

16      In the same vein, a business can request a "safe use determination" from OEHHA, which, if

17  granted, provides an authoritative interpretation concerning how Proposition 65 warning

18  requirements do or do not apply to a specific type of exposure.  See Cal. Code Regs. tit. 27,

19  §§ 25102(s), 25204.  Businesses can also petition OEHHA to take administrative action limiting

20  the scope of the warning requirement as to particular chemicals and products, or OEHHA can

21  initiate such action on its own.  See Cal. Gov't Code § 11340.7 (providing for administrative

22  petitions).  For example, OEHHA recently adopted a regulation providing that exposures to the

23  mixture of chemicals in coffee "that are created by and inherent in the processes of roasting

24  coffee beans or brewing coffee"—which include acrylamide—"do not pose a significant risk of

25  cancer."  Cal. Code Regs. tit. 27, § 25704; see also OEHHA, Final Statement of Reasons,

26  Adoption of New Section 25704: Exposures to Listed Chemicals in Coffee Posing No Significant

27  Risk 5 (June 7, 2019) ("Coffee Exemption Statement of Reasons") (Request for Judicial Notice,

28  Ex. 16 at 3).  In reaching this conclusion, OEHHA's considerations included, among other things,

1   convincing evidence of inverse associations—decreasing risk with increasing coffee consumption

2   for liver and uterine cancers in humans; the overall evidence from animal studies of reduced

3   incidence or reduced multiplicity of tumors with coffee intake; the overall inadequate evidence of

4   carcinogenicity in humans from the consumption specifically of coffee based on a very large

5   number of human studies, and finally the rich mix of cancer-preventative agents present in

6   brewed coffee.  See Coffee Exemption Statement of Reasons at 5 (Request for Judicial Notice,

7   Ex. 16 at 3).  The practical effect of this regulation is that warnings for acrylamide in coffee are

8   not required under Proposition 65.  See Cal. Health & Safety Code § 25249.10(c).[1]

9       In addition to ensuring that people in California are informed about being exposed to

10   chemicals known to cause cancer, the Proposition 65 warning requirement also helps encourage

11   businesses to reduce the levels of harmful chemicals in their products so that they can avoid

12   providing cancer warnings at all.  In this regard, the Attorney General has entered into consent

13   judgments in which companies have agreed to dramatically reduce the amount of acrylamide in

14   their products in order to avoid providing warnings.  See Request for Judicial Notice, Exs. 3-6.

15   Private enforcers have likewise entered into consent judgments, most of which also require food

16   producers to reduce acrylamide levels in their products or else provide warnings.  Id., Ex. 2.

17   These consent judgments are still in effect today.  See id., Exs. 2-6.

18       Proposition 65's warning requirement may be enforced by the Attorney General, by any

19   district attorney, and by city attorneys in large cities.  Cal. Health & Safety Code § 25249.7(c).  In

20   addition, like many environmental statutes, Proposition 65 permits any person to bring an

21   enforcement action, provided that person gives the Attorney General, other prosecutors, and the

22   alleged violator 60 days' notice before filing suit.  See id. § 25249.7(d); compare, e.g., 16 U.S.C.

23   § 1540(g) (federal Endangered Species Act's citizen suit provision, which permits "any person"

24   to bring suit to enforce the Act's requirements); 33 U.S.C. § 1365 (federal Clean Water Act's

25   citizen suit provision).  State enforcement actions concerning acrylamide, including actions

26   _____

   [1] The Council for Education and Research on Toxics, which has moved to intervene in
27   this matter, has challenged this regulation in a pending state court proceeding.  See Council for
   Education and Research on Toxics' Mem. of P & A. in Supp. of. Mot. to Intervene at 8 (filed Oct.
28   16, 2019).

