1
2
3
4
5
6
7
8

Trenton H. Norris (CA Bar No. 164781)
Sarah Esmaili (CA Bar No. 206053)
S. Zachary Fayne (CA Bar No. 307288)
David Barnes (CA Bar No. 318547)
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Telephone:     415.471.3100
Facsimile:     415.471.3400
trent.norris@arnoldporter.com

*Attorneys for California Chamber of Commerce*

9

**UNITED STATES DISTRICT COURT**

10

**EASTERN DISTRICT OF CALIFORNIA**

11
12
13
14
15
16
17
18
19

| | |
|---|---|
| CALIFORNIA CHAMBER OF COMMERCE,<br><br>Plaintiff,<br><br>v.<br><br>XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,<br><br>Defendant. | Civil Action No. 2:19-cv-02019-KJM-EFB<br><br>**PLAINTIFF CALIFORNIA CHAMBER OF COMMERCE'S OPPOSITION TO ATTORNEY GENERAL XAVIER BECERRA'S MOTION TO DISMISS**<br><br>Date:          December 20, 2019<br>Time:          10:00 a.m.<br>Location:     Courtroom 3 (15th Floor)<br>Judge:        Hon. Kimberly J. Mueller<br>Action Filed: October 7, 2019 |

20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 2

    A.    Acrylamide in Food.............................................................................. 2

    B.    Proposition 65 .................................................................................... 4

    C.    Acrylamide Listing and Enforcement ................................................ 6

    D.    Proposition 65 Litigation Concerning the First Amendment.............. 6

    E.    CalChamber's Federal Lawsuit............................................................ 8

ARGUMENT ................................................................................................................... 8

I.    THE *COLORADO RIVER* ABSTENTION DOCTRINE, NOT *BRILLHART*, APPLIES ............................................................................................................ 9

II.    THE *BRILLHART* FACTORS WEIGH IN FAVOR OF THE COURT EXCERISING ITS JURISDICTION UNDER THE DECLARATORY JUDGMENT ACT. ............................................................................................ 11

    A.    CalChamber's Claim Does Not Require Determination of State Law Issues. .............................................................................................. 11

    B.    CalChamber Has Not Engaged In Improper Forum Shopping. .......... 12

    C.    CalChamber's Lawsuit Will *Reduce* the Need for Duplicative Litigation. .......................................................................................... 16

III.    THERE ARE NO "EXCEPTIONAL CIRCUMSTANCES" TO WARRANT A STAY OR DISMISSAL UNDER *COLORADO RIVER*. ................................. 17

    A.    The Court Cannot Abstain Because There Is Substantial Doubt as to Whether the State Court Proceedings Will Resolve All Issues Before the Court............................................................................................ 18

    B.    There Are No Other "Exceptional Circumstances" That Warrant Abstention. ........................................................................................ 19

CONCLUSION ............................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AFL-CIO v. Deukmejian,*
    212 Cal. App. 3d 425 (1989)........................................................................................4, 13, 14

*Am. Bankers Mgmt. Co. v. Heryford,*
    885 F.3d 629 (9th Cir. 2018).........................................................................................9

*Baxter Healthcare Corp. v. Denton,*
    120 Cal. App. 4th 333 (2004).................................................................................12, 15

*Brillhart v. Excess Ins. Co. of America,*
    316 U.S. 491 (1942).......................................................................................... *passim*

*Cedar Rapids Cellular Tel., L.P. v. Miller,*
    280 F.3d 874 (8th Cir. 2002)........................................................................................20

*Coal. to Defend Affirmative Action v. Brown,*
    674 F.3d 1128 (9th Cir. 2012).......................................................................................10

*Colo. River Water Conservation Dist. v. United States,*
    424 U.S. 800 (1976)...............................................................................................8, 17

*Consumer Advocacy Grp., Inc. v. ExxonMobil Corp.,*
    168 Cal. App. 4th 675 (2008).........................................................................................8

*Consumer Cause, Inc. v. SmileCare,*
    91 Cal. App. 4th 454 (2001).......................................................................................5, 6

*Consumer Def. Grp. v. Rental Hous. Indus. Members,*
    137 Cal. App. 4th 1185 (2006).......................................................................................6

*Cont'l Cas. Co. v. Robsac Indus.,*
    947 F.2d 1367 (9th Cir. 1991).......................................................................................16

*Courthouse News Serv. v. Planet,*
    750 F.3d 776 (9th Cir. 2014).........................................................................................11

*DiPirro v. Bondo Corp.,*
    153 Cal. App. 4th 150 (2007).........................................................................................5

*Envtl. Law Found. v. Beech-Nut Nutrition Corp.,*
    235 Cal. App. 4th 307 (2015).........................................................................................5

*Gov't Emps. Ins. Co. v. Dizol,*
    133 F.3d 1220 (9th Cir. 1998).......................................................................................11

*Hadley v. Kellogg Sales Co.*,
  243 F. Supp. 3d 1074 (N.D. Cal. 2017) .......................................................................3

*Holder v. Holder*,
  305 F.3d 854 (9th Cir. 2002)...................................................................................18

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  12 F.3d 908 (9th Cir. 1993)...............................................................................18, 19

*Lexington Ins. Co. v. Silva Trucking, Inc.*,
  No. 2:14-CV-0015, 2014 WL 1839076 (E.D. Cal. May 7, 2014) .......................15, 16

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007) ................................................................................................12

*Monsanto Co. v. OEHHA*,
  22 Cal. App. 5th 534 (2018) ....................................................................................14

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983) ........................................................................................17, 18, 20

*Nat'l Ass'n of Wheat Growers v. Zeise*,
  309 F. Supp. 3d 842 (E.D. Cal. 2018)......................................................................14

*Porter v. Jones*,
  319 F.3d 483 (9th Cir. 2003)...................................................................................11

*R.R. Comm'n of Tex. v. Pullman Co.*,
  312 U.S. 496 (1941) ................................................................................................11

*R.R. St. & Co. v. Transp. Ins. Co.*,
  656 F.3d 966 (9th Cir. 2011)..............................................................11, 15, 17, 18

*R.R. St. & Co. v. Vulcan Materials Co.*,
  569 F.3d 711 (7th Cir. 2009)...................................................................................10

*S.C. Citizens for Life, Inc. v. Krawcheck*,
  301 F. App'x 218 (4th Cir. 2008) ...........................................................................11

*Seneca Ins. Co. v. Strange Land, Inc.*,
  862 F.3d 835 (9th Cir. 2017)........................................................................... passim

*Sharp v. Becerra*,
  393 F. Supp. 3d 991 (E.D. Cal. 2019)........................................................................4

*Sherwin-Williams Co. v. Holmes Cty.*,
  343 F.3d 383 (5th Cir. 2003)...................................................................................15

*Smith v. Cent. Ariz. Water Conservation Dist.*,
  418 F.3d 1028 (9th Cir. 2005)..................................................................................18

PLAINTIFF'S OPPOSITION TO ATTORNEY GENERAL XAVIER BECERRA'S MOTION TO DISMISS

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)............................................................................................12, 14

*United Nat'l Ins. Co. v. R&D Latex Corp.*,
    242 F.3d 1102 (9th Cir. 2001)..................................................................................10

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988)..................................................................................................12

*Wilton v. Seven Falls Co.*,
    515 U.S. 277 (1995)....................................................................................................9

*Wolfson v. Brammer*,
    616 F.3d 1045 (9th Cir. 2010)............................................................................11, 12

