1  Trenton H. Norris (CA Bar No. 164781)
   Sarah Esmaili (CA Bar No. 206053)
2  S. Zachary Fayne (CA Bar No. 307288)
   David Barnes (CA Bar No. 318547)
3  **ARNOLD & PORTER KAYE SCHOLER LLP**
   Three Embarcadero Center, 10th Floor
4  San Francisco, CA 94111
   Telephone:     415.471.3100
5  Facsimile:     415.471.3400
   trent.norris@arnoldporter.com
6
7  *Attorneys for California Chamber of Commerce*
8
9                **UNITED STATES DISTRICT COURT**
10             **EASTERN DISTRICT OF CALIFORNIA**
11

| | |
|---|---|
| 12 CALIFORNIA CHAMBER OF COMMERCE, | Case No. 2:19-cv-02019-KJM-EFB |
| 13 | **PLAINTIFF CALIFORNIA CHAMBER OF COMMERCE'S OPPOSITION TO** |
| Plaintiff, | **ATTORNEY GENERAL XAVIER** |
| 14 | **BECERRA'S MOTION TO DISMISS FIRST** |
| v. | **AMENDED COMPLAINT** |
| 15 | |
| 16 XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, | Date:           May 15, 2020 |
| 17 | Time:           10:00 a.m. |
| Defendant. | Location:       Courtroom 3 (15th Floor) |
| 18 | Judge:          Hon. Kimberly J. Mueller |
| | Action Filed:   October 7, 2019 |

19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

    A.    Proposition 65 Warning Requirement.................................................... 2

    B.    Proposition 65 Enforcement................................................................... 2

    C.    Proposition 65 Litigation Concerning the First Amendment................. 3

    D.    Calchamber's Amended Complaint ....................................................... 4

ARGUMENT .................................................................................................................... 4

  I.    THE AMENDED COMPLAINT STATES A CLAIM UNDER SECTION
      1983........................................................................................................... 4

    A.    The Attorney General Is A Proper Defendant Under *Ex Parte Young*. ................. 5

    B.    Calchamber Has Alleged Facts Sufficient to Demonstrate a Credible Threat
        of Enforcement, Thereby Establishing an Article III Case or Controversy.......... 6

        1.    Conduct Arguably Proscribed By Proposition 65..................................... 7

        2.    A Credible Threat of Enforcement............................................................ 8

        3.    CalChamber Satisfies the Remaining Elements of Article III
            Standing. ................................................................................................. 11

    C.    Private Enforcers Of Proposition 65 Act Under Color Of State Law. ................. 12

        1.    Private Enforcers Act Jointly With the Attorney General. ...................... 13

        2.    Private Enforcers Have a Symbiotic Relationship with the State. ........... 15

  II.  BECAUSE CALCHAMBER HAS ALLEGED A VIABLE SECTION 1983
     CLAIM, *BRILLHART* DOES NOT APPLY....................................................... 17

  III. THERE ARE NO "EXCEPTIONAL CIRCUMSTANCES" TO WARRANT A
      STAY OR DISMISSAL UNDER *COLORADO RIVER*. ................................. 17

    A.    The Court Cannot Abstain Because There Is Substantial Doubt as to
        Whether the State Court Proceedings Will Resolve All Issues Before the
        Court....................................................................................................... 17

    B.    There Are No Other "Exceptional Circumstances" That Warrant
        Abstention. ............................................................................................. 19

    C.    Abstention Is Inappropriate Because First Amendment Rights Are at Stake. ..... 20

CONCLUSION ............................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A Woman's Friend Pregnancy Res. Clinic v. Harris*,
  153 F. Supp. 3d 1168 (E.D. Cal. 2015), *rev'd in part on other grounds*,
  901 F.3d 1166 (9th Cir. 2018).........................................................................7

*Am. Bankers Mgmt. Co. v. Heryford*,
  885 F.3d 629 (9th Cir. 2018)...........................................................................17

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
  526 U.S. 40 (1999)...........................................................................................15

*Ariz. Right to Life Political Action Comm. v. Bayless*,
  320 F.3d 1002 (9th Cir. 2003)...........................................................................7

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
  729 F.3d 937 (9th Cir. 2013).............................................................................5

*Babbitt v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979)..............................................................................6, 7, 9, 10

*Baxter Healthcare Corp. v. Denton*,
  120 Cal. App. 4th 333 (2004)...........................................................................20

*Bland v. Fessler*,
  88 F.3d 729 (9th Cir. 1996)....................................................................9, 10, 12

*Brunette v. Humane Soc'y of Ventura Cty.*,
  294 F.3d 1205 (9th Cir. 2002).............................................................13, 15, 16

*Burton v. Wilmington Parking Auth.*,
  365 U.S. 715 (1961)..........................................................................................16

*Cal. Pro-Life Council, Inc. v. Getman*,
  328 F.3d 1088 (9th Cir. 2003).............................................................................7

*Coal. to Defend Affirmative Action v. Brown*,
  674 F.3d 1128 (9th Cir. 2012).............................................................................5

*Colo. River Water Conserv. Dist. v. United States*,
  424 U.S. 800 (1976)..........................................................................................17

*Consumer Advocacy Group, Inc. v. ExxonMobil Corp.*,
  168 Cal. App. 4th 675 (2008)...........................................................................12

*Consumer Cause, Inc. v. SmileCare*,
    91 Cal. App. 4th 454 (2001)...............................................................................................5

*Consumer Def. Grp v. Rental Hous. Indus. Members*,
    137 Cal. App. 4th 1185 (2006)..........................................................................................14

*Cornwell v. Cal. Bd. of Barbering & Cosmetology*,
    962 F. Supp. 1260 (S.D. Cal. 1997) ..................................................................................5

*Courthouse News Serv. v. Planet*,
    750 F.3d 776 (9th Cir. 2014)............................................................................................20

*Ex parte Young*,
    209 U.S. 123 (1908) .......................................................................................................4, 5

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
    528 U.S. 167 (2000) .........................................................................................................11

*Holder v. Holder*,
    305 F.3d 854 (9th Cir. 2002)............................................................................................19

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    12 F.3d 908 (9th Cir. 1993)..............................................................................................18

*Italian Colors Rest. v. Becerra*,
    878 F.3d 1165 (9th Cir. 2018)..........................................................................................10

*Kirtley v. Rainey*,
    326 F.3d 1088 (9th Cir. 2003)............................................................................................4

*KVUE, Inc. v. Moore*,
    709 F.2d 922 (5th Cir. 1983), *aff'd*, 465 U.S. 1092 (1984) ..............................................9

*Lee v. Katz*,
    276 F.3d 550 (9th Cir. 2002)............................................................................................13

*Lopez v. Candaele*,
    630 F.3d 775 (9th Cir. 2010).....................................................................................6, 8, 9

*LSO, Ltd. v. Stroh*,
    205 F.3d 1146 (9th Cir. 2000)......................................................................................7, 9

*Lugar v. Edmondson Oil Co.*,
    457 U.S. 922 (1982) .........................................................................................................13

*Mobil Oil Corp. v. Attorney General of Va.*,
    940 F.2d 73 (4th Cir. 1991)................................................................................................9

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983)................................................................................................17, 18, 19

- iii -

*Nabors Well Servs. Co. v. Bradshaw*,
    No. 05-8334, 2006 WL 8432088 (C.D. Cal. Feb. 15, 2006)........................................15

*National Ass'n of Wheat Growers v. Zeise*,
    309 F. Supp. 3d 842 (E.D. Cal. 2018)...................................................................5, 11

*People v. Frito-Lay, Inc., et al.*,
    LA Sup. Ct., BC338896 (filed Aug. 26, 2005) .........................................................3, 8

*People v. Snyders of Hanover, et al.*,
    Alameda Sup. Ct., No. RG09455286 (filed June 1, 2009).........................................8

