Trenton H. Norris (CA Bar No. 164781)
Sarah Esmaili (CA Bar No. 206053)
S. Zachary Fayne (CA Bar No. 307288)
David Barnes (CA Bar No. 318547)
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Telephone:    415.471.3100
Facsimile:    415.471.3400
trent.norris@arnoldporter.com

*Attorneys for California Chamber of Commerce*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA CHAMBER OF COMMERCE, <br><br> Plaintiff, <br><br> v. <br><br> XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, <br><br> Defendant. | Civil Action No. 2:19-cv-02019-KJM-EFB <br><br> **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:          December 11, 2020 <br> Time:          10:00 a.m. <br> Courtroom:   Courtroom 3 (15th Floor) <br> Judge:         Honorable Kimberly J. Mueller <br> Action Filed:  October 7, 2019 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 3

    A.    Acrylamide in Food.................................................................................. 3

    B.    Scientific Research on Dietary Acrylamide and Cancer.......................... 4

    C.    Proposition 65 Regulatory Framework .................................................. 5

    D.    Proposition 65 Enforcement.................................................................... 6

    E.    Proposition 65 Listing of Acrylamide and Subsequent Litigation......... 7

ARGUMENT ....................................................................................................... 8

    I.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS .............. 9

        A.    Requiring a Cancer Warning For Acrylamide In Food Products Is Unconstitutional Under *Zauderer.* .......................................... 9

            1.    A Cancer Warning For Acrylamide In Food Is Not "Purely Factual and Uncontroversial" and Would Mislead Consumers.................................................... 10

                a.    A Proposition 65-Compliant Warning Must Convey to Consumers That Acrylamide In Foods Increases Cancer Risk in Humans.................................. 11

                b.    The Message That Acrylamide In Food Is Known to Cause Cancer in Humans Is Not "Purely Factual and Uncontroversial." ........................... 12

            2.    Defendant Cannot Satisfy the Remaining Elements of *Zauderer.* .................................................................... 15

        B.    The Required Cancer Warning Is Unconstitutional Under *Central Hudson.* ..................................................................... 16

        C.    Proposition 65 Is Unconstitutional On Its Face Under *NIFLA.* .............. 18

    II.    THE REMAINING EQUITABLE FACTORS WEIGH IN PLAINTIFF'S FAVOR....................................................................... 18

CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

*44 Liquormart, Inc. v. Rhode Island,*
 517 U.S. 484 (1996).................................................................................................17

*AFL-CIO v. Deukmejian,*
 212 Cal. App. 3d 425 (1989)..................................................................................5

*All. for the Wild Rockies v. Cottrell,*
 632 F.3d 1127 (9th Cir. 2011).................................................................................8

*Am. Beverage Ass'n v. City & Cty. of S.F.,*
 916 F.3d 749 (9th Cir. 2019) (en banc).............................................................14, 16

*Am. Meat Inst. v. U.S. Dep't of Agric.,*
 760 F.3d 18 (D.C. Cir. 2014) ................................................................................10

*Baxter Healthcare Corp. v. Denton*
 120 Cal. App. 4th 333 (2004)................................................................................19

*Brown v. Cal. Dep't of Transp.,*
 321 F.3d 1217 (9th Cir. 2003)...............................................................................19

*Cal. Chamber of Commerce v. Brown,*
 196 Cal. App. 4th 233 (2011)................................................................................17

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
 447 U.S. 557 (1980) ............................................................................................9, 17

*Consumer Cause, Inc. v. SmileCare,*
 91 Cal. App. 4th 454 (2001)...................................................................................7

*Consumer Def. Grp. v. Rental Hous. Indus. Members,*
 137 Cal. App. 4th 1185 (2006)................................................................................7

*CTIA - The Wireless Ass'n v. City of Berkeley* ("*CTIA II*"),
 928 F.3d 832 (9th Cir. 2019) (cert. filed)....................................................10, 14, 15

*CTIA-The Wireless Ass'n v. City of Berkeley* ("*CTIA I*"),
 854 F.3d 1105 (9th Cir. 2017)................................................................................19

*DiPirro v. Bondo Corp.,*
 153 Cal. App. 4th 150 (2007)..................................................................................6

*Doe v. Harris,*
 772 F.3d 563 (9th Cir. 2014)..................................................................................20

*Dowhal v. SmithKline Beecham Consumer Healthcare*,
  32 Cal. 4th 910 (2004) ................................................................................................11

*Edenfield v. Fane*,
  507 U.S. 761 (1993) ...................................................................................................17

*Elrod v. Burns*,
  427 U.S. 347 (1976) ...............................................................................................3, 19

*Envtl. Law Found. v. Beech-Nut Nutrition Corp.*,
  235 Cal. App. 4th 307 (2015).......................................................................................6

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp.*,
  515 U.S. 557 (1995) .....................................................................................................1

*Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation, Bd. of Accountancy*,
  512 U.S. 136 (1994) ...................................................................................................16

*Index Newspapers LLC v. U.S. Marshals Service*,
  No. 20-35739, 2020 WL 5988501 (9th Cir. Oct. 9, 2020)..........................................20

*Italian Colors Rest. v. Becerra*,
  878 F.3d 1165 (9th Cir. 2018).....................................................................................17

*Johnson v. Am. Standard, Inc.*,
  43 Cal. 4th 56 (2008) .................................................................................................20

*KH Outdoor, LLC v. City of Trussville*,
  458 F.3d 1261 (11th Cir. 2006)...................................................................................20

*Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*,
  601 F. App'x 469 (9th Cir. 2015) ................................................................................19

*Mason v. SmithKline Beecham Corp.*,
  596 F.3d 387 (7th Cir. 2010).......................................................................................20

*Milavetz, Gallop & Milavetz, P.A., v. United States*,
  559 U.S. 229 (2010) ...................................................................................................10

*Morris CM Enters., LLC v. Wingstop Franchising, LLC*,
  No. 2:19-cv-2306, 2020 WL 42241 (E.D. Cal. Jan. 3, 2020) ........................................8

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
  272 F.3d 104 (2d Cir. 2001).........................................................................................10

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
  138 S. Ct. 2361 (2018) ........................................................................................ *passim*

*National Association of Wheat Growers v. Zeise ("Wheat Growers I")*,
  309 F. Supp. 3d 842 (E.D. Cal. 2018)....................................................................15, 19

*National Association of Wheat Growers v. Becerra (“Wheat Growers II”),*
  No. 2:17-cv-2401, 2020 WL 3412732 (E.D. Cal. June 22, 2020) .......................................... *passim*

*Nicolle-Wagner v. Deukmejian,*
  230 Cal. App. 3d 652 (1991).............................................................................................16

*Nken v. Holder,*
  556 U.S. 418 (2009) .........................................................................................................20

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.,*
  475 U.S. 1 (1986) .............................................................................................................10

*Riley v. Nat'l Fed. of Blind of N.C., Inc.,*
  487 U.S. 781 (1988) .........................................................................................................18

*Sorrell v. IMS Health, Inc.,*
  564 U.S. 552 (2011) .........................................................................................................18

*Thalheimer v. City of San Diego,*
  645 F.3d 1109 (9th Cir. 2011)..............................................................................................8

*Thompson v. Cty. of Alameda,*
  27 Cal. 3d 741 (1980) ......................................................................................................20

*Valle Del Sol Inc. v. Whiting,*
  709 F.3d 808 (9th Cir. 2013)...............................................................................................19

