UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

California Chamber of Commerce,

        Plaintiff,

    v.

Xavier Becerra in his official capacity as
Attorney General of the State of California,

        Defendant.

No. 2:19-cv-02019-KJM-EFB

ORDER

      The California Chamber of Commerce contends California has compelled businesses to display misleading warnings about the dangers of acrylamide, a carcinogen. It seeks a preliminary injunction barring the California Attorney General and anyone else from filing new lawsuits against businesses that do not display the warning.

      The Council for Education and Research on Toxics, or "CERT," joins the State as a defendant in this case. CERT is an intervening nonprofit organization that often files lawsuits against businesses that do not display warnings about acrylamide. CERT moves for summary judgment against the Chamber of Commerce. It argues its right to prosecute private enforcement actions is protected by the First Amendment.

/////

The court held a hearing by videoconference on December 11, 2020.  Trenton Norris and S. Zachary Fayne appeared for the Chamber of Commerce.  Joshua Purtle and Harrison Pollak appeared for the State.  Raphael Metzger and Scott Brust appeared for CERT.  As explained in this order, **the Chamber of Commerce's motion is granted, and CERT's motion is denied**.  The State has not shown that the cancer warnings it requires are purely factual and uncontroversial.  Nor has it shown that Proposition 65 imposes no undue burden on those who would provide a more carefully worded warning.  CERT, for its part, has not shown it is entitled to judgment as a matter of law.

I.    **BACKGROUND**

Acrylamide is a toxic chemical.  It is produced industrially for use in plastics, grouts, water treatment products, and cosmetics.  *See, e.g.*, U.S. Food & Drug Admin., "Acrylamide Questions and Answers" (Sept. 25, 2019), Norris Decl. Ex. E, ECF No. 95-7.[1]  It is also found in cigarette smoke.  *Id.*  And in 2002, it was detected in food.  Maier Decl. at 16 ¶ 44, ECF No. 95-24,[2] Solomon Decl. ¶ 18, ECF No. 101-1.[3]

Although acrylamide was first detected in food in 2002, it has likely always been a part of many foods.  *See* Acrylamide Questions & Answers, *supra*.  Sometimes it occurs naturally.  Maier Decl. ¶ 44.  Often, however, it forms as a result of a reaction between sugars and the amino acid asparagine, which naturally occur in many foods.  *See* Acrylamide Questions & Answers, *supra*.  Roasting, baking, frying, or otherwise cooking food at a high temperature appears to cause acrylamide to form, whether at home or at industrial scale.  *Id.*; Solomon Decl. ¶ 18; Letter from /////

---

[1] https://www.fda.gov/food/chemicals/acrylamide-questions-and-answers, last visited Mar. 24, 2021.  *See also* U.S. Food & Drug Admin., "Survey Data on Acrylamide in Food" (Sept. 27, 2019), https://www.fda.gov/food/chemicals/survey-data-acrylamide-food, last visited Mar. 24, 2021.

[2] Dr. Andrew Maier is a toxicologist with a Ph.D. in molecular toxicology and a principal science advisor at Cardno ChemRisk, a consulting firm.  Maier Decl. ¶¶ 4–6, 13.  The Chamber of Commerce retained him to offer opinions on its behalf.  *See id.* ¶ 13.

[3] Dr. Gina Solomon is a medical doctor with an expertise in environmental health who teaches at the University of California San Francisco Medical School.  Solomon Decl. ¶ 5 & Ex. A.  The State retained her to offer opinions on its behalf.  *See id.* ¶ 17.

1  Lester Crawford, Deputy Comm'r, U.S. Food & Drug Admin. at 2 (July 14, 2003), Norris Decl.

2  Ex. G, ECF No. 95-9.

3      Acrylamide is most commonly found in foods made from plants.  *See* Acrylamide

4  Questions & Answers, *supra*.  Dairy products, meat, and fish do not usually contain acrylamide

5  after they are cooked at high temperatures, and when acrylamide is found in these foods, it forms

6  at lower levels.  *Id.*  According to the U.S. Food & Drug Administration (FDA), the foods that

7  contribute the most acrylamide to the American diet are baked and fried starchy foods like french

8  fries, chips, crackers, donuts, pancakes, and toast.  Solomon Decl. ¶ 19 (citing Eileen Abt et al.,

9  "Acrylamide Levels and Dietary Exposure from Foods in the United States, An Update Based on

10  2011-2015 Data," 36 Food Additive Contamination Part A 1475–90 (July 18, 2019)).  Coffee also

11  contains acrylamide, *see id.,* as do almonds, olives, and asparagus, Maier Decl. at 16 ¶ 44; Nat'l

12  Cancer Institute, "Acrylamide and Cancer Risk" (Dec. 5, 2017).[4]

13      For decades, experiments have shown that when mice and rats eat or drink food or water

14  containing acrylamide, they develop cancerous tumors in many parts of their bodies, including in

15  their lungs, stomachs, skin, brains, and reproductive organs.  *See* Solomon Decl. ¶ 33 (citing,

16  among other materials, Keith A. Johnson, et al., "Chronic Toxicity and Oncogenicity Study on

17  Acrylamide Incorporated in the Drinking Water of Fischer 344 Rats," 85 Toxicology & Applied

18  Pharmacology 154–68 (Sept. 15, 1986)).  The greater the quantity of acrylamide the animals

19  ingest, the more cancer is found in the tested group.  *Id.* ¶ 34.

20      Administering toxic chemicals to people is, of course, highly unethical, so the most

21  powerful and reliable clinical tools for testing the effects of food-borne acrylamide, such as

22  double-blind clinical trials, are impossible.  *See* Lipworth Decl. ¶ 17,[5] ECF No. 95-20; *see also*

23  Michael D. Green, et al., Reference Guide on Epidemiology, in Federal Judicial Center Reference

24  Manual on Scientific Evidence at 555 (3d ed. 2011).  Animal studies are the main source of data

---

[4] https://www.cancer.gov/about-cancer/causes-prevention/risk/diet/acrylamide-fact-sheet, last visited Mar., 24, 2021.

[5] Dr. Lauren Lipworth is an epidemiologist and professor at the Vanderbilt University School of Medicine.  Lipworth Decl. ¶ 6–8.  The Chamber of Commerce retained her to offer opinions on its behalf.  *See id.* ¶ 15.

for assessing whether chemicals are safe or dangerous to people.  *See, e.g.*, Solomon Decl. ¶ 24.  Public health authorities commonly rely on them.  *See, e.g.*, *id.* ¶¶ 27–28.  As a result of these experiments, many public health authorities have concluded that exposure to acrylamide probably increases the risk of cancer in people.  *See id.* ¶¶ 37–40.  The U.S. National Toxicology Program, for example, has said that acrylamide is "reasonably anticipated to be a human carcinogen."  *See id.* ¶ 37; U.S. Dep't of Health & Human Servs. Nat'l Toxicology Program, Report on Carcinogens, "Acrylamide" (12th ed. 2011).[6]  The U.S. Environmental Protection Agency has found that acrylamide is "likely to be carcinogenic in humans."  Solomon Decl. ¶ 39; U.S. Envt'l Protection Agency, Acrylamide Integrated Risk Assessment (Mar. 22, 2010).[7]  And a World Health Organization (WHO) committee that includes representatives from the FDA has concluded that acrylamide is carcinogenic.  Solomon Decl. ¶ 20; J. Agric. Org. & Expert Comm. on Food Additives, "Evaluation of Certain Contaminants in Food" (Feb. 16–25, 2010).[8]

Animal experiments have limitations.  When researchers study the effects of a chemical on animals in a laboratory, they must frequently use very large doses to compensate for small study groups and limited timeframes, and these doses usually do not approximate a person's real-world exposure.  *See* Solomon Decl. ¶ 26; Maier Decl. ¶¶ 78–83, 87; *see supra* note 1, "Survey Data."  According to an expert retained by the Chamber of Commerce, a person would have to eat more than ninety large bags of potato chips every day to consume an equivalent dose of acrylamide.  *See* Maier Decl. ¶ 82.  Some researchers also believe that rats and mice react differently to acrylamide.  *See id.* ¶ 58.  Acrylamide changes to glycidamide when it is broken down in the body, and glycidamide reacts more potently with DNA to cause cancer.  *See id.*; *see also* Solomon Decl. ¶¶ 43–44, 48.  Mice and rats may metabolize acrylamide into glycidamide more efficiently than people, so they may be more sensitive to acrylamide.  *See* Maier Decl. ¶ 58.

