POULSEN LAW P.C.
Aida Poulsen, Esq., SBN 333117
282 11th Avenue, Suite 2612
New York, NY 10001
Telephone: (646) 776-5999

ATTORNEYS FOR PROPOSED INTERVENOR-DEFENDANT
PENNY NEWMAN

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA CHAMBER OF COMMERCE,<br><br>   PLAINTIFF,<br><br>v.<br><br>ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,<br><br>   DEFENDANT,<br><br>and<br><br>COUNCIL FOR EDUCATION AND RESEARCH ON TOXICS,<br><br>   DEFENDANT-INTERVENOR | Civil Action No. 2:19-cv-02019-KJM-EFB<br><br>**REPLY TO OPPOSITION BY CALIFORNIA CHAMBER OF COMMERCE TO PENNY NEWMAN'S MOTION TO INTERVENE**<br><br>DATE:   August 6, 2021<br>TIME:    10:00 a.m.<br>ROOM:  3 (15th Floor)<br>JUDGE:  Kimberly A. Mueller |

REPLY TO CHAMBER'S RESPONSE TO NEWMAN'S MOTION TO INTERVENE

**TABLE OF CONTENTS**

**I. REPLY TO OPPOSITION OF CHAMBER**................................................................................. **1**

**II. INTERVENTION AS OF RIGHT** ........................................................................................... **2**

      **A. Significant Protectable Interest** ..................................................................................... **2**

      **B. Newman's Motion is Timely**.......................................................................................... **8**

**III. CONCLUSION**........................................................................................................................ **11**

## I. REPLY TO OPPOSITION OF CHAMBER

California Chamber of Commerce ("Chamber") first attempted to initiate this action on October 7 2019. When Council For Education And Research On Toxics ("CERT"), a private enforcer of Proposition 65 ("enforcer(s)") who previously co-litigated with AG, [Dkt. 45 at 13 n.1], and knew about the case without a notice, successfully dismissed the action on March 3, 2020 [Doc. 56], Chamber refiled the complaint on March 16, 2020 [Doc. 57]. Chamber concedes that after CERT moved to intervene, Chamber mailed (although improper) notices to select attorneys of enforcers, inviting 18 interventions. When the Court granted a preliminary injunction, Chamber drastically reversed its position, admitting: "a week after the Court issued its preliminary injunction on March 30, 2021... I declined to stipulate [to an intervention of unnamed enforcer]...." [Doc. 141-1 at 3].

Chamber's celebration in the press of the wide implications of the injunction, and of the future impending relief for other Proposition 65 chemicals, then led Chamber to trying to extinguish the fire with misrepresentation of the same fact to the Ninth Circuit Court as a "bare procedural issue" "devoid of any harm" and about "just one of over 900 listed chemicals when found in one set of products." [Dkt. 35-2, at 11-12], while asking relief for "thousands of food products" sold and produced by its members. [Doc. 57 at 19]. Granting Chamber the relief it seeks would potentially repeal in what may amount to 92% of chemicals which are in the same or lower than acrylamide group, [Dkt. 20 at 9], and changing the allowable levels of acrylamide in drinking water from 0.2 mcg/day as a carcinogen now and 140 mcg/day as a reproductive toxin, to 140 mcg/day only, 87 times higher than EPA's Reference Dose for Oral Exposure. Water supply is increasingly treated with acrylamide and is increasingly endangered by major industrial sources of acrylamide, and the enormity of an impact of Chamber's "success" with this case will be felt by every Californian. Newman asks this Court to save Chamber from itself. Injunction is currently stayed by the Ninth Circuit Court only as relates to private enforcers, [Dkt. 16] as a result of AG's failure to appeal- the result that showcases AG's inadequacy in protecting the people from yet another industrial attack on their health. AG historically has shown not only inadequacy to protect people when the riches' interests are involved, it actually used people's money for decades to help the polluters, cover it up, and exonerate their interests. protecting them against the community in *Newman v. Stringfellow* (Super. Ct. Riverside County, No. 165994MF).

