Trenton H. Norris (CA Bar No. 164781)
S. Zachary Fayne (CA Bar No. 307288)
David Barnes (CA Bar No. 318547)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Telephone:    415.471.3100
Facsimile:    415.471.3400
trent.norris@arnoldporter.com

*Attorneys for California Chamber of Commerce*

*Counsel for other parties listed on signature page*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA CHAMBER OF COMMERCE, <br><br> Plaintiff, <br><br> v. <br><br> ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, <br><br> Defendant. | Case No. 2:19-cv-02019-DAD-JDP <br><br> **JOINT STATUS REPORT** <br><br> Date:          April 18, 2023 <br> Time:          1:30 p.m. <br> Courtroom:  Courtroom 4 (15th Floor) <br> Judge:        Hon. Dale A. Drozd <br> Action Filed: October 7, 2019 |

Pursuant to the Court's February 14, 2023 Order (ECF No. 219), Plaintiff California Chamber of Commerce ("CalChamber"), Defendant Rob Bonta, in his official capacity as Attorney General of the State of California ("Attorney General"), and Defendant-Intervenor Council for Education and Research on Toxics ("CERT") hereby submit the following Joint Status Report.  This Joint Status Report addresses the status of the litigation, the parties' proposals for discovery and scheduling, and the issues identified in the Court's Order.

I.      **STATUS OF LITIGATION**

A.      **Appeal of Preliminary Injunction**

The preliminary injunction issued by the Court on March 30, 2021 (ECF No. 114) remains in effect.  The preliminary injunction enjoins the Attorney General and all those in privity or acting in concert with him from filing or prosecuting new lawsuits to enforce the Proposition 65 warning requirement for cancer as applied to acrylamide.

CERT filed an emergency appeal of the preliminary injunction order to the Ninth Circuit and a motions panel granted CERT's motion to stay the injunction, finding CERT was likely to prevail on the merits of its claim.  The Attorney General did not appeal the order (ECF Nos. 119, 120).  On March 17, 2022, the Ninth Circuit merits panel unanimously affirmed the preliminary injunction order.  *California Chamber of Commerce v. CERT*, Ninth Circuit Case No. 21-15745 (Dkt Entry 85-1).  CERT filed a petition for rehearing en banc (Dkt Entry 87-1).  The Ninth Circuit denied the petition for rehearing en banc on October 26, 2022, with five judges dissenting (Dkt Entry 93).

On January 24, 2023, CERT filed a petition for certiorari with the United States Supreme Court.  *CERT v. California Chamber of Commerce*, U.S. Supreme Court Case No. 22-699.  The Supreme Court ordered CalChamber to respond to the Petition and CalChamber filed its response on March 15, 2023.  The petition for certiorari remains pending.

B.      **Prior Scheduling Conference and Judge Mueller's Recusal**

The parties submitted a joint status report on July 14, 2021 (ECF No. 144), in advance of an August 30 scheduling conference.  On August 16, 2021, CERT filed a motion to disqualify Judge Mueller on the ground that she had unwaivable financial and other conflicts of interest that precluded

her from acting in the case.  (ECF No. 152).  Subsequent to the scheduling conference, which took place on August 30, 2021, the Court issued a pre-trial case schedule (ECF No. 160) pursuant to which the parties were to complete initial disclosures by September 17, 2021. While disagreeing with the merits of CERT's disqualification motion, Judge Mueller issued an order recusing herself on September 24, 2021 (ECF No. 174).  The recusal order vacated all dates and deadlines set at the August 30, 2021 status conference, and thereby reinstated the stay of discovery in this case.  No pre-trial deadlines are currently on calendar.  The recusal order resulted in the reassignment of this case to Judges Mendez, England, and Shubb, who each recused themselves as well, and ultimately to Judge Drozd on October 1, 2021 (ECF Nos. 176-179).  On August 24, 2022, the case was reassigned to Judge de Alba upon her appointment (ECF. No. 210), but the clerk later stated that was in error, so the case remains before Judge Drozd (ECF No. 217).

### C.      New Safe Harbor Warning for Acrylamide

On September 24, 2021, the state agency responsible for implementing Proposition 65, the Office of Environmental Health Hazard Assessment ("OEHHA"), issued a proposed rulemaking to "add an additional non-mandatory, safe harbor warning option for businesses that cause significant exposures to acrylamide from food"[1] (the "New Safe Harbor Warning").  The New Safe Harbor Warning provides as follows:

> **CALIFORNIA WARNING:**  Consuming this product can expose you to acrylamide, a probable human carcinogen formed in some foods during cooking or processing at high temperatures. Many factors affect your cancer risk, including the frequency and amount of the chemical consumed. For more information including ways to reduce your exposure, see www.P65Warnings.ca.gov/acrylamide.

Cal. Code Regs. tit. 27, § 25607.2(b).

As discussed below, and as noted in the parties' most recent joint status report (ECF No. 212 at 3), the parties disagree about the impact of the New Safe Harbor Warning on this action.

---

[1] OEHHA, Initial Statement of Reasons, Title 27 California Code of Regulations, New subsection 25607.2(b) (Sept. 24, 2021), at 3, available at https://oehha.ca.gov/media/downloads/crnr/isoracrylamide091721.pdf.

1   Nevertheless, the parties recognized when the New Safe Harbor Warning was proposed that, if the

2   regulation was finalized, its constitutionality would be a critical issue in this action.  The parties

3   disagreed about the impact the New Safe Harbor Warning would have on this action, but agreed that

4   once it was approved or rejected by the California Office of Administrative Law ("OAL"), or if it

5   was not timely submitted to OAL, CalChamber and the Attorney General would negotiate a schedule

6   for expert discovery and a briefing schedule for cross-motions for summary judgment that they hoped

7   to agree upon and submit to the Court for approval.

8       On October 26, 2022, OAL approved the New Safe Harbor Warning regulation.  *See* ECF No.

9   215.  The New Safe Harbor Warning regulation became effective on January 1, 2023.  On November

10  17, 2022, the Attorney General filed a notice with the Court to inform it of the new regulation's status

11  (ECF No. 215).  On January 9, 2023, the parties submitted a Joint Request for Status and Scheduling

12  Conference (ECF No. 216).

13      **D.      Pending Motions**

14      Three motions are currently pending before this Court:

15  1.  CERT's motion to dismiss for lack of a case or controversy within this Court's Article III

16      jurisdiction (ECF No. 192). CalChamber filed an opposition to this motion (ECF No. 194).

17      The Attorney General took no position on this motion, but filed a response (ECF No. 195).

18      CERT filed a reply in support of its motion (ECF No. 196). CERT's position is that the

19      motion should be addressed before all other matters, because all federal courts are obliged

20      to first determine federal subject matter jurisdiction, because CERT's motion directly

21      challenges the court's subject matter jurisdiction and, if granted, this case would be

22      concluded and the preliminary injunction would be dissolved.

23  2.  CERT's motion for vacatur, to vacate the preliminary injunction issued by Judge Mueller

24      on the ground that she was disqualified from issuing the preliminary injunction (ECF No.

25      205). CalChamber filed an opposition to this motion (ECF No. 208). The Attorney General

26      took no position on this motion. CERT filed a reply in support of its motion (ECF No. 209).