1  brought by the Attorney General and by private parties against the Chamber's members, have

2  been ongoing for over a decade, and at least thirty-eight such actions are currently pending in

3  California state courts.  See Request for Judicial Notice, Ex. 1 (listing pending state court

4  enforcement proceedings); see also Complaint for Declaratory and Injunctive Relief, ¶ 60 (filed

5  Oct. 7, 2019) ("Complaint").  Chamber members have also received 60-day notice letters from

6  private enforcers but have not yet been sued.  See Complaint, ¶ 60.[2]

7  **III.   THE CHAMBER'S LAWSUIT**

8       The Chamber seeks to preempt these ongoing and impending state court enforcement

9  proceedings through the federal declaratory judgment action now before the Court.  The Chamber

10  filed this action against the Attorney General on October 7, 2019, claiming that requiring its

11  members to give acrylamide warnings violates their First Amendment free speech rights.  See

12  Complaint.  The Chamber's claim is based primarily on its allegation that cancer warnings for

13  exposures to acrylamide are false and misleading because, according to the Chamber, "there is no

14  reliable scientific evidence that dietary acrylamide increases the risk of cancer in humans."

15  Complaint, ¶ 78 (emphasis added).  In this regard, the Chamber asserts that "studies in laboratory

16  animals" are inadequate to support a finding that acrylamide is a human carcinogen, and that

17  studies in humans have found "no reliable evidence" that exposure to acrylamide in food products

18  is associated with an increased risk of cancer.  Complaint, ¶¶ 3, 80.

19       The Chamber seeks a declaration and an injunction preventing the Attorney General and all

20  private enforcers—none of which have been joined to this action, and only one of which has

21  moved to intervene—from enforcing or threatening to enforce the acrylamide warning

22  requirement.  Complaint, Prayer for Relief, ¶ 3.  The requested injunction would potentially block

23  ongoing state enforcement proceedings and enforcement of prior judgments, as well as preempt

24  enforcement actions by private parties that have given the Chamber's members' 60 days' notice

25  of Proposition 65 violations but have not yet sued.

26

27

28  _____

   [2] All 60-day notice letters submitted to the Attorney General are available on the Attorney
   General's website at https://oag.ca.gov/prop65/60-day-notice-search.

1  The Council for Education and Research on Toxics, one of the private parties that has

2  brought ongoing acrylamide enforcement actions, has moved to intervene in this matter and

3  lodged a motion to dismiss the Chamber's complaint on abstention and other grounds.  The

4  Attorney General now files this motion to provide additional grounds on which the Court should

5  dismiss the Chamber's declaratory judgment action.

6  **ARGUMENT**

7  The Court should exercise its discretion under the Declaratory Judgment Act to dismiss the

8  Chamber's complaint.  Alternatively, it should dismiss under <u>Colorado River</u> abstention.

9  **I.   THE COURT SHOULD DISMISS THE COMPLAINT UNDER THE DECLARATORY**

10  **JUDGMENT ACT**

11  The Declaratory Judgment Act provides that a federal district court "<u>may</u> declare the rights

12  and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a)

13  (emphasis added).  The Act thus grants district courts "broad discretion" to abstain from deciding

14  a declaratory judgment action for the "purpose of enhancing 'judicial economy and cooperative

15  federalism.'"  <u>R.R. St. & Co. v. Transp. Ins. Co.</u>, 656 F.3d 966, 975 (9th Cir. 2011) (quoting

16  <u>Gov't Emps. Ins. Co. v. Dizol</u>, 133 F.3d 1220, 1224 (9th Cir. 1998) (en banc)); <u>see also</u> <u>Brillhart</u>

17  <u>v. Excess Ins. Co. of Am.</u>, 316 U.S. 491 (1942).  As relevant here, dismissal is appropriate where

18  there are pending, parallel state court proceedings "aris[ing] from the same factual circumstances"

19  as the federal declaratory judgment action.  <u>Golden Eagle Ins. Co. v. Travelers Cos.</u>, 103 F.3d

20  750, 754-55 (9th Cir. 1996), <u>overruled in part on other grounds by</u> <u>Dizol</u>, 133 F.3d 1120.