**Constitutional Provisions**

U.S. Const. amend. I ................................................................................. *passim*

**Statutes**

28 U.S.C. §1343 ..............................................................................................10

42 U.S.C. §1983 ..............................................................................................10

Cal. Code Civ. Proc. §1021.5 ...........................................................................5

Cal. Code Regs. tit. 22, §12601 ........................................................................4

Cal. Code Regs. tit. 27,
    §25306(m).....................................................................................................4
    §25601..........................................................................................................4
    §25607.2.......................................................................................................4
    §25704..........................................................................................................8
    §25705.......................................................................................................4, 5

Cal. Health & Safety Code
    §25249.6.......................................................................................................4
    §25249.7....................................................................................................5, 6
    §25249.8.......................................................................................................4
    §25249.10..................................................................................................4, 5
    §25249.12.....................................................................................................5

PLAINTIFF'S OPPOSITION TO ATTORNEY GENERAL XAVIER BECERRA'S MOTION TO DISMISS

## **INTRODUCTION**

This case presents the question of whether the State can force businesses to warn consumers about acrylamide in foods and beverages they make and sell, even though there is no scientific evidence that acrylamide in food poses any risk of cancer in humans, and indeed the State itself has admitted that it does not know that acrylamide causes cancer in humans. Under bedrock First Amendment principles, the answer to that question is no.

The Attorney General does not contend that this lawsuit fails to state a claim for which relief can be granted. Instead, the Attorney General urges this Court to not even consider this important question of federal law. The Court should reject this invitation to maintain the status quo, which subjects California businesses that sell and produce acrylamide-containing food products to a constant threat of costly litigation that impermissibly chills their First Amendment rights.

Under the Safe Drinking Water and Toxic Enforcement Act of 1986 (commonly known as Proposition 65), businesses are required to warn consumers about an exposure to any chemical that the California Office of Environmental Health Hazard Assessment ("OEHHA") has designated as "known to the State to cause cancer." Proposition 65 imposes civil penalties for each failure to provide an adequate warning and authorizes *any* person (even someone who has not been injured) to file a lawsuit to enforce the warning requirement. OEHHA listed acrylamide as a carcinogen in 1990 based on studies in laboratory animals. Twelve years later, researchers discovered that acrylamide was present in many common foods. Acrylamide is not intentionally added to food; rather, it forms naturally in many types of plant-based foods when cooked at high temperatures.

The discovery that acrylamide is present in certain foods (including beverages) triggered a flood of Proposition 65 litigation that is growing even today. The science, however, does not support a cancer warning for acrylamide in food. To the contrary, scientific studies on humans have found no reliable evidence that exposure to acrylamide in food is associated with a risk of developing cancer. It is firmly established under the First Amendment that California cannot compel businesses that sell and produce acrylamide-containing food products to provide a warning that is, at best, misleading, and California certainly cannot compel a warning that is literally false on its face (because California does not "know" that acrylamide causes cancer in humans). As such, the California Chamber of

Commerce ("CalChamber") filed this lawsuit to vindicate its members' First Amendment rights.

The Attorney General asks this Court to abstain because, according to the Attorney General, the First Amendment claim in this case has been, or will be, addressed in parallel state court proceedings concerning acrylamide in specific food products. The Attorney General's contentions are misplaced. In fact, the First Amendment issue has largely evaded review in state court because of the economics of Proposition 65's draconian, free-for-all enforcement regime, and there is no pending state court action that could fully resolve CalChamber's claim that compelled cancer warnings for acrylamide in *any* food product violate the First Amendment. At the same time, CalChamber's members that sell or produce acrylamide-containing food products—many of whom have not yet been sued—face a continuing threat of a Proposition 65 lawsuit by the Attorney General and any number of private enforcers and urgently need relief from this Court. Accordingly, the Court should exercise its jurisdiction to hear this case and deny the Attorney General's motion to dismiss.

## BACKGROUND

### A.    Acrylamide in Food

Acrylamide forms naturally in many types of foods when cooked at high temperatures or otherwise processed with heat. *See* Complaint for Declaratory and Injunctive Relief (Doc. 1) ("Compl.") ¶ 2. Acrylamide is found mainly in foods made from plants, such as potato products (e.g., French fries, potato chips), grain products (e.g., breakfast cereals, cookies, and toast), and coffee. *Id.* ¶ 16. Other common sources of acrylamide in the diet include roasted asparagus, roasted nuts, canned sweet potatoes, canned black olives, and prune juice. *Id.* ¶ 18. Acrylamide was first detected in certain foods in 2002, but has probably always been present in cooked foods. *Id.* ¶ 16.

There is an extensive body of scientific research that shows that acrylamide that forms naturally in certain foods does *not* pose a cancer risk *to humans*. The National Cancer Institute has explained, for example, that "a large number of epidemiologic studies . . . in humans have found no consistent evidence that dietary acrylamide exposure is associated with the risk of any type of cancer." *Id.* ¶ 23. Likewise, the American Cancer Society stated in February 2019 that, "[s]o far, reviews of studies done in groups of people (epidemiologic studies) suggest that dietary acrylamide isn't likely to be related to risk for most common types of cancer." *Id.* ¶ 24. In fact, as addressed in

the declaration of Dr. Loren Lipworth accompanying CalChamber's Motion for a Preliminary

Injunction (Doc. 26-17) ("Lipworth Decl."), there have been more than 40 epidemiologic studies

evaluating the association between dietary acrylamide and cancer, and those studies have consistently

found that exposure to acrylamide in food does not increase cancer risk *in humans*. *Id.* ¶¶ 40-41, 114.

        Certain governmental and scientific entities—including the U.S. Environmental Protection

Agency ("EPA") and the International Agency for Research on Cancer ("IARC")—have identified

acrylamide as a "likely" or "probable" human carcinogen based on studies in laboratory animals.

Compl. ¶¶ 28, 50.  Critically, however, the Attorney General does not assert—nor could it—that any

governmental or scientific organization has identified acrylamide as a *known* human carcinogen, and

both EPA and IARC have concluded that epidemiological studies provide limited or no evidence of

carcinogenicity *in humans*.  *See id.* ¶ 50.  In addition, since EPA's most recent toxicological review

of acrylamide in 2010, there have been more than 20 additional epidemiologic studies on dietary

acrylamide and cancer published in the peer-reviewed literature, and those studies have consistently

found that exposure to acrylamide in food does not pose a cancer risk to humans.  *See* Lipworth Decl.

¶¶ 41, 114.  Moreover, there is not a scientific consensus that studies in laboratory animals translate

to humans, as "toxicology studies have shown that humans and rodents not only absorb acrylamide at

different rates, they metabolize it differently as well."  Compl. ¶ 28.[1]

        In short, there is a bona fide controversy as to whether acrylamide in food causes cancer *in

humans*.  Indeed, the State itself has *admitted* in litigation that it does not "know" that acrylamide

causes cancer in humans.  Compl. ¶ 51; *see also* Decl. of Trenton H. Norris In Support Of Pl.'s Mot.

for a Prelim. Inj. (Doc. 26-2) ("Norris Decl."), Ex. L (Doc. 26-14) (Stipulation of Undisputed Facts)

at 2; *id.*, Ex. M (Doc. 26-15) (deposition testimony of OEHHA scientist that OEHHA does not

---

[1] The Attorney General seeks judicial notice of several governmental and non-governmental reports, and purports to rely on these materials to show that acrylamide poses a cancer risk in humans.  *See* Memorandum In Support Of Attorney General Xavier Becerra's Motion to Dismiss (Doc. 21) ("AG Mem.") at 3-5.  CalChamber disputes many of the factual assertions set forth in these materials, which in any event are not relevant to the motion to dismiss presently before the Court.  Thus, although CalChamber does not object to the Court taking judicial notice of the existence of these documents, the Court should not take judicial notice of the "facts" stated therein, which are subject to reasonable dispute.  *See Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1086 (N.D. Cal. 2017).