*Planned Parenthood of Idaho, Inc. v. Wasden*,
    376 F.3d 908 (9th Cir. 2004).............................................................................11, 12

*Porter v. Jones*,
    319 F.3d 483 (9th Cir. 2003)...................................................................................20

*R.R. St. & Co. v. Transp. Ins. Co.*,
    656 F.3d 966 (9th Cir. 2011)..............................................................................17, 18

*Regal Knitwear Co. v. NLRB*,
    65 S.Ct. 478 (1945) ...................................................................................................12

*S.C. Citizens for Life, Inc. v. Krawcheck*,
    301 F. App'x 218 (4th Cir. 2008) .............................................................................20

*Seneca Ins. Co. v. Strange Land, Inc.*,
    862 F.3d 835 (9th Cir. 2017).......................................................................17, 18, 20

*Smith v. Cent. Ariz. Water Conservation Dist.*,
    418 F.3d 1028 (9th Cir. 2005)..................................................................................18

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)..........................................................................................6, 7, 10

*Thomas v. Anchorage Equal Rights Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) (en banc)....................................................................8

*Vincent v. Trend Western Tech. Corp.*,
    828 F.2d 563 (9th Cir. 1987)....................................................................................16

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988) ...............................................................................................7, 9

*Wolfson v. Brammer*,
    616 F.3d 1045 (9th Cir. 2010)...............................................................................7, 20

*Yeroushalmi v. Miramar Sheraton*,
    88 Cal. App. 4th 738 (2001)....................................................................................14

**Statutes, Rules, and Regulations**

16 U.S.C. § 1540(g) ...................................................................................................14

42 U.S.C.
  § 300j-8(d)................................................................................................................14
  § 1983.......................................................................................................1, 4, 6, 12
  § 7604(g) ..................................................................................................................14

Fed. R. Civ. P.
  12(b)(1) ....................................................................................................................11
  12(b)(6) ....................................................................................................................11
  65(d)(2) ....................................................................................................................12

Cal. Code Civ. Proc. § 1021.5.......................................................................................2, 3

Cal. Health & Safety Code
  § 25249.6...................................................................................................................2
  § 25249.7(b)..............................................................................................................2
  § 25249.7(c)...........................................................................................................2, 6
  § 25249.7(d)..........................................................................................................3, 13
  § 25249.7(d)(2)........................................................................................................12
  § 25249.7(e)(1)(A).............................................................................................3, 8, 9, 13
  § 25249.7(e)(1)(B)....................................................................................................9
  § 25249.7(f)..........................................................................................................3, 14
  § 25249.8(a)..............................................................................................................2
  § 25249.12(b)............................................................................................................3
  § 25249.12(c)............................................................................................................3
  § 25249.12(d)............................................................................................................2

Cal. Code Regs. tit. 11,
  § 3003(a) ...................................................................................................................3
  § 3200........................................................................................................................3

Cal. Code Regs. tit. 27,
  § 25607.2(a)(2)..........................................................................................................2
  § 25704 (effective Oct. 1, 2019) ............................................................................4

**Constitutional Provisions**

Cal. Const. art. V, § 13.............................................................................................5, 14

**Other Authorities**

Martin A. Schwartz, *Section 1983 Litigation* (3d ed. 2014) ...............................5

**INTRODUCTION**

The California Chamber of Commerce ("CalChamber") brought this suit to vindicate the First Amendment rights of its many members that make and sell food in California that contains acrylamide. These businesses—from large companies to corner stores—must either warn consumers that they will be exposed to a chemical "known to the state to cause cancer" or else risk state court litigation in which they face penalties of $2,500 per unit sold if they are unable to bear the expensive burden of scientific proof. Many businesses have been sued to date by both the Attorney General ("AG") and private enforcers. Am. Compl. ¶ 54-59. But because acrylamide forms naturally during cooking and is found in thousands of food products, *id.* ¶ 2, many more businesses remain to be sued. Indeed, since CalChamber initiated this lawsuit, food companies have received over a hundred notices of violation as to acrylamide, 45 in the month of February 2020 alone. *Id.* ¶ 58-59.

CalChamber therefore brought this suit to prevent additional lawsuits and the ongoing chill of its members' First Amendment rights. The costs of Proposition 65 litigation, the one-sided nature of its enforcement regime, and the incentives it provides for enforcement by bounty hunters make it uneconomical—deliberately so—for individual businesses to vindicate their First Amendment rights on a case-by-case basis. *Id.* ¶ 60. CalChamber asks this U.S. District Court to resolve this core legal issue under the U.S. Constitution—an issue that no state court has ever finally adjudicated.

On the AG's prior motion to dismiss, the Court abstained from hearing CalChamber's claim for a declaratory judgment and an injunction against enforcement, but permitted CalChamber to amend, as it has now done, to state a claim under 42 U.S.C. § 1983. The AG now argues that this claim fails because *private* enforcement actions under Proposition 65 are not "fairly attributable to the State," and thus there is no "state action" sufficient to support a Section 1983 claim. But this misses the point. CalChamber did not sue private parties. It sued the AG—the State's chief law enforcement officer and the lead enforcer of Proposition 65—who has and continues to enforce the warning requirement with respect to acrylamide in food, and who is unquestionably a state actor.

The AG also asks this Court to abstain because, he argues, the First Amendment claim in this case will be addressed in state court proceedings concerning acrylamide in specific food products. In fact, as CalChamber alleges, the First Amendment issue has largely evaded review in state court

1    because of the economics of Proposition 65's draconian, free-for-all enforcement regime.  Am.

2    Compl. ¶¶ 60-61.  Moreover, there is no pending state court action that could resolve CalChamber's

3    claim that compelled cancer warnings for acrylamide in *any* food product violate the First

4    Amendment.  At the same time, CalChamber's members that sell or produce acrylamide-containing

5    food products—many of whom have not yet been sued for some or all of their acrylamide-containing

6    products—face a *continuing* threat of a Proposition 65 lawsuit by the AG and private enforcers.  They

7    urgently need relief from this Court.  Accordingly, under bedrock principles of federal jurisdiction, to

8    protect their First Amendment rights, the Court must deny the AG's motion and hear this case.

9                                            **BACKGROUND**[1]

10        **A.**    **Proposition 65 Warning Requirement**

11             Proposition 65 generally prohibits businesses from exposing Californians to chemicals

12   "known to the state to cause cancer" without providing required warnings, unless an affirmative

13   defense applies.  Health & Safety Code § 25249.6.  The California Office of Environmental Health

14   Hazard Assessment ("OEHHA") is responsible for maintaining the list of chemicals "known to the

15   state to cause cancer" (*id.* § 25249.8(a)), which includes acrylamide (Am. Compl. ¶ 49).  Pursuant to

16   OEHHA regulations, cancer warnings for food products containing acrylamide are deemed to be

17   "clear and reasonable" if they state: "**WARNING:** Consuming this product can expose you to

18   [acrylamide], which is known to the State of California to cause cancer.  For more information, go to

19   www.P65Warnings.ca.gov/food."  Cal. Code Regs. tit. 27, § 25607.2(a)(2).

20        **B.**    **Proposition 65 Enforcement**

21             Proposition 65 imposes penalties of up to $2,500 *per day* for *each* failure to provide an

22   adequate warning.  Health & Safety Code § 25249.7(b).  The statute authorizes the AG, a district

23   attorney, or certain city attorneys to bring enforcement actions.  *Id.* § 25249.7(c).  In addition, *any*

24   *person* (even someone who has not been injured) may bring a private enforcement action "in the

25   public interest."  *Id.* § 25249.7(d).  These bounty hunters are eligible to recover 25 percent of the

26   penalty (*id.* § 25249.12(d)), as well as their reasonable attorneys' fees and costs (Cal. Code Civ. Proc.

27   ───────────────────

28   [1] For additional background, CalChamber directs the Court to its briefing on the prior motions to dismiss (ECF Nos. 30, 31) and motion for a preliminary injunction (ECF Nos. 26-1, 52).