*Video Software Dealers Ass'n v. Schwarzenegger,*
  556 F.3d 950 (9th Cir. 2009)........................................................................................10, 15

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ..........................................................................................................8, 18

*Zauderer v. Office of Disciplinary Counsel,*
  471 U.S. 626 (1985) ..................................................................................................... *passim*

**Statutes and Regulations**

Cal. Code Civ. Proc. § 1021.5.....................................................................................................6

Cal. Code Regs. tit. 11, § 3200 ................................................................................................12

Cal. Code Regs. tit. 27, § 25306 ................................................................................................5

Cal. Code Regs. tit. 27, § 25601 (abrogated Aug. 30, 2018) ...........................................5, 11

Cal. Code Regs. tit. 27, § 25607.2(a)(2) ....................................................................................5

Cal. Code Regs. tit. 27, § 25704 ................................................................................................7

Cal. Code Regs. tit. 27, § 25705 ...............................................................................6

Cal. Health & Safety Code § 25249.6 ........................................................................5

Health & Safety Code § 25249.7(b) ...........................................................................6

Health & Safety Code § 25249.7(c) ...........................................................................6

Health & Safety Code § 25249.7(d) ........................................................................6, 8

Health & Safety Code § 25249.10(c) .....................................................................6, 18

**INTRODUCTION**

This case presents the question of whether the State can force businesses who make and sell foods and beverages to provide the State's cancer warning for acrylamide based on the State's assumption—derived from studies on laboratory animals, and contrary to studies on humans and modern methods of analysis—that acrylamide in foods and beverages *might* pose a risk of cancer in humans. Under bedrock First Amendment principles, the answer to that question is no.

Under California's Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65"), businesses are required to warn consumers about exposures to any chemical that the California Office of Environmental Health Hazard Assessment ("OEHHA") has designated as "known to the State to cause cancer." OEHHA added acrylamide to the list of carcinogens in 1990 based on determinations by the U.S. Environmental Protection Agency ("EPA") and the International Agency for Research on Cancer ("IARC") that acrylamide is a "likely" or "probable" carcinogen, which in turn were based on studies in laboratory animals and assumptions that those studies are relevant to humans. Twelve years later, researchers discovered that acrylamide forms naturally in many foods during cooking. This discovery triggered a wave of Proposition 65 litigation, which has not yet crested, alleging failures to provide cancer warnings for acrylamide in foods and beverages.

The First Amendment, however, generally prohibits the State from compelling speech to the same extent that it prohibits the State from restricting speech. *See, e.g.*, *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 573 (1995). In *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), the U.S. Supreme Court recognized a narrow exception to this rule where the government seeks to require commercial speakers to disclose "purely factual and uncontroversial" information about their products. *Id.* at 651. Thus, the government can compel commercial speakers to disclose certain indisputable facts about their products, such as ingredient lists, calorie counts, or countries of origin. Such facts can be objectively and definitively ascertained.

The compelled disclosure at issue in this case, however, is far different. Under threat of civil penalties and costly litigation, the State requires businesses that sell food and beverage products containing acrylamide to warn consumers that the product may expose them to a chemical that is "known to the State to cause cancer." But California has admitted that it *does not know* that

1    acrylamide causes cancer in humans, and has not even studied whether it does.  Likewise, the

2    governmental and scientific agencies on which OEHHA relied to list acrylamide as a carcinogen have

3    not classified acrylamide as a "known" human carcinogen.  As such, California's compelled cancer

4    warning for acrylamide in food—which conveys to consumers that dietary acrylamide is *known* to the

5    State to cause cancer in humans—is plainly unconstitutional under *Zauderer*.

6          Although the contradiction between the State's knowledge and the State's warning means the

7    Court need not delve deeply into the science to resolve the First Amendment issue, the science is

8    clear that a cancer warning for acrylamide in food is unfounded.  In particular, studies on humans

9    have found no reliable evidence that exposure to acrylamide through the diet is associated with any

10   risk of developing cancer.  As the federal government's National Cancer Institute explained in 2017,

11   "a large number of epidemiologic studies (both case-control and cohort studies) in humans have

12   found no consistent evidence that dietary acrylamide exposure is associated with the risk of any type

13   of cancer."  Decl. of Trenton H. Norris, Ex. C at 2.  The American Cancer Society has reached the

14   same conclusion, stating that "reviews of studies done in groups of people (epidemiologic studies)

15   suggest that dietary acrylamide isn't likely to be related to risk for most common types of cancer."

16   *Id.*, Ex. D at 2.  Consistent with this conclusion, analysis of studies in animals using modern methods

17   shows that there is significant certainty that the threshold level of acrylamide exposure at which

18   cancer risk begins in animals is far higher than the dietary level in humans.  Decl. of Dr. Andrew

19   Maier, ¶¶ 3, 79-83.  Indeed, the available toxicological evidence, like the epidemiological evidence,

20   does not suggest a likely association between acrylamide exposure at dietary levels and cancer

21   formation.  *Id.* ¶¶ 3, 86.  As such, there is no scientific or factual basis for the State's warning that

22   conveys to consumers that acrylamide in foods and beverages is known to cause cancer in humans.

23         Accordingly, Plaintiff California Chamber of Commerce ("CalChamber") seeks a preliminary

24   injunction to enjoin future enforcement of the Proposition 65 warning requirement for cancer as

25   applied to acrylamide in foods, including beverages.  Specifically, CalChamber asks the Court to

26   preliminarily enjoin the filing and/or prosecution of *new* Proposition 65 lawsuits in order to preserve

27   the status quo pending final resolution of CalChamber's First Amendment claim.  It is firmly

28   established under the First Amendment that California cannot compel CalChamber's members to

1    provide a warning that is, at best, misleading.  And California certainly cannot compel a warning that

2    is literally false (because California does not *know* that acrylamide causes cancer in humans).  That

3    legal conclusion is reinforced by years of Supreme Court and Ninth Circuit precedent, as well as by

4    this Court's recent decision in *National Association of Wheat Growers v. Becerra*, No. 2:17-cv-2401,

5    2020 WL 3412732 (E.D. Cal. June 22, 2020) (Shubb, J.) (*"Wheat Growers II"*) (enjoining warning

6    requirement as applied to glyphosate).  As such, CalChamber is likely to succeed on the merits of its

7    First Amendment claim.  At a minimum, it has demonstrated serious questions as to that claim.

8          Moreover, CalChamber and its members urgently need relief from this Court to prevent

9    further infringement of their First Amendment freedoms, the loss of which, "for even minimal

10   periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373

11   (1976).  Indeed, since CalChamber initiated this lawsuit, food companies have been named in more

12   than 390 notices of alleged violation and in 43 new Proposition 65 state court enforcement actions

13   concerning acrylamide in food.  Consequently, CalChamber's members must either provide a State-

14   mandated warning they believe to be false and misleading, or face the substantial risk of an

15   enforcement action under Proposition 65 for failing to do so.  Either option impermissibly chills their

16   First Amendment rights, warranting interim relief from this Court.

17                              **FACTUAL BACKGROUND**

18         **A.      Acrylamide in Food**

19         Acrylamide forms naturally in many types of foods when cooked at high temperatures or

20   otherwise processed with heat.  Norris Decl., Ex. E at 1.  Acrylamide is found mainly in foods made

21   from plants, such as potato products (e.g., French fries, potato chips), grain products (e.g., breakfast

22   cereals, cookies, and toast), and coffee.  *Id.* at 2.  Other common sources of acrylamide in the diet

23   include roasted asparagus, roasted nuts, canned sweet potatoes, canned black olives, and prune juice.