---

[6] https://ntp.niehs.nih.gov/ntp/roc/content/profiles/acrylamide.pdf, last visited Mar. 24, 2021.

[7] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/0286_summary.pdf#nameddest=woe, last visited Mar. 24, 2021.

[8] https://apps.who.int/iris/bitstream/handle/10665/44514/WHO_TRS_959_eng.pdf;jsessionid=B264F817F200B900E810643F558BD16D?sequence=1, last visited Mar. 24, 2021.

The National Cancer Institute offers similar cautions about animal experiments. *See supra* Acrylamide and Cancer Risk ("[T]oxicology studies have shown that humans and rodents not only absorb acrylamide at different rates, they metabolize it differently as well."). Some of the studies of acrylamide were authored by researchers with financial connections to the food and beverage industries, however, and many experts disagree with their conclusions. *See* Solomon Decl. ¶¶ 49–58.

Experiments on animals are not the only tool researchers can use to evaluate the danger of acrylamide for people. For example, researchers can and have exposed human cells to acrylamide and glycidamide in a laboratory setting. *See id.* ¶ 44; U.S. Envt'l Protection Agency, "Toxicology Review of Acrylamide" at 168 (Mar. 2010), Purtle Decl. Ex. G, ECF No. 101-11. They observed that these chemicals react with human DNA and may become permanently attached. *See* Solomon Decl. ¶ 44. These attachments are called "adducts," and they are known to cause breaks and mutations in chromosomes, *id.*, which can in turn cause cancer if the damaged cells proliferate, *id.* ¶ 59.

Researchers have also found that glycidamide leaves a unique genetic signature when it causes mutations in human cells. *See id.* ¶ 64 (citing Maria Zhivagui et al., "Experimental and Pan-Cancer Genome Analyses Reveal Widespread Contribution of Acrylamide Exposure to Carcinogenesis in Humans," 29 Genome Res. 521–31 (Apr. 2019)). The International Agency for Research on Cancer (IARC) maintains a database of 1,600 human tumor genomes, and scientific researchers scanned that database to see how many tumor genomes could be matched with the unique glycidamide signature. *See id.* According to the scientists who published the results of this analysis, about one third of the tumor genomes could be connected to glycidamide and thus to acrylamide. *See* Zhivagui, *supra*, Abstract; *see also* Solomon Decl. ¶ 64. This may mean that a large portion of human cancer is connected to acrylamide exposure. *See* Solomon Decl. ¶ 64.

Epidemiology also offers well-known statistical tools for investigating whether people are at greater risk of cancer as a result of acrylamide exposure. *See* Lipworth Decl. ¶ 31. Epidemiologists can, for example, collect data about human consumption of foods that contain relatively high amounts of acrylamide. *See id.* ¶¶ 19, 44; Green, *supra*, at 557–59. A "food

frequency questionnaire" is a common survey tool for that purpose. Researchers ask participants

how often they eat or drink various foods and beverages and then categorize the participants by

their levels of likely acrylamide consumption. *See* Lipworth Decl. ¶¶ 44, 46, 48; Solomon Decl.

¶¶ 82–83. If people in low-exposure groups later report lower average cancer rates, and if people

in higher-exposure groups report higher average cancer rates, then it could be that eating foods

with more acrylamide increases the risk of cancer, assuming other causes can be excluded and the

data is free of errors and biases. *See* Lipworth Decl. ¶ 19.

Dozens of epidemiological studies conducted in Europe, the United States, and Asia have

investigated whether acrylamide in food causes cancer in humans. *See id.* ¶¶ 35–43, 57–58. An

epidemiologist retained by the Chamber of Commerce reviewed these studies. She found none

showing that eating food with acrylamide increases the risk of cancer. *See id.* ¶¶ 141, 144. In her

opinion, "there is no consistent or reliable evidence to support a finding that dietary exposure to

acrylamide increases the risk of any type of cancer in humans." *Id.* ¶ 144. "In fact," she

concludes, "most cancer-specific relative risks have been close to or below the null value." *Id.*

¶ 141. That is, statistical tests do not reveal any increase in cancer risk among people who report

greater consumption of acrylamide in food and drinks. *Id.* The National Cancer Institute reports

a similar assessment of this research. *See supra* Acrylamide and Cancer Risk ("[A] large number

of epidemiologic studies . . . in humans have found no consistent evidence that dietary acrylamide

exposure is associated with the risk of any type of cancer.").

Aside from a brief note that some data do show correlations, *see* Cal. Opp'n Prelim. Inj. at

8, ECF No. 101, the State does not contest the epidemiological analysis above. It argues instead

that epidemiological studies are poorly suited to investigating the effects of acrylamide in food.

*See id.* at 6. Cancer caused by acrylamide may not surface for decades, and if it does not, then the

absence of a statistical relationship may prove only that a study did not last long enough. *See*

Solomon Decl. ¶ 70. Data might also be inaccurate. Food frequency questionnaires, for example,

may not reliably estimate acrylamide exposure if people cannot consistently remember what they

ate, when, and how often. *See id.* ¶¶ 70, 84–88. If measurements of acrylamide exposure are

unreliable, studies that rely on those measurements might systematically underestimate the effects

of acrylamide.  *See id.* ¶¶ 72–73; Lipworth Decl. ¶ 52.  But that is not always so.  *See* Lipworth Decl. ¶ 55.

Epidemiological studies must also contend with the ubiquity of acrylamide.  It may be impossible to find a truly low-exposure group.  *See* Solomon Decl. ¶ 76.  Acrylamide exposure is also relatively uniform.  *See id.*  If everyone in a study is exposed at similar rates, then everyone in that study can be expected to experience similar outcomes.  *See id.*  So epidemiological studies that reveal no relationship between acrylamide and cancer might not be meaningful.

Despite these uncertainties in the epidemiological evidence, many government authorities have concluded, as noted above, that acrylamide "probably" causes or is "likely" to cause cancer in humans.  But none of these authorities has urged people to avoid foods that contain acrylamide.  At most they voice "concern."  *See* Purtle Decl. Ex. O, ECF No. 101-19.  Some, such as the FDA, have also offered guidance for reducing acrylamide consumption and production.  *See* U.S. Food & Drug Amin., "You can Help Cut Acrylamide in Your Diet (Mar. 14, 2016)[9]; U.S. Food & Drug Admin., "Guidance for Industry: Acrylamide in Foods" (Mar. 2016).[10]

At the end of the day, however, because acrylamide is found in so many foods, it is probably impossible to avoid it completely.  *See* U.S. Food & Drug Admin., Statement from Comm'r Scott Gottlieb, M.D. (Aug. 29, 2018), Norris Decl. Ex. H, ECF No. 95-10.[11]  Both federal and state public health authorities in fact recommend eating foods that may contain acrylamide.  The FDA advises Americans not to attempt removing fried, roasted, and baked foods from their diets.  *See* Acrylamide Questions and Answers, *supra*.  Its best advice is to eat a variety of healthy foods.  *Id.* (citing U.S. Dep't of Health & Human Servs. & U.S. Dep't of Agriculture, "2015–2020 Dietary Guidelines" (8th ed. Dec. 2015)).  California public health authorities have also decided not to warn against acrylamide exposure in coffee.  *See* Cal. Envt'l Protection

---

[9] https://www.fda.gov/consumers/consumer-updates/you-can-help-cut-acrylamide-your-diet, last visited Mar. 24, 2021.

[10] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-acrylamide-foods, last visited Mar. 24, 2021.

[11] https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-fdas-support-exempting-coffee-californias-cancer, last visited Mar. 24, 2021.

Agency, Office of Envt'l Health Hazard Assessment, Final Statement of Reasons on Adoption of New Section 25704, Purtle Decl. Ex. C, ECF No. 101-7. The State found "inadequate evidence for the carcinogenicity of drinking coffee" in "a very large number of human studies"; in fact, the State found "inverse associations—decreasing risk with increasing coffee consumption—for [some] human cancers." *Id.* at 5.