REPLY TO CHAMBER'S RESPONSE TO NEWMAN'S MOTION TO INTERVENE (2:19-CV-02019-KJM-JDP)   Page 1

## II. INTERVENTION AS OF RIGHT

**A. Significant Protectable Interest**

**Chamber portrays Newman as a pawn**

Chamber portrays the bigger than life personality- Penny Newman- as a reticent puppet of unclear whom- of HLF, of Newman's counsel, or of some scattered enforcers, ignoring the fact that Newman's activism and accomplishments may dwarf accomplishments of all other participants in this trial, or Erin Brockovich for that matter, especially considering her utter failure to be born into privilege. Unlike all of the participants, Newman, a lay person without any resources, somehow managed to enact a law by a vast majority of people of California; a law that has been working and protecting the people beyond her family, community and even California, for decades. Newman, unlike all case participants, has managed to win the biggest case in the history of California: *Stringfellow*, against AG and 217 likes of General Electric, Hughes Aircraft, McDonnell-Douglas, Montrose Chemical, Philco-Ford, Northrop, among other major cases. A character and a lifetime proof that Newman is not made of somebody's mold and is unlikely to follow anyone's footsteps or take orders.

**Chamber: Newman's arguments focused on Proposition 65's discharge into drinking water**

Playing a wolf in a lambskin, Chamber implies that the relief sought in this case is irrelevant for Proposition 65's prohibition of discharge of toxic chemicals into the drinking water, one of the major sources of Newman's community poisoning in 1978 that led to enactment of Proposition 65; as well as for commercial and other applicable standards for drinking water, and a warning requirement for exposure to acrylamide in drinking water. [Doc. 146 at 7]. And indeed, none of the defendants brought into the case, and the Court therefore did not consider, the obvious facts that food and beverage are made of water, as well as about 60% of human body,[1] and that the government does not have a monopoly on drinking water. Water comes from all sorts of sources and is an indivisible part of food.

Cal. Code Regs., tit. 27, § 25249.5 prohibits discharge of acrylamide, among other 900 chemicals, into drinking water; with two exemptions: (1) the discharge or release is below "significant amount" under Proposition 65 to enter any source of drinking water, and (2) the discharge or release is in conformity with

---

[1] https://www.usgs.gov/special-topic/water-science-school/science/water-you-water-and-human-body?qt-science, last visited July 30, 2021.

all other laws and with every applicable regulation. Section 25102(i) provides: "Expose" means to cause to ingest… a listed chemical." Under § 25401(d).

Acrylamide is regulated under the National Primary Drinking Water Standards established by EPA. However, EPA regulates acrylamide only through limiting the allowable amount of acrylamide in commercial polyacrylamide products used in drinking water treatment (<0.05%), and the polyacrylamide dose in water treatment (<1mg/L). EPA does not have data on the actual concentration of residual acrylamide in drinking water, or what percent of the population served by public water systems might be exposed to acrylamide through drinking water[2]. Ex. A at 2. The term "polyacrylamide" ("PAM") is loosely used to describe any polymer with acrylamide present as one of the monomers.[2] All PAM products contain some level of free acrylamide. The use of polyacrylamide in chemical water treatment, oil and gas extraction, soil conditioning for erosion control is increasing exponentially,[3] including in enhanced oil recovery and high-volume hydraulic fracturing that occur throughout Los Angeles, Riverside, San Bernardino, Ventura and many other California counties (*see* map),[4] presenting a strong potential for environmental acrylamide exposures and discharges into private and public water supplies. It is used agriculturally along the canals for erosion control; as a grout in private wells. These applications of PAM can result in significant environmental challenges, both in water management and contamination of local water supplies after accidental spills: "Acrylamide is highly mobile in aqueous environments and readily leachable in soil."[5] Although PAM is relatively nontoxic to humans, animals, fish, or plants, it degrades into acrylamide and is a known neurotoxin and potential carcinogen: it is dangerous at concentrations of 0.06 mg/L and is lethal (LD50) at 150–200 mg/kg body weight. However, in tap water, acrylamide can