27

28

3.   Proposed Intervenor The Chemical Toxin Working Group Inc. dba Healthy Living Foundation Inc.'s motion to intervene (ECF No. 136). The Attorney General (ECF No. 140) and CalChamber (ECF No. 141) filed oppositions to this motion.  The Chemical Toxin Working Group filed replies in support of its motion (ECF Nos. 142, 143).

## II.   STATUS REPORT FOR THE APRIL 18, 2023 STATUS CONFERENCE

### A.   Anticipated Discovery and Scheduling of Discovery

#### 1.   Initial Disclosures and Discovery Conferences

Pursuant to the Court's prior Scheduling Order (ECF No. 160), the parties completed initial disclosures on September 17, 2021.  The parties will supplement their initial disclosures as necessary in accordance with the applicable rules.

CERT requests that CalChamber be directed to supplement its initial disclosure to include the identities of the following:

(1) All members of the California Chamber of Commerce that are also parties to *CERT v. Starbucks, et al.*, Los Angeles Superior Court consolidated case no. BC435759 in which CERT prevailed on the false compelled speech issue;

(2) All members of the California Chamber of Commerce that actually approved and authorized the filing of this lawsuit;

(3) All individuals employed by the California Chamber of Commerce who approved and authorized the filing of this lawsuit by CalChamber;

(4) All individuals who authorized the filing of this lawsuit by CalChamber, and who were also aware at the time of the such authorization that the First Amendment defense had been decided adversely to defendants in the *CERT v. Starbucks* action.

CERT contends that this information is directly relevant to this case, because it is relevant to CERT's collateral estoppel defense and may also lead to the discovery of information underlying either a conspiracy or a collusive effort to thwart the decision-making of the Los Angeles Superior Court. Such a bad faith motivation for filing this action could also provide a basis for a motion for summary judgment.

CalChamber believes that none of the information sought by CERT is appropriate for initial disclosures. *See* Fed. R. Civ. P. 26(a)(1)(A)(i). That provision requires litigants to disclose individuals "likely to have discoverable information . . . that the *disclosing party* may use to support its claims or defenses. . . ." *Id.* (emphasis added). It does not require CalChamber to identify individuals that CERT believes may have information relevant to *CERT's* claims or defenses. CalChamber also believes that this information is not relevant to the issues in this case and therefore is not discoverable at any stage. CERT has no basis for any collateral estoppel argument based on the interlocutory ruling by the Los Angeles Superior Court in the *CERT v. Starbucks* case regarding the First Amendment defense asserted by certain defendant coffee companies because that ruling was not a final judgment on the merits. Indeed, that ruling was abrogated by the judgment entered by the Superior Court in favor of all defendant coffee companies and against CERT on the basis of the OEHHA regulation effectively exempting coffee from Proposition 65 warnings for acrylamide, which ruling was recently upheld on appeal. *Council for Educ. & Research on Toxics v. Starbucks Corp.*, 84 Cal. App. 5th 879 (2022).

## 2. Subjects on Which Discovery May Be Needed:

CalChamber. CalChamber believes that no discovery is necessary. In affirming this Court's issuance of the preliminary injunction order, the Ninth Circuit applied the United States Supreme Court's three-factor *Zauderer* test, which provides that the State must prove that a compelled disclosure: "(1) requires the disclosure of purely factual and uncontroversial information only, (2) is justified and not unduly burdensome, and (3) is reasonably related to a substantial government interest." Dkt Entry 85-1 at 15-16 (citing *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) (internal quotation marks omitted)). CalChamber prevailed on this standard at the preliminary injunction stage by submitting three expert declarations and without any discovery being exchanged between the parties. CalChamber contends that the updated expert declarations it will submit with its motion for summary judgment are sufficient for the Court to determine whether the New Safe Harbor Warning regulation, or any warning that complies is Proposition 65, is both "purely factual" and "uncontroversial" under the First Amendment. Barring a reversal of the Ninth Circuit's ruling by the

1   United States Supreme Court or a significant change in the longstanding legal standard it applied,

2   CalChamber does not plan to seek fact discovery and contends that none is required for any party.

3        Indeed, Judge Shubb resolved the most recent comparable case, *National Association of*

4   *Wheat Growers v. Zeise*, Case No. 2:17-cv-02401-WBD-EFB (E.D. Cal., filed Nov. 15, 2017)

5   ("*Wheat Growers*"), on summary judgment without any party contending it needed fact or expert

6   discovery.  In that case—which addressed whether Proposition 65's compelled cancer warning for

7   the chemical glyphosate violates the same First Amendment standard at issue here—plaintiffs and the

8   Attorney General agreed that no fact or expert discovery was necessary for the Court to dispose of the

9   case on summary judgment.  The situation is identical here.

10       Should the Court be inclined to permit fact or expert discovery, CalChamber contends that the

11  discovery contemplated by CERT is overbroad and irrelevant under the First Amendment and other

12  applicable legal standards as well as unduly burdensome.  It also calls for the discovery of

13  information protected by the attorney-client privilege (e.g., the identity of CalChamber employees

14  who approved and authorized the filing of this lawsuit), and the First Amendment right to freedom of

15  association (e.g., the identity of CalChamber members).  Should such discovery be sought as to

16  CalChamber, CalChamber will seek a protective order.

17       Specifically, CERT's categories 1 through 5 (as referenced below) relate to its collateral

18  estoppel argument, which has no basis, as discussed above.  Categories 6 and 7 are irrelevant at this

19  stage because the Court has already found, in issuing the preliminary injunction, that CalChamber has

20  shown irreparable harm, which in any event is presumed for violations of free speech rights and need

21  not be shown by CalChamber to prove its claims for declaratory judgment and injunctive relief.

22  Categories 8 and 9 are topics for expert discovery.  Furthermore, to the extent CERT seeks discovery

23  beyond that sought by the Attorney General, CERT must establish that it has Article III standing to

24  invoke the power of this Court.  *Town of Chester v. Laroe Estates*, 137 S.Ct. 1645, 1651 (2017);

25  *Akebia Therapeutics, Inc. v. FibroGen, Inc.*, 793 F.3d 1108, 1111 (9th Cir. 2015).

26       <u>Attorney General.</u>  From the Attorney General's perspective, the issues in this case will turn

27  primarily on expert opinion, and thus further fact discovery may not be necessary.  However, the

28

1    Attorney General believes that expert discovery is needed, and that this discovery needs to take place

2    before he can file his opposition to the motion for summary judgment CalChamber intends to file.

3    (*See* discussion in Section B, below.)

4           This case is very different from *National Association of Wheat Growers v. Zeise*, Case No.

5    2:17-cv-02401-WBD-EFB (E.D. Cal., filed Nov. 15, 2017) ("*Wheat Growers*"), which CalChamber

6    cites above, in that plaintiffs in *Wheat Growers* did not rely predominantly on expert declarations by

7    scientists about the carcinogenicity of glyphosate, but rather mainly relied on the judicially-noticeable

8    findings of a number of expert agencies. Here, there will be expert evidence for the Court to weigh.