21  In determining whether to exercise this discretion, the Court should consider whether

22  dismissal will avoid "needless determination of state law issues," discourage "forum shopping,"

23  and avoid "duplicative litigation."  <u>R.R. St. & Co.</u>, 656 F.3d at 975 (quotation omitted).  The first

24  factor (needless determination of state law issues) does not apply here, but the second and third

25  factors (forum shopping and duplicative litigation) both strongly favor dismissal.

26  **A.   Dismissal is Warranted to Discourage Improper Forum Shopping**

27  Dismissal under the Declaratory Judgment Act is warranted to discourage the Chamber's

28  improper attempt at forum shopping in this matter.  As relevant here, improper forum shopping

9

1   occurs when a party seeks a new, federal forum for claims it has raised and litigated without

2   success in state courts, see Montanore Minerals Corp. v. Bakie, 867 F.3d 1160, 1169-70 (9th Cir.

3   2017) (evaluating Colorado River argument), or when a party files a "reactive declaratory

4   action[]" in federal court in order to preempt a state court action that is impending but has not yet

5   been filed, see Dizol, 133 F.3d at 1225.  The present case has both of these traits.

6      The Court should dismiss this matter first to prevent the Chamber from improperly seeking

7   a new forum for claims and arguments that for years have failed to gain traction in state courts.

8   As discussed, enforcement litigation concerning the acrylamide warning for food products has

9   been ongoing in state court for over a decade.  See, e.g., Request for Judicial Notice, Exs. 4-6.

10  The Chamber's members and others have raised First Amendment defenses from the start,

11  without any success to show for it.  Most recently, in Council for Education and Research on

12  Toxics v. Starbucks Corp., BC435759, a state superior court in Los Angeles rejected industry

13  representatives' argument that acrylamide warnings violate the First Amendment.  That issue is

14  now before the California Court of Appeal on a writ petition.  See Starbucks Corp. v. Superior Ct.

15  of Cal., Cty. of Los Angeles, B292762 (Cal. Ct. App., 2nd Dist.).

16     Moreover, the central factual theory underlying the Chamber's First Amendment claim—

17  that it is improper to require a cancer warning based solely on studies demonstrating the

18  carcinogenicity of a chemical in animals—has been roundly rejected by state courts, including the

19  California Court of Appeal in Sacramento.  In AFL-CIO v. Deukmejian, 212 Cal. App. 3d 425

20  (1989), the Third District Court of Appeal rejected an argument that Proposition 65 does not

21  allow listing of chemicals based on animal studies, noting that "[t]he qualitative assessment of

22  carcinogenic risks to humans ordinarily is based on data from experiments in animals" because

23  "[i]t is unethical to test humans" and "epidemiological studies" often "do not adequately warn

24  humans and protect them from the risk of exposure to new carcinogens."  Id. at 438, n.7.  Thus,

25  the Court noted, "the principle which supports qualitative animal to human extrapolation from

26  carcinogenesis 'has been accepted by all health and regulatory agencies and is regarded widely by

27  scientists in industry and academia as a justifiable and necessary inference.'"  Id. (quoting report

28  of federal Office of Science and Technology Policy).  As discussed, the Court of Appeal's

1  conclusion in this regard is in accord with the views of expert scientific agencies charged with

2  evaluating cancer risks.  The Chamber nevertheless seeks to revive its debunked scientific theory

3  in this Court, where the authoritative Deukmejian decision and its progeny are not binding

4  precedent.  See also Exxon Mobil Corp. v. OEHHA, 169 Cal. App. 4th 1264, 1288 (2009)

5  (approving OEHHA finding "that it is a 'generally accepted toxicological assumption that, absent

6  evidence to the contrary, a chemical that causes developmental harm in experimental animals,

7  will cause similar harm in humans'"); W. Crop Prot. Ass'n v. Davis, 80 Cal. App. 4th 741 (2000).