1   "know" whether acrylamide causes cancer in humans).  In any event, at this stage, CalChamber's

2   "allegations of material fact must be accepted as true and construed in the light most favorable to"

3   CalChamber.  *Sharp v. Becerra*, 393 F. Supp. 3d 991, 996 (E.D. Cal. 2019) (citation omitted).

4       **B.      Proposition 65**

5       Proposition 65 prohibits businesses with ten or more employees from knowingly and

6   intentionally exposing Californians to chemicals "known to the state to cause cancer" without

7   providing required warnings, unless an affirmative defense applies.  Cal. Health & Safety Code

8   § 25249.6.  The state agency responsible for implementing Proposition 65—OEHHA—maintains "a

9   list of those chemicals known to the state to cause cancer."  *Id.* § 25249.8(a).  As relevant here,

10  OEHHA is required to list a chemical as "known to the state to cause cancer" if it is so identified by

11  an "authoritative body."  *Id.* § 25249.8(b).  EPA and IARC have been designated as "authoritative

12  bodies" for identifying carcinogens.  Cal. Code Regs. tit. 27, § 25306(m).  Notably, OEHHA can list

13  a chemical under this mechanism based on evidence that it causes cancer in laboratory animals alone.

14  *See, e.g.*, *AFL-CIO v. Deukmejian*, 212 Cal. App. 3d 425, 441 (1989).

15      A year after a chemical is added to the Proposition 65 list, Proposition 65 requires that any

16  "person in the course of doing business" provide a "clear and reasonable warning" before "expos[ing]

17  any individual to" the listed chemical.  Health & Safety Code § 25249.6.  For decades, OEHHA's

18  regulations provided that the warning "must clearly communicate that the chemical in question is

19  known to the state to cause cancer."  Cal. Code Regs. tit. 27, § 25601 (adopted as Cal. Code Regs. tit.

20  22, §12601 (1988); abrogated Aug. 30, 2018).  In August 2016, OEHHA adopted new warning

21  regulations, pursuant to which cancer warnings for food products are deemed to be "clear and

22  reasonable" if they state: "**WARNING:**  Consuming this product can expose you to [name of

23  chemical], which is known to the State of California to cause cancer.  For more information, go to

24  www.P65Warnings.ca.gov/food."  Cal. Code Regs. tit. 27, § 25607.2(a)(2).

25      Proposition 65 provides an affirmative defense to the warning requirement if the business can

26  "show that the exposure poses no significant risk assuming lifetime exposure at the level in

27  question."  Health & Safety Code § 25249.10(c).  This threshold is referred to as the "No Significant

28  Risk Level," or "NSRL."  For some listed substances, OEHHA has published a "safe harbor" NSRL,

1  which is a presumptive limit such that a court cannot apply a more stringent NSRL in litigation.  Cal.

2  Code Regs. tit. 27, § 25705.  The NSRL is not a concentration limit; rather, it is a daily exposure-

3  based limit based on lifetime exposure at the level in question.  Health & Safety Code § 25249.10(c).

4  The "safe harbor" NSRL for acrylamide—based on animal studies—is 0.2 micrograms per day.  Cal.

5  Code Regs. tit. 27, § 25705(c).  To determine whether this exemption applies to a particular product,

6  a business or court must determine both the concentration level of acrylamide in the product (which

7  can vary from unit to unit) and the amount of the product eaten by average consumers on a daily

8  basis.  *See, e.g.*, *Envtl. Law Found. v. Beech-Nut Nutrition Corp.*, 235 Cal. App. 4th 307, 327 (2015).

9  Proposition 65 imposes penalties of up to $2,500 *per day* for *each* failure to provide an

10  adequate warning.  Health & Safety Code § 25249.7(b).  The Attorney General, a district attorney, or

11  certain city attorneys may bring enforcement actions under Health & Safety Code §25249.7 (c).  In

12  addition, *any person* (even someone who has not been injured) may bring a private enforcement

13  action on behalf of the public.  *Id.* §25249.7(d).  These private enforcers are eligible to recover 25

14  percent of the penalty (*id.* § 25249.12(d)), as well as their reasonable attorneys' fees and costs (Cal.

15  Code Civ. Proc. § 1021.5), creating very strong incentives for private enforcement.

16  Significantly, private enforcement actions are pervasive even for chemicals, like acrylamide,

17  for which OEHHA has adopted a "safe harbor" NSRL.  A private enforcer is not required to prove

18  that the exposure exceeds the NSRL.  Instead, the burden to prove the opposite—that the exposure

19  *does not* exceed the NSRL—rests with the defendant business.  Health & Safety Code § 25249.10(c);

20  *see also DiPirro v. Bondo Corp.*, 153 Cal. App. 4th 150, 185 (2007) (NSRL is an "affirmative

21  defense").  And proving this negative is a costly and time-consuming endeavor, typically requiring

22  expert testimony and evidence.  *See, e.g.*, *Beech-Nut*, 235 Cal. App. 4th at 314 (safe harbor defense

23  litigated at trial).  In other words, a safe harbor NSRL does not effectively deter a private enforcer

24  with significant financial incentives from initiating suit with the aim of collecting a settlement.

25  California judges have recognized how onerous private enforcement suits can be for industry.

26  "[L]awsuits under Proposition 65 can be filed and prosecuted by any person against any business

27  based on bare *allegations* of a violation unsupported by any evidence of an *actual* violation—or even

28  a good faith belief that a defendant is using an unsafe amount of a chemical known by the state to

1  cause cancer." *Consumer Cause, Inc. v. SmileCare*, 91 Cal. App. 4th 454, 477 (2001) (Vogel, J.,

2  dissenting) (emphases in original); *see also Consumer Def. Grp. v. Rental Hous. Indus. Members*,

3  137 Cal. App. 4th 1185, 1217 (2006) ("bringing Proposition 65 litigation is so absurdly easy").  As a

4  result, businesses faced with the threat of costly litigation to prove a defense to the warning

5  requirement often are forced to acquiesce and provide a warning, regardless of whether the warning

6  is false or misleading.  *See* Norris Decl. ¶¶ 27-29; *see also Consumer Def. Grp.*, 137 Cal. App. 4th at

7  1216 (Proposition 65 lawsuits are "intended to frighten all but the most hardy of targets (certainly any

8  small, ma and pa business) into a quick[] settlement") (footnote omitted); *SmileCare*, 91 Cal. App.

9  4th at 477–78 (Vogel, J., dissenting) (Proposition 65 burden-shifting results in "judicial extortion").

10      **C.    Acrylamide Listing and Enforcement**

11      OEHHA added acrylamide to the Proposition 65 list of carcinogens in 1990 based on EPA's

12  and IARC's classifications of acrylamide as a "probable" or "possible" carcinogen based on studies

13  in laboratory animals (and not based on studies in humans).  *See* p. 3, *supra*.