1   § 1021.5), creating very strong incentives for private enforcement.  The remaining 75 percent of the

2   penalty is deposited in the State Treasury's Safe Drinking Water and Toxic Enforcement Fund, which

3   is used by OEHHA to implement Proposition 65.  Health & Safety Code § 25249.12(b), (c).

4         Private enforcers are required to provide 60 days' notice to the AG and alleged violator before

5   filing an enforcement action and can sue only if a public enforcer, such as the AG, has not already

6   sued.  *Id.* § 25249.7(d).  The pre-litigation notice must include supporting factual information.  *Id.*  If,

7   after reviewing the factual information and meeting and conferring with the noticing party, "the

8   Attorney General believes there is no merit to the action, the Attorney General shall serve a letter to

9   the noticing party and the alleged violator stating the Attorney General believes there is no merit to

10  the action."  *Id.* § 25249.7(e)(1)(A).  In addition, the AG is authorized to review proposed settlements

11  and may challenge a settlement that is not in the public interest.  *Id.* § 25249.7(f); Cal. Code Regs. tit.

12  11, § 3003(a).  The AG has adopted detailed regulations setting forth its "guidelines for review of

13  settlements" by private enforcers proceeding "in the public interest."  Cal. Code Regs. tit. 11, § 3200.

14        **C.**      **Proposition 65 Litigation Concerning the First Amendment**

15        The First Amendment issue has been litigated only twice in state court enforcement actions

16  (both involving acrylamide), and only once on the merits.  *See* Decl. of Trenton Norris ("Norris

17  Decl.") ¶¶ 4-10.  In the first case in 2008—*People v. Frito-Lay, Inc., et al*—the Court denied the

18  defendant businesses' motion for summary judgment and the AG's cross-motion for summary

19  adjudication on First Amendment grounds, finding that there was a triable issue of material fact.  The

20  defendants subsequently settled, and therefore the Court never issued a ruling on the merits.  *Id.* ¶ 5.

21        In the second case—*Council for Education & Research on Toxics v. Starbucks, et al.*

22  ("*Starbucks*")—the Court ruled after a trial that certain defendants failed to meet their burden to show

23  that compelling a cancer warning on coffee products violated their First Amendment rights.  *Id.* ¶¶ 6-

24  7.  The procedural posture of that case is described in CalChamber's opposition to CERT's motion to

25  dismiss (ECF No. 31).  Two points bear emphasis here, however:

26        First, the California Court of Appeal has not considered the merits of the First Amendment

27  issue in the *Starbucks* case.  *Id.* ¶¶ 7-9.  Indeed, the California Court of Appeal has *never* addressed

28  the question of whether a Proposition 65 warning requirement for cancer as applied to acrylamide in

1   a food or beverage product violates the First Amendment.  *Id.* ¶ 10.

2       Second, in June 2019, after the first phase of trial, OEHHA adopted a regulation that exempts

3   acrylamide formed in roasting coffee beans.  Cal. Code Regs. tit. 27, § 25704 (effective Oct. 1, 2019).

4   That regulation, if upheld against CERT's challenges, will resolve the *Starbucks* case regarding

5   coffee without any need for consideration of the federal constitutional issue it presents.  *See id.* ¶ 8.

6       **D.**    **CalChamber's Amended Complaint**

7       On March 3, 2020, the Court granted in part the AG's and CERT's motions to dismiss and

8   granted CalChamber leave to amend.  ECF No. 56.  CalChamber filed an Amended Complaint (ECF

9   No. 57) that (1) adds a claim for relief under 42 U.S.C. § 1983 for violations of the First Amendment

10  (Am. Compl. ¶¶ 88-96), and (2) clarifies that CalChamber seeks only prospective relief (*id.*, Prayer

11  for Relief).  These amendments address the issues identified in the Court's March 3 Order.

12      <u>**ARGUMENT**</u>

13  **I.**    **THE AMENDED COMPLAINT STATES A CLAIM UNDER SECTION 1983.**

14      To assert a claim under 42 U.S.C. § 1983, a plaintiff must allege "a deprivation of a right

15  secured by the Constitution or laws of the United States, and that the defendant acted under color of

16  state law."  *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003).  Here, CalChamber has satisfied

17  this standard, alleging that (1) the Proposition 65 warning requirement deprives CalChamber's

18  members of their rights under the First Amendment (Am. Compl. ¶¶ 91-94); and (2) the AG is

19  charged with enforcing Proposition 65 and does so under color of state law (*id.* ¶ 95).

20      The AG nevertheless contends (at 4-5) that the Amended Complaint fails to state a claim

21  under Section 1983 because private enforcement actions are not fairly attributable to the State, and

22  thus there is no "state action" to support a Section 1983 claim.  But this misses the point.  It is well

23  established that state officials authorized to enforce an allegedly unconstitutional statute are the

24  proper defendants in a suit for prospective injunctive relief against the statute's enforcement.  *See*

25  *generally Ex parte Young*, 209 U.S. 123 (1908).  The AG is the lead enforcer of Proposition 65, and

26  therefore CalChamber properly states a Section 1983 claim against him for prospective injunctive

27  relief.  Thus, it is not necessary, as the AG suggests, for CalChamber to establish that private

28  enforcers are "state actors."  Further, CalChamber alleged facts sufficient to demonstrate that its

1    members face a "credible threat of prosecution," such that this case is justiciable under Article III.

2          **A.**      **The Attorney General Is a Proper Defendant Under *Ex Parte Young*.**

3          It is well-established that "state officials with the statutory duty to enforce and administer [an]

4    allegedly unconstitutional state statute are the proper defendants in a suit for prospective injunctive

5    relief." *Cornwell v. Cal. Bd. of Barbering & Cosmetology*, 962 F. Supp. 1260, 1266 (S.D. Cal. 1997)

6    (citing *Ex parte Young*, 209 U.S. at 157-61); *see also* Martin A. Schwartz, *Section 1983 Litigation*, at

7    124 (3d ed. 2014) ("the plaintiff must name as defendant the state official responsible for enforcing

8    the contested statute in her official capacity . . . .") (citation omitted).

9          In *Ex parte Young*, the Supreme Court recognized an exception to Eleventh Amendment

10   immunity whereby citizens may "sue state officers in their official capacities 'for prospective

11   declaratory or injunctive relief . . . for their alleged violations of federal law.'" *Ass'n des Eleveurs de*

12   *Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) (quoting *Coal. to Defend*

13   *Affirmative Action v. Brown*, 674 F.3d 1128, 1133 (9th Cir. 2012)).  A state official is a proper

14   defendant under *Ex parte Young* if he has "some connection with the enforcement of the act" that is

15   "fairly direct," as distinct from a "generalized duty to enforce state law or general supervisory power

16   over the persons responsible for enforcing the challenged provision." *Id.*

17         In *Harris*, for example, food companies filed a Section 1983 lawsuit against the AG, seeking

18   to enjoin enforcement of a California statute banning certain food products. *Id.* at 942-43.  The Ninth

19   Circuit held that the AG had a sufficiently direct connection to enforcement of the statute such that

20   she was a proper defendant. *Id.* at 943-44.  The Court explained that the statute expressly authorized

21   enforcement by district attorneys, and the AG has the "'powers of a district attorney,' whenever she

22   believes that the law is not being adequately enforced." *Id.* at 943 (quoting Cal. Const. art. V, § 13).

23   Thus, the Court reasoned, "[t]he combination of [the statute], which gives district attorneys the

24   authority to prosecute violations of [the statute], and the Attorney General's duty to prosecute as a

25   district attorney establishes sufficient enforcement power for *Ex Parte Young*." *Id.* at 943-44.