24   *Id.*, Ex. F at 1.  Acrylamide was first detected in certain foods in 2002, but "has probably always been

25   present in cooked foods."  *Id.*, Ex. E at 1.  The U.S. Food and Drug Administration ("FDA") also has

26   observed that acrylamide is not present only in store-bought food; in fact, consumer exposure to

27   acrylamide "may be greatest through home cooking."  *Id.*, Ex. G at 2.

28         FDA does not recommend that consumers avoid eating foods that contain acrylamide.

1   Instead, FDA recommends that consumers adopt a healthy eating plan that consists of a variety of

2   foods, including foods that—when cooked—often contain acrylamide.  *Id.*, Ex. H at 3.  FDA also has

3   expressed concern about cancer warnings for acrylamide in food, advising that "warning labels based

4   on the presence of acrylamide in food may be misleading," and cautioning that such warnings may

5   cause consumers to avoid foods that are part of a healthy diet.  *Id.*, Ex. G at 3; *id.*, Ex. H at 2.

6         **B.**     **Scientific Research on Dietary Acrylamide and Cancer**

7        As summarized in the declaration of Dr. Loren Lipworth (a Professor of Epidemiology at the

8   Vanderbilt University School of Medicine), a significant amount of scientific research has evaluated

9   whether acrylamide that forms naturally in certain foods poses a cancer risk to humans.  In 2012, for

10  example, Dr. Lipworth and other researchers published a systematic review of the epidemiological

11  literature on dietary acrylamide and cancer in the European Journal of Cancer Prevention.  *See*

12  Lipworth Decl., Ex. B.  After critically reviewing more than 15 epidemiologic studies examining

13  almost every major cancer site, the researchers "found no consistent or credible evidence that dietary

14  acrylamide increases the risk of any type of cancer in humans . . . ."  *Id.* at 1.  Since 2012, there have

15  been more than 25 additional studies evaluating dietary acrylamide intake and cancer.  Lipworth

16  Decl., ¶¶ 35-43.  These studies have continued to find no consistent evidence that exposure to

17  acrylamide in food increases human cancer risk.  *Id.* ¶¶ 65-144.  The National Cancer Institute and

18  the American Cancer Society have reached the same conclusion.  *See* p. 2, *supra.*

19       Recent toxicological reviews reinforce the epidemiological findings.  As set forth in the

20  declaration of Dr. Andrew Maier, there is mounting evidence that the mechanisms that drive tumor

21  formation in experimental animals are not relevant to humans at real-world levels of exposure to

22  acrylamide through the diet.  *See* Maier Decl., ¶ 87 & Ex. C.  Humans process acrylamide differently

23  than rodents and in ways that detoxify acrylamide more readily than in rodents.  *Id.* ¶¶ 3, 56-59.  For

24  example, several studies have demonstrated that humans are less proficient than rodents in

25  metabolizing acrylamide into the genotoxic compound glycidamide, and that acrylamide in the body

26  is primarily metabolized by an antioxidant (i.e., detoxified) to form acids that are excreted from the

27  body.  *Id.*  Likewise, modern analysis shows that even in the most sensitive rodent studies, which are

28  likely not applicable to humans, an increased incidence of tumors was observed only at levels of

1   exposure that are approximately 500 times higher than the average daily amount of acrylamide

2   consumed by Americans through the diet, and approximately 200 times higher than the 90th

3   percentile of Americans' dietary intake.  *Id.* ¶¶ 78-83.  Accordingly, there is significant certainty that

4   the threshold level of acrylamide exposure at which cancer risk begins in animals is far higher than

5   the dietary level in humans.  *Id.* ¶ 3.  In other words, both epidemiological evidence and toxicological

6   analysis confirm that acrylamide at ordinary levels in food does not increase cancer risk in humans.

7        **C.**    **Proposition 65 Regulatory Framework**

8        Proposition 65 prohibits businesses with ten or more employees from knowingly and

9   intentionally exposing Californians to chemicals "known to the state to cause cancer" without

10  providing required warnings, unless an affirmative defense applies.  Cal. Health & Safety Code

11  § 25249.6.  OEHHA maintains "a list of those chemicals known to the state to cause cancer."  *Id.*

12  § 25249.8(a).  OEHHA is required to list a chemical as "known to the state to cause cancer" if it is so

13  identified by an "authoritative body."  *Id.* § 25249.8(b).  Notably, OEHHA can list chemicals under

14  this mechanism based on evidence they cause cancer in laboratory animals alone.  *See, e.g.*, *AFL-CIO*

15  *v. Deukmejian*, 212 Cal. App. 3d 425, 441 (1989); Cal. Code Regs. tit. 27, § 25306(e)(2).

16       Twelve months after a chemical is added to the Proposition 65 list, Proposition 65 requires

17  that any "person in the course of doing business" provide a "clear and reasonable warning" before

18  "expos[ing] any individual to" the listed chemical.  Health & Safety Code § 25249.6.  Although the

19  statute does not define what text and method suffice to convey a "clear and reasonable warning,"

20  OEHHA's regulations for decades provided that "[t]he message must clearly communicate that the

21  chemical in question is known to the state to cause cancer."  Cal. Code Regs. tit. 27, § 25601

22  (adopted as Cal. Code Regs. tit. 22, § 12601 (1988); abrogated Aug. 30, 2018).  In August 2016,

23  OEHHA adopted new warning regulations, pursuant to which cancer warnings for food products are

24  deemed to be "clear and reasonable" if they state: "**WARNING:** Consuming this product can expose

25  you to [name of chemical], which is known to the State of California to cause cancer.  For more

26  information, go to www.P65Warnings.ca.gov/food."  Cal. Code Regs. tit. 27, § 25607.2(a)(2).

27       Proposition 65 provides an affirmative defense to the warning requirement if the business

28  "can show that the exposure poses no significant risk assuming lifetime exposure at the level in

question . . . ."  Health & Safety Code § 25249.10(c).  This threshold is commonly referred to as the "No Significant Risk Level," or "NSRL."  For some listed substances, including acrylamide, OEHHA has published a "safe harbor" NSRL, which is a presumptive limit such that a court cannot apply a more stringent NSRL in litigation.  Cal. Code Regs. tit. 27, § 25705.  The NSRL is not a concentration limit; rather, it is a daily exposure-based limit based on lifetime exposure at the level in question.  Thus, unlike other laws that set concentration-based thresholds, it is not readily apparent from the NSRL and a laboratory test whether there is a duty to warn for a given product.

### D.  Proposition 65 Enforcement

Proposition 65 imposes penalties of up to $2,500 *per day* for *each* failure to provide an adequate warning.  Health & Safety Code § 25249.7(b).  In addition to these penalties, the statute also provides that any person who "threatens to violate" the warning requirement may be "enjoined in any court of competent jurisdiction."  *Id.* § 25249.7(a).  The Attorney General, a district attorney, and certain city attorneys may bring an enforcement action under Health & Safety Code § 25249.7(c).