Sources of acrylamide other than coffee, however, remain subject to the warning requirements of California's Safe Drinking Water and Toxic Enforcement Act of 1986, more commonly known as "Proposition 65," the initiative that put the act on the books, *see AFL-CIO v. Deukmejian*, 212 Cal. App. 3d 425, 429 (1989). Under Proposition 65, businesses must not knowingly or intentionally expose people to chemicals "known to the state to cause cancer or reproductive toxicity" without a "prior clear and reasonable warning." *Id.* at 431 (citing Cal. Health & Safety Code § 24249.6). A chemical is "known" to cause cancer or reproductive toxicity if it meets one of three statutory criteria:

- "[I]n the opinion of the state's qualified experts it has been clearly shown through scientifically valid testing according to generally accepted principles to cause cancer or reproductive toxicity";

- "[A] body considered to be authoritative by such experts has formally identified it as causing cancer or reproductive toxicity";

- "[A]n agency of the state or federal government has formally required it to be labeled or identified as causing cancer or reproductive toxicity."

Cal. Health & Safety Code § 25249.8(a)–(b).

The list of chemicals "known to cause cancer" must also include, "at a minimum," any substances listed in California Labor Code subsections 6382(b)(1) and (d), which define "hazardous substances" under California's Hazardous Substances Information and Training Act. Those subsections refer to "[s]ubstances listed as human or animal carcinogens by [IARC]" and "any substance within the scope of the federal Hazard Communication Standard" as specified by federal regulation. *See* Cal. Labor Code § 6382(d) (citing 29 C.F.R. § 1910.1200). The cited

/////

8

federal regulation refers again to chemicals identified by IARC and the National Toxicology Program. *See Deukmejian*, 212 Cal. App. 3d at 435 (citing 29 C.F.R § 1910.1200 App'x A & B).

A few years after Proposition 65 was passed, a California Court of Appeal interpreted Health & Safety Code 25249.8(a)–(b), Labor Code section 6382, and the regulations they cite as requiring the list of chemicals to include "not only those chemicals that are known to cause cancer in humans, but also those that are known to cause cancer in experimental animals." *Baxter Healthcare Corp. v. Denton*, 120 Cal. App. 4th 333, 345 (2004) (citing *Deukmejian*, 212 Cal. App. 3d at 436). A chemical "must be listed even if it is known to be carcinogenic or a reproductive toxin only in animals." *Am. Chemistry Council v. Office of Envt'l Health Hazard Assessment*, 55 Cal. App. 5th 1113, 1142 (2020). In Proposition 65 enforcement litigation over acrylamide in potato chips, California has agreed that a chemical may be listed as "known to the state to cause cancer" even if the State does not "know" in the colloquial sense "that acrylamide causes cancer in humans." Norris Decl., Ex. L at 2 ¶ 4, ECF No. 95-14 (Joint Stipulation of Undisputed Facts, *People v. Frito-Lay, Inc.*, No. BC 338956 (Cal. Sup. Ct. L.A. Cty., filed July 28, 2008)). That finding is simply not required. *See id.*

Proposition 65 does not specify what warning is necessary for chemicals "known" to cause cancer; it requires only that the warning be "clear and reasonable." Cal. Health & Safety Code § 25249.6. Regulations promulgated by the California Office of Environmental Health Hazards Assessment require warnings to name the chemical and to be displayed "prominently," "with such conspicuousness" that they are "likely to be seen, read, and understood by an ordinary individual." *See* Cal. Code Regs. tit. 27 § 25601(b)–(d). A warning may include more information than this, but only if the addition "identifies the source of the exposure or provides information on how to avoid or reduce exposure." *Id.* § 25601(e). The regulations also offer a model warning that serves as a safe harbor against liability for food warnings: "Consuming this product can expose you to [name of one or more chemicals], which is [are] known to the State of California to cause cancer. For more information go to www.P65warnings.ca.gov/food." Cal. Code Regs. tit. 7, § 25607.2(a)(2) (bracketed phrases in original).

/////

California has permitted more nuanced warnings about acrylamide in at least some foods in settlement agreements. It permitted a warning about acrylamide in the potato chip litigation to say the chips "contain acrylamide, a substance identified as causing cancer under California's Proposition 65." Purtle Decl. Ex. E at 10, ECF No. 101-9 (Consent J. as to Frito-Lay at 10, *People v. Frito-Lay, Inc.*, *supra* (filed Aug. 1, 2008)). The State also permitted the potato chip warning to explain that foods other than chips contain acrylamide and that acrylamide is not added to these foods, but rather is "created when these and certain other foods are browned." *Id.* The State further permitted the chip warning to say the "FDA has not advised people to stop eating potato crisps and/or potato chips . . . or any foods containing acrylamide as a result of cooking." *Id.*

The penalties under California law for a failure to warn are "severe." *Deukmejian*, 212 Cal. App. 3d at 430. Violations are subject to civil penalties of up to $2,500 "per day for each violation." Cal. Health & Safety Code § 25249.7(b)(1). Proposition 65 also permits injunctions against both existing violations and conditions "in which there is a substantial probability that a violation will occur." . *See id.* §§ 25249.7(a), 25249.11(e). State and local prosecutors can bring enforcement actions for failures to warn, *id.* § 25249.7(c), as can private litigants, *see id.* § 25249.7(d). Successful private enforcers can recover a quarter of the civil penalty imposed and their reasonable attorneys' fees. *See id.* § 25249.12(d); Cal. Civ. P. Code § 1021.5.

Proposition 65 does include some safeguards against overzealous or frivolous private enforcement. For example, a private litigant must give sixty days' notice of the alleged violation both to the alleged violator and to the prosecutor in whose jurisdiction the violation is alleged. *See id.* § 25249.7(d)(1). That notice must include a "certificate of merit" stating the private enforcer "has consulted with one or more persons with relevant and appropriate experience or expertise who has reviewed facts, studies, or other data regarding the exposure to the listed chemical." *Id.* The certificate must then confirm the private enforcer believes "there is a reasonable and meritorious case for the private action." *Id.*

/////

The warning requirement is also subject to exceptions and affirmative defenses. Proposition 65 grants businesses an affirmative defense if they can prove the alleged exposure "poses no significant risk assuming lifetime exposure at the level in question." *See* Cal. Health & Safety Code § 25249.10(c). The defendant must prove that fact using "evidence and standards of comparable scientific validity" to the evidence and standards that led to the inclusion of that substance on the Proposition 65 list. *See id.* A business can also make that showing preemptively in a declaratory judgment action. *See Baxter*, 120 Cal. App. 4th at 344. Under the terms of this exception, the California Office of Environmental Health Hazards Assessment has determined that an exposure of 0.2 micrograms of acrylamide per day "poses no significant risk." *See* Cal. Code Regs. tit. 27, § 25705(c)(2). That Office has also published regulations permitting higher levels of exposure in some circumstances, including when "chemicals in food are produced by cooking necessary to render the food palatable or to avoid microbial contamination." *Id.* ¶ 25703(b)(1). A business can also ask the Office for a formal opinion about whether a warning is necessary (a "safe use determination"). *See* Cal. Code Regs. tit. 27, § 25204. And finally, as is clear from the record on this matter, businesses could urge the Office to create an exception for a specific food or drink as it did for acrylamide in coffee.

Despite these safeguards and exceptions, a successful defense might be impossible to mount, practically speaking. It is a defendant's burden to prove an exposure poses no significant risk under section 25249.10(c), so a plaintiff need not plead or prove that an exposure did or could cause cancer. *See Consumer Defense Group v. Rental Housing Industry Members*, 137 Cal. App. 4th 1185, 1214–15 (2006). And given the high standard of scientific proof required by section 25249.10(c), "it may take a full scale scientific study to establish the amount of the carcinogen is so low that there is no need for a warning." *Id.* at 1215. One state appellate court has observed that this allocation of burdens, when combined with other provisions of the private enforcement regime, sets up a framework that may permit unscrupulous attorneys to "shake down" vulnerable targets" wielding dubious claims of carcinogenic exposure. *See id.* at 1215–19.