---

[2] Table 2 summarizes the structure and name of commonly used PAM and its co-polymers: https://www.nature.com/articles/s41545-018-0016-8/tables/2, last visited July 30, 2021.
[3] EPA's Study of Hydraulic Fracturing and Its Potential Impact on Drinking Water Resources Characterization of liquid chromatography-tandem mass spectrometry method for the determination of acrylamide in complex environmental samples Patrick DeArmond and Amanda DiGoregorio. Analytical and Bioanalytical Chemistry. May 2013. https://www.epa.gov/hfstudy/characterization-liquid-chromatography-tandem-mass-spectrometry-method-determination, last visited July 30, 2021.
[4] Chen H, Carter KE. Characterization of the chemicals used in hydraulic fracturing fluids for wells located in the Marcellus Shale Play. J Environ Manage. 2017 Sep 15;200:312-324. doi: 10.1016/j.jenvman.2017.05.069. Epub 2017 Jun 4. PMID: 28591666. https://pubmed.ncbi.nlm.nih.gov/28591666/, last visited July 30, 2021.
[5] World Health Organization. "Acrylamide in Drinking-water" https://www.who.int/water_sanitation_health/dwq/chemicals/acrylamide.pdf, last visited July 30, 2021.



persist for more than two months.[6] Wastewaters generated from oilfields and fracturing sites contain a high concentration of PAM residues (10-1000 mg/L) that can be released into groundwater source via accidental spill and leakage.[7] The map shows the common major source of acrylamide discharge into drinking water- fracking sites in California, with Newman's home in Riverside in the middle right.

      The relief sought by Chamber amounts to declaring that acrylamide is not a carcinogen. That would entail removal of this toxin from the Proposition 65 list as a carcinogen and leaving it as only a reproductive toxin, freezing the enforcement of acrylamide in drinking water which would be measured against the only other existing standard, which is Prop. 65 as a reproductive toxin, a safe harbor 700-times more lenient at 140 mcg/day. Animal studies have shown neural degeneration upon chronic exposure to acrylamide in drinking water. Based on these studies, the current reference dose for chronic oral exposure (e.g., food and water) for humans was concluded to be 0.002 mg/kg/day.[8] Based on drinking water standards by EPA, the maximum allowable acrylamide concentration in drinking water would be 0.05 ug/L. Assuming Americans drink 3.2 L water per day on average, then EPA standards suggest limiting acrylamide intake at 1.6 ug/day. Ex. A at 4. The relief sought is 87 times higher, at 140 mcg/day.

      The table demonstrates the devastating effect on discharge prohibition for drinking water of the relief sought in this case:

| The Prop. 65 standard for a "significant amount" of acrylamide in drinking water, food and beverage ||
| Now | If Chamber's prevails |
| --- | --- |
| .2 mcg/day     140 mcg/day | **140 mcg/day** |

---

[6] Brown, L., Rhead, M. M., Bancroft, K. C. C. & Allen, N. Model studies of the degradation of acrylamide monomer. Water Res. 14, 775–778 (1980) cited in Xiong, B., Loss, R.D., Shields, D. et al. Polyacrylamide degradation and its implications in environmental systems. npj Clean Water 1, 17 (2018). https://doi.org/10.1038/s41545-018-0016-8, last visited July 30, 2021; https://www.nature.com/articles/s41545-018-0016-8, last visited July 30, 2021.

[7] Polyacrylamide degradation and its implications in environmental systems. Boya Xiong, Rebeca Dettam Loss, Derrick Shields, Taylor Pawlik, Richard Hochreiter, Andrew L Zydney, Manish Kumar. https://www.nature.com/articles/s41545-018-0016-8#ref-CR1, last visited July 30, 2021.

[8] Acrylamide; CASRN 79-06-1, Chemical Assessment Summary, Reference Dose for Oral Exposure, Integrated Risk Information System (IRIS), United States Environmental Protection Agency, 2010.

|  |  | x **700** higher than .2 mcg/day (Prop. 65 carcinogen) **x 87 higher than EPA standard** |
|---|---|---|
| Carcinogen | Reproductive toxin | Reproductive toxin |

Newman represents the major consequences that neither AG nor CERT have contemplated and brought to this case involving acrylamide in drinking water and water used for food and beverage products.