9    CalChamber introduced expert declarations in support of its preliminary injunction motion, well

10   before expert discovery, and it has indicated it plans to rely on updated expert declarations in support

11   of its proposed motion for summary judgment. The Attorney General plans to introduce expert

12   declarations/reports to establish his defense and to rebut the expert declarations that CalChamber has

13   introduced, and plans to introduce, from experts seeking to challenge the *unanimous* findings of

14   multiple expert agencies (the United States Environmental Protection Agency, the World Health

15   Organization's International Agency for Research on Cancer, the National Toxicology Program, the

16   United States Food and Drug Administration, and the European Food Safety Authority) that

17   acrylamide is a likely or probable human carcinogen.[2]

18          The Attorney General contends that the discovery contemplated by CERT from the Attorney

19   General, including discovery regarding "the conduct of the State with respect to the enforcement of

20   Proposition 65 in connection with acrylamide in food, starting with the Attorney General's earliest

21   _____

22          [2] The United States Environmental Protection Agency concluded that acrylamide is "likely to
     be carcinogenic to humans," (ECF No. 101-1 [Declaration of Gina Solomon, Ph.D. ("Solomon

23   Decl."), ¶¶ 29, 39]); the International Agency for Research on Cancer classified acrylamide as
     "probably carcinogenic to humans," (ECF No. 101-4 [Declaration of Joshua Purtle ("Purtle Decl."),

24   Exh. H]); the National Toxicology Program has concluded that acrylamide is "reasonably anticipated
     to be a human carcinogen," (*id.*, Exh. I at 2; *see also* ECF No. 101-1 [Solomon Decl., ¶¶ 37-38]); and

25   the European Food Safety Authority has found that "acrylamide is a carcinogenic substance and that
     current levels of dietary exposure to acrylamide indicate a concern with respect to carcinogenic

26   effects," (ECF No. 101-4 [Purtle Decl., Exh. O]). In addition, the United States Food and Drug
     Administration agrees that acrylamide is "reasonably anticipated to be a human carcinogen" and has

27   provided recommendations for food producers to reduce the level of acrylamide in their products.
     (ECF No. 101-4 [Purtle Decl., Exh. J at 3; *see also* ECF No. 101-1 [Solomon Decl., ¶ 20]).

28                                                     -7-

1    enforcement actions in the 2000's, along with the State's subsequent efforts to adopt regulations to

2    limit the scope of enforcement of Proposition 65," is overbroad and irrelevant.  Moreover, because

3    California is not a unitary government, the Attorney General would object to producing any

4    information in the custody, possession, and control of state agencies outside the California

5    Department of Justice.  *See, e.g.*, *People ex rel. Lockyer v. Superior Court*, 122 Cal. App. 4th 1060,

6    1078-80 (2004) (denying a motion that sought to compel one California state agency to provide

7    information in other agencies' custody, possession, or control).  Should CERT seek such discovery

8    from the Attorney General, the Attorney General will seek a protective order.  However, in the event

9    the Court grants CERT's request for fact and document discovery, the Attorney General reserves the

10   right to propound such discovery.

11        CERT.  CERT believes that this court should finally vacate the stay of discovery that has been

12   in effect since the inception of this case so that CERT may finally commence discovery.  CERT

13   considers vacation of the stay of discovery critical, because CalChamber has expressed its desire to

14   file a motion for summary judgment as soon as possible.  CERT's position is that discovery should be

15   opened as soon as possible and that it is premature for any party to file any motion for summary

16   judgment or summary adjudication of issues until the parties have had a reasonable opportunity to

17   conduct discovery. CERT anticipates seeking fact and document discovery on a number of topics,

18   including but not limited to (1) All members of the California Chamber of Commerce that are also

19   parties to *CERT v. Starbucks, et al.*, Los Angeles Superior Court consolidated case no. BC435759 in

20   which CERT prevailed on the false compelled speech issue; (2) All members of the California

21   Chamber of Commerce that actually approved and authorized the filing of this lawsuit; (3) All

22   individuals employed by the California Chamber of Commerce who approved and authorized the

23   filing of this lawsuit by CalChamber; (4) All individuals who authorized the filing of this lawsuit by

24   CalChamber, and who were also aware at the time of the such authorization that the First Amendment

25   defense had been decided adversely to defendants in the *CERT v. Starbucks* action;  (5) The identities

26   of CalChamber members who claim to have been injured as a result of the requirement for health

27   warnings concerning acrylamide in food products; (6) The nature and scope of the purported injury to

28

CalChamber members resulting from the giving of Proposition 65 health warnings; (7) the measures that CalChamber members have undertaken, if any, to reduce the level of acrylamide in their products; (8) the scientific basis for CalChamber's claims regarding the health impacts of acrylamide; (9) the purported factual basis for the opinions expressed by CalChamber's expert witnesses in their declarations filed in support of CalChamber's motion for a preliminary injunction; and (10) the State's conduct with respect to the regulation and enforcement of Proposition 65, particularly regarding the topic of acrylamide in food.

The first five categories of information listed above are essential to determining whether this action is barred by the doctrine of collateral estoppel and whether this action was filed by CalChamber for a collusive or improper purpose, which would be grounds for a summary judgment motion.

Categories 6 through 7 will explore whether and the extent to which CalChamber's members have actually been harmed as a result of having to provide Proposition 65 warning for acrylamide, and whether CalChamber members have undertaken any measures to reduce the level of acrylamide in their products, as a viable alternative to providing Proposition 65 warnings.

Categories 8 and 9 will explore the basis for CalChamber's allegations that acrylamide is not a human carcinogen, as alleged in its First Amended Complaint.

Category 10 will explore the conduct of the State with respect to the enforcement of Proposition 65 in connection with acrylamide in food, starting with the Attorney General's earliest enforcement actions in the 2000's, along with the State's subsequent efforts to adopt regulations to limit the scope of enforcement of Proposition 65.  If the Attorney General takes the position that certain information responsive to CERT's discovery requests is in the custody, possession, and control of state agencies outside the California Department of Justice, then CERT will seek to determine where that information may be found, and will serve subpoenas to obtain it.

### 3.     Whether Discovery Should Be Phased

CalChamber believes that no fact or expert discovery is necessary.

The Attorney General believes that expert discovery is necessary, and that there is no need for

phasing of discovery.

CERT believes that discovery should be conducted in two phases: Phase 1 regarding standing issues and other matters that do not require expert testimony, and Phase 2 regarding the scientific issues involving expert testimony, such as the opinions expressed by CalChamber's expert witnesses in their declarations filed in support of CalChamber's motion for a preliminary injunction. If CalChamber should file a summary judgment motion supported by expert witness opinion, then CERT will need to immediately conduct responsive discovery and depose CalChamber's expert witnesses and other witnesses supporting such a motion.

### 4.   Proposed Changes to FRCP Discovery

The parties do not currently propose any changes to the limits on discovery set forth in the Federal Rules of Civil Procedure, to the extent that discovery occurs.

### 5.   Expert Witness Disclosures

CalChamber.  CalChamber does not anticipate disclosing any additional expert witnesses beyond the three experts disclosed in support of CalChamber's motion for preliminary injunction. CalChamber does not believe that expert discovery is necessary.