8        In short, the Chamber's members have apparently become "dissatisfied with the state court"

9  and now seek "a new forum for their claims by filing in federal court." Montanore Minerals, 867

10  F.3d at 1169 (quotation and alterations omitted).  This case is thus like Montanore Minerals, in

11  which the Ninth Circuit held that a stay of federal court litigation was required under the more

12  stringent Colorado River standard.  Id.; see Scotts Co. LLC v. Seeds, Inc., 688 F.3d 1154, 1158

13  (9th Cir. 2012) (Colorado River allows dismissal "when exceptional circumstances exist").

14  There, after six years of state court litigation, a mining company "filed in federal court a few

15  months after it received an unfavorable decision in state court." Id. at 1169-70.  Under the

16  circumstances, the Ninth Circuit concluded that it could "reasonably infer that [the company] was

17  seeking to avoid the state court judge whose rulings it repeatedly characterized as wrong in its

18  appellate briefing." Id. at 1170; see also Nakash v. Marciano, 882 F.2d 1411, 1417 (9th Cir.

19  1989) ("Apparently, after three and one-half years, Nakash has become dissatisfied with the state

20  court and now seeks a new forum for their claims.  We have no interest in encouraging this

21  practice.").  Similarly, here, the Court should reject the Chamber's members' attempt to make an

22  end-run around state courts and bring their First Amendment claim in this Court instead.  See

23  R.R. St. & Co., 656 F.3d at 976 (dismissal appropriate where party filed in federal court merely to

24  obtain "a tactical advantage from litigating in a federal forum") (quotation omitted).

25        Dismissal is also warranted to block the Chamber's improper attempt to seize a federal

26  forum for claims its members could raise in impending state court proceedings.  As discussed,

27  private Proposition 65 enforcers have submitted statutorily-required 60-day notice letters to

28  several alleged acrylamide-warning violators, including some of the Chambers' members, but in

1   numerous cases have not yet filed suit.  <u>See</u> Complaint, ¶ 60.  The Chamber, through this

2   declaratory judgment action, seeks to preempt these impending enforcement actions and seize a

3   federal forum for its First Amendment claim before the private enforcers have an opportunity to

4   file in their chosen forum and at their chosen time.  Indeed, the Chamber requests preliminary

5   injunctive relief that would prohibit the private enforcers—none of which have been joined to this

6   action, and only one of which has sought intervention—from initiating state court enforcement

7   proceedings at all.  <u>See</u> Complaint, Prayer for Relief, ¶ 3.  "[F]ederal courts should generally

8   decline to entertain reactive declaratory actions," <u>Dizol</u>, 133 F.3d at 1225, which, like the

9   Chamber's action here, are filed "in anticipation of an impending state court suit," <u>Md. Cas. Co.</u>

10  <u>v. Knight</u>, 96 F.3d 1284, 1289 (9th Cir. 1996), to "obtain a tactical advantage from litigating in a

11  federal forum."  <u>R.R. St. & Co.</u>, 656 F.3d at 976 (quotation omitted).

12       This case is therefore similar to <u>Cont'l Cas. Co. v. Robsac Indus.</u>, 947 F.2d 1367 (9th Cir.

13  1991), <u>overruled in part on other grounds by</u> <u>Dizol</u>, 133 F.3d 1120.  There, the Ninth Circuit

14  found improper forum shopping where an insurer brought a federal declaratory judgment action

15  to preempt a state court action filed by its insured.  <u>Id.</u> at 1372.  This element thus also weighs

16  strongly in favor of dismissal in this matter, to prevent the Chamber's improper attempt to seize a

17  federal forum for its First Amendment defense.