14      Since the discovery of acrylamide in foods in 2002, private enforcers—at times joined by the

15  Attorney General—have relentlessly pursued Proposition 65 enforcement for alleged exposures to

16  acrylamide in food.  Under Proposition 65, private enforcers are required to provide 60 days' notice

17  before initiating a lawsuit.  Health & Safety Code § 25249.7(d)(1).  As of November 7, 2019, private

18  enforcers had served more than **five hundred** of these pre-litigation notices for alleged violations

19  with respect to acrylamide in food.  Norris Decl. ¶ 8.  More than 250 companies, including many of

20  CalChamber's members, have been targeted by these pre-litigation notices from private enforcers.

21  *Id.* ¶ 10.  And notably, although acrylamide has been on the Proposition 65 list for nearly 30 years,

22  the number of pre-litigation notices has increased significantly in recent years.  *Id.* ¶ 9.  In fact, in the

23  ***one month*** after CalChamber filed its Complaint, private enforcers served 7 new (and 11 renewed or

24  amended) notices of violation concerning alleged exposures to acrylamide in food products such as

25  roasted almonds, vanilla wafers, and ice cream cones.  *Id.*

26      **D.    Proposition 65 Litigation Concerning the First Amendment**

27      CalChamber does not dispute that there have been numerous Proposition 65 lawsuits in state

28  court concerning acrylamide in food, and that many of the defendant businesses in those cases have

1    asserted the First Amendment as an affirmative defense in their responsive pleadings.  But the

2    Attorney General's characterization of the state court proceedings is incomplete.  In particular, the

3    First Amendment issue has been litigated only twice in state court enforcement actions (both

4    involving acrylamide), and only once on the merits.  *See* Norris Decl. ¶¶ 11-16.

5        In the first case in 2008—*People v. Frito-Lay, Inc., et al.* (Los Angeles County Sup. Ct., No.

6    BC 338956)—the California Superior Court denied the defendant businesses' motion for summary

7    judgment and the Attorney General's cross-motion for summary adjudication on First Amendment

8    grounds, finding that there was a triable issue of material fact.  Facing the risk and expense of trial,

9    the defendants in that lawsuit subsequently settled, and therefore the Superior Court never issued a

10   ruling on the merits of the businesses' First Amendment defense.  Norris Decl. ¶ 11.

11       In the second case—*Council for Education & Research on Toxics v. Starbucks, et al.* (Los

12   Angeles County Sup. Ct., No. BC 435759)—the California Superior Court ruled after the first phase

13   of trial that certain of the defendants failed to meet their burden to show that compelling a cancer

14   warning on coffee products violated their First Amendment rights.  Norris Decl. ¶ 13.  The

15   procedural posture of that case is complicated and described in greater detail in CalChamber's

16   Opposition to the Motion to Dismiss filed by Defendant-Intervenor Council for Education and

17   Research on Toxics ("CERT").  Two points bear emphasis here, however:

18       First, the California Court of Appeal has not considered the merits of the First Amendment

19   issue in the *Starbucks* case.  *Id.* ¶¶ 13-15.  Indeed, the California Court of Appeal has *never* addressed

20   the question of whether a Proposition 65 warning requirement for cancer as applied to acrylamide in

21   a food or beverage product violates the First Amendment.  *Id.* ¶ 16.  Thus, although it is true that

22   enforcement actions concerning acrylamide have been ongoing for over 15 years, the First

23   Amendment issue has largely evaded review in the state courts.  This disconnect is driven by

24   Proposition 65's enforcement structure: a business faced with the threat of costly litigation and

25   potentially crippling civil penalties of up to $2,500 per day has overwhelming economic incentives to

26   acquiesce and settle, regardless of whether the business believes the warning is false or misleading.

27   Few companies are able to accept the risk of litigating a Proposition 65 enforcement action through

28   trial while incurring hundreds of thousands—if not millions—of dollars in legal fees to do so.

Second, in June 2019, after the first phase of trial in the *Starbucks* case, OEHHA adopted a regulation that states:  "Exposures to chemicals in coffee, listed on or before March 15, 2019 as known to the state to cause cancer, that are created by and inherent in the processes of roasting coffee beans or brewing coffee do not pose a significant risk of cancer."  Cal. Code Regs. tit. 27, § 25704 (effective Oct. 1, 2019).  That regulation, if upheld against CERT's challenges, will resolve the *Starbucks* case regarding coffee without any need for consideration of the federal constitutional issue it presents.  Indeed, the Superior Court judge overseeing the case recently issued a stay on enforcement of the warning requirement in a prior settlement, indicating that the validity of the regulation may well be dispositive of the litigation.  *See* Nov. 12, 2019 Hearing Tr., *CERT v. Starbucks, et al.*, Request for Judicial Notice ("RJN"), Ex. C at 30-31.

**E.    CalChamber's Federal Lawsuit**

CalChamber filed this lawsuit in October 2019 seeking (1) a declaration that the Proposition 65 warning requirement for cancer, as applied to acrylamide in foods or on its face, violates the First Amendment; and (2) an injunction prohibiting the Attorney General and all those in privity with him from enforcing the Proposition 65 warning requirement for cancer with respect to acrylamide in foods.[2]  Compl., Prayer for Relief, ¶¶ 1-3.  CalChamber subsequently clarified that it does not seek to enjoin pending state court cases; rather, CalChamber only seeks an injunction prohibiting initiation of *new* enforcement actions concerning acrylamide.  *See* Pl.'s Mot. for Prelim. Inj. (Doc. 26).

## ARGUMENT

"Abstention from the exercise of federal jurisdiction is the exception, not the rule."  *Colo. River Water Conserv. Dist. v. United States*, 424 U.S. 800, 813 (1976).  Indeed, federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," and "the pendency of an action in the state court is [generally] no bar to proceedings concerning the same matter in the Federal court having jurisdiction . . . ."  *Id.* at 817 (citation and quotation omitted).  Here, the Attorney General urges the Court not to exercise its jurisdiction, arguing that the Court should dismiss CalChamber's complaint under the Declaratory Judgment Act ("*Brillhart* abstention") or, in the

---

[2] Private enforcers of Proposition 65 are in privity with the Attorney General.  *See, e.g.*, *Consumer Advocacy Grp., Inc. v. ExxonMobil Corp.*, 168 Cal. App. 4th 675, 693 (2008).

1    alternative, under the *Colorado River* doctrine.  The Attorney General is wrong in both respects.

2    **I.        THE *COLORADO RIVER* ABSTENTION DOCTRINE, NOT *BRILLHART*, APPLIES**

3              At the outset, the Attorney General contends that the more lenient abstention test from *Wilton*

4    *v. Seven Falls Co.*, 515 U.S. 277 (1995), and *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491

5    (1942), should apply.  This is incorrect.  The *Wilton/Brillhart* test derives from the premise that

6    district courts have discretion to decide whether to declare the rights of litigants under the

7    Declaratory Judgment Act.  The Ninth Circuit has held, however, that "[s]o long as the suit seeks

8    more than merely declaratory relief . . . , the entire action should be analyzed under the *Colorado*

9    *River* framework."  *Seneca Ins. Co. v. Strange Land, Inc.*, 862 F.3d 835, 840 (9th Cir. 2017); *see also*

10   *Am. Bankers Mgmt. Co. v. Heryford*, 885 F.3d 629, 633 (9th Cir. 2018) ("In addition to declaratory

11   relief, however, American Bankers seeks injunctive relief that is independent of, but related to, the

12   requested declaratory relief.  *Brillhart* does not apply in such circumstances.").