26         The AG's connection to enforcement of Proposition 65 is even more direct.  By his own

27   admission, the AG is the "lead enforcer of Proposition 65." Norris Decl. ¶ 16 & Ex. D at 49 (AG's

28   brief in *Wheat Growers*); *see also Consumer Cause, Inc. v. SmileCare*, 91 Cal. App. 4th 454, 470

(2001) (quoting AG amicus brief stating that the AG is the "principal enforcer of Proposition 65").
And unlike in *Harris*, the AG is authorized to *directly* enforce Proposition 65.  Health & Safety Code
§25249.7(c).  Indeed the AG has done so with respect to acrylamide in food. Am. Compl. ¶ 54.  Thus,
the AG is a proper defendant for this Section 1983 claim seeking to enjoin prospective enforcement
of the Proposition 65 warning requirement, both on its face and as applied to acrylamide in food.

### B.   CalChamber Has Alleged Facts Sufficient to Demonstrate a Credible Threat of Enforcement, Thereby Establishing an Article III Case or Controversy.

The AG cannot dispute that he is a state actor subject to suit for prospective injunctive relief
under Section 1983.  Instead, the AG contends (at 13-14) that he has not caused a deprivation of
CalChamber's members' First Amendment rights because there is no allegation that he intends to
enforce the acrylamide warning requirements against them.  But this is not the applicable test under
Section 1983.  Rather, the AG apparently contends that there is no Article III case or controversy, as
the AG cites as support for his argument *Lopez v. Candaele*, 630 F.3d 775 (9th Cir. 2010), which
recites the long-standing principle that in order to establish *standing* for pre-enforcement review of a
statute, a plaintiff must demonstrate a "credible threat of prosecution."  *Id.* at 785.

In pre-enforcement review cases, "a plaintiff satisfies the injury-in-fact requirement where he
alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest,
but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'"  *Susan B.
Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l
Union*, 442 U.S. 289, 298 (1979)).[2]  In *Babbitt*, for example, the law at issue proscribed "dishonest,
untruthful, and deceptive publicity."  442 U.S. at 302.  The plaintiffs "actively engaged in consumer
publicity campaigns in the past" and planned to continue them.  *Id.* at 301.  Although they did not
"plan to propagate untruths," they argued that "erroneous statement is inevitable in free debate."  *Id.*
The Supreme Court concluded that plaintiffs' fear of prosecution was not "imaginary or wholly
speculative," and therefore their challenge presented a justiciable case or controversy.  *Id.* at 302.

---

[2]  It is not clear whether the AG challenges CalChamber's standing, ripeness, or both (or neither), but
the Supreme Court has observed that the "doctrines of standing and ripeness 'originate' from the
same Article III limitation" and "'boil down to the same question'" of whether there is a "credible
threat of prosecution."  *Susan B. Anthony List*, 573 U.S. at 158 n.5.

1     Importantly, courts apply "the requirements of ripeness and standing less stringently in the

2   context of First Amendment claims." *Wolfson v. Brammer*, 616 F.3d 1045, 1058-59 (9th Cir. 2010);

3   *see also Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) ("[I]n the First

4   Amendment-protected speech context, the Supreme Court has dispensed with rigid standing

5   requirements."); *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir.

6   2003) (noting the Supreme Court does not "require[e] litigants to speak first and take their chances

7   with the consequences.").  Thus, "when the threatened enforcement effort implicates First

8   Amendment rights, the inquiry tilts dramatically toward a finding of standing." *LSO, Ltd. v. Stroh*,

9   205 F.3d 1146, 1155 (9th Cir. 2000); *see also Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393

10   (1988) (permitting pre-enforcement review because "self-censorship" is "a harm that can be realized

11   even without an actual prosecution").  And as this Court has recognized, this principle applies equally

12   in cases involving statutes that compel rather than restrict speech, because "just as a plaintiff may be

13   constitutionally injured by self-censorship, a plaintiff may be injured if compelled to speak." *A*

14   *Woman's Friend Pregnancy Res. Clinic v. Harris*, 153 F. Supp. 3d 1168, 1189–90 (E.D. Cal. 2015)

15   (Mueller, J.), *rev'd in part on other grounds*, 901 F.3d 1166 (9th Cir. 2018).

16              **1.      Conduct Arguably Proscribed By Proposition 65**

17     The AG cannot dispute that CalChamber has sufficiently alleged that its members intend to

18   engage in conduct that implicates First Amendment interests but is arguably proscribed by statute.

19   CalChamber alleges that: its members sell and produce food products that contain acrylamide (Am.

20   Compl. ¶¶ 8, 63, 64); as a result of California's listing of acrylamide as a chemical "known to the

21   State to cause cancer," Proposition 65 presumptively requires such businesses to provide a cancer

22   warning on their acrylamide-containing products (*id.* ¶¶ 5, 33-36); businesses that have opted not to

23   provide acrylamide warnings, including many CalChamber members, *already* have been threatened

24   with litigation and sued for violating Proposition 65 by the AG and others (*id.* ¶¶ 56-59, 63); and,

25   consequently, CalChamber's members that have not yet been sued must either provide a warning they

26   believe to be false and misleading (thereby compelling their speech), or face the substantial risk of an

27   enforcement action under Proposition 65 for failing to do so (*id.* ¶¶ 64-66, 87, 94).  These allegations

28   more than satisfy the first two prongs of the test articulated in *Susan B. Anthony List* and *Babbitt*.

### 2.   A Credible Threat of Enforcement

CalChamber also has alleged facts sufficient to show that its members face a risk of enforcement that is not only "credible," but highly likely.

a.   The Attorney General Has Enforced and Continues to Enforce Proposition 65 as Applied to Acrylamide in Food.

One factor courts consider in evaluating the threat of enforcement is whether there is a "history of past prosecution or enforcement under the challenged statute." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc). "[T]he plaintiffs themselves need not be the direct target of government enforcement. A history of past enforcement against parties similarly situated to the plaintiffs cuts in favor of a conclusion that a threat is specific and credible." *Lopez*, 630 F.3d at 786-87.

Here, the AG has directly enforced Proposition 65 with respect to acrylamide in food. *See* Am. Compl. ¶¶ 13, 54. In 2005, the AG joined private enforcers "in pursuing claims that several major restaurants and food manufacturers failed to provide Proposition 65 warnings for acrylamide in French fries, potato chips, and other potato products." *Id.* ¶ 54; *see also* Norris Decl. ¶ 12 & Ex. A (*People v. Frito-Lay, Inc., et al.*, LA Sup. Ct., BC338896 (filed Aug. 26, 2005)). Likewise, in 2009, the AG filed and subsequently settled another Proposition 65 action against the makers of various snack foods, again alleging violations for failure to provide Proposition 65 cancer warnings for acrylamide in food products. Am. Compl. ¶ 54; *see also* Norris Decl. ¶ 14 & Ex. C (*People v. Snyders of Hanover, et al.*, Alameda Sup. Ct., No. RG09455286 (filed June 1, 2009)).

And the AG continues to engage in other enforcement-related activities. For example, the AG continues to perform acrylamide testing on food products to confirm compliance with past consent judgments, and his office has sent letters to several signatories as recently as last year. *See* Norris Decl. ¶ 15. The AG also continues to play a supervisory role over private enforcement actions concerning acrylamide in food. The AG reviews pre-litigation notices filed by private enforcers and, if he "believes there is no merit to the action," is required to "serve a letter to the noticing party and the alleged violator stating that the Attorney General believes there is no merit to the action." Health & Safety Code § 25249.7(e)(1)(A). The AG also reviews private settlements, and indeed has

1    objected to settlements that—in the AG's view—are insufficient to address acrylamide exposures

2    from food.  *See, e.g.*, Norris Decl. ¶¶ 20-22 & Ex. H.  The AG's longstanding enforcement of

3    Proposition 65 concerning acrylamide in food demonstrates that CalChamber's members face a

4    credible risk of enforcement that is not "imaginary or wholly speculative." *Babbitt*, 442 U.S. at 302.

5                          b.       The Attorney General Has Not Disavowed Enforcement.