In addition, *any person* (even someone who has not been injured) may bring a private enforcement action on behalf of the public.  *Id.* § 25249.7(d).  Private enforcers are eligible to recover 25 percent of the penalty (*id.* § 25249.12(d)), as well as their reasonable attorneys' fees (Cal. Code Civ. Proc. § 1021.5), creating very strong incentives for private enforcement.  Private enforcement actions are pervasive even for chemicals, like acrylamide, for which OEHHA has adopted a "safe harbor" NSRL.  A private enforcer is not required to prove that the exposure exceeds this level.  Instead, the burden to prove the opposite—that the exposure *does not* exceed the NSRL—rests on the business.  Health & Safety Code § 25249.10(c); *DiPirro v. Bondo Corp.*, 153 Cal. App. 4th 150, 185 (2007) (NSRL is an "affirmative defense").  And proving this negative is a costly and time-consuming endeavor, often requiring expert testimony and evidence.  *See, e.g.*, *Envtl. Law Found. v. Beech-Nut Nutrition Corp.*, 235 Cal. App. 4th 307, 314 (2015) (safe harbor defense litigated at trial).

California judges have recognized how onerous private enforcement suits can be for industry.  "[L]awsuits under Proposition 65 can be filed and prosecuted by any person against any business based on bare *allegations* of a violation unsupported by any evidence of an *actual* violation—or even a good faith belief that a defendant is using an unsafe amount of a chemical known by the state to

1    cause cancer." *Consumer Cause, Inc. v. SmileCare*, 91 Cal. App. 4th 454, 477 (2001) (Vogel, J.,

2    dissenting) (emphases in original); *see also Consumer Def. Grp. v. Rental Hous. Indus. Members*,

3    137 Cal. App. 4th 1185, 1217 (2006).  As a result, in practice, businesses faced with the threat of

4    costly litigation to prove a defense to the warning requirement often are forced to acquiesce and

5    provide a warning, regardless of whether the warning is false or misleading.  *See generally* Norris

6    Decl. ¶¶ 27-29; *see also Consumer Def. Grp.*, 137 Cal. App. 4th at 1216 (private enforcement actions

7    are "intended to frighten all but the most hardy of targets (certainly any small, ma and pa business)

8    into a quick[] settlement") (footnote omitted); *SmileCare*, 91 Cal. App. 4th at 477–78 (Vogel, J.,

9    dissenting) (noting that Proposition 65's burden-shifting scheme results in "judicial extortion").

10       **E.    Proposition 65 Listing of Acrylamide and Subsequent Litigation**

11            OEHHA added acrylamide to the Proposition 65 list of carcinogens in 1990 based on EPA's

12    determination that acrylamide was a "probable" human carcinogen and IARC's classification of

13    acrylamide as "possibly carcinogenic to humans" (IARC has since re-classified acrylamide as

14    "probably carcinogenic to humans").  *See* Norris Decl., Ex. I at 8; *id.*, Ex. J at 43.  Both the EPA and

15    IARC classifications of acrylamide are based on studies in laboratory animals in which nearly pure

16    acrylamide was administered to rats and mice.  *Id.*  Both agencies have concluded that

17    epidemiological studies (i.e., human studies) provide limited or no evidence of carcinogenicity *in*

18    *humans*, and neither agency has ever classified acrylamide as a "known" human carcinogen.  *Id.*

19            In 2008, the State admitted in litigation that "[t]he State of California does not know that

20    acrylamide causes cancer in humans, and is not required to make any finding to that effect in order to

21    list the chemical under Proposition 65."  Norris Decl., Ex. L at 2 (Joint Stipulation of Undisputed

22    Facts); *see also id.* Ex. M at 9 (admission by OEHHA's Person Most Knowledgeable).  Indeed, the

23    State acknowledged that it "does not make a conclusion as to whether any chemical is a human

24    carcinogen."  *Id.* at 8.  OEHHA has since recognized that acrylamide in certain food products—

25    namely, coffee—does *not* pose a risk of cancer in humans.  In June 2019, OEHHA adopted a new

26    regulation that states:  "Exposures to chemicals in coffee, listed on or before March 15, 2019 as

27    known to the state to cause cancer, that are created by and inherent in the process of roasting coffee

28    beans or brewing coffee do not pose a significant risk of cancer."  Cal. Code Regs. tit. 27, § 25704.

1    OEHHA explained that "[t]he weight of the evidence from the very large number of studies in the

2    scientific literature does not support an association between the complex mixture of chemicals that is

3    coffee [including acrylamide] and a significant risk of cancer." Norris Decl., Ex. N at 5.

4         Since the discovery of acrylamide in foods, private enforcers—at times joined by the Attorney

5    General—have relentlessly pursued Proposition 65 enforcement actions for alleged failures to warn

6    about acrylamide in food. Under Proposition 65, private enforcers are required to provide 60-days'

7    notice before initiating an enforcement action. Health & Safety Code § 25249.7(d)(1). As of

8    October 27, 2020, private enforcers have served more than 900 pre-litigation notices with respect to

9    acrylamide in food, targeting more than 350 companies, including many CalChamber members.

10   Norris Decl. ¶¶ 8, 10. Notably, although acrylamide has been on the Proposition 65 list for 30 years,

11   the number of pre-litigation notices has grown exponentially over recent years. *Id.* ¶ 9. In fact, since

12   CalChamber filed its complaint, private enforcers have served 391 pre-litigation notices and filed 43

13   new Proposition 65 lawsuits in state courts for alleged exposures to acrylamide in food. *Id.* ¶ 9.

14                                    **ARGUMENT**

15        In determining whether to issue a preliminary injunction, this Court must consider whether

16   [1] the plaintiff "is likely to succeed on the merits, [2] [the plaintiff] is likely to suffer irreparable

17   harm in the absence of preliminary relief, . . . [3] the balance of equities tips in [plaintiff's] favor,

18   and . . . [4] an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,

19   20 (2008). "[I]n the First Amendment context, the moving party bears the initial burden of making a

20   colorable claim that its First Amendment rights have been infringed, or are threatened with

21   infringement, at which point the burden shifts to the government to justify the restriction" on speech.

22   *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011).

23        As this Court has recognized, "[t]he Ninth Circuit sometimes employs an alternate

24   formulation of the *Winter* test, referred to as the 'serious questions' test." *Morris CM Enters., LLC v.*

25   *Wingstop Franchising, LLC*, No. 2:19-cv-2306, 2020 WL 42241, at *3 (E.D. Cal. Jan. 3, 2020)

26   (Mueller, J.) (citing *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012)). Under this formulation,

27   a "preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions

28   going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *All.*

1  for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (quoting Lands Council v.

2  McNair, 537 F.3d 981, 986-87 (9th Cir. 2008) (internal quotation marks omitted)).

3  **I.      PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS**

4           In general, regulations of non-misleading commercial speech are subject to at least

5  intermediate scrutiny, pursuant to which the government must show that its "regulation directly

6  advances" a "substantial" government interest and is no more "extensive than is necessary to serve

7  that interest." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566

8  (1980).  In *Zauderer*, the Supreme Court recognized a narrow exception to *Central Hudson* where the

9  government seeks to compel the disclosure of "purely factual and uncontroversial information" about

10  commercial products or services and the disclosure is reasonably related to a substantial government

11  interest and not unjustified nor unduly burdensome.  *Zauderer*, 471 U.S. at 651; *see also Nat'l Inst. of*

12  *Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018) ("*NIFLA*").

13          Here, a heightened standard of review is appropriate because the State cannot satisfy its

14  burden to show that a compelled cancer warning for acrylamide in food is "purely factual and

15  uncontroversial."  In any event, compelling businesses to provide a false and misleading cancer

16  warning for acrylamide in food plainly violates the First Amendment under either *Zauderer* or

17  *Central Hudson*.  As such, Plaintiff is likely to succeed on the merits of its First Amendment claim

18  or, at a minimum, has demonstrated that there are serious questions going to the merits of that claim.