Acrylamide was added to the Proposition 65 list in 1990, long before the publication of research showing acrylamide was present in food. *See* Norris Decl. Ex. L at 2. After acrylamide

was discovered in food, CERT—the intervenor defendant in this case—was one of the first plaintiffs to file a private enforcement action. *See* Metzger Decl. ¶ 5, ECF No. 93. Its early lawsuits resulted in consent judgments in Los Angeles County Superior Court. *Id.* French fry manufacturers agreed to display warnings, potato chip manufacturers agreed to reduce acrylamide levels in chips, and the defendants paid more than $2 million in penalties and attorneys' fees. *See id.*

CERT also pursued Proposition 65 litigation through multiple cases against coffee roasters and retailers after the California Office of Environmental Health Hazards Assessment published opinions about the risks of acrylamide in coffee. *See id.* ¶¶ 6–13; *see also* Cal. Off. of Envt'l Health Hazards Assessment, "Characterization of Acrylamide Intake from Certain Foods at 11–12 (Mar. 2005).[12] These cases were consolidated and tried in several phases. *See* Metzger Decl. ¶¶ 10–13; Norris Decl. ¶¶ 5, 12–15. Some of the defendants settled after unsuccessfully attempting to prove exposures to acrylamide in coffee did not elevate the risk of cancer and to show Proposition 65 was unconstitutional because it compelled false cancer warnings. *See* Metzer Decl. ¶ 12. CERT secured an award of more than $1.8 million in attorneys' fees. *Id.* Other defendants continued in the litigation. While the case was still pending, the Office of Environmental Health Hazards Assessment proposed to change its Proposition 65 regulations to make an exception for coffee. The FDA supported the proposed change. *See supra* Gottlieb Statement, ECF No. 95-10. The exception was eventually adopted, as described above. On the coffee roasters' and retailers' motion, the California court then granted summary judgment to the defendants remaining in the case, and CERT appealed. *See* Metzger Decl. ¶ 14; Norris Decl. ¶ 5 & Ex. Q. The appeal is pending, as are many other private enforcement actions about acrylamide in food, which have multiplied in recent years. *See* Sixth Not., ECF No. 111.

The Chamber of Commerce filed this case in October 2019 while the coffee litigation was ongoing. Its legal claim is simple: the First Amendment prohibits California from forcing businesses to make false statements, so because California does not "know" that eating food with

---

[12] https://oehha.ca.gov/media/downloads/crnr/acrylamideintakereport.pdf, last visited Mar. 24, 2021.

acrylamide causes cancer in people, Proposition 65 is unconstitutional if it mandates that assertion. *See generally* Compl., ECF No. 1. The Chamber named one defendant, the Attorney General in his official capacity, and asserted one claim for declaratory relief. *See id.* ¶¶ 13, 73–84. CERT moved to intervene as a defendant, and the court approved the parties' stipulation to permit the intervention. *See* Stip. & Order, ECF No. 29. The court then granted the State's and CERT's motions to dismiss. *See* Order, ECF No. 56. It declined to assert jurisdiction over the Chamber's claim in light of the pending litigation in state court, described above. *See id.* at 3–6 (applying *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942)). The Chamber's request for relief was also partially retrospective, so the court found dismissal was appropriate under the Anti-Injunction Act, 28 U.S.C. § 2283. *See id.* at 6–8.

The Chamber then amended its complaint to add a claim under 42 U.S.C. § 1983 and to request only prospective relief. *See* First Am. Compl., ECF No. 57. California and CERT both moved to dismiss for lack of subject matter jurisdiction and under the abstention doctrine described in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). The court denied these motions. ECF No. 84. The case is thus proceeding on the First Amended Complaint, ECF No. 57, which again names only the Attorney General as a defendant, with CERT remaining a defendant in intervention.

The Chamber now asks the court to enter a preliminary injunction. Chamber's Mot., ECF Nos. 95 & 95-1. CERT has moved for summary judgment to the extent the Chamber's claims would prohibit private enforcement of Proposition 65. CERT Mot., ECF No. 93. CERT argues those claims are barred by the *Noerr–Pennington* doctrine. *See E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965). The court addresses CERT's motion first.

## II.    SUMMARY JUDGMENT

A court may grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, the parties dispute none of the relevant facts. CERT's motion rests on a legal question:

/////

whether the Chamber's claims are barred by the *Noerr–Pennington* doctrine because those claims

burden CERT's First Amendment right to petition.

"Under the *Noerr–Pennington* doctrine, those who petition all departments of the

government for redress are generally immune from liability." *Empress LLC v. City & Cty. of San*

*Francisco*, 419 F.3d 1052, 1056 (9th Cir. 2005). "Although the *Noerr–Pennington* doctrine

originally immunized individuals and entities from antitrust liability, *Noerr–Pennington*

immunity now applies to claims under § 1983 that are based on the petitioning of public

authorities." *Id.* It also protects "conduct incidental to the prosecution of the suit," such as

demand letters and related prelitigation communications. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923,

935–36 (9th Cir. 2006) (citation omitted). In practical effect, however, the doctrine is one of

constitutional avoidance: courts should "construe federal statutes so as to avoid burdening

conduct that implicates the protections afforded by the Petition Clause unless the statute clearly

provides otherwise." *Id.* at 931.

The Ninth Circuit has derived a three-step "analysis" for evaluating *Noerr–Pennington*

defenses from the Supreme Court's decision in *BE & K Construction Co. v. NLRB*, 536 U.S. 516

(2002). *See Sosa*, 437 F.3d at 930–31. First, would an adverse decision impose a burden on the

defendant's alleged petitioning activity? Second, is there at least a "substantial question" whether

the statute that imposes this burden conflicts with the Constitution? And third, can the statute be

construed in a way to avoid the burden? If so, then that construction should prevail; if not, then

the court must decide whether the statute cannot be enforced because it would deprive the

defendant of a constitutional right.

This analysis is easier to understand when expressed in more concrete terms. In *Sosa*, for

example, DirecTV had sent more than a hundred thousand demand letters to people who bought

"smart cards" that allowed them to intercept DirecTV's satellite signals without paying. *See id.* at

926. Several of the recipients then sued DirecTV for extortion and unfair business practices in

California state court, and DirecTV successfully moved to strike the complaint. *Id.* at 927. Some

of the unsuccessful state-court plaintiffs then filed a lawsuit in federal district court, claiming

DirecTV had violated the Racketeer Influenced and Corrupt Organizations Act. *Id.* DirecTV

14

moved to dismiss, citing the *Noerr–Pennington* doctrine, and prevailed. *Id.* The Ninth Circuit affirmed. First, the federal lawsuit sought "to impose RICO liability on DirecTV for sending the demand letters," so it burdened the petitioning activity, *id.* at 932–33; second, that burden implicated the Petition Clause, which at least arguably protects "reasonably based prelitigation settlement demands," *id.* at 933–39; and third, the RICO statute could be interpreted to permit legitimate prelitigation demand letters. *Id.* at 939–42. For that reason, the Ninth Circuit concluded that the trial court had correctly dismissed the claims against DirecTV. *See id.* at 942.

Here, as in *Sosa*, the answer to the first question is clear. If the Chamber of Commerce ultimately succeeds in this lawsuit, CERT would no longer be able to enforce Proposition 65's warning requirements against businesses that sell food and drink containing acrylamide. The Chamber's claims thus impose a burden on CERT's attempts to petition California courts.

But in answer to the second question, the burden imposed does not weigh on a right protected by the Petition Clause. The Petition Clause prohibits Congress from making laws that abridge "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. First Am. The court is aware of no authority interpreting the First Amendment as preserving a person's right to enforce a state law that contradicts the Constitution, which is the effect of CERT's argument here. The court declines to read the Petition Clause as CERT would have it. Doing so would permit states to insulate their unconstitutional laws from constitutional challenges by permitting private parties to enforce them.

Another way to express this reasoning is in terms of liability, as the Chamber argues persuasively. It points out, for example, that CERT is not named in the Chamber's complaint and will not face any liability if the Chamber prevails. *See* Opp'n Summ. J. at 6–12. The Chamber's goal in this case is not to punish CERT. Nor is its purpose to obtain compensation for an injury CERT caused or to discourage CERT from petitioning for relief under Proposition 65. It is instead to vindicate the constitutional rights of the Chamber's own members. The *Noerr– Pennington* doctrine is a defense against claims "based on the petitioning of public authorities," *Empress LLC*, 419 F.3d at 1056, not claims based on the proponent's own constitutional rights, *see Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813, 825 (N.D. Cal. 2019)

("Defendants' declaratory judgment claim is not seeking to hold [the plaintiff] liable for its protected activity . . . . [T]he claim seeks a declaration that *Defendants* are *not* liable for infringement under the Lanham Act. The claim thus is outside the ambit of *Noerr–Pennington*." (emphasis in original)). The *Noerr–Pennington* defense is thus unavailable to CERT.