**Newman's Significant Protectable Interest**

Chamber begins with asserting that Newman was "one of three individuals who signed the "Arguments in Favor of Proposition 65" whereas she was the only non-official, a true individual who represented the people, signing it, Doc. 146 at 7. Next, Chamber not only misrepresents ballot language arguing that Newman signed the "Arguments in Favor of Proposition 65," thus supporting Chamber's challenge to Proposition 65's because "Chemicals that are only suspect are not included." [Doc. 146 at 7, footnote 2, Dkt. 35-2 at 13], but fails to disclose to the Court the authority that litigated and rejected this very argument in *AFL-CIO v. Deukmejian*,[9] the case Chamber later cites for another purpose.

Had Newman, as a proponent, intended to exclude acrylamide or any IARC Group 2A toxin, she would have then necessarily also intended to exclude dioxane[10] or trichloroethylene[11] present in drinking and ground water of Glen Avon and listed in the acrylamide group of "reasonably anticipated" carcinogens for 16 years.[3] *Deukmejian* court found:

> Placed in its relevant context, the portion of the proponents' ballot argument cited by defendant [Chemicals that are only suspect are not included] does not support defendant's position... Thus the proponent's ballot argument squares completely with the provisions of section 25249.8, subdivisions (a) and (b); nothing there suggests the Act is limited to those chemicals known to cause cancer only in humans. Rather, the list must include at a minimum those chemicals already known to cause cancer and already listed by "highly regarded national and international scientists." These lists include substances known to cause cancer in humans or animals.

Thus, Chamber's attempt at novel interpretations and added classification proves that imperative reasons support intervention.

---

[9] "All known or probable human carcinogens identified by the International Agency for Research on Cancer and the National Toxicology Program are presumed conclusively by the federal Hazard Communication Standard to be carcinogens and must be included on the initial list pursuant to Cal. Health & Safety Code § 25249.8(a) and Cal. Lab. Code § 6382(d)." *AFL-CIO v. Deukmejian* (1989) 212 Cal.App.3d 425, 429 [260 Cal.Rptr. 479]
[10] Jurupa Community Service District "2020 Water Quality Report," pp. 5-6
https://en.calameo.com/read/005549230d3dfb1dce4a5, last visited July 30, 2021.
[11] Stringfellow Mira Loma, CA Contamnant List
https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.contams&id=0902680, last visited July 30, 2021.

**Newman need not be an enforcer to have a significant interest**

Chamber asserts that Newman is not an enforcer and therefore lacks standing. [Doc. 146 at 15-16], all while: 1) denying standing to HLF, an enforcer of 19 acrylamide cases; 2) knowing that Newman never claimed to be an enforcer nor based her significant interest on an enforcer's rights; 3) knowing that Newman asserts standing on a different legal theory. [Dkt. 29-1 at 10-22].

**Chamber asserts Newman lacks a significant interest because she 1) did not litigate against Big Pharma 2) does not legislate like Senator Hollingsworth**

Chamber argues that Newman, a former elementary school aid, derelicted her right to defend her Proposition by failing to spend millions of dollars to retain Big Law to take on Big Pharma and medical device manufacturers in cases like *Chemical Specialties Mfrs. Ass'n v. Allenby*, 958 F.2d 941 (1992)), *Comm. of Dental Amalgam Mfrs. and Dists. v. Stratton*, 92 F.3d 807 (1996), *Dowhal v. SmithKline Beecham Consumer Healthcare*, 32 Cal.4th 910 (2004), *AFL-CIO v. Deukmejian*, 212 Cal. App. 3d 425 (1989) [Doc. 146 at 15, Dkt. 35-2 at 10]; which somehow disqualifies her from intervention here, citing no authority to substantiate the stretch. It is, however, curious to note that she was actually prevented by AG from such litigation because she was in the courtroom of historically the biggest case in California where AG was spending millions of California people's dollars trying to prove that 217 of the world's biggest environmental polluters did not poison the people of Glen Avon. Newman's influence was evident in *Deukmejian*- the example Chamber cites, *see id*. at 441 (noting that the trial court took judicial notice of various pre-election materials including those distributed by initiative proponents). Newman's role in helping to develop and support the self-funded Proposition 65 is what is most crucial.  As the court noted in *Friends of Del Norte v. Cal. DOT*, 2020 U.S.Dist.LEXIS 134504, at *4-5 (N.D.Cal. July 29, 2020, No. 3:18-cv-00129-JD):