Attorney General.  The Attorney General believes that expert discovery will be necessary, both to enable him to oppose the motion for summary judgment and the updated expert declarations CalChamber intends to file (*see* discussion in Section B below), and for the resolution of this case. He intends to disclose one or more additional expert witnesses beyond the expert whose declaration was attached to the opposition to CalChamber's motion for preliminary injunction.  The Attorney General proposes the following dates for affirmative and rebuttal expert disclosures:

- Affirmative Expert Disclosures:  June 30, 2023
- Rebuttal Expert Disclosures:   August 15, 2023

CERT.  CERT contends that it is premature to propose dates related to expert discovery, because the parties have not yet been allowed commence fact discovery.

With respect to expert discovery more generally, trial of this case will be heavily dependent upon the testimony of numerous experts, as CERT is well aware, having already won a similar case at

-10-

1 | trial, only to lose it when OEHHA came to the aid the coffee industry, including defendants
2 | represented by CalChamber's counsel Trenton Norris.  Trial of this case will require a team of
3 | experts, just as it did in the coffee litigation, with a trial presentation that cost CERT and its counsel
4 | over $500,000.  CERT is not in a financial position to make a similar expenditure for a second trial,
5 | and therefore, CERT will request that the Court allow CERT to introduce all of the expert testimony
6 | that was presented at trial of the coffee litigation during the trial of this case.  Such admission, would,
7 | of course, be subject to whatever objections may be made by the other parties prior to trial, for which
8 | the Court can issue rulings as to admissibility.  There would be no surprises regarding the substance
9 | of this testimony, as counsel for CalChamber participated in the coffee litigation.

**6.    Discovery Cutoff**

11 | <u>CalChamber.</u>  CalChamber does not believe that any fact or expert discovery is required for
12 | the Court to determine whether the New Safe Harbor Warning Regulation, or any warning that
13 | complies with Proposition 65, is "purely factual and uncontroversial."

14 | <u>Attorney General.</u>  The Attorney General proposes the following cutoff dates for fact and
15 | expert discovery:

16 | • Fact Discovery Cutoff:    June 30, 2023
17 | • Expert Discovery Cutoff:  October 16, 2023

18 | <u>CERT.</u>  CERT contends that it is premature to propose a date for the cutoff of fact and expert
19 | discovery, but believes that any date less than one year hence would be inadequate.

**B.    Dispositive and Non-Dispositive Motions:**

21 | <u>CalChamber.</u>  As discussed below, CalChamber believes that there is no genuine issue as to
22 | any material fact that the content of the New Safe Harbor Warning Regulation, like the prior Safe
23 | Harbor Warning and any other warning for dietary acrylamide that complies with Proposition 65, is
24 | both "controversial" and not "purely factual."  *See* Dkt Entry 85-1 at 15;16; *see also Am. Beverage*
25 | *Ass'n v. City and Cty. of San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc).  CalChamber is
26 | prepared to file its summary judgment motion within the next month.  CalChamber proposes that the

Court set a briefing and hearing schedule for the parties' cross-motions for summary judgment similar to the one Judge Shubb set in the *Wheat Growers* case:

**April 13, 2023:** Deadline for CalChamber to file its motion for summary judgment;

**June 30, 2023**: Deadline for the Attorney General to file its combined cross-motion for summary judgment and opposition to CalChamber's motion for summary judgment;

**September 6, 2023**: Deadline for CalChamber to file its combined opposition to the Attorney General's cross-motion for summary judgment and reply in support of CalChamber's motion for summary judgment;

**September 27, 2023:** Deadline for the Attorney General to file its reply in support of its cross-motion for summary judgment;

**October 17, 2023**: Hearing on CalChamber's motion for summary judgment and Attorney General's cross-motion for summary judgment.

Attorney General.  The Attorney General believes that a motion for summary judgment on the timeframe proposed by CalChamber is premature, for three reasons. First, the Attorney General believes that CalChamber should be required to amend the First Amended Complaint (an amendment to which the Attorney General would stipulate) to address the significant change in the facts at issue in this case:  specifically, to address the New Safe Harbor Warning, which was proposed and which became effective after the filing of the First Amended Complaint.[3]

Second, the Attorney General is entitled to engage in expert discovery necessary for his case before the Court rules on a motion for summary judgment. *See* Fed. R. Civ. P. 56(d) (formerly 56(f)). A district court is required to postpone ruling on summary judgment until the nonmovant has had the opportunity to discover information that is essential to his opposition. *State of Cal., on Behalf of Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998) (citing *McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869, 885 (9th Cir.1994)) (holding "[a] district court should continue a

---

[3] CalChamber filed the First Amended Complaint on March 16, 2020. (ECF No. 57.) OEHHA issued a Notice of Proposed Rulemaking for the New Safe Harbor Warning in September, 2021. (ECF No. 188.)

summary judgment motion upon a good faith showing by affidavit that the continuance is needed to obtain facts essential to preclude summary judgment."); *see also Hodgin v. UTC Fire & Security Americas Corp. Inc.* 888 F.3d 243, 250 (4th Cir. 2018). Expert discovery is necessary for the Attorney General to present facts essential to justify his opposition. The New Safe Harbor Warning became effective on January 1, 2023, and the Attorney General has been in the process of hiring one or more additional experts to address CalChamber's anticipated challenge to the language of the New Safe Harbor Warning; however, that process is not yet complete. Consequently, the Attorney General needs more time to conduct expert discovery, including deposing CalChamber's experts, and more time to prepare his opposition than would be permitted by CalChamber's expedited briefing schedule. If a motion for summary judgment is scheduled for hearing prior to the close of expert discovery, the Attorney General may need to file a declaration pursuant to Federal Rule of Civil Procedure Rule 56(d) requesting that the court defer consideration of the motion or deny it.

Third, there is no legitimate reason that the Attorney General should be foreclosed from taking the time required to present his defense. The preliminary injunction remains in place, and no party in this case will be prejudiced by a briefing schedule that permits the Attorney General to adequately prepare his defense on these important issues.

The parties have met and conferred in an effort to reach agreement on a briefing schedule, but were unsuccessful. The Attorney General proposes the following briefing schedule for CalChamber's motion and any cross-motion for summary judgment that the Attorney General may file. The Attorney General's proposed schedule includes time for the resolution of the currently outstanding motions, the filing of a Second Amended Complaint, any related motion practice, and the completion of expert discovery. The proposed schedule is as follows:

**April 25, 2023:**  Deadline for CalChamber to file its motion for summary judgment;

**December 1, 2023**:  Deadline for the Attorney General to file his combined opposition to CalChamber's motion for summary judgment and cross-motion for summary judgment, if any;

**December 29, 2023**:  Deadline for CalChamber to file its combined reply in support of CalChamber's motion for summary judgment and opposition to the Attorney General's cross-motion for summary judgment, if any;

**January 19, 2024**:  Deadline for the Attorney General to file his reply in support of his cross-motion for summary judgment, if any;

**February 6, 2024, or thereafter**:  Hearing on CalChamber's motion for summary judgment and cross-motion for summary judgment filed by the Attorney General, if any.