18       **B.**    **Dismissal is also Warranted to Avoid Duplicative Litigation and the Waste**
              **of Judicial Resources**
19

20       Dismissal is also warranted in this matter to avoid litigation that is duplicative of ongoing

21  state court proceedings in which the same First Amendment claim has been or could be raised.  In

22  this regard, courts should decline to entertain a declaratory judgment action where "[a]ll of the

23  issues presented by the declaratory judgment action could be resolved in state court" in a pending

24  state proceeding.  <u>Robsac</u>, 947 F.2d at 1373; <u>see also</u> <u>Lexington Ins. Co. v. Silva Trucking, Inc.</u>,

25  No. 2:14-CV-0015-KJM-CKD, 2014 WL 1839076, at *9 (E.D. Cal. May 7, 2014).  Dismissal

26  under such circumstances promotes judicial economy by ensuring that this Court does not waste

27  limited judicial resources on an issue that could be presented and addressed in an action already

28  pending in state court.  <u>See</u> <u>R.R. St. & Co.</u>, 656 F.3d at 975 (purpose of Declaratory Judgment

1    Act is to promote "'judicial economy and cooperative federalism'") (quoting Dizol, 133 F.3d at

2    1224).

3        The Chamber's federal declaratory action, if allowed to go forward, would be duplicative of

4    ongoing state court proceedings.  As discussed, at least thirty-eight enforcement actions brought

5    by private parties are currently pending in state court.  See Request for Judicial Notice, Ex. 1.

6    The Chamber's Complaint recognizes that "[s]everal" of their members are involved in these

7    lawsuits and that "several of the companies represented on [the Chamber's] Board of Directors

8    have received 60-day notices on acrylamide in food products and been sued in connection with

9    such notices."  Complaint, ¶ 60.  In almost every one of these matters, the defendants have

10   asserted a First Amendment defense through which they will be able to make the same arguments

11   for why they should not be compelled to provide a cancer warning for acrylamide in food.  See

12   Request for Judicial Notice., Ex. 1.

13       Thus, the ongoing state court proceedings provide a "procedural vehicle" for the Chamber's

14   members to resolve their First Amendment claim.  Polido v. State Farm Mut. Auto. Ins. Co., 110

15   F.3d 1418, 1423 (9th Cir. 1997), overruled in part on other grounds by Dizol, 133 F.3d 1220

16   ("[T]he dispositive question is not whether the pending state proceeding is 'parallel,' but rather,

17   whether there was a procedural vehicle available … in state court to resolve the issue raised in the

18   action filed in federal court."); Lexington Ins. Co., 2014 WL 1839076, at *9 (applying Polido).

19   Under these circumstances, there is no reason for this Court to waste judicial resources and

20   disrupt the comity between the federal and state court systems by stepping into the fray, as the

21   Chamber requests.  See R.R. St. & Co., 656 F.3d at 975; see also Huffman v. Pursue, Ltd., 420

22   U.S. 592, 601 (1975) (Comity is the "proper respect for state functions … and a continuance of

23   the belief that the National Government will fare best if the States and their institutions are left

24   free to perform their separate functions in their separate ways.") (quoting Younger v. Harris, 401

25   U.S. 37, 44 (1971).  This factor thus also weighs in favor of dismissal.

26       Importantly, it does not matter for Declaratory Judgment Act purposes that some of the

27   Chamber's members are not parties to the state enforcement actions; "[i]t is enough that the state

28   proceedings arise from the same factual circumstances."  Golden Eagle, 103 F.3d at 755; see also

1   Lexington Ins. Co., 2014 WL 1839076, at *9 (applying Golden Eagle).  Thus, this Court in

2   Lexington Ins. Co. rejected an argument that it should not dismiss a declaratory action where

3   certain parties in the federal action before the Court were not also parties in related state

4   proceedings.  2014 WL 1839076, at *9.  This Court concluded that such parity of the parties was

5   not required, and that it was sufficient that the federal and state proceedings arose "'from the

6   same factual circumstances.'"  Id. (quoting Golden Eagle, 103 F.3d at 754-55).  Likewise, here,

7   this declaratory judgment action and the state court enforcement proceedings both arise from

8   private parties' attempt to enforce the acrylamide warning requirement against the Chambers'

9   members and others, and the Chamber's allegation that the warning requirement is

10  unconstitutional.  Dismissal in favor of these pending state court proceedings is therefore

11  appropriate.