13             Here, CalChamber's complaint includes a prayer for injunctive relief—namely, an injunction

14   prohibiting the Attorney General and those in privity with him (i.e., private enforcers) from enforcing

15   the Proposition 65 warning requirement for cancer with respect to acrylamide in food.  *See* Compl.,

16   Prayer for Relief, ¶ 3.  As such, the *Colorado River* framework—not *Brillhart*—applies.  In *Seneca*,

17   for example, the Ninth Circuit held that the district court properly applied *Colorado River* where the

18   plaintiff "seeks remedies beyond declaratory judgment," explaining that the plaintiff's "prayers for

19   'declaratory' relief . . . seek non-declaratory remedies."  862 F.3d at 841.  In that case, the plaintiff

20   sought "rescission of the contract based on [the defendant's] alleged misrepresentations—thereby

21   *altering* the relationship of the parties—and not simply requesting that the court 'announce[ ] the

22   rights and obligations of the parties.'"  *Id.* (emphasis in original) (citation omitted).  The same is true

23   here.  CalChamber seeks a non-declaratory remedy—an injunction—that will alter the relationship

24   between the Attorney General and CalChamber's members.

25             The Attorney General nevertheless contends (AG Mem. at 14-15) that *Colorado River* does

26   not apply because CalChamber's request for an injunction is "dependent" on its claim for declaratory

27   relief.  This, too, is incorrect.  A claim for non-declaratory relief is "independent" if it "would

28   continue to exist if the request for a declaration simply dropped from the case."  *Seneca*, 862 F.3d at

840.  Put differently, "the district court should consider whether it has subject matter jurisdiction over the [non-declaratory] claim alone, and if so, whether that claim must be joined with one for declaratory relief."  *United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1113 (9th Cir. 2001); *see also R.R. St. & Co. v. Vulcan Materials Co.*, 569 F.3d 711, 715 (7th Cir. 2009) ("Non-declaratory claims are 'independent' of a declaratory claim when they are alone sufficient to invoke the court's subject matter jurisdiction and can be adjudicated without the requested declaratory relief.").

Here, CalChamber's request for an injunction is "independent" of its request for declaratory relief because (a) the Court would have subject matter jurisdiction over the request for injunctive relief even if CalChamber had not also asserted a claim for declaratory relief, and (b) the request for injunctive relief can be adjudicated separately and need not be joined with a request for declaratory relief.  *See, e.g.*, 28 U.S.C. § 1343(a)(3) ("The district courts shall have original jurisdiction of any civil action . . . [t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States . . . ."); 42 U.S.C. § 1983 (cause of action for violations of the U.S. Constitution).  Indeed, the Attorney General concedes (at 14) that a claim for injunctive relief under 42 U.S.C. § 1983 to redress a constitutional violation is sufficiently "independent" so as not to require dismissal under the Declaratory Judgment Act.  The Attorney General might contend that CalChamber did not assert a separate cause of action for injunctive relief, but this elevates form over substance.  Plainly, CalChamber "seeks remedies beyond declaratory judgment," *Seneca*, 862 F.3d at 841, and this Court has "subject matter jurisdiction over the [non-declaratory] claim alone," *United Nat'l Ins. Co.*, 242 F.3d at 1113.  This case is therefore properly analyzed under *Colorado River*.[3]

In any event, regardless of whether the Court applies *Brillhart* or *Colorado River*, this case does not warrant dismissal.  As such, CalChamber will first address the *Brillhart* factors, because if dismissal is not warranted under the more lenient *Brillhart* test, it necessarily follows that abstention or dismissal also is not warranted under *Colorado River*.

---

[3] To the extent the Court is inclined to dismiss this case pursuant to *Brillhart*—and it should not— CalChamber should be afforded leave to amend its Complaint to add a claim for injunctive relief under Section 1983.  *See, e.g.*, *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (Eleventh Amendment does not "bar actions for prospective declaratory or injunctive relief against state officers in their official capacities for their alleged violations of federal law").

## II.  THE *BRILLHART* FACTORS WEIGH IN FAVOR OF THE COURT EXCERISING ITS JURISDICTION UNDER THE DECLARATORY JUDGMENT ACT.

Courts in the Ninth Circuit applying *Brillhart* consider three factors when examining the propriety of entertaining a declaratory judgment action:  "[1] avoiding 'needless determination of state law issues'; [2] discouraging 'forum shopping'; and [3] avoiding 'duplicative litigation.'"  *R.R. St. & Co. v. Transp. Ins. Co.*, 656 F.3d 966, 975 (9th Cir. 2011) (quoting *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998) (en banc)).  These three factors "remain the philosophic touchstone" for the *Brillhart* analysis, *id.*, and all three weigh against dismissal here.

### A.  CalChamber's Claim Does Not Require Determination of State Law Issues.

The Attorney General concedes (at 9) that the first factor—needless determination of state law issues—does not favor dismissal, and rightly so.  CalChamber's Complaint arises solely under the federal Constitution and does not require this Court to determine *any* issue of state law.  As such, this factor weighs heavily against dismissal.  *See, e.g.*, *Brillhart*, 316 U.S. at 495 (abstention warranted when "another suit is pending in a state court presenting the same issues, *not governed by federal law*, between the same parties") (emphasis added).  Indeed, the Ninth Circuit has explained that "constitutional challenges based on the [F]irst [A]mendment right of free expression are the kind of cases that the federal courts are particularly well-suited to hear."  *Wolfson v. Brammer*, 616 F.3d 1045, 1066 (9th Cir. 2010) (quoting *Porter v. Jones*, 319 F.3d 483, 492-93 (9th Cir. 2003)).

Courts considering whether to abstain under the related abstention doctrine set forth in *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496 (1941), for example, have found that "abstention is generally inappropriate when [F]irst [A]mendment rights are at stake."  *Wolfson*, 616 F.3d at 1066.  Courts "disfavor abstention in First Amendment cases because of the 'risk . . . that the delay that results from abstention will itself chill the exercise of the rights that the plaintiffs seek to protect by suit.'"  *Courthouse News Serv. v. Planet*, 750 F.3d 776, 787 (9th Cir. 2014) (quoting *Porter*, 319 F.3d at 487); *see also S.C. Citizens for Life, Inc. v. Krawcheck*, 301 F. App'x 218, 222 n.6 (4th Cir. 2008) ("[A]bstention in this case is inappropriate given that courts have been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment because the delay involved might itself effect the impermissible chilling of the very constitutional right the

1  litigant seeks to protect.") (citations and internal quotations omitted).

2    The same is true here.  Absent relief from this Court, CalChamber's members will face what

3  the California Court of Appeal has called a "Hobson's choice":  either communicate to consumers a

4  disparaging health warning about their products that is unsupported by the science, or face the

5  significant risk of an enforcement action under Proposition 65 for failing to do so.  *Baxter Healthcare*

6  *Corp. v. Denton*, 120 Cal. App. 4th 333, 344 (2004).  This forced choice impermissibly chills the

7  First Amendment rights of CalChamber's members.  *See, e.g.*, *Wolfson*, 616 F.3d at 1059 ("Self-

8  censorship is a constitutionally recognized injury.").  This Court should therefore exercise its

9  jurisdiction to avoid further delay.  *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988)

10  (recognizing need to allow pre-enforcement challenges to avoid the chilling of speech).