6           Courts also have found a credible threat of enforcement where—as here—the government has

7    failed to disavow enforcement of the statute against parties similarly situated to the plaintiff.  *See,*

8    *e.g.*, *LSO*, 205 F.3d at 1155 ("Courts have also considered the Government's failure to disavow

9    application of the challenged provision as a factor in favor of a finding of standing."); *Mobil Oil*

10   *Corp. v. Attorney General of Va.*, 940 F.2d 73, 76 (4th Cir. 1991) (finding standing where no

11   disavowal); *KVUE, Inc. v. Moore*, 709 F.2d 922, 930 (5th Cir. 1983) (same), *aff'd*, 465 U.S. 1092

12   (1984); *see also American Booksellers Ass'n*, 484 U.S. at 393 ("The State has not suggested that the

13   newly enacted law will not be enforced, and we see no reason to assume otherwise.").

14          In *Bland v. Fessler*, 88 F.3d 729 (9th Cir. 1996), for example, the Ninth Circuit held that the

15   plaintiff had standing to challenge the constitutionality of a state statute where the Attorney General

16   had "not stated affirmatively that his office will not enforce the civil statute." *Id.* at 737.  Even

17   though a senior official "declared that the Attorney General's office 'has not brought or indicated that

18   it would bring any action' under the civil statute," *id.* at 737 n.12, the court found that this was "far

19   short of a disavowal of enforcement" and provided "little comfort" to those like plaintiff.  *Id.*

20          Here, the AG has not disavowed enforcement of Proposition 65 with respect to acrylamide in

21   food.  Nor could he do so as "a mere litigation position."  *Lopez*, 630 F.3d at 788.  Indeed, to this day,

22   the AG's actions evidence at least tacit support for enforcement of the warning requirement as

23   applied to acrylamide in food.  For example, the AG has never publicly asserted that the multitude of

24   pre-litigation notices on acrylamide in food lack merit (Health & Safety Code § 25249.7(e)(1)(A)),

25   much less stated that *no* private enforcement with respect to acrylamide in food can have merit.[3]

26

27   [3] To be sure, the AG's failure to serve a no-merit letter "shall not be construed as an endorsement by

28   the Attorney General of the merit of the action."  Health & Safety Code § 25249.7(e)(1)(B).  But
     similarly it is certainly not an express disavowal of enforcement of the statute.

                                                    - 9 -

1  c.  Substantial Threat of Enforcement By Bounty Hunters.

2  Finally, there is no dispute that CalChamber's members face a real and credible threat of

3  enforcement by private bounty hunters.  Since the discovery of acrylamide in foods in 2002, such

4  bounty hunters—at times joined by the AG—have relentlessly pursued Proposition 65 enforcement

5  for alleged exposures to acrylamide in food.  Am. Compl. ¶¶ 56-59, 63.  Indeed, they have served

6  more than *600* pre-litigation notices for such alleged violations, targeting more than 250 companies,

7  including many of CalChamber's members.  *Id.* ¶¶ 56, 63.  And the number of pre-litigation notices

8  has increased significantly in recent years.  *Id.* ¶¶ 58-59.  The AG apparently contends, however, that

9  such private enforcement actions cannot support CalChamber's standing because they do not

10  demonstrate a credible threat of enforcement *by the AG*.  But this is not the test:  the Supreme Court

11  and Ninth Circuit have made clear that the threat of enforcement by *private parties* is evidence of a

12  "credible threat of enforcement" that supports a plaintiff's standing to sue *state officials* to challenge

13  the statute.  This is so regardless of whether the private parties are deemed to be "state actors."

14  The Ninth Circuit's decision in *Bland* is illustrative.  There, the plaintiff sued the California

15  AG challenging under the First Amendment a civil statute that regulated telephone auto-dialing

16  devices.  88 F.3d at 731-32.  The statute authorized enforcement by the AG and also authorized

17  private citizens to sue for damages.  *Id.* at 731.  The Ninth Circuit, applying *Babbitt*, held that the

18  plaintiff had standing to sue the AG to challenge the statute, reasoning that the statute "places

19  [plaintiff] between the rock of forgoing the use of his [auto-dialing devices] and the hard place of

20  violating the law. . . .  Had he chosen to violate the civil statute, he would have run a substantial risk

21  of civil fines and *private enforcement actions*."  *Id.* at 737 (emphasis added).  The Ninth Circuit was

22  "not troubled" that the AG had "never enforced the civil statute against anyone," reasoning that the

23  AG "has not stated affirmatively that his office will not enforce the civil statute."  *Id.*

24  *Bland* is no outlier.  In *Susan B. Anthony List*, the Supreme Court held that the plaintiff faced

25  a credible threat of future enforcement that was "bolstered" by the fact that the statute "allow[ed]

26  'any person' with knowledge of the purported violation to file a complaint."  573 U.S. at 164 (citation

27  omitted).  The Court reasoned that the threat of enforcement was heightened because "the universe of

28  potential complainants is not restricted to state officials who are constrained by explicit guidelines or

- 10 -

1   ethical obligations."  *Id.*  Likewise, in *Italian Colors Restaurant v. Becerra*, 878 F.3d 1165 (9th Cir.

2   2018), the Ninth Circuit found that plaintiffs had standing to sue the AG even though they

3   "concede[d] that California has not communicated any threat or warning of impending proceedings

4   against them."  *Id.* at 1173.  The court reasoned that "even if the Attorney General would not enforce

5   the law, [the statute] gives private citizens a right of action to sue for damages."  *Id.*  And in *National*

6   *Ass'n of Wheat Growers v. Zeise*, 309 F. Supp. 3d 842 (E.D. Cal. 2018), Judge Shubb concluded that

7   plaintiffs' First Amendment suit against the AG challenging the warning requirement for glyphosate

8   was ripe because the plaintiffs faced a "credible threat of enforcement" by bounty hunters.  *Id.* at 848.

9        Accordingly, the AG's contention that the threat of private enforcement does not support

10  CalChamber's standing is plainly incorrect.  Moreover, here the AG plays an active and supervisory

11  role over private enforcement that goes far beyond what other courts have found sufficient.

12              **3.    CalChamber Satisfies the Remaining Elements of Article III Standing.**

13       The AG has not directly challenged CalChamber's standing, and indeed moves to dismiss for

14  failure to state a claim under Fed. R. Civ. P. 12(b)(6) (and *not* for lack of subject matter jurisdiction

15  under Fed. R. Civ. P. 12(b)(1)).  But the AG may nevertheless contend that even if CalChamber has

16  sufficiently alleged an injury-in-fact by showing a "credible threat of prosecution," it has not shown

17  that its injuries are "fairly traceable" to the AG or likely to be redressed by a favorable decision.

18  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180 (2000).  This is incorrect.

19       Where, as here, a plaintiff brings a pre-enforcement challenge to the constitutionality of a

20  state statute, the causation element of standing is satisfied where the named defendant possesses the

21  authority to enforce the challenged statute.  *See, e.g.*, *Planned Parenthood of Idaho, Inc. v. Wasden*,

22  376 F.3d 908, 919 (9th Cir. 2004).  In *Wasden*, for example, the plaintiff sued the Idaho AG under

23  Section 1983 challenging the constitutionality of a state statute.  Under Idaho law, the county

24  prosecutors—not the AG—were principally responsible for enforcing the statute.  376 F.3d at 919.

25  The Ninth Circuit nevertheless concluded that the plaintiff had standing to sue the AG, reasoning that

26  the AG's power under state law to assume the role of a county prosecutor, absent objection by the

27  county prosecutor, "demonstrates the requisite causal connection for standing purposes."  *Id.* at 920.

28  Here, the AG is the lead enforcer of Proposition 65.  *See* pp. 5-6, *supra*.  The AG also has the power

1  to preempt private lawsuits under Proposition 65 by filing his own enforcement action.  *See* Health &

2  Safety Code § 25249.7(d)(2).  This power to enforce Proposition 65 "demonstrates the requisite

3  causal connection for standing purposes."  *Wasden*, 376 F.3d at 920.