19
   **A.      Requiring a Cancer Warning For Acrylamide In Food Products Is**
20           **Unconstitutional Under *Zauderer*.**

21          To survive First Amendment scrutiny under *Zauderer*, a compelled disclosure must be

22  (i) purely factual and uncontroversial, (ii) reasonably related to a substantial government interest, <u>and</u>

23  (iii) neither unjustified nor unduly burdensome.  *See Zauderer*, 471 U.S. at 651.  Importantly, "*[t]he*

24  *State has the burden* of demonstrating that a disclosure requirement is purely factual and

25  uncontroversial, not unduly burdensome, and reasonably related to a substantial government

26  interest."  *Wheat Growers II*, 2020 WL 3412732, at *7 (emphasis added); *see also NIFLA*, 138 S. Ct.

27  at 2377 ("California has the burden to prove that the [compelled disclosure] is neither unjustified nor

28  unduly burdensome.").  Thus, Defendant must prove that *each* element is satisfied.  *See, e.g., Wheat*

1    *Growers II*, 2020 WL 3412732, at *12 n.19 (finding *Zauderer* inapplicable because warning

2    requirement was not "purely factual and uncontroversial," and therefore not reaching the other two

3    elements).  Defendant cannot meet his burden to make any of these showings here, let alone all three.

<strong>1.    A Cancer Warning For Acrylamide In Food Is Not "Purely Factual and Uncontroversial" and Would Mislead Consumers.</strong>

6        The First Amendment prohibits the government from forcing its citizens to repeat the

7    government's—or any third party's—subjective views.  *See, e.g.*, *Pac. Gas & Elec. Co. v. Pub. Utils.*

8    *Comm'n of Cal.*, 475 U.S. 1, 13–14 (1986) (plurality opinion); *Video Software Dealers Ass'n v.*

9    *Schwarzenegger*, 556 F.3d 950, 965–67 (9th Cir. 2009).  Courts have thus limited the *Zauderer*

10   exception to compelled disclosures of purely factual information, the accuracy of which cannot be

11   reasonably disputed.  *See, e.g.*, *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 27 (D.C. Cir.

12   2014) (product's country of origin); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 107 (2d Cir.

13   2001) (whether product contains mercury); *Zauderer*, 471 U.S. at 650 (costs a client is liable to pay);

14   *Milavetz, Gallop & Milavetz, P.A., v. United States*, 559 U.S. 229, 232 (2010) (what contents are

15   included in a package of services offered).  But the government cannot compel disclosure of

16   purported "facts" over which there is significant room for disagreement.

17       In *Wheat Growers*, for example, this Court permanently enjoined the Proposition 65 warning

18   requirement as applied to the herbicide glyphosate.  Glyphosate was added to the Proposition 65 list

19   based on IARC's determination that glyphosate is a probable human carcinogen.  *Wheat Growers II*,

20   2020 WL 3412732, at *2.  Applying *Zauderer*, Judge Shubb reasoned that a Proposition 65 cancer

21   warning for glyphosate would not be "purely factual and uncontroversial" because it "conveys the

22   message glyphosate is known to cause and actually causes cancer," when in fact "[e]very regulator of

23   which the court is aware, with the sole exception of the IARC, has found that glyphosate does not

24   cause cancer or that there is insufficient evidence to show that it does."  *Id.* at *8.  Thus, the court

25   concluded, the required safe harbor warnings—and the alternative warnings proposed by the Attorney

26   General—were "false and misleading when used for glyphosate."  *Id.* at *8.

27       Importantly, the case law makes clear that "a statement may be literally true but nonetheless

28   misleading and, in that sense, untrue."  *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832,

847 (9th Cir. 2019) ("*CTIA II*").  In *Wheat Growers*, for example, the State argued that a cancer warning for glyphosate would be truthful and not misleading because under Proposition 65, chemicals are "known" to the State to cause cancer when they meet the statutory criteria for listing. Judge Shubb rejected the State's literalist argument, reasoning that "[while] it may be literally true that California technically 'knows' that glyphosate causes cancer as the State has defined that term in the statute and regulations, the required warning would nonetheless be misleading to the ordinary consumer" because "[o]rdinary consumers do not interpret warnings in accordance with a complex web of statutes, regulations, and court decisions."  2020 WL 3412732, at *8.

Here, a Proposition 65 cancer warning for acrylamide in food products is not "purely factual and uncontroversial" because it conveys to consumers that acrylamide in food is *known* to cause cancer in humans, when in fact (i) the State has admitted that it *does not know* that acrylamide causes cancer in humans, (ii) the regulatory and scientific bodies on which the State relies have not classified acrylamide as a "known" human carcinogen, and (iii) a large body of scientific evidence and analysis has found *no association* between exposure to acrylamide from food products and cancer in humans.

### a.    A Proposition 65-Compliant Warning Must Convey to Consumers That Acrylamide In Foods Increases Cancer Risk in Humans.

Proposition 65 does not specify what content suffices to convey a "clear and reasonable warning," but OEHHA's regulations for decades provided that the warning "must clearly communicate that the chemical in question is known to the state to cause cancer."  Cal. Code Regs. tit. 27, § 25601 (adopted 1988; abrogated Aug. 30, 2018).  Likewise, the California Supreme Court has held that a Proposition 65 warning must convey that "this product contains [chemical], a chemical known to the state of California to cause reproductive harm [or cancer],' or words to that effect."  *Dowhal v. SmithKline Beecham Cons. Healthcare*, 32 Cal. 4th 910, 918 (2004).  OEHHA's current regulations, cited above, provide that a cancer warning is "clear and reasonable" if it states:

> **WARNING:**  Consuming this product can expose you to [name of chemical], which is known to the State of California to cause cancer. For more information, go to www.P65Warnings.ca.gov/food.

This "safe harbor" language is the only warning that a business can provide to ensure compliance, as any deviation could be deemed not "clear and reasonable."  *See, e.g.*, Norris Decl.

¶¶ 33-41.  In fact, OEHHA has explained that a warning that states simply that a chemical is known to cause cancer "in animals" likely would not comply with Proposition 65:

> Several commenters . . . recommended that different warnings be provided where chemicals are listed on the basis of animal bioassay data, rather than human evidence. . . .  [T]he authority of the Agency to fashion warnings creating such a distinction is doubtful.  Further, the Agency believes that making such a distinction in the warning may create the incorrect impression that chemicals for which only animal data exists pose less of a risk than chemicals for which there is human data.

Norris Decl., Ex. O at 25 (OEHHA, Final Statement of Reasons, Nov. 1, 1998).

Likewise, the Attorney General's own regulations—providing his "view as to the legality and appropriateness of various types of [Proposition 65] settlement provisions" (Cal. Code Regs. tit. 11, § 3200)—state expressly that "[c]ertain phrases or statements in warnings are not clear and reasonable," including any "additional words or phrases that contradict or obfuscate otherwise acceptable warning language."  *Id.* § 3202(b).  Not surprisingly, then, every one of the hundreds of Proposition 65 settlements approved by courts since September 2016 provides that the warning—if required as injunctive relief—must include the words "known to cause" or "known to the State to cause" cancer and/or reproductive harm.  Norris Decl. ¶¶ 17-22.