This is not to say the *Noerr–Pennington* doctrine never a offers a defense to requests for equitable relief, including in a declaratory judgment action. "[A]n action seeking a declaratory judgment . . . may force a citizen who petitions the government to incur the expense of defending his position in court and may therefore have precisely the sort of chilling effect on protected petitioning activity that the *Noerr–Pennington* doctrine is designed to prevent." *Westlands Water Dist. Distribution Dist. v. Nat. Res. Def. Council, Inc.*, 276 F. Supp. 2d 1046, 1054 (E.D. Cal. 2003). This court's decision in *B&G Foods North America, Inc. v. Embry* is a rare example of exactly such a case. *See* No. 20-0526, 2020 WL 5944330 (E.D. Cal. Oct. 7, 2020). The plaintiff in *B&G Foods*, a food manufacturer, sued a consumer who had herself filed a Proposition 65 enforcement action in state court the day before. *See generally* Compl., No. 20-0526 (E.D. Cal. filed Mar. 6, 2020).[13] The food manufacturer even sued the attorney who was representing the consumer in state court. *See id.* As a result, the federal lawsuit's burden on the defendant's right to petition was clear even though the claims were, on their face, equitable constitutional claims. Here, by contrast, the Chamber is not litigating concurrently against CERT in state court, did not sue CERT or CERT's attorneys, and did not even name CERT in its complaint. CERT became a defendant by its own choice when it moved to intervene.

Granting CERT's motion could also lead to an absurd result. The State does not argue it is entitled to a defense under the *Noerr–Pennington* doctrine. CERT implies the State would remain a defendant in this case even if CERT is entitled to summary judgment. *See* Reply Summ. J. at 2, ECF No. 105 (suggesting Chamber of Commerce "could litigate solely against [Attorney General] Becerra"). If this implication were correct, CERT and others would be free to pursue

---

[13] The court takes judicial notice of this document, its filing, and its allegations (but not their truth). *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record.").

private enforcement actions, but this case could continue.  And if the Chamber eventually prevailed, the State itself could not enforce Proposition 65.  This would leave consumers free to file enforcement actions even though the same enforcement actions would be unconstitutional if filed by the State.  CERT has cited no authority that could justify such an improbable outcome, and the court is aware of none.  If anything, California law appears to favor public enforcement of Proposition 65, not private enforcement, while not precluding the latter.  *See, e.g.*, *Yeroushalmi v. Miramar Sheraton*, 88 Cal. App. 4th 738, 750 (2001) (concluding that Proposition 65 notice letters are intended to encourage public enforcement).

CERT is not entitled to a defense under the *Noerr–Pennington* doctrine.  Its motion for summary judgment is denied.

## III.    PRELIMINARY INJUNCTION

The Chamber of Commerce moves for a preliminary injunction barring the State and any private litigant from enforcing Proposition 65 against businesses who do not warn consumers that acrylamide in food is "known to the State of California to cause cancer."  It seeks prospective relief only; it asks the court to enjoin only "new lawsuits."  *See* Chamber's Mot. at 20.  It does not ask the court to prohibit notices of alleged Proposition 65 violations, to enjoin existing suits, to prohibit settlements or consent decrees, or to bar CERT from continuing its litigation about acrylamide in coffee.  *See* Chamber's Reply at 14–15.

The State and CERT both oppose the motion.  Each argues separately that the Chamber has not met its obligation to show a preliminary injunction should be granted under the test in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).  *See* Cal. Opp'n at 9–20, ECF No. 101; CERT Opp'n at 17, ECF No. 100.  CERT also contends, more ardently, that a preliminary injunction would be an unconstitutional prior restraint on its First Amendment rights.  *See* CERT Opp'n at 8–16.  The court addresses that argument first.

### A.    Prior Restraint

A "prior" or "previous" restraint is an administrative or judicial order "forbidding certain communications" before those communications occur.  *Alexander v. United States*, 509 U.S. 544, 550 (1993) (citation, quotation marks, and emphasis omitted).  Preliminary injunctions barring

17

speech "are classic examples of prior restraints." *Id.* They are almost always improper; the Supreme Court has described the "constitutional freedom from previous restraint" as an "immunity" against "censorship" rooted deeply in American and English legal history. *See Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 716, 720 (1931). There is "a heavy presumption" against the validity of a prior restraint on speech. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (citations and quotation marks omitted).

Not all orders that make expression more difficult, expensive, or less effective are prior restraints. An order forfeiting a publisher's assets, for example, is not a prior restraint even if it prevents the publisher from selling its magazines. *See Alexander*, 509 U.S. at 550–51. If the publisher could find new funding, it could continue publishing. *See id.* at 551. Nor is an order closing a bookstore necessarily a prior restraint. *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706–07 (1986). The store could move to a new building. *See id.* at 706.

If the Chamber of Commerce were requesting a preliminary injunction against pre-suit demand letters, settlement negotiations, or notices of violations, it would likely be requesting a prior restraint. These are "communications" under *Alexander*, 509 U.S. at 550. But the Chamber is not asking for that relief. As confirmed at hearing, at this stage it is asking only for an injunction against future lawsuits while this case is pending. An injunction barring enforcement through litigation would admittedly dull the teeth of a demand letter or notice for the injunction's duration. Without a legal threat, a recipient may not negotiate or even respond. But the injunction the Chamber requests today would not forbid letters and demands, so it would not be a prior restraint on speech. *See id.* at 550–51 (holding that order was not prior restraint because it did not "*forbid* petitioner from engaging in any expressive activities in the future" (emphasis in original)). The court need not and does not consider now whether some broader or more permanent form of relief might be an unconstitutional prior restraint.

What remains, then, is CERT's argument that a preliminary injunction against future enforcement actions and nothing more would still be an impermissible prior restraint. CERT cites no decision denying a preliminary injunction against likely unconstitutional private litigation because the injunction would amount to a prior restraint. This court's own searches have

18

uncovered no such case.  To the contrary, the All Writs Act permits federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions," 28 U.S.C. § 1651, and the Anti-Injunction Act permits "injunctions against the institution of state court proceedings," *Dombrowski v. Pfister*, 380 U.S. 479, 484 n.2 (1965), which implies that a federal court may enjoin new state court lawsuits if necessary and appropriate, *see, e.g.*, *In re Baldwin-United Corp.*, 770 F.2d 328, 335–36 (2d Cir. 1985).  Federal courts have indeed enjoined lawsuits preemptively in many circumstances, for example to quiet post-settlement donnybrooks,[14] to resolve class actions[15] and multidistrict litigation,[16] to consolidate admiralty claims in a single venue,[17] and to sanction vexatious litigants or prevent frivolous lawsuits,[18] among other reasons.[19] In rare circumstances, district courts in this circuit can even enjoin a litigant from pursuing claims in another country.[20]

[14] *See, e.g.*, *Flanagan v. Arnaiz*, 143 F.3d 540, 544–45 (9th Cir. 1998) (affirming injunction against "filing any action in the courts of any state" related to settlement agreement because "'federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case.'" (quoting *Atl. Coast Line R.R. Co. v. B'hood of Locomotive Eng'rs*, 398 U.S. 281, 295 (1970))).

[15] *See, e.g.*, *Nitsch v. Dreamworks Animation SKG Inc.*, No. 14-04062, 2016 WL 4424965, at *8 (N.D. Cal. July 6, 2016) (enjoining any lawsuits by members of proposed settlement class).

[16] *See, e.g.*, *Baldwin-United*, 770 F.2d at 331 (affirming injunction against "persons having actual knowledge of" injunction from "commencing any action or proceeding" against any defendants in multidistrict litigation that "may in any way affect the right of any plaintiff or purported class member in any proceeding under" multidistrict litigation).

[17] *See, e.g.*, *In re Complaint of Ross Island Sand & Gravel*, 226 F.3d 1015, 1017 (9th Cir. 2000) (per curiam) (describing Limitation of Liability Act, 46 U.S.C. § 183, which permits district courts to enjoin related actions against owner of vessel).