> DNLTC has a right to intervene. "A public interest group is entitled as a matter of right to intervene in an action challenging the legality of a measure it has supported." *Idaho Farm Bureau Fed'n*, 58 F.3d at 1397 (citation omitted). In *Wilderness Society*, the Ninth Circuit, sitting en banc, abandoned a rule that prohibited non-federal government entities from intervening as defendants in NEPA suits like this one, rejecting the premise that "such parties lack a 'significantly protectable' interest warranting intervention of right under Rule 24(a)(2) because NEPA is a procedural statute that binds only the federal government." 630 F.3d at 1177 (citation omitted).

Chamber continues by stating that Newman has failed to have sufficient legislative activity "unlike appellants in *Hollingsworth*," demanding of an elementary schoolaid to Senator Dennis Hollingsworth, California State Senate Minority Leader, who defended the same-sex marriage ban with his uncomparable resourses, and who was paid to participate in legislative actions. [Doc. 146 at 15].

Chamber criticizes Newman for omitting subsequent history and citing *Yniguez v. Arizona*, 939 F.2d 727, 733 (9th Cir. 1991) for its "virtual per se rule that the sponsors of a ballot initiative have a sufficient interest in the subject matter of litigation concerning that initiative to intervene." [Doc. 144 at 14]. However, courts, including the Ninth Circuit, regularly cite *Yniguez* without subsequent history. *See, e.g., Cal. Dep't of Soc. Servs. v. Thompson*, 321 F.3d 835, 845-46 (9th Cir. 2003):

> Intervenors in suits with a governmental party can often continue an appeal after the governmental party has declined to do so, even if they would not have been proper parties at the outset. *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1398(9th Cir. 1995)(allowing intervening environmental groups to appeal judgment setting aside endangered species listing even though Fish and Wildlife Service did not pursue appeal); *Didrickson v. U.S. Dep't of Interior*, 982 F.2d 1332, 1338 (9th Cir. 1992)(allowing Friends of the Sea Otter to appeal invalidation of federal regulations, despite government's decision to forego appeal); *Yniguez v. Arizona*, 939 F.2d 727, 732-34(9th Cir. 1991)(allowing intervenor to appeal where state declined to appeal after losing in district court); *National Wildlife Fed'n v. Lujan*, 289 U.S. App. D.C. 41, 928 F.2d 453, 456 n.2 (D.C. Cir. 1991).

Courts have omitted the history and recognized how the Ninth Circuit in *Vivid* specifically provided that the rule from *Yniguez* is still in place after the *Hollingsworth* decision:

> Intervenors' Motion to Intervene is GRANTED. *See Yniguez v. State of Ariz.*, 939 F.2d 727, 733 (9th Cir. 1991) ("there is a virtual per se rule that the sponsors of a ballot initiative have a sufficient interest in the subject matter of litigation concerning that initiative to intervene pursuant to Fed.R.Civ.P. 24(a)"); *Vivid Entertainment, LLC v. Fielding*, 2013 U.S. Dist. LEXIS 109251, 2013 WL 3989558, at *1-2 (C.D. Cal. Aug. 2, 2013) (this rule still has force following the Supreme Court's decision in *Hollingsworth v. Perry*, 133 S. Ct. 2652, 186 L. Ed. 2d 768 (2013)).

*Park at Cross Creek, LLC v. City of Malibu*, 2015 U.S.Dist.LEXIS 174939 (C.D.Cal. Apr. 10, 2015, No. LA CV15-00033 JAK (SHx)).[12] Here, such a personal interest is preserving Newman's lifetime achievement- the important, powerful and influential public health law, Proposition 65.