CERT.  CERT believes that the New Safe Harbor Warning (that acrylamide is a probable human carcinogen) is indisputably true, because that is exactly how the International Agency for Research on Cancer has classified the carcinogenicity of acrylamide.  CERT contends that the adoption of the New Safe Harbor Warning moots this entire case which is predicated on the notion that Proposition 65 warnings regarding acrylamide in food constitute false compelled speech in violation of the First Amendment.  CERT believes that the issue whether the New Safe Harbor Warning constitutes false compelled speech is amenable to summary judgment.  CERT intends to file a motion for summary judgment on the basis that the New Safe Harbor Warning is indisputably true and not misleading and therefore cannot constitute false compelled speech as a matter of law.

**C.**      **Unnecessary Proof/Cumulative Evidence and Expert Limitations**

The parties will endeavor to stipulate to undisputed facts in order to limit unnecessary or cumulative discovery.  The parties do not currently anticipate any limitations or restrictions on the use of testimony under Federal Rule of Evidence 702.

**D.**      **Final Pretrial Conference**

The parties propose that the final pretrial conference be held 14 days before the trial date.

**E.**      **Trial**

The parties believe that it is premature to propose a trial date.  No party has demanded a jury. CalChamber believes a trial will not be necessary, but if one were to occur, it estimates that two to three days will be sufficient.  The Attorney General believes it is premature to estimate the length of trial at this juncture.  CERT estimates that the trial of this matter will require at least six months, and

-14-

1  possibly up to a year, to complete, unless CalChamber drastically limits the number and type of

2  acrylamide-containing foods for which it seeks to deem Proposition 65 warnings violative of the First

3  Amendment.

4     **F.     Magistrate Judge**

5        The parties have not consented to the jurisdiction of a U.S. Magistrate Judge.

6     **G.     Pretrial Procedures**

7        The parties do not currently propose any changes to the standard pretrial procedures.

8     **H.     Settlement**

9        The parties do not believe that this case is conducive to settlement, and agree that this case

10  does not warrant referral to Voluntary Dispute Resolution or a court-convened settlement conference.

11  **III.   ADDITIONAL ISSUES**

12        The Court's February 14, 2023 Order (ECF No. 219) directed the parties to address the

13  following issues: (i) whether the Motion to Intervene (ECF No. 136) filed by the Chemical Toxin

14  Working Group Inc. ("CTWG") has been rendered moot in light of the Ninth Circuit's decision (ECF

15  No. 204) on appeal filed by CERT, particularly given that the Ninth Circuit denied the motion to

16  intervene by CTWG; and (ii) the impact of the newly approved safe harbor warning regulation, which

17  became effective on January 1, 2023.  The parties address these issues below.

18     **A.     Mootness of CTWG's Motion to Intervene**

19        <u>CalChamber.</u>  The Ninth Circuit has already addressed the merits of CTWG's[4] motion to

20  intervene in the appeal of an order issued in this action; that motion raised the same arguments CTWG

21  presented this Court.  CTWG's motion is accordingly moot under the "law of the case doctrine."

22        In a typical case, the Ninth Circuit hears the appeal of a district court's denial of a motion to

23  intervene, not a separate motion to intervene raised by a nonparty in the district court proceedings.

24  Here, however, CTWG first filed a motion to intervene in the Ninth Circuit (Dkt Entry 14-1) and then

25  filed a motion to intervene in this Court (ECF No. 136).  The Ninth Circuit refers to intervention at the

26  _____

27        [4] CTWG does business as the "Healthy Living Foundation" ("HLF").  CTWG refers to itself
as HLF in its motions.

28

appellate stage as an "unusual" practice but applies the same standards as district courts in assessing whether mandatory or permissive intervention is appropriate. *Bates v. Jones*, 127 F.3d 870, 873 (9th Cir. 1997) ("Intervention on appeal is governed by Rule 24 of the Federal Rules of Civil Procedure.").

Ninth Circuit precedent allows intervention as a matter of right under Rule 24 only when a movant makes the following four showings: "(1) it has a significant protectable interest relating to the property or transaction that is the subject of the action; (2) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; (3) the application is timely; and (4) the existing parties may not adequately represent the applicant's interest." *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004) (citing *United States v. City of L.A.*, 288 F.3d 391, 397 (9th Cir. 2002)). CTWG raised identical arguments addressing these factors in the Ninth Circuit and in this Court, *compare* ECF No. 136 *with* Dkt Entry 14-1 (Tables of Contents):

| Ninth Circuit Motion (Dkt Entry 14-1) | District Court Motion (ECF No. 136) |
|---|---|
| Intervention as of right: HLF's motion is timely | HLF's application for intervention is timely |
| HLF has a significant protectable interest in this appeal | HLF has a significant protectable interest related to plaintiff's claims |
| Impairment of HLF's ability to protect its interests | Disposition of this action will impair HLF's ability to protect its interests |
| Fiction of AG adequately representing fetuses | Legal fiction of AG representing fetuses |
| HLF has more narrow and parochial interests than AG | HLF's narrow and parochial interest |
| AG cannot adequately represent all citizens | AG is not charged by law to represent HLF |

CTWG also asserted in each motion cursory, substantively identical arguments that permissive intervention should be granted because it purportedly shares a common defense with the Attorney General and CERT. *Compare* Dkt Entry 14-1 at 19 *with* ECF No. 136 at 19.

The Ninth Circuit considered and addressed these arguments on the merits in denying CTWG's motion to intervene. Dkt Entry 47. Of note, the Ninth Circuit's denial of CTWG's motion to intervene

-16-

1    was without prejudice to the submission of a motion for leave to file an amicus curiae brief

2    accompanied by the proposed brief.  *Id.*  CTWG did not seek leave to file an amicus brief.

3         Because the Ninth Circuit already addressed the merits of CTWG's motion to intervene, the

4    motion pending in this Court is rendered moot.  Pursuant to the "law of the case" doctrine, "a court is

5    generally precluded from reconsidering an issue that has already been decided by the same court, or a

6    higher court in the identical case."  *U.S. v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997).  This is

7    precisely the situation here.

8         Strong policy concerns also support this conclusion.  As CalChamber argued in its response to

9    CTWG's motion to intervene in the Ninth Circuit (Dkt Entry 20 at 8-10), it was procedurally improper

10   for CTWG to simultaneously seek to intervene in the district court and the court of appeal.  Instead,

11   CTWG should have filed one motion to intervene in this Court.  *See Marino v. Ortiz*, 484 U.S. 301,

12   304 (1988) ("[T]he better practice is for such a nonparty to seek intervention for purposes of appeal;

13   denials of such motions are, of course, appealable.").  Considering CTWG's ex parte application to

14   intervene (ECF No. 128), its two concurrent motions to intervene (ECF No. 136, Dkt Entry 14), and

15   the two subsequent concurrent motions to intervene that CTWG's counsel filed for Penny Newman

16   (ECF No. 137, Dkt Entry No. 21), five separate motions to intervene were filed when the proper course

17   of action would have required two.  The filing of these extraneous motions unnecessarily expended

18   both party and court resources.  Separate consideration of the merits of CTWG's motion to intervene

19   in this Court could encourage future nonparties who are dissatisfied with a district court's ruling to take

20   two bites at the intervention apple.