12          **C.      The Chamber's Request for Injunctive Relief Does Not Prevent Dismissal
                      Under the Declaratory Judgment Act**

13

14          Finally, the fact that the Chamber seeks injunctive relief in addition to declaratory relief

15  does not prevent this Court from dismissing the Chamber's Complaint in full.  The Ninth Circuit

16  has held that a court normally should not dismiss a claim for declaratory relief when the

17  complaint also raises a request for money damages or injunctive relief under an independent

18  claim that would "'continue to exist if the request for a declaration simply dropped from the

19  case.'"  Scotts Co., 688 F.3d at 1158 (quoting Snodgrass v. Provident Life & Accident Ins. Co.,

20  147 F.3d 1163, 1168 (9th Cir. 1998));  Dizol, 133 F.3d at 1225-26.  Thus, the Ninth Circuit has

21  declined to require dismissal under the Declaratory Judgment Act where a plaintiff raised an

22  independent claim for injunctive relief under 42 U.S.C. § 1983, Am. Bankers Mgmt. Co. v.

23  Heryford, 885 F.3d 629, 633 (9th Cir. 2018); Vasquez v. Rackauckas, 734 F.3d 1025, 1040 (9th

24  Cir. 2013), or an independent claim based on breach of contract, Scotts Co., 688 F.3d at 1156,

25  1159.  Here, by contrast, the Chamber has not pled an independent claim that might support its

26  request for injunctive relief if its Declaratory Judgment Act claim were dismissed.  Instead, it

27  cites only the Declaratory Judgment Act, 28 U.S.C. § 2201.  See Complaint, Prayer for Relief,

28  ¶¶ 1-3.  The Chamber's request for injunctive relief is therefore dependent on its declaratory

1  judgment claim, and dismissal is appropriate.  See Emp'rs Reinsurance Corp. v. Karussos, 65

2  F.3d 796, 801 (9th Cir. 1995), overruled in part on other grounds by Dizol, 133 F.3d 1220

3  (dismissal under Declaratory Judgment Act appropriate where plaintiff's "request for an order

4  granting monetary relief is dependent on the district court's first favorably resolving its claim for

5  declaratory relief"); Chapman's Las Vegas Dodge, LLC v. Chrysler Grp., LLC, No. 2:14-CV-

6  00504-GMN-CWH, 2014 WL 12607723, at *2 (D. Nev. May 29, 2014) (dismissal appropriate

7  where "there are no independent claims in this case beyond the action for declaratory relief under

8  state law and request for an injunction based on that declaration").

9  **II.   IN THE ALTERNATIVE, DISMISSAL IS WARRANTED UNDER COLORADO RIVER**

10         In the alternative, if the Court decides to exercise its discretion to hear this case under the

11  Declaratory Judgment Act, the Court should nevertheless dismiss or stay this proceeding under

12  Colorado River.  See Colorado River Water Conservation Dist. v. United States, 424 U.S. 800

13  (1976).  Federal courts may dismiss or stay a matter under Colorado River "in deference to

14  pending, parallel state proceedings" in "exceptional circumstances."  Montanore Minerals, 867

15  F.3d at 1165.  In determining whether such exceptional circumstances exist, the court should

16  consider:

17         (1) which court first assumed jurisdiction over any property at stake;

18         (2) the inconvenience of the federal forum;

19         (3) the desire to avoid piecemeal litigation;

20         (4) the order in which the forums obtained jurisdiction;

21

22         (5) whether federal law or state law provides the rule of decision on the merits;

23         (6) whether the state court proceedings can adequately protect the rights of the
               federal litigants;

24

25         (7) the desire to avoid forum shopping; and

26         (8) whether the state court proceedings will resolve all issues before the federal
               court.