11    **B.**  **CalChamber Has Not Engaged In Improper Forum Shopping.**

12    The second *Brillhart* factor also weighs against dismissal, as CalChamber did not improperly

13  forum shop by filing this lawsuit in federal court.  As described above, many of CalChamber's

14  members that sell acrylamide-containing food products have not yet been sued under Proposition 65.

15  If these businesses stand on their First Amendment rights and refuse to provide a Proposition 65

16  cancer warning, they face a significant—and imminent—risk of a lawsuit by the Attorney General or

17  any number of private enforcers.  Under these circumstances, such businesses (or CalChamber on

18  their behalf) may seek pre-enforcement review of whether the statutory warning requirement is

19  constitutional, and need not wait to be sued to assert their First Amendment rights.  *See, e.g.*, *Susan*

20  *B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (permitting "pre-enforcement review under

21  circumstances that render the threatened enforcement sufficiently imminent"); *MedImmune, Inc. v.*

22  *Genentech, Inc.,* 549 U.S. 118, 128–29 (2007) (same).  It is therefore well-established that

23  CalChamber is entitled to seek pre-enforcement review, and CalChamber reasonably selected a

24  federal forum to pursue its federal constitutional claim for declaratory and injunctive relief.

25    The Attorney General nevertheless contends (at 10) that CalChamber engaged in improper

26  forum shopping by (i) seeking a federal forum for claims it has raised and litigated without success in

27  state courts, and (ii) filing a "reactive declaratory action[]" in federal court in order to preempt a state

28  court action that is impending but has not yet been filed.  Both contentions are misplaced.

1    *First*, the Attorney General greatly exaggerates the extent to which CalChamber's members—

2    or *any* business—has had a meaningful opportunity to challenge in state court the constitutionality of

3    a compelled cancer warning for acrylamide in food under the First Amendment.  Indeed, as described

4    above, undersigned counsel is aware of only two cases in which the First Amendment issue has been

5    litigated in state court, and only *one case* in which a state court has decided it on the merits.  *See* p. 7,

6    *supra*.  In that case (*Starbucks*), which began almost *ten years ago*, the trial court rejected the

7    defendants' First Amendment argument with respect to coffee.  Notably, however, the California

8    Court of Appeal has not yet reached the merits of the First Amendment issue.  And in June 2019, the

9    state agency adopted a regulation that, if upheld, will resolve the *Starbucks* case regarding coffee

10   without any need for further consideration of the First Amendment issue.  *See* p. 8, *supra*.

11   Thus, although it is true that "State enforcement actions concerning acrylamide . . . have been

12   ongoing for over a decade" (AG Mem. at 7-8)—and although the First Amendment defense

13   frequently is asserted in these cases as a matter of pleading—the First Amendment issue has largely

14   evaded review in the state courts.  The reason for this disconnect is straightforward:  the economics

15   of Proposition 65's draconian enforcement regime make it nearly impossible for a business to stand

16   on its First Amendment rights and take an enforcement action to trial.  *See* pp. 5-6, *supra*.  As such, it

17   is misleading to suggest that CalChamber's members and other businesses have litigated the First

18   Amendment issue without success in state courts.  The reality is that they have not been able to

19   withstand the expense and risk of Proposition 65 litigation to get the First Amendment issue resolved.

20   The Attorney General's contention (at 10) that the California Court of Appeal has rejected

21   "the central factual theory underlying the Chamber's First Amendment claim," citing *AFL-CIO v.*

22   *Deukmejian*, 212 Cal. App. 3d 425 (1989), is even further off base.  The Attorney General conflates

23   two separate issues:  whether a chemical may (or must) be listed under Proposition 65, and whether

24   the government may require private businesses to provide a warning based on such listing.  The

25   former issue does *not* implicate private speech and therefore does not raise First Amendment

26   concerns.  The latter issue, however, does implicate private speech, and therefore requires a different

27   analysis under Supreme Court and Ninth Circuit precedent.

28   In *AFL-CIO v. Deukmejian*, the California Court of Appeal held that, as a matter of statutory

- 13 -

1  interpretation, the State was required to include on the Proposition 65 list chemicals that were

2  identified by IARC as known to cause cancer in animals.  212 Cal. App. 3d at 440-41.  The court

3  reasoned that Proposition 65, by cross-reference to the California Labor Code, "refers expressly both

4  to human and animal carcinogens," *id.* at 435, and therefore the statute required the State to *list*

5  chemicals that are known to cause cancer in animals, *id.* at 438.  Critically, however, the court was

6  not presented with the separate question of whether the State, consistent with the First Amendment,

7  may then require businesses to provide a cancer warning that states that the chemical is "known to the

8  State to cause cancer," particularly where such a warning conveys to ordinary consumers that the

9  chemical poses a risk of cancer *in humans*.  That issue was not before the court.

10       As the Attorney General knows, this Court recently addressed the distinction between the

11  listing of a chemical under Proposition 65 and the attendant warning requirement in *Nat'l Assoc. of*

12  *Wheat Growers v. Zeise*, 309 F. Supp. 3d 842 (E.D. Cal. 2018).  At issue was the herbicide

13  glyphosate, which was added to the Proposition 65 list based on IARC's determination that

14  glyphosate is a probable human carcinogen with "sufficient evidence of carcinogenicity in

15  experimental animals."  *Id.* at 846–47.  The Court held that the plaintiffs were unlikely to succeed

16  "on the merits of their claim that the listing of glyphosate violates the First Amendment, because the

17  listing is government speech, not private speech."  *Id.* at 850.[4]  The Court reasoned, however, that

18  "[a] different analysis is required for the warning requirement, as it compels commercial speech."  *Id.*

19  Applying well-established First Amendment case law, the Court preliminary enjoined the *warning*

20  *requirement*, finding that the required warning for glyphosate was not "factually accurate and

21  uncontroversial," as required by the First Amendment, because it was "inherently misleading for a

22  warning to state that a chemical is known to the state of California to cause cancer based on the

23  finding of one organization [IARC] . . . , when apparently all other regulatory and governmental

24  bodies have found the opposite."  *Id.* at 852.  In other words, even though the State could lawfully list

25  glyphosate based on IARC's classification, it was not permitted under the First Amendment to

26  compel businesses to provide a cancer warning on the basis of that listing.  *Cf. Baxter Healthcare*,

27  ───────────────────

[4] The California Court of Appeal also upheld the validity of the glyphosate *listing* against a challenge
28  that the listing was unconstitutional because it was based solely on IARC's classification.  *See
Monsanto Co. v. OEHHA*, 22 Cal. App. 5th 534 (2018).

120 Cal. App. 4th at 352-54 (upholding trial court's ruling that business was exempt from providing a *warning* for chemical DEHP, even though the chemical was properly *listed* based on animal studies).

The same is true for acrylamide.  CalChamber does not contest the State's *listing* of acrylamide based on animal data.  A ruling in CalChamber's favor will leave acrylamide on the Proposition 65 list, where it can be applied for warnings on other (non-food) products or for discharges to sources of drinking water.[5]  Rather, CalChamber contests the constitutionality of the *warning requirement* as applied to acrylamide in foods.  The California Court of Appeal has never addressed this issue, for acrylamide or any other chemical.  And as CalChamber explained in its pending Motion for Preliminary Injunction, the First Amendment prohibits the State from compelling businesses to provide a cancer warning that is false, misleading, and controversial.  Thus, even if the State lawfully listed acrylamide based on animal studies, it cannot compel CalChamber's members to provide a warning that conveys that acrylamide is "known" to cause cancer *in humans*.  The Attorney General might disagree with CalChamber's legal analysis, but it cannot plausibly contend that that analysis has been "roundly rejected" (AG Mem. at 10) by the California Court of Appeal.