4      Likewise, a favorable decision enjoining the AG from enforcing the Proposition 65 warning

5  requirement as applied to acrylamide in food would redress CalChamber's members' First

6  Amendment injuries.  *See, e.g.*, *id.* (finding that because the AG had the power to enforce the statute,

7  "[a]n injunction against the [AG] could redress plaintiffs' alleged injuries").  Any contention that

8  such an order would not redress CalChamber's members' injuries because it would not stop private

9  parties from suing is wrong.  First, this argument was expressly rejected by the Ninth Circuit in

10 *Bland*.  There, the Ninth Circuit reasoned that even if the AG were correct that an injunction against

11 the AG would not "stop California's consumers from enforcing the civil statute against [plaintiff] in

12 the California courts," a decision in plaintiff's favor "would certainly help redress [plaintiff's] injury"

13 because of all the plaintiff's "potential legal adversaries, the Attorney General of California has far

14 and away the greatest resources, both economic and political."  88 F.3d at 737-78.

15     Furthermore, CalChamber seeks an injunction prohibiting the AG "and all those in privity

16 with and/or acting in concert with" him from enforcing the Proposition 65 warning requirement as

17 applied to acrylamide in food.  Am. Compl., Prayer for Relief, ¶ 3.  Under Fed. R. Civ. P. 65(d)(2),

18 an order granting an injunction binds not only the defendant, but also all "other persons who are in

19 active concert or participation" with the defendant, which has been interpreted to include privies of

20 an enjoined party.  *Regal Knitwear Co. v. NLRB*, 65 S.Ct. 478, 481 (1945) (finding that Rule 65(d)

21 codified "the commonlaw doctrine that a decree of injunction not only binds the parties defendant but

22 also those . . . in 'privity' with them . . . .").  Irrespective of whether private enforcers are "state

23 actors" for purposes of Section 1983, they are in privity with the AG when they file Proposition 65

24 actions.  *See, e.g.*, *Consumer Advocacy Group, Inc. v. ExxonMobil Corp.*, 168 Cal. App. 4th 675, 693

25 (2008).  Therefore, a prospective injunction against the AG would bind private enforcers as well.

26    **C.    Private Enforcers of Proposition 65 Act Under Color of State Law.**

27     Although CalChamber need not establish that private enforcers are "state actors" to state a

28 viable Section 1983 claim against the AG, they are, and their actions to enforce the Proposition 65

1    warning requirement are "fairly attributable to the State."  This further undermines the AG's motion.

2         Whether private parties are state actors is fact-specific.  "Several tests have emerged,"

3    including, among others, the joint action test and the symbiotic relationship test.  *Brunette v. Humane*

4    *Soc'y of Ventura Cty.*, 294 F.3d 1205, 1210 (9th Cir. 2002).  Satisfaction of *either* of these tests is

5    sufficient to find state action.  *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002).[4]

6              **1.      Private Enforcers Act Jointly With the Attorney General.**

7         A private party acts under color of state law when he engages in "joint activity with the State

8    or its agents."  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982).  This "joint action" test is

9    satisfied where officials and private parties act in concert to cause a deprivation of the plaintiff's

10   constitutional rights, and the state "has so far insinuated itself into a position of interdependence with

11   [the] private entity that [it] must be recognized as a joint participant in the challenged activity."

12   *Brunette*, 294 F.3d at 1210 (citation omitted).  In *Lugar*, for example, the Supreme Court held that a

13   creditor who used a state prejudgment attachment statute with the aid of the court clerk and sheriff

14   acted under color of state law by engaging in joint activity with state officials.  457 U.S. at 942.

15        Private enforcers of Proposition 65 act jointly with the AG and other officials, as the State has

16   effectively deputized them.  Health & Safety Code § 25249.7(d).  Indeed, private enforcers' rights to

17   both commence and resolve enforcement actions necessarily derive from the AG's enforcement of

18   Proposition 65.  Private enforcers cannot initiate an action without first providing 60 days' notice to

19   the AG, and then only if the AG or another public official has not yet commenced an action.  *Id*.  If,

20   after reviewing the 60-day notice, the AG believes there is no merit to the action, he "shall" send a

21   letter to the private enforcer and alleged violator "stating the Attorney General believes there is no

22   merit to the action."  *Id.* § 25249.7(e)(1)(A).  In other words, there is significant communication

23   between private enforcers and the AG prior to the initiation of a private enforcement action.[5]

---

24   [4] A private party also becomes a state actor by engaging in activity that has been "traditionally the
25   exclusive prerogative of the State."  *Brunette*, 294 F.3d at 1214; *Katz*, 276 F.3d at 554-55.  Private
     enforcers are "state actors" under this test as well, as enforcement of public health laws "in the public
26   interest" (Health & Safety Code § 25249.7(d)) is traditionally an exclusive government function.

27   [5] The AG states (at 10) that federal citizen suit statutes also contain pre-litigation notice requirements,
     but does not explain why this is relevant.  The AG does not cite any authority for the proposition that
28   citizen suit plaintiffs are not government actors.  In addition, these statutory frameworks are

1    The AG has recognized that 60-day notices are "fundamental to the Proposition 65

2  enforcement scheme."  Norris Decl. ¶ 24 & Ex. J at 2; *see also Yeroushalmi v. Miramar Sheraton*, 88

3  Cal. App. 4th 738, 750 (2001) (drafters of Proposition 65 "intended that the notice contain sufficient

4  facts to facilitate and encourage the alleged polluter to comply with the law, and to encourage the

5  public attorney charged with enforcement to undertake its duty") (emphasis omitted).  And in some

6  cases, the AG has preempted private enforcement by bringing his own action in response to a 60-day

7  notice (*e.g.*, Norris Decl. ¶ 27 & Ex. L [*People v. PepsiCo, Inc.*, lead in Mexican soda]), or co-

8  litigated and resolved enforcement actions with the private enforcers (*e.g.*, *id.* ¶¶ 28-29 & Exs. M, N

9  [*People v. Dakota Brothers, et al.*, lead in ginger candy, and *People v. Burlington Coat Factory, et

10 al.*, lead in children's jewelry]).[6]  With respect to acrylamide in food, the AG filed an enforcement

11 action in 2005 against several restaurants and food companies "because they were the companies

12 targeted in the actions filed by" various private enforcers.  *Id.* ¶ 30 & Ex. O.

13    Similarly, AG oversight of Proposition 65 settlements is critical to the enforcement scheme.

14 *See, e.g.*, *Consumer Def. Grp v. Rental Hous. Indus. Members*, 137 Cal. App. 4th 1185, 1206-07

15 (2006) (noting that the AG is the "one party who *necessarily* represents the public interest in any

16 Proposition 65 litigation") (emphasis in original).  Private enforcers cannot resolve a Proposition 65

17 lawsuit without first notifying the AG and affording him an opportunity to object.  Health & Safety

18 Code § 25249.7(f).  And although the AG cannot unilaterally block a settlement, admonitions from

19 the "chief law enforcement officer of the State" (Cal. Const. art. V, § 13) do come with potent force.

20 In *Embry v. Earthbound Farm*, for example, the plaintiff withdrew a proposed settlement concerning

21 alleged exposures to acrylamide in potatoes just ten days after the AG objected on the basis that the

22 settlement allocated excessive funds to the private enforcer and included injunctive relief measures

23 that were "illusory."  Norris Decl. ¶¶ 21-23 & Exs. H, I.  In fact, the AG does not simply review

---

24 materially different from Proposition 65 because penalties recovered under the federal statutes are
25 paid solely to the government, <u>not</u> to the private citizen plaintiffs.  *See* 16 U.S.C. § 1540(g); 42
   U.S.C. § 7604(g); 42 U.S.C. § 300j-8(d).  Furthermore, the federal enforcers of these statutes do not
26 have many of the special duties and powers that the AG has with respect to Proposition 65.