In other words, a Proposition 65-compliant cancer warning—irrespective of the specific language used—must state that the chemical is "known" to cause cancer, which conveys to the average consumer of food intended for human consumption that the chemical at issue (acrylamide) causes cancer *in humans*.  *See, e.g.*, Decl. of Stephen M. Nowlis, ¶ 54 (California consumers interpret a Proposition 65 cancer warning for acrylamide in food to convey the message that eating such food increases their risk of getting cancer).  Indeed, that is the message California *intends* to convey, as evidenced by OEHHA's position that a warning stating that a chemical is known to cause cancer "in animals" might leave consumers with the "incorrect impression."  As addressed below, this message—that dietary acrylamide is known to cause cancer *in humans*—is false and misleading.

### b.    The Message That Acrylamide In Food Is Known to Cause Cancer in Humans Is Not "Purely Factual and Uncontroversial."

The message that acrylamide in food is known to the State to cause cancer in humans is not "purely factual and uncontroversial."  To the contrary, the State itself has *admitted* that it does not

-12-

1  "know" that acrylamide causes cancer in humans.  In 2008, the State stipulated in litigation that

2  "[t]he State of California does not know that acrylamide causes cancer in humans, and is not required

3  to make any finding to that effect in order to list the chemical under Proposition 65."  Norris Decl.,

4  Ex. L at 2; *see also id.*, Ex. M at 9.  OEHHA also has recognized that acrylamide in certain food

5  products (namely, coffee) does *not* pose a risk of cancer in humans, based in significant part on

6  negative findings from epidemiological studies.  *See* p. 7, *supra*; *see also* Lipworth Decl. ¶ 49.

7       Moreover, the governmental and scientific agencies on which OEHHA relied to list

8  acrylamide as a carcinogen have not stated that they "know" that acrylamide causes cancer in

9  humans.  EPA, for example, classifies acrylamide as a "likely" (not "known") human carcinogen, and

10  stated in its most recent toxicological review in 2010 that human studies assessing the carcinogenicity

11  of acrylamide "are judged as providing limited or no evidence of carcinogenicity in humans."  Norris

12  Decl., Ex. I at 9.  Likewise, IARC classified acrylamide as a "probable" (not "known") human

13  carcinogen in 1994 based on studies in laboratory animals, but concluded—consistent with the

14  epidemiology—that there was "*inadequate evidence* in humans for the carcinogenicity of

15  acrylamide."  *Id.*, Ex. J at 43.  Indeed, to CalChamber's knowledge, no expert governmental or

16  scientific body has ever classified acrylamide as a *known* human carcinogen.

17       These undisputed facts are dispositive.  Despite the State's admission that neither it nor the

18  "authoritative bodies" on which it relies "know" that acrylamide causes cancer in humans, the State's

19  compelled cancer warning conveys to consumers just the opposite—that acrylamide is *known* to the

20  State to cause cancer in humans.  *See* Section I.A.1.a, *supra*.  This message is not "purely factual and

21  uncontroversial" and therefore cannot survive First Amendment scrutiny under *Zauderer*.

22       Accordingly, the Court need not delve into the underlying science to determine that

23  California's compelled cancer warning for acrylamide in food violates the First Amendment.  But the

24  science further demonstrates that a compelled cancer warning for acrylamide in food cannot be

25  deemed "purely factual and uncontroversial."  In particular, epidemiological studies (i.e., studies in

26  humans) have found no consistent evidence that exposure to acrylamide in food is associated with a

27  risk of developing *any* type of cancer.  As Dr. Lipworth explains, "[t]he association between dietary

28  acrylamide intake and various types of cancer has been extensively studied" and "there is no

-13-

1  consistent or reliable evidence to support a finding that dietary exposure to acrylamide increases the

2  risk of any type of cancer in humans."  Lipworth Decl. ¶¶ 140, 144.  The National Cancer Institute

3  and American Cancer Society have reached the same conclusion.  *See* p. 2, *supra*.

4        Recent toxicological studies corroborate the epidemiological data, providing further support

5  for the conclusion that tumors observed in studies on laboratory rodents are not predictive of a risk of

6  cancer *to humans* from exposure to acrylamide through the diet.  *See* pp. 4-5, *supra*.  Indeed,

7  OEHHA and other regulatory bodies, for policy reasons, have merely *assumed* that dietary

8  acrylamide causes cancer in humans because acrylamide at very high doses causes cancer in

9  laboratory animals.  But while that assumption may be appropriate for some chemicals—or for some

10 scientific or regulatory purposes—it is an unconstitutional basis for government mandated speech.

11       In short, there is significant doubt—among scientists, government agencies, and even

12 OEHHA—about whether acrylamide in food is "known" to cause cancer *in humans*.  Yet that is

13 precisely what Proposition 65 requires CalChamber's members to state on their products.  As such,

14 Defendant cannot meet his burden to show that cancer warnings for acrylamide in food are "purely

15 factual and uncontroversial."  The warning requirement is unconstitutional under the First

16 Amendment on this basis alone.  *See Am. Beverage Ass'n v. City & Cty. of S.F.*, 916 F.3d 749, 756

17 (9th Cir. 2019) (en banc) ("A compelled disclosure . . . must meet all three [*Zauderer*] criteria . . . .").

18       The Ninth Circuit's decision in *CTIA II* is instructive.  It held that an ordinance requiring

19 retailers to disclose information regarding the Federal Communications Commission's ("FCC")

20 radio-frequency radiation exposure guidelines was purely factual and uncontroversial.  928 F.3d at

21 847–48.  The court reasoned that these disclosures were both literally true and not misleading

22 because they merely referenced existing federal guidelines.  *Id.* at 847.  Here, in contrast, a compelled

23 cancer warning for acrylamide in food does not merely summarize existing federal guidelines; it is

24 contrary to them.  *See* pp. 3-4, *supra*.  In addition, unlike the compelled disclosure in *CTIA II*, such a

25 warning is, at a minimum, misleading because it conveys to consumers that acrylamide in food is

26 *known* to cause cancer in humans, when in fact the scientific evidence and the State's own admissions

27 indicate just the opposite.  *See, e.g.*, *Wheat Growers II*, 2020 WL 3412732 at *11 (distinguishing

28 *CTIA II* because the required warning did not state "that cell phones are known to cause cancer, or

-14-

1  known to cause some other adverse health condition").

2  Two other aspects of the Ninth Circuit's reasoning in *CTIA II* are relevant here.  First, the

3  Ninth Circuit found that CTIA failed to show that the disclosure was misleading to consumers, noting

4  that CTIA had not "presented any evidence in the district court showing how Berkeley consumers

5  have understood the compelled disclosure."  *Id.* at 848.  Here, in contrast, CalChamber presents a

6  consumer survey showing, unsurprisingly, that a majority of California consumers interpret a

7  Proposition 65 cancer warning for acrylamide in food to convey the misleading (and false) message

8  that consuming such products increases their risk of cancer.  *See* Nowlis Decl. ¶¶ 53-54.  This survey

9  confirms the common-sense conclusion that a cancer warning on food intended for human

10  consumption conveys to consumers that such products pose a risk of cancer *in humans*.