[18] *See, e.g.*, *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 705 F.2d 1515, 1523 (9th Cir. 1983) ("A United States District Court hearing a particular case possesses the power to enjoin the filing of related lawsuits in other federal courts."); *De Long v. Hennessey*, 912 F.2d 1144, 1147 (9th Cir. 1990) ("[T]here is strong precedent establishing the inherent power of federal courts to regulate the activities of abusive litigants by imposing carefully tailored restrictions under the appropriate circumstances." (citation omitted)).

[19] *See, e.g.*, *Orange Cty. v. Air California*, 799 F.2d 535, 537 (9th Cir. 1986) (affirming district court's decision to bar intervention after explaining the district court had enjoined "filing [of] new CEQA actions in state court").

[20] *See, e.g.*, *Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 652 F.2d 852, 855 (9th Cir. 1981) ("A federal district court with jurisdiction over the parties has the power to enjoin

That said, the Supreme Court has suggested that "enjoining a lawsuit could be characterized as a prior restraint." *BE & K*, 536 U.S. at 530. An injunction against future litigation "carries at least some risk" of violating the First Amendment's Petition Clause. *Jones v. Rd. Sprinkler Fitters Local Union No. 669, U.A., AFL-CIO*, No. 13-3015, 2013 WL 5539291, at *2 (C.D. Cal. July 24, 2013). In this respect, CERT's prior restraint argument echoes its *Noerr–Pennington* argument. Both rest on CERT's claim to a First Amendment right to pursue Proposition 65 litigation in state court regardless of any constitutional implications of that litigation. As explained in the previous section, CERT's argument leads to an absurd conclusion. In addition, if the Chamber is correct that Proposition 65 lawsuits about acrylamide in food are inconsistent with the First Amendment, private enforcement actions targeting acrylamide would run head-on into a constitutional prohibition. And "if the lawsuit seeking to be enjoined 'has an illegal objective,' it is 'not protected by the Petition Clause.'" *Id.* (quoting *Small v. Operative Plasters' Local 200*, 611 F.3d 483, 493 (9th Cir. 2010), in context of retaliatory labor claims); *see also Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 737 n.5 (1983) (holding that suit with "an objective that is illegal" may be enjoined without violating First Amendment).

In sum, if the presumption against prior restraints protects a Petition Clause right to file new lawsuits, it would not bar the relief the Chamber seeks here. The court thus considers whether the Chamber is likely to succeed on the merits of its First Amendment claim.

### B.    Likelihood of Success on the Merits

"A preliminary injunction is an extraordinary remedy, never awarded as of right." *Winter*, 555 U.S. at 24. In determining whether to issue a preliminary injunction, courts must consider (1) whether the moving party "is likely to succeed on the merits" (2) whether it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) whether "the balance of equities tips in [its] favor, and" (4) whether "an injunction is in the public interest." *Id.* at 20. The moving party

/////

---

them from proceeding with an action in the courts of a foreign country, although the power should be used sparingly." (citation and quotation marks omitted)); *Sun World, Inc. v. Lizarazu Olivarria*, 804 F. Supp. 1264, 1270 (E.D. Cal. 1992) (same).

has the burden of proving an injunction is warranted by "a clear showing." *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation, quotation marks, and emphasis omitted)).

The court begins with Chamber's potential for success on the merits of its First Amendment claim. "The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Family & Life Advocates* (*NIFLA*) *v. Becerra*, 138 S. Ct. 2361, 2371 (2018). Laws that target speech "based on its communicative content" are unconstitutional unless the government shows the laws survive strict scrutiny in that they are "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). The government must also satisfy this test when it compels people to say something they would not otherwise say, as Proposition 65 does here, because these types of regulations necessarily change what a person says. *See NIFLA*, 138 S. Ct. at 2371; *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988).

Although strict scrutiny is the "ordinary" rule in such cases, the Supreme Court has sometimes "applied a lower level of scrutiny" to regulations of commercial speech. *NIFLA*, 138 S. Ct. at 2372. "Commercial speech" is "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980). Under *Zauderer v. Office of Disciplinary Counsel*, "the government may compel truthful disclosure in commercial speech as long as the compelled disclosure is 'reasonably related' to a substantial governmental interest." *CTIA—The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 845 (9th Cir.), *cert. denied*, 140 S. Ct. 658 (2019) (quoting 471 U.S. 626, 651 (1985)). The required disclosure must be "limited to 'purely factual and uncontroversial information.'" *NIFLA*, 138 S. Ct. at 2372 (quoting *Zauderer*, 471 U.S. at 651). Although *Zauderer* itself concerned the government's interest in preventing deception, *see* 471 U.S. at 651, the Ninth Circuit has held that the *Zauderer* test also applies when "the disclosure does not protect against deceptive speech," *CTIA*, 928 F.3d at 843–44.

The parties agree Proposition 65 compels commercial speech. *See* Cal. Opp'n at 9 n.4; Chamber's Mot. at 9. This leaves the court to decide whether, under *Zauderer*, the compelled warning (1) requires the disclosure of purely factual and uncontroversial information only, (2) is

justified and not unduly burdensome, and (3) is reasonably related to a substantial government interest. *See Am. Beverage Ass'n v. City & Cty. of San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc). The court may consider these requirements in any order. *See id.* The State bears the burden to show each element of this test is likely to be resolved in its favor, both in response to a motion for a preliminary injunction and on the merits. *See id.*; *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115–16 (9th Cir. 2011), *overruled in part on other grounds by Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019) (en banc).

In analyzing whether the Chamber is likely to succeed, the safe harbor warning described in the regulations implementing Proposition 65 is the natural place to start. In this case, the safe-harbor warning would read: "Consuming this product can expose you to [acrylamide], which is . . . known to the State of California to cause cancer. For more information go to www.P65warnings.ca.gov/food." Cal. Code Regs. tit. 27, § 25607.2(a)(2).

At this stage of the case, the State has not shown this warning is purely factual and uncontroversial. By asserting vaguely that consuming a product can "expose" a person to acrylamide—a chemical most people have likely never used in preparing food or even heard of— the warning implies incorrectly that acrylamide is an additive or ingredient. The safe harbor language is also only "factual" if consumers can discern its underlying logic:

- Animals more frequently develop cancerous tumors when they consume doses of the chemical many hundreds of times larger than the amounts in the food.

- Toxicologists presume that chemicals causing cancer in experimental animals also cause cancer in people, even in much smaller doses, absent evidence to the contrary, and

- As a result, following a cascade of self-referential state and federal regulations, the chemical is, by definition, "known" to cause cancer in humans. *See* Cal. Opp'n at 12–13.

Such discernment is unlikely. People who read the safe harbor warning will probably believe that eating the food increases their personal risk of cancer. *See id.* at 2 (citing Nowlis Decl. ¶ 54, ECF No. 95-25).

22

Some evidence does support such an inference, including laboratory experiments with mice and rats, in vitro studies of human cells, and statistical investigations of tumor genomes. But dozens of epidemiological studies have failed to tie human cancer to a diet of food containing acrylamide. Nor have public health authorities advised people to eliminate acrylamide from their diets. They have at most voiced concern. California has also decided that coffee, one of the most common sources of acrylamide, actually reduces the risk of some cancers. And that decision rested in part on a review of epidemiological evidence similar to the evidence the Chamber cites now. *See* Norris Decl. Ex. N at 5. In short, the safe harbor warning is controversial because it elevates one side of a legitimately unresolved scientific debate about whether eating foods and drinks containing acrylamide increases the risk of cancer. *Cf. CTIA*, 928 F.3d at 845 (distinguishing *NIFLA*, 138 S. Ct. at 2372).

The State cannot escape these uncertainties by redefining what it means for California to "know" that acrylamide causes cancer, *see Nat'l Ass'n of Manufacturers v. S.E.C.*, 800 F.3d 518, 529–30 (D.C. Cir. 2015), or by showing the warning contains no affirmative falsehoods, *CTIA— The Wireless Ass'n v. City & Cty. of San Francisco, Cal.*, 827 F. Supp. 2d 1054, 1062–63 (N.D. Cal. 2011), *aff'd in relevant part*, 494 F. App'x 752 (9th Cir. 2012) (unpublished). Statements are not necessarily factual and uncontroversial just because they are technically true. Courts in this Circuit have reached that conclusion many times with respect to Proposition 65 and other regulations. Another judge of this court recently enjoined a Proposition 65 warning about what was "known" to California because the warning was only correct if the reader understood the "complex web of statutes, regulations, and court decisions" behind Proposition 65. *Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247, 1259–60 (E.D. Cal. 2020). A Northern District court found similarly that a warning about radiation from cell phones went too far because it could leave "the uninitiated" with a "misleading impression" about the dangers they actually faced. *CTIA*, 827 F. Supp. 2d at 1062–63. And the Ninth Circuit rejected California's argument that a label about a video game age ratings was uncontroversial and factual because the scheme invited incorrect conclusions about what was legal and what was not. *See Video Software*

/////

1   *Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 966–67 (9th Cir. 2009), *aff'd sub nom. Brown v.*
2   *Entm't Merchants Ass'n*, 564 U.S. 786 (2011).