---

[12] In a case decided two months after `Hollingsworth`, this Court likewise held that an official proponent of the Patients' Bill of Rights had shown a significant protectable interest in an action challenging the validity of California statutes and regulations to restrict skilled nursing facilities' arbitration of violations of the Patient's Bill of Rights. `See Valley View Health Care, Inc. v. Chapman`, 2013

**B. Newman's Motion is Timely**

**1. Early Stage of Proceeding Before Any Discovery**

Chamber appears to be confused and disoriented about the current stage of the proceedings, claiming that the main issue of the case has been already litigated (without a trial) and Newman seeks to "relitigate" it. [Doc. 146 at 13]. It is unlikely that Chamber genuinely is unaware of the meaning of the trial as opposed to preliminary, pre-trial proceedings, therefore it could only be interpreted as an attempt to confuse and mislead the court into preserving its preliminary finding that it was led into by Chamber's Dr. Lipworth's "expertise," known for never finding a chemical that could cause cancer, including asbestos. [Doc. 128 at 12-13]. Chamber's argument about an advanced stage of the proceedings fails. The case is in an early, pre-scheduling phase, at the very least about nine months from a ruling on a summary judgment if the motions will be filed sometime in 2022.

**Court considers divergence of interests instead of specific argument and identified differences**

Likewise, the Ninth Circuit held it was immaterial that the intervenors had not identified any specific argument that the government was "either incapable or unwilling to make"; "it was sufficient for intervenors to show that 'because of the difference in interests, it is likely that Defendants will not advance the same arguments.'" *Id*. at *20 (quoting *Southwest Center for Biological Diversity v. Berg*, 268 F.3d 810 (9th Cir. 2001)). The Ninth Circuit approach focuses upon if the intervenor and the government might eventually, even if they do not at present, differ in their interests and potential arguments:

> Each of these Ninth Circuit cases demonstrates that **clear governmental opposition or abandonment of an issue or claim is not required to rebut the presumption of adequate representation**. Even where the government and a proposed intervenor share the same "ultimate objective," their underlying interests may differ sufficiently to justify intervention. Here, the proposed… Intervenors are, or represent, individuals directly affected by the activities of the Plaintiffs and by the restrictions on those activities encompassed by Ordinance 960… Their interests in upholding the law are decidedly more palpable than the County's generalized interest… As in *Southwest Center for Biological Diversity*, it is immaterial at this point of the litigation that the Intervenors' proposed answer to Plaintiffs' complaint and the County's do not decidedly differ, because the **Court's analysis is based upon a divergence of interests and possible future arguments, not presently identified differences**.

---

U.S.Dist.LEXIS 122112, at *14-16 (E.D.Cal. Aug. 27, 2013, No. 1: 13-cv-0036-LJO-BAM).

REPLY TO CHAMBER'S RESPONSE TO NEWMAN'S MOTION TO INTERVENE (2:19-CV-02019-KJM-JDP) Page 8

1  *Id.* at *20-21 (emphasis added). Here, the AG has clearly abandoned challenging the preliminary
2  injunction in opposition of Newman's interests. Even if the AG and Newman have the same objective to
3  uphold Proposition 65, their interests diverge and their future legal arguments are likely to do so as well.
4  Any presumption that AG might represent Newman is rebutted. The same holds true for CERT.

**Chamber and AG: Newman lacks expertise**

6  If a litigant was required of expertise to protect its significant interest, there would be no other
7  parties in any case but experts. *See, e.g., Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 533 (9th Cir.
8  1983) (special expertise, special economic interests, or divergence in trial strategy may show government
9  will not vigorously defend intervenor's interests).

10  Chamber cites several cases for the idea that the motive or understanding of an individual legislator
11  is generally not considered, [Doc. 146 at 14], but Newman, as a proponent and beneficiary of Proposition
12  65 will add both a necessary element and a valuable perspective. *See Barke v. Banks*, 2020
13  U.S.Dist.LEXIS 83872, at *11-12 (C.D.Cal. May 7, 2020, No. 8:20-cv-00358-JLS-ADS) ("A valuable
14  perspective, and a necessary element that might otherwise be neglected by the existing parties is added to
15  the matter in allowing the Unions, who are the beneficiaries of the challenged statute and sit across the
16  table from Plaintiffs during labor negotiations, to intervene."). Neither AG nor CERT have been a victim
17  of a toxic exposure that caused an influential and powerful law to be enacted, and Stringfellow to become
18  a designated superfund site. Newman's effort on achieving clean water for Glen Avon is well documented,
19  attributing to unquestionable expertise on toxic exposures, clean up, clean water, community works,
20  private enforcement as opposed to governmental nonfeasance, etc.