21        <u>Attorney General.</u>  The Attorney General agrees that the motion to intervene by CTWG, which

22   files its motions as HLF, is moot because the Ninth Circuit addressed and denied CTWG's motion to

23   intervene in the appeal, which is substantively the same as its motion to intervene in this Court. (Dkt

24   Entry 47; *compare* ECF No. 136 *with* Dkt Entry 14.) The Attorney General opposed CTWG's motion

25   to intervene in this Court as it was untimely, and CTWG's interests are adequately represented by the

26   Attorney General and CERT. (ECF No. 140.)

27        <u>CERT.</u>

28

**B.  Impact of Newly Approved Safe Harbor Warning**

The text of the New Safe Harbor Warning (Cal. Code Regs. tit. 27, § 25607.2 (b)) is below:

**CALIFORNIA WARNING:**  Consuming this product can expose you to acrylamide, a probable human carcinogen formed in some foods during cooking or processing at high temperatures.  Many factors affect your cancer risk, including the frequency and amount of the chemical consumed.  For more information including ways to reduce your exposure, see www.P65Warnings.ca.gov/acrylamide.

CalChamber.  CalChamber contends that the New Safe Harbor Warning is just as misleading as the original safe harbor warning, which this Court has preliminarily determined fails the First Amendment standard.

The State bears the burden of establishing that the New Safe Harbor Warning: "(1) requires the disclosure of purely factual and uncontroversial information only, (2) is justified and not unduly burdensome, and (3) is reasonably related to a substantial government interest."  ECF No. 114 at 21-22 (citing *Am. Beverage Ass'n v. City & Cty. of San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc)).  The State will be unable to make any of these showings.

*Purely Factual and Uncontroversial Information*.  The existence of any "controversy" regarding the content of the New Safe Harbor Warning will render the warning unconstitutional.  *See* Dkt Entry 85-1 at 19 n 10 ("However controversial is defined, the acrylamide Prop 65 warning easily meets the definition because of the scientific debate.").  To prevail on summary judgment, CalChamber need only show that there is no genuine dispute that the new safe harbor warning is "controversial."

Established Ninth Circuit precedent provides that "a statement may be literally true but nonetheless misleading and, in that sense, untrue."  *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 847 (9th Cir. 2019) ("*CTIA II*"); *see also Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247, 1259 (2020).  In the first *CTIA* case, for example, the Northern District of California examined the constitutionality of San Francisco's compelled "Cell Phone Disclosure Requirements" for exposures to radiofrequency ("RF") energy emissions.  *CTIA – The Wireless Ass'n v. City and Cty.*

*of San Francisco*, 827 F. Supp. 2d 1054, 1056 (N.D. Cal. 2011) ("*CTIA I*").[5]  Those requirements warned:

> **YOU CAN LIMIT EXPOSURE TO RADIO-FREQUENCY (RF) ENERGY FROM YOUR CELL PHONE.**  ALTHOUGH STUDIES CONTINUE TO ASSESS POTENTIAL HEALTH EFFECTS OF MOBILE PHONE USE, THE WORLD HEALTH ORGANIZATION HAS CLASSIFIED RF ENERGY AS A POSSIBLE CARCINOGEN.

*Id.* at 1058 (emphasis in original).

The Northern District characterized this disclosure requirement as "a series of factoids, all of which seem to be literally true, as far as they go," *id.* at 1060, but nevertheless found its use of the term "possible carcinogen" was misleading.  As the Northern District explained, the World Health Organization's International Agency for Research on Cancer ("IARC") employs a series of terms of art to identify the cancer *hazard* potential of substances: (1) Carcinogenic to humans; (2) Probably carcinogenic to humans; (3) Possibly carcinogenic to humans; (4) Not classifiable as to its carcinogenicity to humans; and (5) Probably not carcinogenic to humans.  *Id.* at 1060.  A finding by IARC that there is "limited evidence of carcinogenicity in humans and less than sufficient evidence of carcinogenicity in experimental animals" is sufficient to classify a substance as "possibly carcinogenic to humans."  *Id.* at 1060.

San Francisco correctly pointed out that IARC placed RF energy into this category and cited a city ordinance establishing that the principle that the government "should not wait for scientific proof of a health or safety risk before taking steps to inform the public of the potential harm."  *Id.* at 1058. But the Northern District observed that San Francisco conflated *risk* (the likelihood of a harm occurring) with *hazard* (the potential for harm to occur): "[T]here is no known statistical known statistical correlation, and the word 'risk' is being used in a different way, namely that there is a 'risk' that the 'possible' may turn out to be a 'definite."  *Id.* at 1061.  Because the "uninitiated" recipients of

---

[5] The Ninth Circuit affirmed the Northern District decision.  *CTIA – The Wireless Ass'n v. City and Cty. of San Francisco*, 494 F. Appx. 752 (9th Cir. 2012).  The Ninth Circuit's decision in *CTIA I* was vacated by the United States Supreme Court and remanded for further consideration in light of *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018), but the Ninth Circuit reaffirmed on remand that "a statement may be literally true but nonetheless misleading and, in that sense, untrue."  *CTIA II*, 928 F. Supp. 3d at 1259.

the compelled disclosures would be unlikely to know the definitions or intent of IARC's cancer hazard classification terms, the disclosures conveyed the message that exposures to RF energy from the use of cell phones increased their risk of cancer.  *See id.* at 1063.  These individuals were also unlikely to know of IARC's other cancer hazard classifications.  The Court further found that the warning was misleading by omissions because it did not state, "RF Energy has been classified by the World Health Organization as a possible carcinogen rather than as a known or a probable carcinogen."  *Id.*

In *National Association of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247 (E.D. Cal. 2020), Judge Shubb applied this same rationale in finding that alternative Proposition 65 warnings for glyphosate offered by the Attorney General were not "purely factual and uncontroversial."  One of these warnings would have informed consumers that glyphosate is listed under Proposition 65 "based on a determination by [IARC] that glyphosate presents a cancer hazard" and also would qualified this statement by advising that the "U.S. Environmental Protection Agency has tentatively concluded in a draft document that glyphosate does not present a cancer hazard."  *Id.* at 1262-63.  While literally true, this warning was still misleading "because it conveys the message that there is equal weight of authority for and against the proposition that glyphosate causes cancer," a proposition that was not true.  *Id.* at 1263.

Here, the New Safe Harbor Warning suffers the same deficiencies as the warnings in *CTIA I* and *Wheat Growers*.  The warning's reference to acrylamide as a "probable human carcinogen" is based on IARC's classification of acrylamide as "probably carcinogenic to humans" and EPA's classification of acrylamide as a "likely" human carcinogen.  Neither of these ***hazard*** classifications, however, address the human cancer ***risk*** of consuming dietary acrylamide.  The New Harbor Warning, however, conflates the two concepts by referring to acrylamide as a probable human carcinogen and then stating: "*Many factors affect your cancer risk, including the frequency and amount of the chemical consumed.*"  Further, its instruction to visit the Proposition 65 website "for information including ways to reduce your exposure" sends the message that consuming less dietary acrylamide lowers one's risk of cancer.  By its plain text, the New Safe Harbor Warning sends the message that consuming dietary acrylamide increases the risk of humans developing cancer, a proposition that is unsupported by the

1  scientific evidence the Court considered at the preliminary injunction stage.  It also, like the warning

2  in *CTIA I*, fails to inform consumers that IARC and EPA have "known" carcinogen classifications.