27

28

1   Id. at 1166 (quoting R.R. St. & Co., 656 F.3d at 978-79).  These factors are not a "'mechanical

2   checklist'; indeed, some may not have any applicability to a case."  Seneca Ins. Co. v. Strange

3   Land, Inc., 862 F.3d 835, 842 (9th Cir. 2017) (quoting Moses H. Cone Mem'l Hosp. v. Mercury

4   Constr. Corp., 460 U.S. 1, 16 (1983)).  The Court should therefore weigh these factors in "a

5   pragmatic, flexible manner with a view to the realities of the case at hand."  Moses H. Cone

6   Mem'l Hosp., 460 U.S. at 21.

7          The Colorado River factors support dismissal here.  The first Colorado River factor does

8   not apply because there is no property at stake, and the fifth factor does not favor abstention

9   because the Chamber asserts only a federal claim.  All of the other Colorado River factors

10  supports dismissal.  Under the second factor—inconvenience of the federal forum—none of the

11  private Proposition 65 enforcers has sued over acrylamide in Sacramento state courts or is located

12  in Sacramento, where this Court sits.  Further, under the third factor, allowing the Chamber's

13  declaratory judgment action to proceed would result in piecemeal litigation, as this Court

14  considers the Chamber's members' First Amendment claim while the same claim has been

15  asserted in parallel state court proceedings.  See Montanore Minerals, 867 F.3d at 1167 (holding

16  that need to avoid piecemeal litigation supported a stay where mining company had filed "two

17  separate actions in two different courts" in pursuit of its "singular goal" of "extinguishing

18  Defendants' claimed rights").  Dismissal is also warranted under the fourth Colorado River factor

19  because the state courts obtained jurisdiction over this matter first in the thirty-eight or more

20  ongoing state enforcement proceedings; indeed the First Amendment issue the Chamber seeks to

21  raise here is currently before the California Court of Appeal on a writ of mandate following a trial

22  court's rejection of the defense.  See id. at 1168 (holding this factor supported Colorado River

23  stay where "not only did the state court obtain jurisdiction long before the federal court, but the

24  state court proceedings had progressed significantly").  Consistent with the sixth Colorado River

25  factor, the state courts will adequately protect the Chambers' members rights, including by

26  considering where necessary any First Amendment claims they may raise.  See id. at 1169

27  ("When it is clear that the state court has authority to address the [federal] rights and remedies at

28  issue this factor may weigh in favor of a stay.") (quotation omitted).  Dismissal is also warranted

1 under the seventh factor to avoid forum shopping by the Chamber's members, who will have an

2 opportunity to litigate their First Amendment claim in state court enforcement proceedings, where

3 defendants have routinely pled it as a defense.  See id. at 1169-70.  Lastly, applying the eighth

4 Colorado River factor, the state courts will necessarily address the Chamber's members' First

5 Amendment claims, if presented for decision, before ruling against them in the state court

6 enforcement proceedings, thus resolving all the issues the Chamber seeks to raise in this action.

7 For these reasons, dismissal is also warranted under Colorado River.

8 **CONCLUSION**

9     For the foregoing reasons, the Court should decline to exercise jurisdiction over the

10 Chamber's Complaint, which is a transparent attempt to shop for a forum that is more favorable

11 to the Chamber's legal theories than state courts have been to date, and which will require this

12 Court to needlessly wade into issues that have been or could be raised in pending state court

13 proceedings.  The Attorney General therefore respectfully requests that the Court dismiss the

14 Complaint.

15

16 Dated:  November 1, 2019             Respectfully submitted,

17                                    XAVIER BECERRA
Attorney General of California
HARRISON POLLAK

18                                    Supervising Deputy Attorney General
JOHN EVERETT

19                                    Deputy Attorney General

20                                    /s/ Joshua R. Purtle
JOSHUA R. PURTLE

21                                    Deputy Attorney General

22                                    *Attorneys for Xavier Becerra, in his Official Capacity as Attorney General of the State of California*

23

24 SD2019300528

25

26

27

28