<u>Second</u>, the Attorney General contends (at 11-12) that CalChamber's lawsuit is improperly "reactive" because CalChamber seeks "to seize a new, federal forum" for claims its members could raise in impending state court proceedings.  This argument, too, is unfounded.  As this Court has recognized, "[f]ederal declaratory judgment suits are routinely filed in anticipation of other litigation," and "[m]erely filing a declaratory judgment action in a federal court with jurisdiction to hear it, in anticipation of state court litigation, is not in itself improper anticipatory litigation or otherwise abusive 'forum shopping.'"  *Lexington Ins. Co. v. Silva Trucking, Inc.*, No. 2:14-CV-0015, 2014 WL 1839076, at *8 (E.D. Cal. May 7, 2014) (Mueller, J.) (quoting *Sherwin-Williams Co. v. Holmes Cty.*, 343 F.3d 383, 391 (5th Cir. 2003)).  CalChamber, on behalf of its members, has a well-established right to seek review of the constitutionality of the acrylamide warning requirement, and CalChamber reasonably selected a federal forum to assert its purely federal claim.

Likewise, the Ninth Circuit has found no improper forum shopping or "reactive" litigation

---

[5] Proposition 65's primary provision prohibits discharges of listed chemicals to sources of drinking water and does not implicate speech.  *See* Health & Safety Code § 25249.5.

1    where the federal plaintiff seeks "a forum that could resolve all issues . . . in one comprehensive

2    proceeding." *R.R. St. & Co.*, 656 F.3d at 976.  That is the case here.  CalChamber seeks a single

3    forum to resolve the First Amendment issue with respect to acrylamide in *all* food products to

4    eliminate the need for businesses to litigate the issue product-by-product in a multitude of state court

5    enforcement actions that are likely to be filed in the future.  Indeed, a primary purpose of

6    CalChamber's lawsuit is to clarify its members' First Amendment rights in one comprehensive

7    proceeding to avoid costly and duplicative litigation in the state courts.  *See Lexington Ins. Co.*, 2014

8    WL 1839076, at *6 (courts may consider under *Brillhart* whether "the declaratory action will serve a

9    useful purpose in clarifying the legal relations at issue").

10         **C.    CalChamber's Lawsuit Will *Reduce* the Need for Duplicative Litigation.**

11             The final *Brillhart* factor—avoiding duplicative litigation—also weighs against dismissal.  In

12   fact, CalChamber's lawsuit, if successful, will *reduce* the need for duplicative litigation.  The

13   Attorney General urges this Court to maintain the status quo, whereby CalChamber's members and

14   other businesses must wait to be sued in state court and then litigate the First Amendment issue

15   piecemeal on a product-by-product basis.  The Court should reject this invitation.  Put simply,

16   dismissing this case will not promote judicial economy; to the contrary, it will force businesses to

17   litigate the First Amendment issue in scores of state court cases (to the extent they can afford to do

18   so), rather than resolving this question of federal law once in a single proceeding.

19             The Attorney General contends (at 12) that "courts should decline to entertain a declaratory

20   judgment action where '[a]ll of the issues presented by the declaratory judgment action could be

21   resolved [by] state court' in a pending state proceeding."  (Quoting *Cont'l Cas. Co. v. Robsac*

22   *Indus.*, 947 F.2d 1367, 1373 (9th Cir. 1991), *overruled in part on other grounds by Dizol*, 133 F.3d at

23   1220).  But there is no pending state court proceeding that could resolve all of the issues presented by

24   CalChamber's lawsuit.  For example, a business sued in state court over acrylamide in roasted

25   almonds could get a favorable ruling that the First Amendment bars the government from requiring a

26   cancer warning for acrylamide in those roasted almonds, but that ruling does not insulate a different

27   business that sells canned olives from Proposition 65 enforcement.  In the *Starbucks* case, for

28   example, the First Amendment briefing was focused heavily on whether *coffee* causes cancer, and

1   therefore that case—even if it were to get that far—cannot definitively resolve the issue with respect

2   to other foods.

3        The Attorney General thus adopts an unduly narrow view of the scope of CalChamber's

4   lawsuit.  CalChamber seeks injunctive (and declaratory) relief in connection with enforcement

5   actions on acrylamide that are likely to be filed in the *future*, relating to a wide variety of food and

6   beverage products that are not currently subjects of pending state court litigation.  Indeed,

7   CalChamber has clarified that it is *not* asking this Court to enjoin any of the *pending* state court cases.

8   *See* Pl.'s Mot. for a Prelim. Inj. (Doc. 26).  As such, if this Court were to decline to exercise its

9   jurisdiction, CalChamber and its members would be left without *any* forum in which to litigate the

10   First Amendment issue, leaving them to the Hobson's choice of abandoning their free speech rights

11   or accepting the risk and expense of waiting to be sued.

12
13   **III.   THERE ARE NO "EXCEPTIONAL CIRCUMSTANCES" TO WARRANT A STAY
     OR DISMISSAL UNDER *COLORADO RIVER*.**

14        "The Supreme Court has emphasized that federal courts have a 'virtually unflagging

15   obligation . . . to exercise the jurisdiction given them,' including in cases involving parallel state

16   litigation."  *Seneca*, 862 F.3d at 841 (quoting *Colo. River*, 424 U.S. at 817).  In *Colorado River*, the

17   Supreme Court recognized a narrow exception to this rule, pursuant to which a federal court may stay

18   or dismiss a federal action in "exceptional circumstances" where a parallel action is pending in state

19   court.  424 U.S. at 813 (citation omitted).  The Ninth Circuit evaluates eight factors in assessing the

20   appropriateness of a stay or dismissal under *Colorado River*:

21       (1) which court first assumed jurisdiction over any property at stake;
22   (2) the inconvenience of the federal forum; (3) the desire to avoid
     piecemeal litigation; (4) the order in which the forums obtained
23   jurisdiction; (5) whether federal law or state law provides the rule of
     decision on the merits; (6) whether the state court proceedings can
24   adequately protect the rights of the federal litigants; (7) the desire to
     avoid forum shopping; and (8) whether the state court proceedings will
25   resolve all issues before the federal court.

26   *R.R. St.*, 656 F.3d at 978-79.  These factors must be evaluated "with the balance heavily weighted in

27   favor of the exercise of jurisdiction."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460

28   U.S. 1, 16 (1983).  As the Ninth Circuit has explained, "[t]he underlying principle guiding this review

1   is a strong presumption against federal abstention." *Seneca*, 862 F.3d at 842.  No exceptional

2   circumstances exist here to overcome the strong presumption against dismissal.