27 [6] On his website, the AG cites *PepsiCo*, *Dakota Brothers*, and *Burlington Coat Factory* as three
   instances in which the Attorney General's enforcement of Proposition 65 protected vulnerable
28 populations, such as children and minorities.  Norris Decl. ¶ 25 & Ex. K.  All three of these public
   enforcement actions relied heavily on work performed by private enforcers.

settlements: "in [his] capacity as reviewer[] of Proposition 65 settlements," the AG has even drafted template settlement language for private enforcers to use.  Norris Decl. ¶ 19 & Ex. G (AG Letter to Private Enforcers, Jan. 10, 2012).

   This comprehensive supervision that the AG exercises over private enforcers extends far beyond "regulating limited aspects of private enforcement actions" (AG Mot. at 8).  Indeed, the AG has emphasized in other contexts the extensive level of oversight he exercises over private enforcers:

> In 2001, when the Legislature amended Proposition 65, it vested this office with a significant role in reviewing and overseeing private-plaintiff Proposition 65 enforcement.  We take that role seriously.

Norris Decl. ¶ 17 & Ex. E at 1 (AG Letter to Private Enforcers, May 13, 2014); *see also id.*, ¶ 18 & Ex. F at 1 (Initial Statement of Reasons, Revision of Chapters 1 and 3, Tit. 11 C.C.R. (2016)) (the AG "monitor[s] [private enforcement] litigation from the notice through judgment/settlement stage").

   In short, the AG's admittedly "significant role" is sufficient to demonstrate "interdependence" such that the State "must be recognized as a joint participant" in the private enforcement scheme. *Brunette*, 294 F.3d at 1210 (citation omitted).  The cases cited by the AG are not to the contrary.  For example, in *Nabors Well Servs. Co. v. Bradshaw*, No. 05-8334, 2006 WL 8432088 (C.D. Cal. Feb. 15, 2006), the court found that the private parties were not state actors because there was "***no*** additional involvement or interaction with state officials" beyond the existence of a state statute that authorized private actions. *Id.* at *3 (emphasis in original).  Likewise, in *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999), the court found no state action where the State amended legislation to allow insurers to withhold payments pending review, reasoning that this was just "a legislative decision not to intervene in a dispute between an insurer and an employee over whether a particular treatment is reasonable and necessary." *Id.* at 53.  Here, in contrast, the AG plays a significant role in the private enforcement scheme, thereby demonstrating the requisite interdependence for state action.

### 2.   Private Enforcers Have a Symbiotic Relationship with the State.

   Private parties also become state actors by virtue of having a "symbiotic relationship" with the government. *Brunette*, 294 F.3d at 1213.  The Ninth Circuit has explained that "substantial coordination and integration between the private entity and the government are the essence of a symbiotic relationship." *Id*.  "Often significant financial integration indicates a symbiotic

1   relationship." *Id.*  For example, where a private party "confers significant financial benefits

2   indispensable to the government's 'financial success,' then a symbiotic relationship may exist." *Id.*

3          In *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), the Supreme Court held that

4   a private restaurant located in a public garage acted under color of state law when refusing to serve

5   African-American customers.  *Id.* at 716.  The Court found that the relationship between the

6   restaurant and the Authority was *symbiotic*:  the restaurant benefitted from the Authority's tax

7   exemption and maintenance, while the Authority received "indispensable" funding from the

8   restaurant.  *Id.* at 719-20.  The Court rejected the Authority's contention that it itself did not carry out

9   the discriminatory practice, observing that the Authority, through its *inaction*, "place[d] its power,

10   property and prestige behind the admitted discrimination."  *Id.* at 725.

11          Private enforcers of Proposition 65 and the State are likewise engaged in such a symbiotic

12   relationship:  (a) private enforcers investigate and prosecute enforcement actions, thereby preserving

13   scarce governmental resources; (b) they do so through a process that involves substantial oversight by

14   the AG, (c) these enforcement actions generate substantial penalties for the State that are used to fund

15   OEHHA's administration of Proposition 65; and (d) the private enforcers receive 25 percent of any

16   penalties recovered (and their attorneys' fees).  Indeed, the AG himself has acknowledged that

17   "[p]rivate enforcement is essential to achieving the public health and information goals of Proposition

18   65."  Norris Decl. ¶ 24 & Ex. J at 1.

19          The AG nevertheless contends (at 11) that this relationship is not "symbiotic" because the

20   civil penalties recovered in private enforcement actions are not "indispensable" to the State.  But over

21   the last three years, civil penalties from private enforcement actions have funded roughly ***15 percent***

22   of OEHHA's annual budget.  *See* Norris Decl. ¶¶ 31-39 & Exs. P-R.  No court has specifically

23   defined what amount of financial integration is "indispensable," but it strains credulity to suggest that

24   15 percent of a State agency's annual budget would not qualify.  For example, the AG cites *Vincent v.*

25   *Trend Western Tech. Corp.*, 828 F.2d 563 (9th Cir. 1987), on this point.  But private enforcers'

26   financial contribution to OEHHA dwarfs the relative financial benefits the private company in

27   *Vincent* afforded the much larger U.S. Air Force pursuant to a single contract.

28

- 16 -

1

2

## II.   BECAUSE CALCHAMBER HAS ALLEGED A VIABLE SECTION 1983 CLAIM, *BRILLHART* DOES NOT APPLY.

3

As the AG concedes (at 14), *Brillhart* does not apply if CalChamber has alleged a viable

4

Section 1983 claim.  *See, e.g.*, *Am. Bankers Mgmt. Co. v. Heryford*, 885 F.3d 629, 633 (9th Cir.

5

2018).  *Brillhart* therefore does not apply.

6

7

## III.   THERE ARE NO "EXCEPTIONAL CIRCUMSTANCES" TO WARRANT A STAY OR DISMISSAL UNDER *COLORADO RIVER*.

8

"Abstention from the exercise of federal jurisdiction is the exception, not the rule."  *Colo.*

9

*River Water Conserv. Dist. v. United States*, 424 U.S. 800, 813 (1976).  Indeed, federal courts have a

10

"virtually unflagging obligation . . . to exercise the jurisdiction given them," and "the pendency of an

11

action in the state court is [generally] no bar to proceedings concerning the same matter in the Federal

12

court having jurisdiction . . . ."  *Id.* at 817 (citation and internal quotation marks omitted).

13

In *Colorado River*, the Supreme Court recognized a narrow exception to this rule, pursuant to

14

which a federal court may stay or dismiss a federal action in "exceptional circumstances" where a

15

parallel action is pending in state court.  *Id.* at 813 (citation omitted).  The Ninth Circuit evaluates

16

eight factors in assessing the appropriateness of a stay or dismissal under *Colorado River*:

17

18

19

20

21

> (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court.

22

*R.R. St. & Co. v. Transp. Ins. Co.*, 656 F.3d 966, 978-79 (9th Cir. 2011).  These factors are evaluated

23

"with the balance heavily weighted in favor of the exercise of jurisdiction."  *Moses H. Cone Mem'l*

24

*Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983); *see also Seneca Ins. Co. v. Strange Land,*

25

*Inc.*, 862 F.3d 835, 842 (9th Cir. 2017) (noting "strong presumption against federal abstention").  No

26

exceptional circumstances exist here to overcome the strong presumption against dismissal.

27

### A.   The Court Cannot Abstain Because There Is Substantial Doubt as to Whether the State Court Proceedings Will Resolve All Issues Before the Court.