11  Second, the Ninth Circuit emphasized that the ordinance in *CTIA II* expressly allows a cell

12  phone retailer to "add to the compelled disclosure any further statement it sees fit to add."  928 F.3d

13  at 848.  Here, in contrast, businesses are protected from Proposition 65 enforcement only if they use

14  the precise safe harbor warning language set forth in the regulations.  *See* pp. 11-12, *supra*.  It is not

15  surprising, then, that Judge Shubb concluded that compliance with the Proposition 65 warning

16  requirement requires rigid adherence to the safe harbor language:  "Under the applicable regulations,

17  in order for a warning to be per se clear and reasonable, the warning must state that the chemical is

18  *known* to cause cancer.  California regulations also discourage, if not outright prohibit, language that

19  calls into doubt California's knowledge that a chemical causes cancer."  *Nat'l Assoc. of Wheat

20  Growers v. Zeise*, 309 F. Supp. 3d 842, 851-52 (E.D. Cal. 2018) (*"Wheat Growers I"*).

21  **2.    Defendant Cannot Satisfy the Remaining Elements of *Zauderer*.**

22  For the same reasons, Defendant cannot meet his burden under *Zauderer* to show that a

23  cancer warning for acrylamide in food is (a) "reasonably related" to a "substantial" government

24  interest (*Zauderer*, 471 U.S. at 651; *CTIA II*, 928 F.3d at 844); and (b) "neither unjustified nor unduly

25  burdensome" (*NIFLA*, 138 S. Ct. at 2377).  Courts recognize that the dissemination of false, or

26  arguably false, information serves no legitimate government interest.  *See, e.g.*, *Video Software

27  Dealers*, 556 F.3d at 967 ("[T]he State has no legitimate reason to force retailers to affix false

28  information on their products.").  Likewise, a compelled disclosure must "remedy a harm that is

-15-

1  'potentially real not purely hypothetical.'" *NIFLA*, 138 S. Ct. at 2377 (quoting *Ibanez v. Fla. Dep't*

2  *of Bus. & Prof'l Regulation, Bd. of Accountancy*, 512 U.S. 136, 146 (1994)).

3          Here, a compelled cancer warning for acrylamide in food cannot be justified nor reasonably

4  related to the government's interest in public health when the scientific evidence shows that exposure

5  to dietary acrylamide is not associated with a risk of cancer in humans. *See* Section I.A.1, *supra*.  In

6  fact, compelling warnings for acrylamide in foods runs *counter* to the government's interest—(1) it

7  discourages consumers from eating foods recognized by FDA as serving an integral role in healthy

8  diets, *see* pp. 3-4, *supra*; (2) it misleads consumers into believing that acrylamide is only present in

9  store-bought foods, when FDA explains that consumer exposure may be greatest through home

10  cooking, *id.* at 3; and (3) it results in warnings on products that do not pose a risk of cancer, thereby

11  reducing the effectiveness of *all* warnings.  *See, e.g.*, Norris Decl., Ex. P at 197 ("OEHHA does not

12  encourage the practice of 'over-warning' and discourages businesses from providing prophylactic

13  warnings when no warning may actually be required."); *Nicolle-Wagner v. Deukmejian*, 230 Cal.

14  App. 3d 652, 661 (1991) (upholding OEHHA regulation that reduced "unnecessary warnings, which

15  could distract the public from other important warnings on consumer products").

16          Thus, Defendant cannot meet his burden to show that a cancer warning for exposures to

17  acrylamide in food is reasonably related to a substantial government interest.  Defendant similarly

18  cannot show that such a warning is "justified" because it seeks to remedy a harm that—based on the

19  current state of the science—is "purely hypothetical."  *NIFLA*, 138 S. Ct. at 2377.

20          **B.      The Required Cancer Warning Is Unconstitutional Under *Central Hudson*.**

21          Because California's compelled cancer warning for acrylamide in food does not survive

22  scrutiny under the more lenient *Zauderer* standard, it necessarily follows that such warning cannot

23  survive heightened scrutiny under *Central Hudson*.  *See, e.g.*, *Am. Beverage Ass'n*, 916 F.3d at 756

24  n.5 ("[W]e do not preclude Defendant from arguing that the Ordinance survives heightened

25  scrutiny. . . .  Logically, though, if the warning does not meet a lower standard, it necessarily does not

26  meet a higher standard.").  But regardless of whether a compelled cancer warning for acrylamide in

27  food is *per se* unconstitutional under *Zauderer* or instead subject to heightened scrutiny under

28  *Central Hudson*, the compelled warning in this case cannot survive constitutional review.

1   Under *Central Hudson*, the government must show that its regulation "directly" advances a

2   "substantial" government interest through burdens on speech that are no more "extensive than is

3   necessary to serve that interest." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996)

4   (O'Connor J., concurring); *Central Hudson*, 447 U.S. at 566.  To "directly advance the state interest,"

5   the government must demonstrate that "its restriction will in fact alleviate [the asserted harms] to a

6   material degree." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993).  The government's "burden under

7   this test is 'heavy,'" and it "cannot satisfy it 'by mere speculation or conjecture.'"  *Italian Colors*

8   *Rest. v. Becerra*, 878 F.3d 1165, 1176 (9th Cir. 2018) (citations omitted); *see also NIFLA*, 138 S. Ct.

9   at 2377 (government has the burden of proving that the compelled speech "remed[ies] a harm that is

10  'potentially real not purely hypothetical'") (citation omitted).

11  The compelled cancer warning for acrylamide in food fails intermediate scrutiny because it

12  does not directly advance a substantial government interest.  California's asserted interest in

13  mandating warnings is in "inform[ing] [California residents] about exposures to chemicals that cause

14  cancer." *Cal. Chamber of Commerce v. Brown*, 196 Cal. App. 4th 233, 258 (2011) (quoting

15  preamble to Proposition 65 ballot initiative).  Here, however, California has not demonstrated—nor

16  could it—that a cancer warning for acrylamide in food would inform consumers about a chemical

17  that actually poses a cancer risk in humans.  To the contrary, a Proposition 65-compliant cancer

18  warning for acrylamide in food would necessarily be false or, at a minimum, misleading.  *See* Section

19  I.A.1, *supra*; *see also Wheat Growers II*, 2020 WL 3412732, at *12 ("[M]isleading statements about

20  glyphosate's carcinogenicity, and the state's knowledge of that purported carcinogenicity, do not

21  directly advance [California's] interest" in informing people about exposures to chemicals that cause

22  cancer); *Italian Colors*, 878 F.3d at 1177 ("[T]he Attorney General must do more than merely

23  identify a state interest served by the statute . . . [he] 'must demonstrate that . . . [the speech]

24  restriction will in fact alleviate [the harms] to a material degree."").  Indeed, mandating warnings

25  that are not factually supported is *contrary* to the government's interest because it conflicts with FDA

26  guidance on maintaining a healthy diet and contributes to *over*-warning, which dilutes the

27  effectiveness of all warnings, even those that are well-founded.  *See* pp. 3-4, 16, *supra*.

28  The compelled cancer warning for acrylamide in food also fails intermediate scrutiny for the

-17-

independent reason that it is not narrowly tailored.  In particular, there are a number of less restrictive

alternatives that do not burden private speech that the State could have explored to communicate its

apparent view that acrylamide in food poses a potential health risk.  As the *NIFLA* Court explained,

the most obvious alternative to "coopt[ing] [a private speaker] to deliver its message for it" is for the

State to convey its message through its own "public-information campaign."  138 S. Ct. at 2376; *see

also Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 578 (2011) ("The State can express [its] view through

its own speech."); *Wheat Growers II*, 2020 WL 3412732, at *12 ("California has options available to

inform consumers of its determination that glyphosate is a carcinogen, without burdening the free

speech of businesses, including advertising campaigns or posting information on the Internet.").

### C.     Proposition 65 Is Unconstitutional On Its Face Under *NIFLA*.

The Proposition 65 warning requirement also is unconstitutional on its face.  In *NIFLA*, the

Supreme Court made clear that the State has the burden to show that a warning is "justified" before it

may compel a business to provide one consistent with the First Amendment.  138 S. Ct. at 2377.