3       The problems posed by the safe harbor warning could have been avoided.  The State could
4   allow businesses to explain that acrylamide forms naturally when some foods are prepared.  It
5   could permit businesses to say that California has listed acrylamide as a chemical that "probably"
6   causes cancer or is a "likely" carcinogen or that the chemical causes cancer in laboratory animals.
7   It could permit businesses to say that acrylamide is commonly found in many foods and that
8   neither the federal government nor California has advised people to cut acrylamide from their
9   diets.  The State indeed permitted a more circumspect warning as a result of the *Frito Lay*
10  litigation.  *See* Consent J. as to Frito-Lay at 10, Purtle Decl. Ex. E.

11      According to the State, an alternative warning along these lines is already available to any
12  California business.  *See* Cal. Opp'n at 15–16.  And the Chamber concedes California regulations
13  no longer require warnings to state that "the chemical in question is known to the state to cause
14  cancer."  *See* Chamber's Mot. at 5.  The Attorney General's current regulations also permit the
15  parties to a private enforcement action to agree for a defendant to warn that a product "may"
16  cause cancer.  *See* Cal. Code Regs. tit. 11, § 3202(b).

17      Other regulations, by contrast, appear to contradict the State's position.  The Attorney
18  General's regulations do not permit warnings that the chemical itself "may" cause cancer.  *See id.*
19  Regulations bar all but a few limited additions and clarifications.  *See* Cal. Code Regs. tit. 27
20  § 25601(e); *id.* tit. 11 § 3202(b).  California courts have overruled demurrers and denied motions
21  for summary adjudication in enforcement actions about warnings similar to those the State
22  accepted in the *Frito Lay* litigation, leading to years-long litigation.  *See* Norris Decl. ¶¶ 34–41.
23  Defending the resulting litigation can then be cost-prohibitive, as described above.  As a result,
24  when recent Proposition 65 settlements have resulted in an agreed warning, rather than, for
25  example, a reformulation or cessation of business, they have almost uniformly used the safe
26  harbor language that is likely misleading.  *See id.* ¶¶ 17–23.  On this basis, the Chamber argues
27  that only the safe harbor warning is actually useable in practice.  *See* Chamber's Mot. at 11–12;
28  Chamber's Reply at 8–9, ECF No. 106.

On this record, the Chamber's argument is persuasive. The State cannot "put the burden on commercial speakers to draft a warning that both protects their right not to speak and complies with Proposition 65." *Wheat Growers*, 468 F. Supp. 3d at 1261. If the seas beyond the safe harbor are so perilous that no one risks a voyage, then the State has either compelled speech that is not purely factual, or its regulations impose an undue burden. *See Am. Beverage Ass'n*, 916 F.3d at 757 (holding State did not carry its burden because warning "'effectively rule[d] out the possibility of having an advertisement in the first place'" and that the disclosure "fail[ed] for that reason alone" (quoting and citing *NIFLA*, 138 S. Ct. at 2378 (other alterations omitted)); *cf. CTIA*, 928 F.3d at 848 (finding disclosure regulation not unduly burdensome in part because it permitted businesses to disclose "additional information"). The State has not carried its burden to show Proposition 65 warnings about acrylamide in food are constitutional under *Zauderer*.

The State relies primarily on two cases to urge the opposite conclusion. Both are readily distinguishable from this one. First, it cites the Second Circuit's decision in *National Electric Manufacturers' Association v. Sorrell*, 272 F.3d 104 (2d Cir. 2001). The compelled speech at issue in that case was a Vermont statute requiring manufacturers to inform consumers if a product contained "mercury added during manufacture." *Id.* at 107 n.1. The warning was required to "clearly inform the purchaser or consumer that mercury is present" and that the product "may not be disposed of . . . until the mercury is removed and reused, recycled, or otherwise managed." *Id.* The statute did not appear to permit any private enforcement scheme analogous to that created by Proposition 65. *See id.* at 107–08. The Second Circuit agreed with Vermont that this warning did not violate the manufacturers' First Amendment rights. *See id.* at 115–16. The manufacturers did not dispute that the warning was factual and uncontroversial under *Zauderer*. *See id.* The Second Circuit focused instead on the relationship between the warning and Vermont's interest in reducing mercury pollution. *See id.* It found that relationship to be obvious. *Id.* at 115. Here, by contrast, the State has not shown that the safe-harbor acrylamide warning is purely factual and uncontroversial, and Proposition 65's enforcement system can impose a heavy litigation burden on those who use alternative warnings.

/////

Second, the State relies on the Ninth Circuit's decision in *CTIA v. City of Berkeley*, 928

F.3d 832. Berkeley required cell phone retailers to give the following warning:

> To assure safety, the Federal Government requires that cell phones meet radio-frequency (RF) exposure guidelines. If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation. Refer to the instructions in your phone or user manual for information about how to use your phone safely.

*Id.* at 838 (quoting Berkeley Mun. Code § 9.96.030(A) (2015)). The city permitted retailers to

add "other information" to the warning at their discretion "as long as that information is distinct

from the notice language." *Id.* (quoting Berkeley Mun. Code § 9.96.030(B) (2015)). The

plaintiffs argued that the warning was neither factual nor uncontroversial because it implied

incorrectly that cell phones emit dangerous radiation. *See id.* at 846. The Ninth Circuit disagreed

and upheld the warning under *Zauderer*. *See id.* at 843–49.

California's acrylamide warning differs from Berkeley's radiation warning in three ways

that, on this record, show that the State's warning is unlikely to survive the Chamber's First

Amendment challenge. First, here, although Berkeley's warning hinted at potential dangers, for

example by referring vaguely to "safety," *cf. id.* at 853–55 (Friedland, J., dissenting), its text was

a purely factual summary of federal regulation about radio frequency radiation. The cell phone

retailers did not even argue that the radiation disclosure was "controversial as a result of

disagreement about whether radio-frequency radiation can be dangerous to cell phone users." *Id.*

at 848. The State's acrylamide warning language, by contrast, states without qualification that the

acrylamide in the particular food identified is "known to cause cancer." The truth of that

statement is the subject of controversy. The State urges this court to draw a contrast between the

hot political and moral controversy at issue in *NIFLA,* abortion, and the Chamber's disagreement

about whether acrylamide causes cancer, along the lines of the Ninth Circuit's opinion in *CTIA*.

*See* Opp'n Prelim. Inj. at 14 (citing 928 F.3d at 845). The court declines to draw that distinction.

A controversy may prevent *Zauderer* from applying even if it is not political. *See, e.g., Nat'l

Ass'n of Mfrs.*, 800 F.3d at 530 (holding compelled warnings about whether mineral was "conflict

free" were controversial).

Second, in *CTIA*, federal regulations had already required cell phone manufacturers to disclose the same or similar information as the Berkeley ordinance required of retailers. *See* 928 F.3d at 840–41. Here, no other public health body has warned that acrylamide in food causes cancer in people or has even reached that conclusion. No regulatory or public health authority has advised against consuming foods with acrylamide.

Third, unlike the Berkeley ordinance, Proposition 65 does not permit businesses to add information to the required warning at their discretion, and thus prevents them from explaining their views on the true dangers of acrylamide in food. That prohibition exacerbates the effect of the warning. It threatens to "drown out" a business's "messaging" addressing the claimed dangers of acrylamide in food. *See id.* at 849.

The court thus concludes the Chamber of Commerce is likely to show the acrylamide warning required by Proposition 65 is controversial and not purely factual. The warning is therefore unlikely to be permissible under *Zauderer*.

It is unclear whether a further analysis under some other more stringent constitutional test is necessary. On the one hand, in *American Beverage Association*, the Circuit held that the plaintiff was likely to succeed on the merits immediately after deciding that the defendant had not carried its burden under *Zauderer*. *See* 961 F.3d at 757–58. But on the other hand, in a footnote, the Circuit suggested that an analysis under a "higher standard" was still necessary, although it left little doubt that if a claim does not meet the "lower standard" of *Zauderer*, it could not meet any "higher standard" either. *See id.* at 757 n.5. It is also unclear what that "higher standard" would be. The Chamber and the State both assume the correct test is the one described in *Central Hudson*. *See* Chamber's Mot. at 16–18; State Opp'n at 16–17. But in *CTIA*, the Circuit made clear that "*Central Hudson*'s intermediate scrutiny test does not apply to compelled, as distinct from restricted or prohibited, commercial speech." 928 F.3d at 842.

This court assumes without deciding that an analysis under a heightened standard of constitutional scrutiny is necessary and that the correct constitutional test is the "intermediate" level of scrutiny described in *Central Hudson*: "the government may restrict or prohibit commercial speech that is neither misleading nor connected to unlawful activity, as long as the

governmental interest in regulating the speech is substantial." *CTIA*, 928 F.3d at 842 (citing 447 U.S. at 564). "The restriction or prohibition must 'directly advance the governmental interest asserted,' and must not be 'more extensive than is necessary to serve that interest.'" *Id.* (quoting 447 U.S. at 566).

"There is no question that protecting the health and safety of consumers is a substantial government interest." *CTIA*, 928 F.3d at 845. California therefore has a substantial interest in protecting its citizens from substances that cause cancer. But at this stage of the litigation, the Chamber has shown the warning the State demands likely does not "directly advance" that interest and is "more extensive than necessary." *Cent. Hudson*, 447 U.S. at 566. As discussed above, the safe harbor warning is incorrect, and it implies misleadingly that the science about the risks of food-borne acrylamide is settled. In setting the statewide rules applicable to all, state regulators have also rejected alternative, less controversial language than the safe harbor language. If a business decides not to use the safe harbor warning, it risks expensive and lengthy litigation against private enforcers or the State, and defendants carry heavy evidentiary burdens if they attempt to show their products contain permissibly small quantities of acrylamide. The State also has many alternatives to compelled private speech at its disposal. It can fund scientific research and pursue public awareness campaigns, for example. Regulators could also modify safe harbor warnings to eliminate inaccuracies and controversial statements.

The Chamber is thus likely to show the Proposition 65 acrylamide warning falls short of the *Central Hudson* test. If a law fails the "intermediate" test of *Central Hudson*, it also fails the more stringent test that applies to content-based restrictions in general. *See NIFLA*, 138 S. Ct. at 2375. The Chamber is likely to succeed on the merits of its First Amendment claims.[21]

## C. Harms and the Public Interest

A likelihood of success on the merits does not alone entitle the Chamber to a preliminary injunction. It must also show it would suffer irreparable harm if new Proposition 65 enforcement

/////

---

[21] The court does not reach the Chamber's facial challenge. *See* Chambers Mem. at 18.

actions can be filed while this lawsuit is pending and that this harm outweighs the State's and the

public's interest in those enforcement actions. *See Winter*, 555 U.S. at 20.

"Irreparable harm is relatively easy to establish in a First Amendment case." *CTIA*,

928 F.3d at 851. Because the Chamber has a "colorable First Amendment claim," it has

demonstrated it "likely will suffer irreparable harm" if Proposition 65 warnings against

acrylamide can be enforced while this litigation is pending. *Am. Bev. Ass'n*, 916 F.3d at 758.

California argues the Chamber cannot show it would suffer any irreparable harm because

its members have known for so long that acrylamide is found in foods. *See* State Opp'n at 18–19.

As the Chamber points out, however, its decision to file this lawsuit now is in response to a recent

increase in private enforcement actions. *See* Chamber's Mot. at 8 ("[S]ince [the Chamber] filed

its complaint, private enforcers have served 391 pre-litigation notices and filed 43 new

Proposition 65 lawsuits in state courts for alleged exposures to acrylamide in food."); Chamber's

Reply at 12–13 ("In 2019 alone, there were 205 notices (up from 147 notices in 2018), and

private enforcers show no signs of slowing down, serving more than 400 notices to date in

2020."); *see also* ECF Nos. 15, 37, 58, 86, 97, 111 (collecting new notices and private

enforcement actions). The cases the State cites are also not comparable to this one. The Chamber

of Commerce is not in the same position as a person who waits several months to assert a

copyright claim after she finds the allegedly infringing video on the internet. *Cf. Garcia v.*

*Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc). Nor is it in the position of a newspaper

that inexplicably delays in asserting a claim that its rival stole its subscribers and harmed its

reputation. *Cf. Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir.

1985). And unlike the plaintiff in *Lydo*, the Chamber has shown it has likely suffered a First

Amendment injury. *Cf. Lydo Enters. v. Las Vegas*, 745 F.2d 1211, 1213–14 (9th Cir. 1984).

As for the balance of harms and the public interest, although a state "suffers a form of

irreparable injury" any time it is "enjoined by a court from effectuating statutes," *New Motor*

*Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., Circuit

Justice), the Ninth Circuit has "consistently recognized the significant public interest in upholding

First Amendment principles," *Am. Bev. Ass'n*, 916 F.3d at 758 (quoting *Doe v. Harris*, 772 F.3d

563, 583 (9th Cir. 2014)). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). The injunction requested here is also quite narrow, as noted above. It leaves private parties and the State with many tools for increasing public awareness about the risks of acrylamide in foods. CERT and other private enforcers can send demand letters and notices of violations. They can litigate existing claims and pursue appeals. They can pursue public relations campaigns. They can fund research. They can buy advertisements.

The State argues a preliminary injunction would create uncertainty because businesses might argue it permits them to modify consent decrees already in place. *See* Cal. Opp'n at 20 (citing *3750 E. Foothill Blvd., Inc. v. City of Pasadena*, 912 F. Supp 1257, 1260 (C.D. Cal. 1995) (explaining injunctions that "change the status quo are viewed with hesitancy and carry a heavy burden of persuasion" (citation and quotation marks omitted)). The Chamber does not request that relief, however. *See* Chamber's Reply at 13. The court sees no reason to award it. This order does not alter existing consent decrees, settlements, or other agreements. For example, this order does not permit businesses that have already agreed to display a certain warning do take those warnings down, and businesses that have agreed to reformulate their products to reduce acrylamide content are not permitted by this order to breach those agreements.

Finally, the State cautions that enjoining an aspect of Proposition 65, even preliminarily, would invite challenges to other regulations about carcinogens and reproductive toxins. *See* Cal. Opp'n at 20; *see also Nat'l Elec. Mfrs.*, 272 F.3d at 116 ("Innumerable federal and state regulatory programs require the disclosure of product and other commercial information."). The risk of misinterpretation or misuse of an order is not lost on this court. California has a substantial and likely compelling interest in protecting people from exposure to dangerous chemicals, including chemicals that have been shown to cause cancer or reproductive harm in experimental animals, even if epidemiological evidence is inconclusive. Health and safety warnings have "long been considered permissible." *NIFLA*, 138 S. Ct. at 2376. The State may ultimately show the Chamber is not entitled to a permanent injunction. It may also move to

/////

dissolve the preliminary injunction, perhaps to permit the enforcement of alternative warnings. But given the record before the court at this juncture, these are questions for another day.

**IV.   CONCLUSION**

The Chamber of Commerce's motion for a preliminary injunction is **granted**.  CERT's motion for summary judgment is **denied**.

While this action is pending and until a further order of this court, no person may file or prosecute a new lawsuit to enforce the Proposition 65 warning requirement for cancer as applied to acrylamide in food and beverage products.  This injunction applies to the requirement that any "person in the course of doing business" provide a "clear and reasonable warning" for cancer before "expos[ing] any individual to" acrylamide in food and beverage products under California Health & Safety Code § 25249.6.  It applies to the Attorney General and his officers, employees, or agents, and all those in privity or acting in concert with those entities or individuals, including private enforcers under section 25249.7(d) of the California Health & Safety Code.

This order does not alter any existing consent decrees, settlements, or other agreements related to Proposition 65 warning requirements.

This order resolves ECF Nos. 93 and 95.

IT IS SO ORDERED.

DATED:  March 29, 2021.

CHIEF UNITED STATES DISTRICT JUDGE