21  Neither CERT nor AG will "undoubtedly make" all of the arguments Newman would make. The
22  Ninth Circuit has recognized that "the government's representation of the public interest may not be
23  'identical to the individual parochial interest' of a particular group just because 'both entities occupy the
24  same posture in the litigation.'" *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 899
25  (9th Cir. 2011) (quoting *WildEarth Guardians v. U.S. Forest Serv.*, 573 F.3d 992, 996 (10th Cir. 2009)).

26  Chamber's reliance on *Prete* here is misplaced [Doc. 146 at 5]. In *Prete*, the government agent
27  was the secretary of state, and not the attorney general. As the Ninth Circuit noted, "defendant, as Oregon's
28  Secretary of State, is undoubtedly familiar with the initiative process and the requisite signature-gathering;

indeed, defendant is the government party responsible for counting the signatures." *Prete*, 438 F.3d at 958. Although the secretary of state in *Prete* may have had knowledge about the signature gathering process, the AG her could not, according to the people of California, without private enforcers, prevent toxic exposure by large industrial companies, in part because protecting those companies also falls under the broad "public interest" the AG is supposed to try to protect. *See Syngenta Seeds, Inc. v. Cnty. of Kauai*, 2014 U.S.Dist.LEXIS 56344, at *17-21 (D.Haw. Apr. 23, 2014, No. 14-00014BMK) ("Even where the government and a proposed intervenor share the same "ultimate objective," their underlying interests may differ sufficiently to justify intervention."). CERT's interests and expertise also differ from Newman's and CERT will not be able to represent her. *See Northwest Envtl. Advocates v. United States DOC*, 769 F.App'x 511, 512 (9th Cir. 2019) (rejecting the government's argument that the state of Washington will advance the same arguments in litigation as the Washington Cattlemen's Association (WCA) and Washington State Farm Bureau Federation (WFB), because the proposed intervenors have a narrower parochial interest in ensuring the continued economic feasibility of their constituents' operations and both WCA and WFB have specialized expertise).

**Adequacy of representation by existing parties**

**Same objective does not support adequacy of representation**

Chamber argues that having the same objective with AG makes the court presume adequacy of representation. [Doc. 144 at 4]. If that were true, no interventions would have been allowed. In the Ninth Circuit the State's broader interest and lack of pursuit of the narrow, parochial, or more material interests of intervenors defeat the presumption of adequacy of governmental representation:

> In *Forest Conservation Council*, the Ninth Circuit reversed the district court's denial of intervention holding that although both the Forest Service and the State sought the same ultimate result, Forest Service was required to represent the broad public interest and was primarily concerned with procedural compliance under NEPA, while the state was concerned with the economic interests of the timber industry. Id. at 1499. Accordingly, the state "satisfied the minimal showing required that the Forest Service may not adequately represent their interests." Id. Similarly, in *Californians For Safe & Competitive Dump Truck Transp. v. Mendonca* 152 F.3d 1184, 1190 (9th Cir. 1998), the Ninth Circuit held that proposed intervenors overcame the presumption of adequate representation by the government because their interests were "potentially more narrow and parochial than the interests of the public at large..." Although the state defended the law, the Ninth Circuit upheld the district court's grant of intervention as of right because the employment interests of the union members were "potentially more narrow and parochial than the interests of the public at large," union members demonstrated that the representation of their interests by the state "may have been inadequate." In *Southwest Center for*

*Biological Diversity v. Berg*, 268 F.3d 810 (9th Cir. 2001), the Ninth Circuit held that intervention as of right was appropriate even though the City and proposed intervenors shared the same ultimate objective of defending the City's land management plan against an environmental challenge. While the City's "range of considerations" in development was broad, the intervening developers were animated by their profit motives and private interests. *Id*. at 823.

*Syngenta Seeds, Inc. v. Cnty. of Kauai,* 2014 U.S.Dist.LEXIS 56344, at *19-20 (D.Haw. Apr. 23, 2014, No. 14-00014BMK) (recognizing Ninth Circuit precedent holding that "clear governmental opposition or abandonment of an issue or claim is not required to rebut the presumption of adequate representation."). Neither the AG nor private enforcers were there before Proposition 65 was enacted. None of them have lived the history of its creation. None has suffered without it, none is grasping the full meaning of Proposition 65 as it was intended. None is versed and educated in those aspects or can name the early proponents, creators, knows their roles and actions, and can cite their intentions, meaning, and goals. A private enforcer develops expertise in an extremely narrow field of 2-10 products and 2-4 chemicals. As to AG, Proposition 65 is about private enforcement and overcoming the indifference of the government, which AG plentifully and vividly demonstrates in conducting this case.

**AG's failure to appeal is not litigation strategy**

Chamber has finally discovered those coveted reasons why AG failed to appeal the injunction, such as CERT's immaculate abilities to litigate, and strategic advantages of waiting for resolution of the *Wheat Growers* appeal," Doc. 146 at 18, citing *Allen v. Hyland's Inc*., 2012 WL 12887827, at 2. This argument fails for two reasons: 1) the Ninth Circuit Court has proven that CERT cannot substitute AG, by granting the stay only to enforcers; AG remains enjoined because of its failure to appeal; 2) *Allen* focused on adequacy of attorneys to represent a class.

As shown, Newman's motion is timely, Newman has a significant interest that the existing parties cannot adequately represent. Newman will significantly contribute to full development of the underlying factual issues in the suit and of the legal questions presented. Therefore, permissive intervention by HLF is proper here under the circumstances.

### III. CONCLUSION

For the above reasons and those in Newman's Motion, Newman respectfully requests an Order allowing it to intervene as a Defendant.

| | |
|---|---|
| Dated: July 30, 2021 | Respectfully submitted, |
| | */s/ Aida Poulsen* |
| | POULSEN LAW P.C.<br>Aida Poulsen, Esq., SBN 333117<br>282 11th Avenue, Suite 2612<br>New York, NY 10001<br>Telephone: (646) 776-5999<br>*Attorneys for Proposed Intervenor-Defendant:*<br>*Penny Newman* |

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2021, I caused the foregoing document, described as **REPLY TO OPPOSITION BY CALIFORNIA CHAMBER OF COMMERCE TO PENNY NEWMAN'S MOTION TO INTERVENE** to be electronically filed with the Court's CM/ECF filing system, which will send a Notice of Electronic Filing to all parties of record who are registered with CM/ECF:

Trenton H. Norris, Esq.
Sarah Esmaili, Esq.
Samuel Zachary Fayne, Esq.
David M. Barnes, Esq.
Arnold & Porter Kaye Scholer LLP
Three Embarcadero Center, 10th Flr.
San Francisco, CA 94111-4024
Telephone: (415) 471-3100
trent.norris@arnolderporter.com
sarah.esmaili@arnoldporter.com
zachary.fayne@arnoldporter.com
david.barnes@arnoldporter.com
(Plaintiff)

Harrison Pollak
Joshua Purtle
Megan Hey
Laura J. Zuckerman
Office of the Attorney General
1515 Clay St., 20th Flr.
Oakland, CA 94612
Telephone: (510) 879-0187
harrison.pollak@doj.ca.gov
joshua.purtle@doj.ca.gov
megan.hey@doj.ca.gov
laura.zuckerman@doj.ca.gov
(Defendant)

Raphael Metzger, Esq.
Scott P. Brust, Esq.
Metzger Law Group, APLC
555 E. Ocean Blvd., Suite 800
Long Beach, CA 90802
Telephone: (562) 437-4499
rmetzger@toxictorts.com
sbrust@toxictorts.com
(Intervenor-Defendant)

Richard Drury
Lozeau Drury LLP
1939 Harrison Street, Suite 150
Oakland, CA 94612
(510) 836-4200
richard@lozeaudrury.com
(Intervenor-Defendant)

I declare that I am employed in the offices of a member of this court, at whose direction service was made.

Executed on July 30, 2021.

*/s/ Kelley Genne*

Kelley Genne, Declarant