3      Indeed, in support of its forthcoming motion for summary judgment, CalChamber will submit

4  an updated consumer survey regarding the language of the New Safe Harbor Regulation and showing

5  that the overwhelming majority of consumers interpret the New Safe Harbor Warning, as they did the

6  original safe harbor warning, as conveying the message that consuming foods with dietary acrylamide

7  increases their risk of cancer.  This evidence shows that the New Safe Harbor Warning, like its

8  predecessor, is "controversial" under any definition of the term.  Dkt Entry 85-1 at 19 n. 10.

9      *Remaining Elements of Zauderer*.  The Attorney General will also be unable to meet his burden

10  of showing that the New Safe Harbor Warning is (a) "reasonably related" to a "substantial" government

11  interest and "neither unjustified nor unduly burdensome."  The State has no legitimate government

12  interest in forcing the dissemination of information that is false or arguably false.  *See, e.g., Video*

13  *Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009).  It also has no interest

14  in warning individuals of exposures to "probable" human carcinogens.  Indeed, Proposition 65's ballot

15  language expressly disclaimed such an interest by assuring voters that the law would address

16  "chemicals that are scientifically known [,] not merely suspected, but known[] to cause cancer."[6]  And

17  the State has no interest in discouraging consumers from eating foods recognized by FDA as serving

18  an integral role in healthy diets.  ECF No. 95-1 at 15.

19      Attorney General.

20      The Attorney General will demonstrate that CalChamber's First Amendment challenge to the

21  language of the New Safe Harbor Warning is without merit.[7] The New Safe Harbor Warning, which is

22  specific to acrylamide, complies with *Zauderer* and the cases that follow it in that it (1) requires the

23  disclosure of "purely factual and uncontroversial" information, (2) is "not unduly burdensome when

24  _____

25      [6] Available at https://oehha.ca.gov/media/downloads/proposition-65/general-info/prop65ballot1986.pdf.

26      [7] Although the Attorney General does not believe this Joint Status Report is the appropriate place for a briefing on the merits, he offers the following preliminary discussion to address

27  CalChamber's discussion of the merits of its case, while reserving his right to fully brief the merits of the case following sufficient time for expert discovery.

28

1   balanced against its likely burden on protected speech," and (3) is "reasonably related to a substantial

2   government interest." *CTIA-The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845, 848-49 (9th

3   Cir. 2019) ("*CTIA II*"), citing *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985),

4   *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 341, 106 S. Ct. 2968

5   (1986), and *National Institute of Family & Life Advocates v. Becerra* ("*NIFLA*"), —— U.S. ——, 138 S.

6   Ct. 2361, 2378 (2018) (internal quotes omitted). It was designed to address the Court's First

7   Amendment concerns about the general consumer product safe harbor warning, which—although

8   optional—the Court believed a business had no choice but to use to protect itself from suit. (ECF No.

9   114 at 24-25.) The general consumer product safe harbor warning that CalChamber challenged

10  contained the statement that acrylamide is "*known* to the State [of California] to cause cancer." (ECF

11  No. 114 at 22-23 [emphasis added].) Because the Court erroneously concluded that there was an

12  "unresolved scientific debate" about the carcinogenicity of acrylamide in foods and beverages, it held

13  – based on the limited record existing at the time of the motion for preliminary injunction – that

14  requiring a warning that stated that acrylamide was "known" to cause cancer would violate the First

15  Amendment. *Id.* at 23.

16        In issuing its ruling, however, the Court posited, "[t]he problems posed by the safe harbor

17  warning could have been avoided." (ECF No. 114 at 24.) It suggested that a safe harbor warning that

18  stated, for example, that acrylamide "forms naturally when some foods are prepared," that acrylamide

19  was listed as "a chemical that 'probably' causes cancer," or that acrylamide "is a 'likely' carcinogen"

20  would be permissible under the First Amendment. (ECF No. 114 at 24.) The New Safe Harbor Warning

21  reflects the Court's suggestions and addresses its constitutional concerns. The New Safe Harbor

22  Warning omits the statement that acrylamide is "known" to cause cancer, identifying acrylamide

23  instead as "a probable human carcinogen formed in some foods during cooking or processing at high

24  temperatures." Cal. Code Regs., tit. 27, § 25607.2(b); *see* ECF No. 114 at 24. As discussed below, the

25  Attorney General will demonstrate that the warning is purely factual and uncontroversial; and the

26  warning is reasonably related to a substantial government interest, and is neither unjustified nor unduly

27  burdensome.

28

*Purely Factual and Uncontroversial*.  The New Safe Harbor Warning is purely factual, and is not "controversial," either from a scientific standpoint or within the meaning of the First Amendment. At the appropriate time, following expert discovery, the Attorney General will demonstrate that there is no genuine scientific debate about the carcinogenicity of acrylamide in food. There is unanimous agreement among the scientific expert agencies in the United States, the World Health Organization's International Agency for Research on Cancer (IARC)—the world's leading agency for cancer hazard identification—and the European Food Safety Agency (*see* discussion at Section 2 and n.2 above) about the carcinogenicity of acrylamide. All of these agencies have concluded that acrylamide causes cancer in animals and is a "likely" or "probable" human carcinogen, as the New Safe Harbor Warning correctly, and accurately, reflects. The Attorney General will demonstrate that CalChamber's attempt to use epidemiological studies to create a scientific controversy where none exists simply fails.[8]

Moreover, even if there were a scientific "debate," this type of disagreement would not constitute a "controversy" under *Zauderer* and its progeny that would render the warning unconstitutional.[9] *Zauderer* and the cases that follow it, including *NIFLA*, 138 S. Ct. at 2372, and *CTIA II*, 928 F.3d 832, 845, make clear that "controversial" for purposes of the compelled commercial speech analysis relates to an ideological or political controversy, one in which the communication compelled by the government intrudes on the individual liberty interests of a person or group. A communication

---

[8] Without waiving the right to advance additional lines of argument, the Attorney General will explain how the epidemiological studies that were the sole basis for CalChamber's motion for preliminary injunction, when properly considered and weighed with the full body of scientific evidence, do not undermine the accuracy of the safe harbor warning language.

[9] Neither *CTIA I*, to which CalChamber devotes a page and a half of discussion*,* nor *National Association of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247 (E.D. Cal. 2020), has any applicability to this case. *CTIA I*, which was affirmed by the Ninth Circuit in an unpublished decision, is a 2011 case in which the district court stated that the warning San Francisco sought to compel "falls short of protecting the public from a 'known' carcinogen or even from a 'probable' carcinogen but amounts only to protecting the public from a 'possible' carcinogen, meaning that no one yet knows if the agent (RF radiation) is actual harmful (or not)." 827 F. Supp. 2d at 1060. Here, the United States Environmental Protection Agency, IARC, and other expert scientific bodies have all concluded that acrylamide is a *likely* or *probable* human carcinogen. And *National Association of Wheat Growers v. Becerra* is a case with very different facts: in that case, scientific expert agencies reached different conclusions about the carcinogenicity of glyphosate, the chemical at issue. Here, by contrast, there is unanimity. Moreover, *National Association of Wheat Growers v. Becerra* is currently on appeal, with oral argument scheduled for April 2023.

about a matter as to which a difference of scientific opinion exists does not impinge on individual liberty interests; does not require a person or group to publish an ideological or political message with which it disagrees; and does not render compelled speech "controversial" for purposes of the *Zauderer* analysis.

Nor is the New Safe Harbor Warning in any way misleading. Consistent with the consensus findings of respected scientific agencies (including the United States Environmental Protection Agency, the National Toxicology Program, the United States Food and Drug Administration, and IARC[10]), the New Safe Harbor Warning states that acrylamide is a "probable human carcinogen," that acrylamide is "formed in some foods during cooking or processing at high temperatures," that various factors can affect an individual's cancer risk (including amount and frequency of exposure), and that additional information may be found on the linked website. Each of these statements is factually accurate, straightforward, and simple for a consumer to understand.  The New Safe Harbor Warning conveys information to consumers that will enable them to make informed decisions about their exposures to acrylamide, a probable human carcinogen.

Moreover, CalChamber's contention that the New Safe Harbor Warning conflates "risk" and "hazard" reflects a fundamental misunderstanding of the statutory scheme. Proposition 65 warnings are required for acrylamide because acrylamide has been determined to be a cancer hazard; thus, it is on the Proposition 65 list. *See* Cal. Health & Safety Code § 25249.8(a). But a warning is only required on a particular product if the business cannot establish that consuming the product will cause no significant risk. Cal. Health & Safety Code § 25249.10(c). When a warning is required to be given, therefore, the business will have been unwilling or unable to make that showing. *See id*. Where a warning is necessary, use of the New Safe Harbor Warning will make clear that the product at issue

---

[10] The United States Environmental Protection Agency, the National Toxicology Program, the United States Food and Drug Administration, and IARC are "authoritative bodies" for purposes of adding carcinogens to the Proposition 65 list. Cal. Health & Saf. Code § 25249.8(b) ("a chemical is known to the state to cause cancer . . . within the meaning of this chapter if . . . a body considered to be authoritative by [the state's qualified experts] has formally identified it as causing cancer . . ."); Cal. Code Regs. tit. 27, § 25306(m).

contains a chemical that health agencies have determined is a probable human carcinogen, but also informs the consumer that many factors affect the risk of getting cancer, including "frequency and amount" of consuming the product. The combination of these messages provides consumers with balanced, appropriate health and safety warning information before they purchase or consume the product, which is the purpose of Proposition 65, a right-to-know statute.

*Remaining Elements of Zauderer*.  In addition, the New Safe Harbor Warning is "reasonably related" to a "substantial" government interest, and is neither unjustified nor unduly burdensome. Every statement in the New Safe Harbor Warning is purely factual and completely accurate, and the warning provides California consumers with information regarding food containing acrylamide, a probable human carcinogen. Proposition 65 is a right-to-know statute, and the requirement that businesses provide consumers with such information when warranted by the level of risk involved is substantially related to California's interest in protecting consumers' health and safety, an important governmental interest. *See CTIA II*, 928 F. 3d at 844 ("the governmental interest in furthering public health and safety is sufficient under *Zauderer* so long as it is substantial."). Moreover, Proposition 65 warnings are small relative to the size of the product that bears them, and various warning methods exist (i.e., a business could elect to place the warning on a sign in a retail store, instead of on the product directly). Such a "minimal requirement does not interfere with advertising or threaten to drown out messaging by the [. . . ] retailers subject to the requirement." *Id*. at 849.

CalChamber's arguments to the contrary, suggesting that the acrylamide warning requirement under Proposition 65 is unjustified and not reasonably related to a substantial governmental interest, have no merit. CalChamber's assertion that the information in the New Safe Harbor Warning is "false" is demonstrably untrue, as every statement in the warning, both individually and taken as a whole, is purely factual and completely accurate. And CalChamber's citation to the Proposition 65 ballot language is misplaced. It is true that Proposition 65 only addresses chemicals that are "scientifically known[,] not merely suspected" to cause cancer:  acrylamide, which is known to cause cancer in

animals,[11] is one such chemical, which is why it is on the Proposition 65 list. The reference in the New Safe Harbor Warning to acrylamide's status as a "probable human carcinogen" (which it is, in addition to being acknowledged to cause cancer in animals) is included in the warning to make it more relevant to consumers. Nor does the New Safe Harbor Warning discourage consumers "from eating foods recognized by FDA as serving an integral role in healthy diets," as CalChamber alleges; rather, it provides them with information about foods containing acrylamide. The United States Food and Drug Administration itself agrees that acrylamide is "reasonably anticipated to be a human carcinogen," and has provided recommendations for food producers to reduce the level of acrylamide in their products. (ECF No. 101-4 [Purtle Decl., Exh. J at 3; *see also* ECF No. 101-1 [Solomon Decl., ¶ 20]).

In sum, after the close of expert discovery, the Attorney General will demonstrate that the New Safe Harbor Warning comports with the First Amendment.

CERT.  As mentioned above, CERT contends that the New Safe Harbor Warning (which states that "consuming this product can expose you to acrylamide. a probable human carcinogen") is indisputably true and neither false, misleading nor controversial, because the International Agency for Research on Cancer has long classified acrylamide as a "probable human carcinogen." CERT contends that CalChamber's position that all warnings regarding acrylamide in food are necessarily false, misleading, and controversial cannot be correct, because holding that all possible health warnings regarding acrylamide in food necessarily constitute false compelled speech would deprive the State of the police power to protect the health and wellbeing of Californians, which right is reserved to the States under the Tenth Amendment of the U.S. Constitution.

---

[11] ECF No. 101-1 [Solomon Decl., ¶¶ 33-41].

Dated: March 23, 2023               Respectfully submitted,

By: /s/ Trenton H. Norris
Trenton H. Norris
S. Zachary Fayne
David M. Barnes
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Tel:  (415) 471-3100
trent.norris@arnoldporter.com

*Attorneys for Plaintiff California Chamber of Commerce*

Dated: March 23, 2023               Respectfully submitted,

ROB BONTA
Attorney General of California
LAURA J. ZUCKERMAN
Supervising Deputy Attorney General

By: /s/ Megan K. Hey
MEGAN K. HEY
RAFAEL J. HURTADO
Deputy Attorneys General
OFFICE OF THE ATTORNEY GENERAL
300 South Spring Street
Los Angeles, CA 90013
Tel:  (213) 269-6344
megan.hey@doj.ca.gov

*Attorneys for Rob Bonta, Attorney General of the State of California*

Dated: March 23, 2023               Respectfully submitted,

By: /s/ Raphael Metzger
Raphael Metzger, Esq.
Scott Brust, Esq.
METZGER LAW GROUP
A Professional Law Corporation
401 E. Ocean Blvd., Suite 800
Long Beach, CA 90802
Tel:  (562) 437-4499
rmetzger@toxictorts.com

*Attorneys for Intervenor-Defendant, Council for Education and Research on Toxics ("CERT")*

-27-