3        **A.       The Court Cannot Abstain Because There Is Substantial Doubt as to Whether
              the State Court Proceedings Will Resolve All Issues Before the Court.**

4

5            Pursuant to the eighth *Colorado River* factor, courts consider "whether the state court

6   proceedings will resolve all issues before the federal court." *Seneca*, 862 F.3d at 845.  The Ninth

7   Circuit has held that "the existence of a substantial doubt as to whether the state proceedings will

8   resolve the federal action precludes a *Colorado River* stay or dismissal." *R.R. St.*, 656 F.3d at 982

9   (citations and internal quotations omitted); *see also Seneca*, 862 F.3d at 845 (same); *Smith v. Cent.*

10  *Ariz. Water Conservation Dist.*, 418 F.3d 1028, 1033 (9th Cir. 2005) (same); *Intel Corp. v. Advanced*

11  *Micro Devices, Inc.*, 12 F.3d 908, 913 (9th Cir. 1993) ("[A] district court may enter a *Colorado River*

12  stay order only if it has 'full confidence' that the parallel state proceeding will end the litigation.")

13  (citation omitted).  Indeed, the Supreme Court has held that if there is any "substantial doubt" as to

14  whether the "parallel state-court litigation will be an adequate vehicle for the complete and prompt

15  resolution of the issues between the parties," "it would be a *serious abuse of discretion* to grant the

16  stay or dismissal at all." *Cone Mem'l Hosp.*, 460 U.S. at 28 (emphasis added).

17           Here, there is more than "substantial doubt" as to whether any of the pending state court

18  lawsuits—or all of them collectively—will resolve CalChamber's First Amendment claim.  No single

19  state court action addressing the First Amendment issue on a product-by-product basis can fully

20  resolve CalChamber's claim that compelled cancer warnings for acrylamide in *any* food product

21  violate the First Amendment.  *See* pp. 7-8, *supra*.  Further, the enforcement history on acrylamide

22  raises substantial doubt as to whether the First Amendment issue will be "complete[ly] and

23  prompt[ly]" resolved in pending (or even future) state court litigation.  *Cone Mem'l Hosp.*, 460 U.S.

24  at 28.  Proposition 65 enforcement concerning acrylamide has been ongoing in state courts for more

25  than a decade, and defendants routinely raise the First Amendment, but the issue has evaded review.

26  *See* Section II.C, *supra*.  Because it is highly unlikely that the pending state court litigation will fully

27  resolve CalChamber's federal lawsuit, dismissal is unwarranted.  This factor is dispositive.  *See*

28  *Holder v. Holder*, 305 F.3d 854, 868, 870 (9th Cir. 2002) ("it is 'dispositive' that the state court

1  judgment will not resolve all of the issues before the federal court") (citation omitted); *Intel Corp.*, 12

2  F.3d at 913 ("substantial doubt as to whether the state proceedings will resolve the federal action" is a

3  "countervailing consideration that [the court] [found] dispositive").

4      **B.**    **There Are No Other "Exceptional Circumstances" That Warrant Abstention.**

5      The other relevant *Colorado River* factors also weigh against dismissal:[6]

6      *(2) Inconvenience of the Federal Forum.*  The Attorney General contends (at 16) that this

7  factor supports dismissal because "none of the private Proposition 65 enforcers has sued over

8  acrylamide in Sacramento state courts or is located in Sacramento, where this Court sits."  But

9  CalChamber did not sue private enforcers; it sued the Attorney General, which is based in

10  Sacramento (as is CalChamber).  The Attorney General cannot seriously contend that a federal court

11  in Sacramento is an "inconvenient forum" for it to litigate.  At most, this factor is neutral.

12      *(3) Desire to Avoid Piecemeal Litigation.*  The Attorney General contends (at 16) that this

13  lawsuit would result in piecemeal litigation.  To the contrary, it is piecemeal litigation that this

14  lawsuit seeks to *avoid*.  Maintaining the status quo—in which Proposition 65 enforcement actions

15  concerning acrylamide are litigated in state court on a product-by-product basis—will result in

16  piecemeal litigation.  *See* Section II.C, *supra*.  As such, this factor weighs against dismissal.

17      *(4) Order in Which Forums Obtained Jurisdiction.*  CalChamber does not dispute that state

18  courts first obtained jurisdiction over certain enforcement actions concerning acrylamide in specific

19  food products, but each of those actions is limited to a specific product and not parallel to this

20  lawsuit.  In addition, the Attorney General's contention that the First Amendment issue is currently

21  before the California Court of Appeal in the *Starbucks* case is incomplete.  OEHHA's recent

22  regulation establishing that no warnings are required for coffee will likely moot the First Amendment

23  issue in that case.  Indeed, the Court of Appeal—without addressing the First Amendment issue—

24  lifted a stay of the trial court proceedings, thereby allowing the trial court to consider and apply the

25  new OEHHA regulation.  *See* RJN, Ex. B (Order).  As such, it is far from certain that the Court of

26  Appeal will ever reach the First Amendment issue, which in any event would be limited to whether

27  compelled cancer warnings *on coffee* violate the First Amendment.  This factor is neutral.

28

---

[6] CalChamber agrees that the first factor does not apply here because there is no property at stake.

*(5) Federal Law vs. State Law.* CalChamber's lawsuit arises solely under the federal Constitution. *See* Section II.A, *supra*. As such, this factor weighs heavily against dismissal. *See Cone Mem'l Hosp.*, 460 U.S. at 26 (holding that the "presence of federal-law issues must always be a major consideration weighing against surrender"); *Cedar Rapids Cellular Tel., L.P. v. Miller*, 280 F.3d 874, 879 (8th Cir. 2002) ("We note particularly that federal law controls most of the appellants' claims, and that this factor is a 'major consideration' against abstention.") (citation omitted).

*(6) Adequate Protection in State Court.* In arguing that this factor supports dismissal, the Attorney General ignores that many of CalChamber's members have not yet been sued, and the threat of a Proposition 65 lawsuit itself chills their First Amendment rights. The opportunity to assert an affirmative defense to an enforcement action does little to protect those rights. Further, the Ninth Circuit has held that this factor "is more relevant when it counsels against abstention, because while inadequacy of the state forum or insufficient parallelism may preclude abstention, the alternatives never compel abstention." *Seneca*, 862 F.3d at 845. This factor weighs against dismissal

*(7) Forum Shopping.* The Attorney General contends (at 17) that this factor supports dismissal because CalChamber's members will have an opportunity to litigate their First Amendment claim in state court. As addressed in Section II.B, *supra*, this contention is unfounded, and CalChamber has not engaged in improper forum shopping. This factor weighs against dismissal.

## **CONCLUSION**

This case arises under unique circumstances in which businesses have endured 15 years of state court lawsuits, which are increasing in number, that implicate their free speech rights under the U.S. Constitution. These cases are initiated primarily by private entities and individuals with economic incentives under a draconian enforcement regime in which the business is guilty until it proves itself innocent, through expensive and uncertain litigation on novel scientific issues under a statute and regulations that provide little specificity. As the representative of California businesses, CalChamber has asked this Court to vindicate the rights of its members in this one efficient case, which otherwise have gone and will continue to go unheard by the state courts. For these and the foregoing reasons, the Court should deny the Attorney General's Motion to Dismiss.

Dated: November 27, 2019                    Respectfully submitted,


                                            By: */s/ Trenton H. Norris*
                                            Trenton H. Norris (CA Bar No. 164781)
                                            Sarah Esmaili (CA Bar No. 206053)
                                            S. Zachary Fayne (CA Bar No. 307288)
                                            David Barnes (CA Bar No. 318547)
                                            ARNOLD & PORTER KAYE SCHOLER LLP
                                            Three Embarcadero Center, 10th Floor
                                            San Francisco, CA 94111
                                            Tel:  (415) 471-3100
                                            trent.norris@arnoldporter.com