28

Pursuant to the eighth *Colorado River* factor, courts consider "whether the state court

1  proceedings will resolve all issues before the federal court." *Seneca*, 862 F.3d at 845.  This factor is

2  dispositive:  "the existence of a substantial doubt as to whether the state proceedings will resolve the

3  federal action precludes a *Colorado River* stay or dismissal."  *R.R. St.*, 656 F.3d at 982 (citations and

4  internal quotation marks omitted); *see also Seneca*, 862 F.3d at 845; *Smith v. Cent. Ariz. Water*

5  *Conservation Dist.*, 418 F.3d 1028, 1033 (9th Cir. 2005); *Intel Corp. v. Advanced Micro Devices,*

6  *Inc.*, 12 F.3d 908, 913 (9th Cir. 1993).  Indeed, the Supreme Court has held that if there is any

7  "substantial doubt" as to whether the "parallel state-court litigation will be an adequate vehicle for the

8  complete and prompt resolution of the issues between the parties," "it would be a *serious abuse of*

9  *discretion* to grant the stay or dismissal at all."  *Cone Mem'l Hosp.*, 460 U.S. at 28 (emphasis added).

10       There is more than "substantial doubt" as to whether any of the pending state court lawsuits—

11  or all of them collectively—will resolve CalChamber's First Amendment claim.  No single state court

12  addressing the First Amendment issue on a product-by-product basis can fully resolve CalChamber's

13  claim that compelled cancer warnings for acrylamide in *any* food product violate the First

14  Amendment.  Indeed, even if every such case currently pending were litigated to a resolution on the

15  First Amendment defense, additional lawsuits will be filed on other products, requiring a multitude of

16  state court lawsuits to finally achieve the resolution sought *as to all food* in this one federal case.

17  And the businesses making products not yet named in these lawsuits will continue to have their First

18  Amendment rights infringed.  Fundamentally, because CalChamber seeks only prospective relief for

19  its members that have not yet been sued in connection with some or all of their food products

20  containing acrylamide, there is—by definition—***no*** parallel proceeding pending in state court.

21       Further, the enforcement history on acrylamide raises substantial doubt as to whether the First

22  Amendment issue will be "complete[ly] and prompt[ly]" resolved in pending (or even future) state

23  court litigation.  *Cone Mem'l Hosp.*, 460 U.S. at 28.  Although Proposition 65 enforcement

24  concerning acrylamide has been ongoing in state courts for more than 15 years, the First Amendment

25  issue has largely evaded review in the state courts.  Am. Compl. ¶¶ 60-61.  This disconnect is driven

26  by Proposition 65's enforcement structure: a business faced with the threat of costly litigation and

27  potentially crippling civil penalties of up to $2,500 per day has overwhelming economic incentives to

28  acquiesce and settle.  Few companies are able to accept this risk in addition to the costs of litigation.

1    Because the pending state court proceedings cannot fully resolve CalChamber's federal

2    lawsuit, abstention is inappropriate.  *See Holder v. Holder*, 305 F.3d 854, 868, 870 (9th Cir. 2002).

3         **B.        There Are No Other "Exceptional Circumstances" That Warrant Abstention.**

4         The other applicable *Colorado River* factors also weigh against dismissal:

5         *(2) Inconvenience of the Federal Forum.*  The AG contends (at 15) that Sacramento is an

6    inconvenient forum for private enforcers.  But CalChamber did not sue private enforcers; it sued the

7    AG, which is based in Sacramento (as is CalChamber).  The AG's contention also is belied by the

8    fact that one private enforcer (CERT) already intervened in this case.  At most, this factor is neutral.

9         *(3) Desire to Avoid Piecemeal Litigation.*  The AG contends (at 15-16) that this lawsuit would

10   result in piecemeal litigation.  Nonsense.  Maintaining the status quo—in which Proposition 65

11   enforcement actions concerning acrylamide in food are litigated in multiple state courts one product

12   at a time—will result (and has resulted) in piecemeal litigation.  This factor weighs against dismissal.

13        *(4) Order in Which Forums Obtained Jurisdiction.*  The pending state court actions concern

14   acrylamide in specific food products and therefore are not parallel to this lawsuit seeking prospective

15   relief for CalChamber's members that have not yet been sued with respect to acrylamide in *any* food

16   product.  In addition, the AG's contention that the First Amendment issue is currently before the

17   California Court of Appeal in the *Starbucks* case is incomplete.  OEHHA's recent regulation

18   establishing that no warnings are required for coffee will likely moot the First Amendment issue in

19   that case.  *See* Norris Decl. ¶¶ 6-9.  It is thus far from certain that the Court of Appeal will ever reach

20   the First Amendment issue, which in any event would be limited to whether compelled cancer

21   warnings *on a single product* (coffee) violate the First Amendment.  This factor is neutral.

22        *(5) Source of Law.*  As the AG concedes (at 15), this "factor does not favor abstention because

23   the Chamber asserts only a federal claim."  *See also Cone Mem'l Hosp.*, 460 U.S. at 26 (the

24   "presence of federal-law issues must always be a major consideration weighing against surrender").

25        *(6) Adequate Protection in State Court.*  In arguing that this factor supports dismissal, the AG

26   again ignores that many of CalChamber's members have not yet been sued, and the threat of a

27   Proposition 65 lawsuit itself chills their First Amendment rights.  The opportunity to assert an

28   affirmative defense to an enforcement action does nothing to protect those rights.  Further, the Ninth

- 19 -

1 Circuit has held that this factor "is more relevant when it counsels against abstention, because while

2 inadequacy of the state forum or insufficient parallelism may preclude abstention, the alternatives

3 never compel abstention." *Seneca*, 862 F.3d at 845.  This factor weighs against dismissal.

4      *(7) Forum Shopping.*  The AG contends (at 16-17) that this factor supports dismissal because

5 CalChamber's members will have an opportunity to litigate their First Amendment claims in state

6 court.  But the AG again ignores that CalChamber's members have the right to seek pre-enforcement

7 review, and need not wait to be sued to assert their First Amendment rights.

8      **C.  Abstention Is Inappropriate Because First Amendment Rights Are at Stake.**

9      "[A]bstention is generally inappropriate when [F]irst [A]mendment rights are at stake."

10 *Wolfson*, 616 F.3d at 1066 (applying *Pullman* abstention).  Courts "disfavor abstention in First

11 Amendment cases because of the 'risk . . . that the delay that results from abstention will itself chill

12 the exercise of the rights that the plaintiffs seek to protect by suit.'"  *Courthouse News Serv. v.*

13 *Planet*, 750 F.3d 776, 787 (9th Cir. 2014) (quoting *Porter v. Jones*, 319 F.3d 483, 487 (9th Cir.

14 2003)); *see also S.C. Citizens for Life, Inc. v. Krawcheck*, 301 F. App'x 218, 222 n.6 (4th Cir. 2008)

15 ("[A]bstention in this case is inappropriate given that courts have been particularly reluctant to

16 abstain in cases involving facial challenges based on the First Amendment because the delay

17 involved might itself effect the impermissible chilling of the very constitutional right the litigant

18 seeks to protect.") (internal quotation marks omitted).

19      The same is true here.  Absent relief from this Court, CalChamber's members will face what

20 the California Court of Appeal has called a "Hobson's choice":  either communicate to consumers a

21 disparaging health warning about their products that is unsupported by the science, or face the

22 significant risk of an enforcement action under Proposition 65.  *Baxter Healthcare Corp. v. Denton*,

23 120 Cal. App. 4th 333, 344 (2004).  This forced choice impermissibly chills CalChamber's members'

24 First Amendment rights.  *See, e.g.*, *Wolfson*, 616 F.3d at 1059 ("Self-censorship is a constitutionally

25 recognized injury.").  This Court should exercise its jurisdiction to avoid further delay that will

26 impermissibly chill the First Amendment rights that CalChamber seeks to protect.

27

28

<u>**CONCLUSION**</u>

For these reasons, the Court should deny the AG's motion to dismiss.

Dated: May 1, 2020                    Respectfully submitted,

**ARNOLD & PORTER KAYE SCHOLER LLP**

By:   /s/ *Trenton H. Norris*
        Trenton H. Norris
        Sarah Esmaili
        S. Zachary Fayne
        David M. Barnes

*Attorneys for California Chamber of Commerce*

- 21 -