OEHHA acknowledges that warnings are "justified" only for products that contain listed chemicals at

levels that exceed the NSRL.  *See* Norris Decl., Ex. P at 197.  Proposition 65, however, reverses this

burden, stating that "the burden of showing that an exposure [poses no significant risk] shall be on

the defendant."  Health & Safety Code § 25249.10(c).  The Proposition 65 warning requirement is

thus unconstitutional on its face because it places the burden on the *business* to show that a warning

is unjustified, when *NIFLA* and other Supreme Court precedent hold that it is the *government's*

burden to prove that a warning is justified.  *Cf. Riley v. Nat'l Fed. of Blind of N.C., Inc.*, 487 U.S.

781, 793 (1988) ("[W]e could not agree to a measure that requires the speaker to prove

'reasonableness' case by case.").  Nevertheless, the Court need not reach this alternative argument,

which extends beyond food containing acrylamide, if it finds that compelled cancer warnings on

these products violate the First Amendment for the reasons discussed herein.

### II.    THE REMAINING EQUITABLE FACTORS WEIGH IN PLAINTIFF'S FAVOR.

CalChamber also satisfies the remaining elements for preliminary equitable relief:  its

members are "likely to suffer irreparable harm in the absence of preliminary relief"; "the balance of

equities tips in [its] favor"; and "an injunction is in the public interest."  *Winter*, 555 U.S. at 20.

1    "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably

2    constitutes irreparable injury." *Elrod*, 427 U.S. at 373; *see also Valle Del Sol Inc. v. Whiting*, 709

3    F.3d 808, 828 (9th Cir. 2013) (same).  Thus, this Court has observed that "[i]rreparable harm is

4    relatively easy to establish in a First Amendment Case." *Wheat Growers I*, 309 F. Supp. 3d at 853

5    (quoting *CTIA-The Wireless Ass'n v. City of Berkeley*, 854 F.3d 1105, 1118 (9th Cir. 2017), *vacated*

6    *on other grounds*, 138 S. Ct. 2708 (2018)).  "To establish irreparable injury in the First Amendment

7    context, [a plaintiff] need only 'demonstrate[] the existence of a colorable First Amendment claim.'"

8    *Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1225 (9th Cir. 2003) (citation omitted).  Plaintiff has

9    done that here in spades.  *See* Section I, *supra*; *see also Harman v. City of Santa Cruz*, 261 F. Supp.

10   3d 1031, 1050 (N.D. Cal. 2017) ("Because the court found that Harman has established a likelihood

11   of success or serious question on the merits of his First Amendment claims, it follows that he—or

12   other third parties—are likely to suffer irreparable injury if a preliminary injunction is not issued.")

13         The First Amendment harms to CalChamber's members are not merely theoretical.

14   CalChamber's members that sell and produce food products containing acrylamide are faced with a

15   "Hobson's choice" (*Baxter Healthcare Corp. v. Denton* 120 Cal. App. 4th 333, 344 (2004)):  either

16   communicate to consumers a disparaging health warning about food containing acrylamide that is

17   unsupported by science, or face the significant risk of an enforcement action under Proposition 65.

18   Either option impermissibly infringes their First Amendment rights.  If CalChamber's members elect

19   to provide a misleading and unsupported cancer warning on their food products to mitigate the risk of

20   litigation, it will damage their reputation and goodwill by branding their products as cancer-causing

21   agents.  *See, e.g.*, Nowlis Decl. ¶ 54 (consumers interpret a Proposition 65 cancer warning on food to

22   convey that consuming the product increases their risk of cancer); *see also Life Alert Emergency*

23   *Response, Inc. v. LifeWatch, Inc.*, 601 F. App'x 469, 474 (9th Cir. 2015) (threat to "reputation and

24   goodwill . . . constitutes irreparable harm").  If, however, CalChamber's members opt not to provide

25   a warning, they risk being sued and could be liable for civil penalties of up to $2,500 per violation per

26   day.  *See generally* Norris Decl. ¶¶ 24-29.  This risk is not hypothetical or speculative.  Indeed, more

27   than 350 companies, including many CalChamber members, have been targeted under Proposition 65

28   in connection with alleged exposures to acrylamide in food, and private enforcers are showing no

1 | signs of slowing down.  *See* p. 8, *supra*.

2 |       The final two factors—balance of equities and public interest—"merge when the Government

3 | is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Courts have "consistently

4 | recognized the significant public interest in upholding First Amendment principles."  *Doe v. Harris*,

5 | 772 F.3d 563, 583 (9th Cir. 2014); *see also Index Newspapers LLC v. U.S. Marshals Service*, No. 20-

6 | 35739, 2020 WL 5988501, at *31 (9th Cir. Oct. 9, 2020) ("It is always in the public interest to

7 | prevent the violation of a party's constitutional rights.") (internal citation and quotation marks

8 | omitted).  And neither the public nor the government "has [any] legitimate interest in enforcing an

9 | unconstitutional" law.  *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

10 |       Apart from the First Amendment considerations, compelled cancer warnings for acrylamide

11 | in food also harm the public directly.  As addressed above, the scientific evidence does not establish

12 | an association between acrylamide in food and cancer in humans.  As such, requiring cancer

13 | warnings for acrylamide in food will result in warnings on a multitude of products that do not pose a

14 | risk of cancer, thereby reducing the effectiveness of *all* warnings.  Such over-warning is contrary to

15 | the public interest.  *See, e.g.*, *Johnson v. Am. Standard, Inc.*, 43 Cal. 4th 56, 70 (2008) (over-warning

16 | "invite[s] mass consumer disregard and ultimate contempt for the warning process"); *Thompson v.*

17 | *Cty. of Alameda*, 27 Cal. 3d 741, 754–55 (1980) (excessive warnings "produce a cacophony . . . that

18 | by reason of their sheer volume would add little to the effective protection of the public."); *Mason v.*

19 | *SmithKline Beecham Corp.*, 596 F.3d 387, 392 (7th Cir. 2010) (over-warning "can dilute the

20 | effectiveness of valid warnings").  Likewise, compelled cancer warnings for acrylamide in food also

21 | harm the public by (1) discouraging consumers from eating foods that are part of a healthy, well-

22 | balanced diet, and (2) misleading consumers that acrylamide is only present in store-bought foods,

23 | when in fact consumer exposure may be greatest through home cooking.  *See* pp. 3-4, 16, *supra*.

24 |       Accordingly, the remaining equitable factors weigh strongly in CalChamber's favor.

25 | <u>**CONCLUSION**</u>

26 |       For the foregoing reasons, the Court should preliminarily enjoin the Attorney General and all

27 | those in privity with him from filing and/or prosecuting new lawsuits to enforce the Proposition 65

28 | warning requirement for cancer as applied to acrylamide in food products.

Dated: October 30, 2020                    Respectfully submitted,

                                           By: */s/ Trenton H. Norris*
                                           Trenton H. Norris (CA Bar No. 164781)
                                           Sarah Esmaili (CA Bar No. 206053)
                                           S. Zachary Fayne (CA Bar No. 307288)
                                           David Barnes (CA Bar No. 318547)
                                           ARNOLD & PORTER KAYE SCHOLER LLP
                                           Three Embarcadero Center, 10th Floor
                                           San Francisco, CA 94111
                                           Tel:  (415) 471-3100
                                           trent.norris@arnoldporter.com

                                           *Attorneys for California Chamber of Commerce*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION