ROB BONTA
Attorney General of California
LAURA J. ZUCKERMAN
Supervising Deputy Attorney General
MEGAN K. HEY, State Bar No. 232345
RAFAEL J. HURTADO, State Bar No. 292694
ELIZABETH SONG, State Bar No. 326616
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6221
  Fax:  (916) 731-2128
  E-mail:  Megan.Hey@doj.ca.gov

*Attorneys for Rob Bonta, in his Official Capacity
as Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CALIFORNIA CHAMBER OF COMMERCE,**<br><br>                              Plaintiff,<br><br>   **v.**<br><br>**ROB BONTA, in his Official Capacity as Attorney General of the State of California,**<br><br>                              Defendant,<br><br>and<br><br>**COUNCIL FOR EDUCATION AND RESEARCH ON TOXICS,**<br><br>                    Defendant-Intervenor. | Case No. 2:19-cv-02019-DJC-JDP<br><br>**ATTORNEY GENERAL ROB BONTA'S OPPOSITION TO THE CALIFORNIA CHAMBER OF COMMERCE'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          January 23, 2025<br>Time:          1:30 p.m.<br>Courtroom:   10<br>Judge:         Hon. Daniel J. Calabretta<br>Trial Date:   None set<br>Action Filed: October 7, 2019 |

1

**TABLE OF CONTENTS**

2
                                                                                        **Page**

3  INTRODUCTION ....................................................................................................... 1

4  BACKGROUND ........................................................................................................ 2

      I.     Statutory and Regulatory Background ............................................... 2

5             A.     The Listing Process............................................................... 2

6             B.     The Warning Requirement..................................................... 3

           C.     Cancer Hazard Identification ................................................ 5

7             D.     Cancer Hazard Determinations for Acrylamide ................... 6

8        II.    Procedural History ........................................................................... 7

9             A.     New Safe Harbor Warning ................................................... 8

10 LEGAL STANDARD ................................................................................................ 10

ARGUMENT ........................................................................................................... 10

11       I.     CalChamber's Motion Must be Denied Because CalChamber Fails
to Establish That Any of Its Members Actually Are Compelled to
12            Provide a Proposition 65 Warning ................................................... 10

13       II.    CalChamber's Motion Fails Because The New Safe Harbor Warning
Complies with *Zauderer* .............................................................. 12

14            A.     The Warning Is "Purely Factual" ........................................ 12

15            B.     The Warning Is Not Misleading........................................... 15

           C.     The Warning Is Not "Controversial".................................... 19
16
           D.     The Warning is Neither Unjustified nor Unduly Burdensome.......... 23

17       III.   CalChamber's Motion Should Be Denied Because the New Safe
Harbor Warning Complies with *Central Hudson*........................................ 24
18
      IV.   CalChamber's Request for Injunctive Relief Is Overbroad and
19              Unsupported by the Evidence ....................................................... 25

20 CONCLUSION......................................................................................................... 25

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

<u>Page</u>

3

**CASES**

4

5

*AFL-CIO v. Deukmejian*
  212 Cal. App. 3d 425 (1989) ...................................................................... 5, 25

6

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*
  916 F.3d 749 (9th Cir. 2019) ......................................................................... 23

7

8

*Am. Chemistry Council*, 55 Cal. App. 5th 1113, 1141-42, 1160 (2020) ...................... 3, 4

9

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 (1986) ................................................................................ 10, 11

10

11

*B&G Foods v. Embry*
  29 F.4th 527 (9th Cir. 2022) ...................................................................... 11, 20

12

*Bd. of Trs. Of State Univ. of N.Y. v. Fox*
  492 U.S. 469 (1989) ................................................................................. 24, 25

13

14

*Cal. Chamber of Commerce v. Council for Education and Research on Toxics*
  29 F.4th 468 (9th Cir. 2022) .................................................................*passim*

15

16

*Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*
  447 U.S. 557 (1980) ............................................................................. 1, 24, 25

17

18

*Commc'ns Maint., Inc. v. Motorola, Inc.*
  761 F.2d 1202 (7th Cir. 1985) ...................................................................... 12

19

20

*Consumer Defense Group v. Rental Housing Industry Members*
  137 Cal. App. 4th 1185 ................................................................................... 11

21

22

*CTIA - The Wireless Ass'n v. City of Berkeley*
  928 F.3d 832 (9th Cir. 2019) (*CTIA II*) ...............................................*passim*

23

*CTIA-The Wireless Ass'n v. City & Cty. of San Francisco*
  827 F. Supp. 2d 1054 (N.D. Cal. 2011) ........................................................ 18

24

25

*DiPirro v. Bondo Corp.*
  153 Cal. App. 4th 150 (2007) .......................................................................... 2

26

27

*Exxon Mobil Corp. v. Off. of Env't Health Hazard Assessment*
  169 Cal. App. 4th 1264,1291-92 (2009) ......................................................... 3

28

1

### TABLE OF AUTHORITIES
**(continued)**

2

Page

3

*McSherry v. City of Long Beach*
  584 F.3d 1129 (9th Cir. 2009) ................................................................ 17

4

5

*Monsanto v. Office of Environmental Health Hazard Assessment*
  22 Cal. App. 5th 534 (2018) ..................................................................... 3

6

*National Association of Wheat Growers v. Bonta*
  85 F.4th 1263 (9th Cir. 2023) ...........................................................*passim*

7

8

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*
  575 U.S. 175 (2015) ............................................................................... 13

9

*Pac. Gas & Elec. Co. v. Pub. Util. Com'n of Cal.*
  475 U.S. 1 (1986) ................................................................................... 20

10

11

*The Personal Care Products Council v. Bonta*
  2024 WL 3011001, at *9 (E.D. Cal. June 12, 2024) ......................... 18, 19

12

13

*United States v. JP Morgan Chase Bank Account No. Ending 8215 in*
  *Name of Ladislao v. Samaniego, VL: $446,377.36*
  835 F.3d 1159 (9th Cir. 2016) ............................................................... 10

14

15

*Zauderer v. Office of Disciplinary Counsel*
  471 U.S. 626 (1985) .........................................................................*passim*

16

17

**STATUTES**

18

15 United States Code
  §§ 2601-2629 ........................................................................................... 6

19

20

California Code of Regulations, Title 27
  §§ 25697.38-24607.47 ............................................................................. 5

21

California Education Code
  § 32062(a) ................................................................................................. 6
  § 32062(b) ................................................................................................. 6

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3
California Health and Safety Code

4
 § 25249.6 ................................................................................................ 4
 § 25249.8 ................................................................................................ 7

5
 § 25249.8(a) ................................................................................... 2, 3, 4
 § 25249.8(b) ...................................................................................... 2, 3

6
 § 25249.10(c) ............................................................................. 4, 10, 11
 § 25607.2(a)(1) ....................................................................................... 7

7
 § 25607.2(a)(2) ....................................................................................... 7
 § 25703(b)(1) ........................................................................................ 11

8
 § 111791.5(b)(2) .................................................................................... 6

9
California Labor Code

10
 § 6382(b)(1) ............................................................................................ 6

11
California Penal Code

12
 § 374.8(c)(2)(D) ..................................................................................... 6

13
CONSTITUTIONAL PROVISIONS

14
First Amendment ................................................................................. *passim*

15
COURT RULES

16
Federal Rules of Civil Procedure

17
 Rule 56(a) ............................................................................................. 10

18
Federal Rules of Evidence
 Rule 201 .................................................................................................. 6

19
OTHER AUTHORITIES

20
29 Code of Federal Regulations

21
 § 1910.1200, Appendix D ...................................................................... 6
 § 1910.1200(g) ....................................................................................... 6

22
40 Code of Federal Regulations § 707.60(c)(2)(ii) ................................... 6

23
50 Federal Register 10375 (Mar. 14, 1985) ............................................. 5

24
71 Federal Register 66244 (Nov. 14, 2006) ............................................. 6

25
80 Federal Register 40,138 (July 13, 2015) ............................................. 6

26

27

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

California Code of Regulations Title 27
  § 25306(b)........................................................................................................3
  § 25306(m)....................................................................................................2, 3
  § 25506..............................................................................................8, 11, 15
  § 25506(a)....................................................................................................11
  § 25506(b)......................................................................................................4
  § 25601..........................................................................................................4
  §§ 25607.2(a)(1), (2)....................................................................................17
  §§ 25607.2(a)(1), (a)(2)................................................................................24
  § 25607.2(a)(2)..............................................................................................4
  §§ 25607.2(b)(ii)(1), (2)..................................................................................8
  § 25607.2(b)(ii) (2)..........................................................................9, 12, 24
  § 25607.2(b)(ii)(2)(C)....................................................................................24
  § 25607.2(b)(ii)(2)(C)(ii)..........................................................................15, 17
  §§ 25607.2(b)(ii)(2)(C)(ii), (iii).......................................................................10
  § 25701..........................................................................................................4
  § 25703..........................................................................................................4
  § 25703(b)......................................................................................................4
  § 25705..............................................................................................4, 11, 15

**WEBSITES**

https://ntp.niehs.nih.gov/whoweare/organization ...........................................6

https://oehha.ca.gov/media/downloads/crnr/noticeadoption122322.pdf ...................8

https://www.epa.gov/fera/risk-assessment-carcinogenic-effects ...................6

https://www.latimes.com/environment/story/2024-11-11/study-deems-
  california-prop-65-warning-labels-effective.............................................2

https://www.niehs.nih.gov/research/atniehs/labs/iha/roc ...........................6

https://www.nytimes.com/2017/09/19/science/epa-chemical-industry-
  dourson.html?unlocked_article_code=1.aU4.TRU4.M7f7VZK4UC18&s
  mid=url-.................................................................................................19

https://www.osha.gov/sites/default/files/publications/OSHA3514.pdf .............6

www.P65Warnings.ca.gov/acrylamide .........................................................9

www.P65Warnings.ca.gov/food..............................................................4, 17

**INTRODUCTION**

Plaintiff California Chamber of Commerce's (CalChamber) First Amendment challenge to the Proposition 65 warning requirement for acrylamide relies upon numerous unproven assumptions, each of which is disputed and unsupported by the record. Because CalChamber fails to meet its evidentiary burden, and there exist genuine disputes of material fact, the Court must deny summary judgment.

First, CalChamber fails to establish that any of its members were actually "compelled" to apply acrylamide-related warnings to any of their food products. That is because, under Proposition 65, a warning is not required for all foods with acrylamide— only for those food products with acrylamide concentrations resulting in exposures that pose a significant risk of cancer (the "no significant risk level") and that are not otherwise exempt. CalChamber does not show that any of its members have products in this category. Therefore, CalChamber cannot show that the speech was compelled.

Second, the Office of Environmental Health Hazard Assessment's new safe harbor warning for acrylamide, which takes effect on January 1, 2025, complies with both *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985), and *Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). Scientific agencies that have made cancer hazard determinations for acrylamide agree that the chemical causes cancer in animals and is probably or likely carcinogenic to humans. CalChamber does not challenge this consensus, or dispute that acrylamide could potentially cause cancer in humans; instead, it argues that the message of *any* compelled Proposition 65 warning for acrylamide in food is inherently misleading, because the amounts typically consumed through food are not high enough to pose a cancer risk. But CalChamber's own expert acknowledges that there is nothing qualitatively different about dietary exposures to acrylamide compared to other kinds of exposures, and CalChamber presents no evidence showing that the amount of acrylamide in its members' food products (let alone *all* food products containing acrylamide) are universally low enough to pose no cancer risk.

1

1    At a minimum, factual disputes preclude the granting of summary judgment here,

2    including, among others: (1) whether there exists a legitimate scientific debate about the

3    carcinogenicity of acrylamide; (2) whether the new safe harbor warning for acrylamide in

4    food is misleading or controversial; and (3) whether being compelled to provide the new

5    safe harbor warning would be unjustified and unduly burdensome. CalChamber's motion

6    should be denied.

7                                    **BACKGROUND**

8    **I.    STATUTORY AND REGULATORY BACKGROUND**

9         **A.    The Listing Process**

10    California's Safe Drinking Water and Toxic Enforcement Act of 1986, known as

11   Proposition 65, is a "right-to-know" law, the purpose of which is "to facilitate the

12   notification of the public of potentially harmful substances, so informed decisions may be

13   made by consumers on the basis of disclosure." *DiPirro v. Bondo Corp.,* 153 Cal. App.

14   4th 150, 183 (2007).[1]

15    Proposition 65 requires the State to publish a "list of those chemicals known to the

16   state to cause cancer . . . within the meaning of this chapter[.]" Cal. Health & Safety

17   Code § 25249.8(a).[2] The California Office of Environmental Health Hazard Assessment

18   (OEHHA) must list a chemical as "known to the State to cause cancer" within the

19   meaning of the statute if, inter alia, a scientific agency determined by regulation to be

20   "authoritative" has formally identified it as a carcinogen. § 25249.8(b). The State's

21   "qualified experts," here the Carcinogen Identification Committee, have designated five

22   agencies as "authoritative bodies" for carcinogen identification, based on the agencies'

23   expertise in, and approach to, identifying carcinogens.[3] Cal. Code Regs. tit. 27, §

24           [1] A recent study evaluating the effects of Proposition 65 has found that the law has "curbed
exposure to toxic substances in California," in part by encouraging companies to reformulate their products
25   to avoid the necessity of Proposition 65 warnings: https://www.latimes.com/environment/story/2024-11-
11/study-deems-california-prop-65-warning-labels-effective.
26           [2] Unless otherwise specified, subsequent statutory references are to the California Health and
Safety Code.
27           [3] A body considered to be "authoritative" for purposes of cancer hazard determination is "an agency
or formally organized program or group which utilizes one of the methods [specified in the regulations] for
28                                                                                    (continued…)

1   25306(m). These agencies are the United Nations World Health Organization's

2   International Agency for Research on Cancer (IARC), the National Institute for

3   Occupational Safety and Health (NIOSH), the National Toxicology Program (NTP), the

4   U.S. Environmental Protection Agency (EPA), and the U.S. Food and Drug

5   Administration (FDA). *Id*. If an authoritative body identifies an agent as a carcinogen

6   (which includes agents that cause cancer in humans and agents that cause cancer in

7   animals), OEHHA must include it on the Proposition 65 list.[4] *Monsanto v. Office of*

8   *Environmental Health Hazard Assessment*, 22 Cal. App. 5th 534, 555-56 (2018).

9       **B.    The Warning Requirement**

10       A two-step process exists for determining whether a warning is required under

11   Proposition 65. *See Am. Chemistry Council*, 55 Cal. App. 5th 1113, 1141-42, 1160

12   (2020); *Exxon Mobil Corp. v. Off. of Env't Health Hazard Assessment*, 169 Cal. App. 4th

13   1264,1291-92 (2009). The first step is "hazard-identification." 55 Cal. App. 5th at 1141.

14   In the hazard identification step, as described more below, the State creates a list of

15   chemicals identified as cancer hazards; i.e., chemicals "capable of causing cancer under

16   some circumstances." Defendant's Separate Statement of Material Facts (DF) 1; *see* §

17   25249.8(a). The second step involves the assessment of risk—that is, the numerical

18   probability that cancer will occur at a certain exposure level.[5] DF 2. Although businesses

19   generally "are required to give a 'clear and reasonable warning' before exposing

20

21   the identification of chemicals, and which the Carcinogen Identification Committee has identified as having expertise in the identification of chemicals as causing cancer." Cal. Code Regs. tit. 27, § 25306(b).

22       [4] As the Court of Appeal explained in *Monsanto v. Office of Environmental Health Hazard Assessment*, 22 Cal. App. 5th 534, 555-56 (2018), "Proposition 65 lays out a broad and overlapping basis

23   for determining the chemicals to list that is couched in the disjunctive. Thus, a 'chemical is known to the state to cause cancer ... if in the opinion of the state's qualified experts it has been clearly shown through

24   scientifically valid testing according to generally accepted principles to cause cancer ..., *or* if a body considered to be authoritative by such experts has formally identified it as causing cancer ..., *or* if an

25   agency of the state or federal government has formally required it to be labeled or identified as causing cancer.'" (quoting § 25249.8(b) (emphasis in original).

26       [5] The distinction between a hazard determination phase and a risk characterization phase, based on dose-response assessment and exposure assessment, is consistent with the approach recommended by

27   the National Research Council of the National Academies of Science. DF 3. It is important because no substance causes cancer in every person who is exposed. The fact that not everyone who is exposed gets

28   cancer does not lessen the fact that the substance is a carcinogen; rather, it illustrates the importance of considering risk as a distinct issue from cancer hazard. DF 4.

1    individuals to [] [a listed] chemical," *id.* (quoting § 25249.6), as relevant here, "a business

2    can obtain an exemption from [this] requirement[] if it can demonstrate [. . .] the

3    exposure to the chemical poses no significant risk at specified exposure levels." *Am.*

4    *Chemistry Council*, 55 Cal. App. 5th at 1142. (quoting § 25249.10(c)). Hazard

5    identification relates to the chemicals in a product, regardless of the type of product; in

6    contrast, cancer risk relates to the specific exposure caused by a particular product

7    (because risk depends not only on the cancer potency of the chemical, but also on the

8    dose, i.e., the amount of exposure). *See* DF 5.

9        Businesses can calculate their own "no significant risk level" (sometimes referred

10   to as an NSRL) for any listed chemical, including for acrylamide. *See* Cal. Code Regs.

11   tit. 27, §§ 25701, 25703, 25506(b). The no significant risk level is a level of exposure that

12   would result in not more than one excess case of cancer in 100,000 individuals exposed

13   to the chemical over a lifetime, "except where sound considerations of public health

14   support an alternative level." *See* § 25249.10(c); Cal. Code Regs. tit. 27, § 25703(b).

15   Businesses can also rely on any no significant risk level that OEHHA has set by

16   regulation for a listed chemical, to determine whether a warning is compelled. *See, e.g.*,

17   Cal. Code Regs. tit. 27, § 25705.

18       Where a warning is required, Proposition 65 allows a business to use any warning

19   that is "clear and reasonable." *See* § 25249.6. However, to assist businesses, OEHHA

20   has developed, and adopted by regulation, optional "safe harbor" language for a variety

21   of types of exposures. Cal. Code Regs. tit. 27, § 25601 et seq. Use of the safe harbor

22   warnings is not required by law, and businesses may develop their own "clear and

23   reasonable" warnings; but businesses may choose to use the safe harbor warnings to

24   reduce their risk of litigation. One such warning is the general safe harbor warning for

25   food, which states (for carcinogens), "Consuming this product can expose you to

26   chemicals including [name of one or more chemicals], which is [are] known to the State

27   of California to cause cancer. For more information go to

28   www.P65Warnings.ca.gov/food." Cal. Code Regs. tit. 27, § 25607.2(a)(2). As discussed

1  below, OEHHA has promulgated additional specialized safe harbor warnings for other

2  listed chemicals. *E.g.*, Cal. Code. Regs. tit. 27, §§ 25697.38-24607.47.

3      **C.    Cancer Hazard Identification**

4      Health and scientific agencies identify carcinogens by conducting hazard

5  assessments, which are based on the evaluation of three "streams" of scientific

6  evidence: epidemiological data, cancer bioassay data (animal studies), and mechanistic

7  data. DF 6. Scientists first assess "the quality and informativeness of individual studies

8  and the strength of the evidence" for each stream of evidence. DF 7. Then, all "bodies of

9  evidence included within each stream of evidence are considered as a whole, in order to

10  reach an overall evaluation of the carcinogenicity to humans." DF 7. Classification

11  requires weighing the relevant data from all three streams of evidence, not just one (for

12  example, epidemiological evidence). DF 8.

13      All health and regulatory agencies consider animal studies when determining

14  whether an agent is carcinogenic. *See AFL-CIO v. Deukmejian*, 212 Cal. App. 3d 425,

15  438, n.7 (1989) (noting qualitative animal-to-human extrapolation for carcinogenesis

16  "'has been accepted by all health and regulatory agencies and is regarded widely by

17  scientists in industry and academia as a justifiable and necessary inference'") (quoting

18  Rep., Office of Science and Technology Policy, 50 Fed. Reg. 10375 (Mar. 14, 1985).).

19  As EPA has explained, "[i]n the absence of information to the contrary, it is assumed that

20  the appearance of cancer in laboratory animals indicates potential carcinogenicity in

21  humans exposed to the substance." DF 9. IARC and NTP are in accord. DF 10, 11.

22      Scientists rely primarily on animal studies to determine whether a chemical is a

23  carcinogen for two reasons. First, "[i]t is unethical to test humans." *Deukmejian*, 212 Cal.

24  App. 3d at 438 n.7. Second, "because of the 20-30-year latency period of many human

25  cancers, epidemiological studies do not adequately warn humans and protect them from

26  the risk of exposure to new carcinogens." *Id.* Moreover, "[a]ll known human carcinogens

27  that have been studied adequately for carcinogenicity in experimental animals have

28  produced positive results in one or more animal species…." *Id.*

1

**D.    Cancer Hazard Determinations for Acrylamide**

Three of the agencies designated as "authoritative" under the regulations have made determinations about the carcinogenicity of acrylamide: EPA, IARC, and NTP.[6] EPA has decades of experience in carcinogen hazard assessment.[7] IARC does too; indeed, EPA considers IARC to be "a recognized international authority on the carcinogenic potential of chemicals and other agents,"[8] and federal law specifically requires manufacturers' Safety Data Sheets[9] to state "[w]hether the hazardous chemical . . . has been found to be a potential carcinogen in the International Agency for Research on Cancer (IARC) Monographs (latest edition), or by OSHA." 29 C.F.R. § 1910.1200, App. D.[10] And the NTP "is an interagency program composed of, and supported by, three government agencies within the Department of Health and Human Services."[11] One of the NTP's hazard evaluation activities is its publication of the Report on Carcinogens, mandated annually by Congress.[12]

In 1986, IARC determined that acrylamide represented a carcinogenic hazard to humans based on "sufficient evidence for the carcinogenicity of acrylamide to experimental animals"; in 1994, after considering new supporting evidence, IARC

---

[6] Pursuant to Federal Rule of Evidence 201, the Attorney General of California requests that the Court take judicial notice of the carcinogenicity determinations of these three agencies with respect to acrylamide. A true and correct copy of each is attached to the Declaration of Megan Hey as Exhibits J, K, WW, and XX.

[7] https://www.epa.gov/fera/risk-assessment-carcinogenic-effects.

[8] 80 Fed. Reg. 40,138, 40,424 (July 13, 2015).

[9] "The Hazard Communication Standard (HCS), 29 CFR 1910.1200(g), revised in 2012, requires that the chemical manufacturer, distributor, or importer provide Safety Data Sheets (SDSs) (formerly MSDSs or Material Safety Data Sheets) for each hazardous chemical to downstream users to communicate information on these hazards." https://www.osha.gov/sites/default/files/publications/OSHA3514.pdf.

[10] Additionally, EPA regulations promulgated under the Toxic Substances Control Act of 1976, 15 U.S.C. § 2601-2629, state that a chemical is a known or potential carcinogen if it is classified as Group 1, 2A, or 2B by IARC. 40 C.F.R., § 707.60(c)(2)(ii) (71 Fed. Reg. 66244 (Nov. 14, 2006)). In addition to Proposition 65, numerous other California statutes rely on IARC hazard determinations, including Cal. Penal Code § 374.8(c)(2)(D), involving the illegal deposit of hazardous substances; Cal. Educ. Code §§ 32062(a) and (b), addressing toxic art supplies in schools; the California Safe Cosmetics Act of 2005, Cal. Health & Safety Code § 111791.5(b)(2); and Cal. Labor Code § 6382(b)(1).

[11] https://ntp.niehs.nih.gov/whoweare/organization. The three US government agencies that comprise the NTP are the National Center for Toxicological Research of the FDA; the National Institute of Environmental Health Sciences of the National Institutes of Health; and NIOSH of the Centers for Disease Control and Prevention. *Id.*

[12] https://www.niehs.nih.gov/research/atniehs/labs/iha/roc

6

1  revised its classification to "probably carcinogenic to humans." DF 12. In 1988, EPA

2  classified acrylamide as a "probable carcinogen in humans"; in 2010, it revised its hazard

3  determination to state that acrylamide is "likely to be carcinogenic to humans." DF 13. In

4  1990, pursuant to Health and Safety Code section 25249.8, OEHHA listed acrylamide as

5  a chemical "known to the State of California to cause cancer" on the basis of these

6  determinations by IARC and EPA. Joint Undisputed Fact (JUF) No. 1, ECF 280-2. The

7  following year, NTP listed acrylamide as "reasonably anticipated to be a human

8  carcinogen." DF 14. Notably, all three authoritative bodies based their determinations of

9  acrylamide's potential to cause cancer in humans on evidence from studies in

10  experimental animals. DF 15.

11  ## II.  PROCEDURAL HISTORY

12  CalChamber filed its complaint in 2019, alleging that Proposition 65 warnings for

13  acrylamide on food products violated its members' and other entities' First Amendment

14  rights because the State does not "know" that acrylamide in food causes cancer in

15  humans. *See generally* ECF 1. In 2020, CalChamber moved for a preliminary injunction

16  to prohibit all prospective enforcement of the acrylamide warning requirement. ECF 95-1.

17  The focus of that motion was the general safe harbor warning for food, found at sections

18  25607.2(a)(1) and (a)(2) of Title 27 of the California Code of Regulations, which

19  describes the chemical at issue as "known to the State of California to cause cancer."

20  Based on the record at that stage, the Court accepted CalChamber's contention that

21  there was an "unresolved scientific debate" about the carcinogenicity of acrylamide in

22  food. ECF 114 at 22-23. The Court held, "[a]t this stage of the case, the State has not

23  shown this warning is purely factual and uncontroversial." *Id.* (emphasis added). As a

24  result, the Court determined that the preliminary injunction should issue notwithstanding

25  the relatively relaxed scrutiny that applies to commercial disclosures under *Zauderer v.*

26  *Off. of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985).

27  The Court noted, however, that "[t]he problems posed by the safe harbor warning

28  could have been avoided." ECF 114 at 24. It suggested that a safe harbor warning that

7

1    stated, for example, that acrylamide "forms naturally when some foods are prepared,"

2    that acrylamide was listed as "a chemical that 'probably' causes cancer," or that

3    acrylamide "is a 'likely' carcinogen" would be permissible under the First Amendment. *Id.*

4    The Attorney General did not appeal the preliminary injunction ruling. However,

5    Defendant-Intervenor Council for Education and Research on Toxics appealed, and the

6    Ninth Circuit Court of Appeals held that the Court had not abused its discretion in

7    granting the motion for preliminary injunction. *Cal. Chamber of Commerce v. Council for*

8    *Education and Research on Toxics*, 29 F.4th 468, 474 (9th Cir. 2022) (*CERT*).

9         In response, OEHHA issued a safe harbor warning, specific to acrylamide in food,

10   that reflected the District Court's suggestions by characterizing acrylamide as "a

11   probable human carcinogen formed in some foods during cooking or processing at high

12   temperatures," and that omitted the statement that acrylamide is "known" to cause

13   cancer. Cal. Code Regs. tit. 27, §§ 25607.2(b)(ii)(1), (2) (Alternative Warning); *see* ECF

14   114 at 24. The Alternative Warning has been in effect since January 1, 2023. JUF No. 5,

15   ECF 280-2. OEHHA also issued an additional regulation for foods containing acrylamide,

16   in effect since April 1, 2023, which exempts food products containing acrylamide created

17   by cooking "if the manufacturer of the food has reduced the levels of acrylamide to the

18   lowest level currently feasible," or if the acrylamide concentration levels are below

19   certain concentration levels set forth in the regulation (for roasted almonds, bread,

20   cookies, crackers, French fries, potato chips, hash browns, and waffles). Cal. Code

21   Regs. tit. 27, § 25506 (Cooking Regulation).[13]

22        **A.    New Safe Harbor Warning**

23        In November 2023, the Ninth Circuit Court of Appeals issued an opinion in *National*

24   *Association of Wheat Growers v. Bonta*, 85 F.4th 1263 (9th Cir. 2023) (*NAWG*), a First

25   Amendment challenge to the Proposition 65 warning requirement for glyphosate, the

26   primary ingredient in Monsanto Company's Roundup weedkiller. This opinion provided

27   _____

28   [13] *See* https://oehha.ca.gov/media/downloads/crnr/noticeadoption122322.pdf (notice of adoption of
     Cooking Regulation)

1  additional guidance regarding the appropriate content of Proposition 65 safe harbor

2  warnings. Subsequently, OEHHA issued, and the California Office of Administrative Law

3  approved, a new regulation, effective January 1, 2025, that provides an additional safe

4  harbor warning option for acrylamide in food (New Safe Harbor Warning), in addition to

5  those already available. *See* ECF 264; JUF No. 6, ECF 280-2.

6      The New Safe Harbor Warning takes a unique approach, allowing businesses to

7  customize their own safe-harbor warning from multiple components, as best reflects their

8  products, situation, marketing approach, and First Amendment concerns.[14] The New

9  Safe Harbor Warning consists, in pertinent part, of the following:

> (A) The words, "Consuming this product can expose you to acrylamide," ***or*** the words "Consuming this product can expose you to acrylamide, a chemical formed in some foods during cooking or processing at high temperatures."
>
> (B) ***At least one*** of the following sentences:
>
>> (i) "The International Agency for Research on Cancer has found that acrylamide is probably carcinogenic to humans."
>>
>> (ii) "The United States Environmental Protection Agency has found that acrylamide is likely to be carcinogenic to humans."
>>
>> (iii) "The United States National Toxicology Program has found that acrylamide is reasonably anticipated to cause cancer in humans."
>
> (C) The content in (A) and (B) ***may*** be followed by one or more of the following sentences:
>
>> (i) "Acrylamide has been found to cause cancer in laboratory animals."
>>
>> (ii) "Many factors affect your cancer risk, including the frequency and amount of the chemical consumed."
>>
>> (iii) "For more information including ways to reduce your exposure, see www.P65Warnings.ca.gov/acrylamide."

Cal. Code Regs. tit. 27, § 25607.2(b)(ii) (2) (emphasis added).

    Thus, if they elect to use the New Safe Harbor Warning, businesses receive safe-

harbor protection without including the word "risk," and without referencing the

---

[14] CalChamber refers to this new warning, disparagingly, as the "Multiplex Warning."

1  Proposition 65 warnings website. Cal. Code Regs. tit. 27, §§ 25607.2(b)(ii)(2)(C)(ii), (iii).

2      In sum, when the New Safe Harbor Warning becomes effective, prior to the

3  hearing on this motion, there will be, in addition to more generic safe harbor warnings,

4  two acrylamide-specific safe harbor options available to businesses that are required to

5  provide warnings for acrylamide in food.

6                          **LEGAL STANDARD**

7      Summary judgment is appropriate "when, viewing the evidence in the light most

8  favorable to the nonmoving party, 'there is no genuine dispute as to any material fact.'"

9  *United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao*

10 *v. Samaniego, VL: $446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016) (quoting Fed. R.

11 Civ. P. 56(a)). The Court must view the evidence and all factual inferences in favor of the

12 nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material

13 fact is one that could affect the outcome of the case; a genuine dispute is one that could

14 permit a reasonable factfinder to enter a verdict in the non-moving party's favor. *Id.*

15                          **ARGUMENT**

16 I.   **CALCHAMBER'S MOTION MUST BE DENIED BECAUSE CALCHAMBER FAILS TO**
      **ESTABLISH THAT ANY OF ITS MEMBERS ACTUALLY ARE COMPELLED TO PROVIDE A**
17    **PROPOSITION 65 WARNING**

18     As a threshold matter, CalChamber fails to show that the statute requires any of its

19 members to warn about acrylamide in their food products. For CalChamber to sustain

20 claims under the First Amendment's compelled speech doctrine, it must first establish

21 that the challenged speech was, in fact, compelled. As discussed above, there is no

22 legal obligation to provide a warning under Proposition 65 when a company can

23 establish that an exposure to acrylamide from its product falls below the no significant

24 risk level. § 25249.10(c). OEHHA has calculated a no significant risk level for acrylamide

25 of 0.2 micrograms (μg)/day. DF 18. Exposures below the no significant risk level, or

26 exempted by the Cooking Regulation, are <u>categorically exempt</u> from Proposition 65's

27

28

                                  10

warning requirements. § 25249.10(c); Cal. Code Regs. tit. 27, §§ 25705, 25506.[15]
Generally, therefore, CalChamber's members are required to warn for exposures to
acrylamide *only* if their food products exceed the no significant risk level, or—if they do
not fall within the Cooking Regulation's identified categories for exemption—they
declined to set their own no significant risk level, or to use best practices for reducing
acrylamide in their products. *See* § 25249.10(c); Cal. Code Regs. tit. 27, §§ 25705,
25506.

CalChamber has adduced no evidence about its members' food products. Instead,
it relies on *dicta* in Judge Mueller's preliminary injunction order, ECF 114, quoting
*Consumer Defense Group v. Rental Housing Industry Members*, 137 Cal. App. 4th 1185,
1214–15)(2006) (commenting on costs to businesses to defend private enforcer actions),
and *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 533 (9th Cir. 2022) (recounting
businesses' claim that in the face of "vague" standards, they "often choose to settle"
instead of litigate private enforcer lawsuits). Mot. at 8. But this falls well short of actual
evidence, and the Court should not adopt CalChamber's *assumption* that its members
were compelled to provide warnings. *Anderson*, 477 U.S. at 248 (court must view the
evidence and make all factual inferences in favor of the nonmoving party). Whether any
of its members are *compelled* to warn based on the concentrations of acrylamide in their
products is a basic fact necessary to the Court's consideration of CalChamber's First
Amendment compelled speech claim, and it should not be assumed.[16] CalChamber thus

[15] CalChamber cites *B&G Foods v. Embry*, 29 F.4th 527, 533 (9th Cir. 2022), suggesting that that decision found that Cal. Code Regs. tit. 27, § 25506(a) was vague and overly burdensome. However, the dicta referenced by CalChamber involved a different regulation entirely, section 25703(b)(1).

[16] At the preliminary injunction stage of this case, when the court was considering CalChamber's likelihood of future success based on inferences from a limited record, the Attorney General stated that "Proposition 65 warnings for acrylamide involve compelled commercial speech," ECF 101 at 9 n.4; *see also* ECF 114 at 21-22 (court's order granting preliminary injunction to Chamber, stating that "the parties agree Proposition 65 compels commercial speech); *accord CERT*, 29 F.4th at 478 (both opinions postdated adoption of the Cooking Regulation, which became effective on April 1, 2023). Now, however, CalChamber is moving for summary judgment, where it has the burden to establish by admissible facts all elements necessary for it to prevail—and to establish that those facts are not subject to dispute even with inferences drawn against it as the movant. Whatever might have seemed likely at earlier stages of the case, what has come to pass is that CalChamber has adduced no evidence of any member that is actually compelled to say anything. As a result, summary judgment must be denied on the present record,

(continued…)

1  falls short of its summary judgment burden to establish standing (since it has established

2  no member's injury-in-fact) and to establish that there is any compelled speech at all.

3  **II.    CALCHAMBER'S MOTION FAILS BECAUSE THE NEW SAFE HARBOR WARNING**
   **COMPLIES WITH *ZAUDERER***

4

5         In any event, even if one of CalChamber's members could show its speech was

6  compelled, the warning requirement would be constitutional under *Zauderer v. Office of*

7  *Disciplinary Counsel*, 471 U.S. 626, 651 (1985), the governing standard in this case.

8  This is because, as set forth below, there is at least one safe harbor warning businesses

9  can use, the New Safe Harbor Warning,[17] that is (1) purely factual; (2) uncontroversial;

10 (3) reasonably related to a substantial state interest; and (4) neither unjustified nor

11 unduly burdensome.[18] *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 842

12 (9th Cir. 2019) (*CTIA II*) (citing *Zauderer*, 471 U.S. at 651).

13        **A.    The Warning Is "Purely Factual"**

14        Every sentence of the New Safe Harbor Warning, whether mandatory or optional,

15 is purely factual. Only two sentences are required: (1) a statement that consuming the

16 product can expose you to acrylamide; and (2) a statement concerning the findings of an

17 authoritative scientific agency on acrylamide's carcinogenicity. The sentences about the

18 agency findings recite their determinations verbatim. Cal. Code Regs. tit. 27, §

19 25607.2(b)(ii)(2).

20        Indeed, CalChamber does not challenge the New Safe Harbor Warning's accuracy.

21 Nor can it: as shown below, every scientific agency that has evaluated the data relevant

22 to acrylamide's carcinogenicity (e.g., EPA, NTP, IARC) has deemed acrylamide to pose

23 _____

24 regardless of what the Court (or parties) might have presumed at the earlier, preliminary stage. *See*
   *generally Commc'ns Maint., Inc. v. Motorola, Inc.*, 761 F.2d 1202, 1205 (7th Cir. 1985) (explaining how

25 differences between preliminary injunction and summary judgment can lead to different outcomes at those
   two stages of a case).

26       [17] While the New Safe Harbor Warning is one example, it is not the only safe harbor warning that
   complies with *Zauderer*.

27       [18] CalChamber's motion does not address, and has therefore waived, any challenge to the
   "reasonably related to a substantial state interest" prong of *Zauderer*. Indeed, it admits that "California

28 unquestionably has an interest in protecting public health." Mot at 23.

a cancer hazard, concluding that it causes cancer in animals and probably causes cancer in humans.

**Table 1: Conclusions by Governmental and International Agencies on Acrylamide**[19]

| Agency | Conclusion | Date |
|---|---|---|
| International Agency for Research on Cancer | "Probably carcinogenic to humans" | 1994 |
| U.S. Environmental Protection Agency | "Probable carcinogen in humans"; Likely to be carcinogenic to humans" | 1988, 2010 |
| U.S. National Toxicology Program | "Reasonably anticipated to be a human carcinogen" | 2011 |
| European Food Safety Authority (EFSA) Panel on Contaminants in the Food Chain | "Acrylamide is a genotoxic carcinogen" | 2015, 2022 |
| Joint Food and Agriculture Organization/World Health Organization (FAO/WHO) Expert Committee on Food Additives | "For a compound that is both genotoxic and carcinogenic, these [levels of exposure] indicate a human health concern" | 2011 |

Given this level of agreement among the agencies, CalChamber cannot manufacture a legitimate scientific debate about acrylamide's status as a cancer hazard.[20]

Instead, CalChamber relies on a handful of references to inconclusive epidemiological studies to discount the scientific consensus of all authoritative agencies to have considered that acrylamide is a probable or likely human carcinogen.[21]

---

[19] DF 12-14, 16, 17.

[20] CalChamber argues that the optional language permitted by the New Safe Harbor Warning is not purely factual but instead contains "unfalsifiable statement of opinion," citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). Mot. at 15. However, *Omnicare* is a securities fraud case; it does not mention the First Amendment. In any event, the sentences at issue do not qualify as an opinion under the *Omnicare* definition. CalChamber appears to argue that requiring businesses to include the phrase "has found" in the attribution (*e.g.*, "the US EPA has found that acrylamide is likely to be carcinogenic to humans") changes a purely factual, refutable statement into an irrefutable statement of opinion. But the phrase "has found" merely identifies the authoritative body that made the hazard determination. Taken to its logical extreme, CalChamber's argument would change any verifiable scientific fact into mere opinion: *e.g.*, "Sir Isaac Newton *found* that for every action, there is an equal and opposite reaction." However, this has been scientifically verified, and is fact, not opinion.

[21] For example, CalChamber states that, in 2015, EFSA "not[ed] that of the few studies suggesting an increased risk for certain kinds of cancer, "the evidence is limited and inconsistent."  Mot. at 4. But

(continued...)

13

1    CalChamber's myopic focus on epidemiological data reflects an erroneous approach to

2    cancer hazard assessment. As even CalChamber's expert acknowledges, scientific

3    agencies like EPA and IARC do not use only one set of information, such as

4    epidemiological studies, to make carcinogenicity determinations. DF 19. No conclusions

5    concerning carcinogenicity can be drawn from epidemiological studies in isolation. DF 9.

6         CalChamber also suggests that findings of inadequate epidemiological evidence

7    are proof that acrylamide does not cause cancer in humans, glossing over the fact that

8    the epidemiological data merely has been inconclusive. Mot. at 20. These "null"

9    epidemiological studies (i.e., studies that did not show a statistically significant

10   association) are not proof there is "no relationship" between acrylamide in food and

11   cancer; they do not exonerate the chemical. As EPA states, "[n]ull results from

12   epidemiologic studies alone generally do not prove the absence of carcinogenic effects

13   because such results can arise either from an agent being truly not carcinogenic or from

14   other factors such as: inadequate statistical power, inadequate study design, imprecise

15   estimates, or confounding factors." DF 20. Many of the epidemiological studies of

16   acrylamide are constrained by these limiting factors. DF 21. CalChamber's singular

17   focus on epidemiological data is, therefore, misplaced.

18        Clearly, CalChamber disagrees with the hazard determinations of the authoritative

19   bodies, but this does not make a warning that references them any less factual. In *CTIA

20   II*, the City of Berkeley required cell phone retailers to provide a warning to consumers

21   based on a warning the Federal Communications Commission already required cell

22   phone manufacturers to provide. 928 F.3d at 845. Plaintiff argued that exposure to radio-

23   frequency radiation from cell phones was not dangerous, but the Court stated that was

24   "beside the point." *Id*. at 846. The Court noted that "the FCC decided, despite the lack of

25   proof of dangerousness, that the best policy was to adopt SAR limits with a large margin

26   of safety," and it found that the City's compelled warning was "literally true." *Id*. Although

27   _____

     EFSA was referring to a limited subset of evidence from epidemiological studies; this did not detract from

28   EFSA's ultimate conclusion that acrylamide is a genotoxic carcinogen, for which it was "inappropriate to
     set a tolerable daily intake." DF 22.

1   the Court acknowledged the possibility that statements that were literally true could also

2   be misleading, it emphasized that the phrase "RF radiation," rather than being

3   "inflammatory and misleading," as plaintiff argued, was "precisely the phrase the FCC

4   has used, beginning in 1996, to refer to radio-frequency emissions from cell phones." *Id*.

5   at 847. Just like the warning in *CTIA II*, the New Safe Harbor Warning repeats verbatim

6   the phrases that U.S. federal agencies, EPA and the NTP, use to refer to the

7   carcinogenicity of acrylamide.

8       **B.    The Warning Is Not Misleading**

9       Rather than challenging the accuracy of any of the statements in the New Safe

10  Harbor Warning, CalChamber argues, in effect, that all safe harbor warnings for

11  acrylamide are misleading because they imply a cancer *risk* when it alleges there is

12  none. Mot. at 12-14. CalChamber makes this assertion even though the New Safe

13  Harbor Warning does not require a reference to risk. Instead, the New Safe Harbor

14  Warning allows a business to provide information about cancer risk *if* it chooses to do so.

15  For example, without losing safe harbor protection, a business can add to the two

16  required statements, "Many factors affect your cancer risk, including the frequency and

17  amount of the chemical consumed." Cal. Code Regs. tit. 27, § 25607.2(b)(ii)(2)(C)(ii).

18      To be misleading, a disclosure must create an important but false implication about

19  the product offered. *CERT*, 29 F.4th at 479. There may be some food products

20  containing acrylamide whose consumption does not expose consumers to a significant

21  risk of cancer. However, those products *would not require a warning.* If a product bears a

22  Proposition 65 warning for acrylamide, it is because the product will expose consumers

23  to acrylamide levels above the no significant risk level or concentration limit set by

24  regulation, or because the business chose to provide the warning even though not

25  legally compelled to do so. *See* Cal. Code Regs. tit. 27, §§ 25705, 25506. Because a

26  warning would only be required for products whose acrylamide concentrations would

27  create exposures posing a significant risk of cancer, even a "risk" warning for such

28  products would not be misleading. Moreover, for a carcinogen like acrylamide that

15

1    operates by way of genotoxicity (i.e., by inducing mutations in DNA), "every individual

2    interaction with DNA carries with it a certain risk that that mutation, for example, could

3    turn into a cancer." DF 23. Thus, products with *compelled* warnings under Proposition 65

4    *do* pose an increased risk of cancer, and a warning to this effect is not misleading under

5    *Zauderer*. At minimum, a triable issue of material fact exists on this issue.

6        Further, the Court should not assume that CalChamber's members' unspecified

7    products (much less *all* food products containing acrylamide), no matter how high their

8    acrylamide concentrations, fail to pose a cancer risk. As CalChamber's toxicology

9    expert, Dr. Maier, conceded, there is nothing "qualitatively" different about "dietary

10   exposures" to acrylamide in food compared to other kinds of exposures, such as those

11   from tobacco smoke or water. DF 24. Rather, CalChamber uses the term "dietary

12   acrylamide" as a shorthand for the relative amount or "quantity" of acrylamide typically

13   derived from foods, which Dr. Maier contends is about 1 to 3 µg/kg per day. DF 25.

14   Exposures to acrylamide within this "low dose" range, according to CalChamber's expert,

15   do not constitute a cancer risk for humans, DF 26; for this reason too, CalChamber

16   argues that any warning that suggests even a *potential* cancer risk is misleading.[22]

17       But CalChamber fails to provide evidence to support its contention that the

18   amounts of acrylamide in its members' food products are typical of other food exposures.

19   Indeed, there is wide variability in the amount of acrylamide in foods. The FDA has found

20   that the levels of acrylamide in different brands of crackers ranged by over 400-fold, from

21   5 to 2,110 µg/kg, and the levels in different brands of potato chips ranged by nearly

22   1,700-fold, from 5 to 8,440 µg/kg. DF 27. CalChamber's expert Dr. Maier did *not* testify

23   that regular consumption of a food product with 8,440 µg/kg of acrylamide has no effect

24   on a person's cancer risk; nor did CalChamber establish that fact with other evidence.

25

26   [22] CalChamber also relies on the opinion of its survey expert to support its claim that the Original
     and Alternative Warnings were not purely factual and were misleading to consumers. Mot., 17-19.
     CalChamber's expert's conclusions rest entirely on survey results that are neither valid nor credible;
27   accordingly, his conclusions are neither reliable nor supported. DF 47-52. More importantly, however,
     CalChamber presented no survey evidence addressing the New Safe Harbor Warning, DF 46, and the
28   Court need not rely on a survey to determine whether a warning is misleading.

16

1    Without knowing the actual acrylamide levels in its members' food products, the

2    Court cannot fill in these evidentiary gaps. The Court should not draw inferences in

3    CalChamber's favor. *McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir.

4    2009) ("All justifiable inferences are to be drawn in [non-movant's] favor"). And given the

5    absence of CalChamber's evidence, it would have to in order to find that any acrylamide

6    warning would be misleading as applied to all food products containing acrylamide,

7    including those of CalChamber's members.

8    Rather than provide evidence of acrylamide levels in its members' food products,

9    CalChamber relies on opinions in a series of other First Amendment challenges by

10    industry to Proposition 65 warning requirements. Mot. at 9-10. However, the facts of

11    those cases are distinct from those here.

12    In a prior ruling in this case, Judge Mueller granted CalChamber's motion for

13    preliminary injunction based on an analysis of a materially-different safe harbor

14    warning—the general safe harbor warning for food that includes the phrase "known to

15    the State" to cause cancer.[23] ECF 114 at 17; *CERT*, 29 F.4th at 479. The Ninth Circuit

16    affirmed the decision, finding the District Court's ruling was not an abuse of discretion.

17    *Id*. Judge Mueller's review concerned a different warning and was based on a limited

18    evidentiary record, before expert discovery; the Attorney General has since added two

19    new experts and additional evidence. *See* Declarations of Dr. Kurt Straif and Dr. Joseph

20    Arvai, filed herewith. The Court's ruling also rested on a finding that Proposition 65 "does

21    not permit businesses to add information to the required warning at their discretion, and

22    thus prevents them from explaining their views on the true dangers of acrylamide in

23    food." ECF 114 at 27. In contrast, with the promulgation of the New Safe Harbor

24    Warning, businesses can provide additional context to reassure consumers. Cal. Code

25    Regs. tit. 27, § 25607.2(b)(ii)(2)(C)(ii); *see supra* at 9. And the new warning incorporates

26    features that Judge Mueller's opinion had forecast could survive *Zauderer* scrutiny. *See*

27    _____

[23] "**WARNING**: "Consuming this product can expose you to chemicals including [name of one or
more chemicals], which is [are] known to the State of California to cause cancer. For more information go
28    to www.P65Warnings.ca.gov/food." Cal. Code Regs. tit. 27, §§ 25607.2(a)(1), (2).

1    *supra* at 9; ECF 114 at 24 ("The problems posed by the safe harbor warning could have

2    been avoided.")

3        Similarly, in *NAWG,* the Ninth Circuit considered another set of extremely different

4    facts, and a different warning, when industry challenged the Proposition 65 warning

5    requirement for glyphosate. First, it addressed a situation in which it found that "IARC

6    stands essentially alone in its determination that glyphosate is probably carcinogenic to

7    humans, while EPA, OEHHA, and regulators from around the world conclude that it is

8    not." 85 F.4th 1263,1279. The Court relied upon EPA's "vigorous disagreement with []

9    IARC" about the effects of glyphosate and its "stat[ement] that a Proposition 65 warning

10   for glyphosate would be false and misleading and would violate the federal herbicide

11   labeling law." *Id.* at 1260. That situation is diametrically opposed to the present case, in

12   which there is unanimity among the authoritative scientific bodies—including EPA, IARC,

13   and NTP, and other agencies like FDA and EFSA—that have considered the

14   carcinogenicity of acrylamide. DF 12-14, 16, 17, 42. Second, this case is materially

15   different on its facts because of the amount of *choice* the New Safe Harbor Warning

16   provides to businesses. The New Safe Harbor Warning requires only two statements, for

17   each of which businesses have several options, and it permits them to append other

18   optional statements as well. *See supra* at 9.

19       By the same token, the unpublished decision in *CTIA-The Wireless Ass'n v. City &*

20   *Cty. of San Francisco*, 827 F. Supp. 2d 1054, 1062 (N.D. Cal. 2011), *aff'd*, 494 F. App'x

21   752 (9th Cir. 2012) has no applicability here. Unlike the radiation at issue in that case,

22   which IARC determined was a "possible carcinogen," *see id.* at 1057-58, EPA, IARC,

23   and all other authoritative scientific bodies have concluded that acrylamide is a likely or

24   probable human carcinogen. *See* Table 1, above.[24] And in *The Personal Care Products*

25   *Council v. Bonta*, No. 2:23-cv-01006-TLN-JDP, Chief Judge Nunley granted plaintiff's

26

27       [24] Additionally, the Ninth Circuit reasoned that "the findings made by the San Francisco Board of
     Supervisors on which the challenged ordinance [wa]s predicated acknowledge[] that '[t]here is a debate in
     the scientific community about the health effects of cell phones,'" 494 F. App'x 752, 753–54. There is no

28   similar concession here.

ATTORNEY GENERAL'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
(Case No. 2:19-cv-02019-DJC-JDP)

1  motion for preliminary injunction based on a limited evidentiary record for a chemical

2  also listed as a "possible" human carcinogen—airborne, unbound titanium dioxide of

3  respirable size—where the safe harbor warning at issue contained the "known to" cause

4  cancer language. 2024 WL 3011001, at *9 (E.D. Cal. June 12, 2024).

5  　　　Although the Attorney General contends that the New Safe Harbor Warning is not

6  misleading, either as applied to CalChamber's members' products or to any other food

7  products, at a minimum there exists a dispute of material fact on this issue that

8  precludes a grant of summary judgment.

9  　　　**C.    The Warning Is Not "Controversial"**

10  　　　Not every "purely factual statement that can be tied in some way to a controversial

11  issue is, for that reason alone, controversial." *NAWG*, 85 F.4th at 1277 (*quoting CTIA II*,

12  928 F.3d at 845). As demonstrated above, there is no legitimate scientific debate

13  regarding whether acrylamide causes cancer in animals and is a probable or likely

14  human carcinogen. Contrary opinions have come only from a few individuals funded by

15  the food industry,[25] such as Gerhard Eisenbrand,[26] or from selected statements on

16  various websites taken out of context to create the appearance of a scientific

17  controversy. While a few entities acknowledge that the science about acrylamide

---

[25] Dr. Maier himself is a longstanding member and former director of Toxicology Excellence for Risk Assessment (TERA), an organization underwritten by industry groups and led by Michael Dourson, whose 2017 nomination to the EPA was withdrawn after bipartisan opposition and widespread allegations of industry bias. DF 28, 34, 35; *see* https://www.nytimes.com/2017/09/19/science/epa-chemical-industry-dourson.html?unlocked_article_code=1.aU4.TRU4.M7f7VZK4UC18&smid=url-.

[26] CalChamber cites a single review article that purports to be the opinion of the German Senate Commission on Food Safety (SKLM). Mot. at 4. The German SKLM, despite having the name "Senate" in the translation of its title, does not refer to the German Senate, or to any regulatory or government body. Rather, the term "Senate" merely refers to the fact that this group was formed to serve an internal commission (known as the "Senatskommission") within a private German research funding organization. DF 29. In fact, the article at issue is the product of a *working group* within the SKLM chaired by a food industry-supported scientist, Gerhard Eisenbrand, who is featured as a senior author. DF 30. Eisenbrand is employed by the International Life Sciences Institute (ILSI) Europe, a nonprofit organization that pools industry funding to support arguments consistent with the policy goals of its member corporations. DF 31. The European Food Safety Authority has recently taken action to strengthen its conflict of interest policies due to concerns about scientists working for ILSI seeking to influence EFSA policies. DF 32. Unsurprisingly, the SKLM article was limited to a narrow focus, reviewing "evidence generated at low doses/concentrations" (doses less than 1 mg/kg per day), thereby excluding most experimental animal studies. DF 33. As a result, the article did not challenge the cancer hazard determinations of authoritative bodies; it addressed the separate issue of "risk assessment" at certain low doses.

19

1  continues to evolve, this acknowledgment exists in the context of a decades-long

2  consensus in favor of carcinogenicity.

3          To the extent that *NAWG* subsequently suggested that controversies may

4  sometimes be substantiated by scientific disagreements, the prerequisites the Ninth

5  Circuit noted—such as an assertion that the regulating entity "kn[o]ws" the fact at issue,

6  or that there is a requirement to make a "scientific statement[] that a federal regulatory

7  agency view[s] as false"—are not present here. *NAWG*, 85 F.4th at 1279; *see id*. at n.12

8  ("We do not hold [the warning] controversial simply because its message runs counter to

9  Plaintiffs' business interests. Rather, mandating the display of [the warning] is

10  controversial because Plaintiffs do not agree with its message *and* Plaintiffs'

11  disagreement is currently supported by a majority of the authorities in this as-yet-

12  unresolved scientific debate.") (emphasis added).[27]

13          The required statement in the New Safe Harbor Warning about EPA's, IARC's, or

14  NTP's hazard determination acknowledges the existence of a consensus among

15  reputable scientific agencies that acrylamide is a probable or likely human carcinogen. In

16  *CERT*, the Ninth Circuit ruled it was not an abuse of discretion for the trial court to find,

17  at the preliminary injunction stage, that statements by the American Cancer Society and

18  the National Cancer Institute suggested the existence of a "scientific debate over

19  whether acrylamide in food causes cancer in humans." 29 F.4th 478. Given the present

20  evidentiary record and the New Safe Harbor Warning language, however, CalChamber

21  cannot rely on statements by those entities to establish a "controversy" under *Zauderer*.

22          To support its manufactured "scientific debate" about acrylamide's carcinogenicity,

23  CalChamber cites selective excerpts from the websites of the American Cancer Society,

---

[27] CalChamber contends that *Pacific Gas & Electric* bars California from forcing CalChamber's members "to carry the message of third parties, where the messages themselves are biased against them or are expressly contrary to the[ir] … views." Mot. at 15 (quoting *Pac. Gas & Elec. Co. v. Pub. Util. Com'n of Cal.*, 475 U.S. 1, 15, n.12 (1986)). But *Pacific Gas & Electric* did not apply the *Zauderer* test; rather, it applied strict scrutiny, as it found PG&E's newsletter, which contained, inter alia, political editorials, and feature stories on matters of public interest, was protected speech and that the California Public Utility Commission could not force PG&E to allow a nonprofit to use its billing envelopes to raise funds, communicate with ratepayers, and disseminate competing views. 475 U.S. at 5-20.

the National Cancer Institute (NCI), and the FDA. Mot. at 3-4. However, none of these entities made carcinogenicity hazard determinations about acrylamide; instead, they *expressly and publicly defer* to the determinations of EPA, IARC, and NTP—the same determinations referenced in the New Safe Harbor Warning. DF 39-42. Thus, the Ninth Circuit's concern about the apparent conflict between the American Cancer Society and the National Cancer Institute, on the one hand, and the safe harbor warning language on the other has been addressed: no conflict exists.

More fundamentally, the website of the American Cancer Society (ACS) acknowledges that, rather than making its own cancer hazard determination for acrylamide, it relied on the determinations of IARC, NTP, and EPA; it proceeds to quote these determinations in full. DF 38, 39. Likewise, NCI specifically names the NTP and IARC as the entities that decide which exposures can cause cancer in humans. DF 40, 41. And the FDA relies on NTP's determination that acrylamide is "reasonably anticipated to be a human carcinogen," providing recommendations for food producers to enable them to reduce the levels of acrylamide in their products. DF 42, 43. FDA's 2016 Guidance for Industry about Acrylamide in Food states that "[a]crylamide in food is a concern because it can cause cancer in laboratory animals at high doses, and is 'reasonably anticipated to be a human carcinogen' [citing the NTP's determination]." DF 42. That the FDA did not recommend Proposition 65 warnings for acrylamide a decade ago, in 2003, as CalChamber notes, Mot. at 3, does not make the New Safe Harbor Warning "controversial" as a matter of law. These facts were not before the Ninth Circuit at the time of the *CERT* decision.

Moreover, the organizations CalChamber relies on appear to accept the fact that acrylamide poses a credible human cancer hazard.[28] CalChamber's selective quotes

---

[28] As a result, contrary to the language of the *CERT* decision, none of these agencies have concluded that acrylamide was "not carcinogenic" to humans (i.e., not a human cancer hazard). *See CERT* ("While EPA, IARC, and the U.S. National Toxicology Program each classified acrylamide as some level of carcinogen, the American Cancer Society, the National Cancer Institute, and an 'epidemiologist who reviewed 56 studies' concluded that it was not carcinogenic.") 85 F.4th at 478. Instead, the record shows that all three agencies agree that acrylamide is a probable or likely human carcinogen. For her part,

(continued…)

1    from these agencies go only to the secondary question of cancer risk. For example,

2    despite acknowledging some uncertainty regarding the exact amount of "risk," the FDA

3    does not dispute that acrylamide is a credible cancer hazard, and has actively attempted

4    to minimize the cancer risks posed by acrylamide through its guidance to consumers and

5    the food industry on reducing acrylamide formation in foods. DF 42, 43.

6        Similarly, NCI does not dispute the scientific consensus that acrylamide is a

7    probable human carcinogen. It cites the hazard determination of the NTP, which

8    considers acrylamide "reasonably anticipated to be a human carcinogen." DF 41. To

9    make its case, CalChamber takes a statement by NCI about epidemiological studies and

10   "cancer risk" out of context. While NCI's website states that epidemiological studies "in

11   humans have found no consistent evidence that dietary acrylamide exposure is

12   associated with the risk of any type of cancer," it goes on to explain that "[o]ne reason for

13   the inconsistent findings from human studies may be the difficulty in determining a

14   person's acrylamide intake based on their reported diet." DF 44.

15       Similarly, CalChamber plucks one statement out of context from ACS's website

16   concerning epidemiological evidence: "So far, reviews of studies done in groups of

17   people (epidemiologic studies) suggest that dietary acrylamide isn't likely to be related to

18   risk for *most common types of cancer*. But ongoing studies will continue to provide new

19   information on whether acrylamide levels in foods are linked to increased cancer risk."

20   Mot. at 4. That statement, again, relates to "cancer risk" (of most common types of

21   cancer, not all cancers), not "cancer hazard." (Emphasis added.)

22       Given the scientific consensus concerning acrylamide's status as a carcinogen, the

23   warning is not objectively controversial. Nevertheless, CalChamber argues that the

24   warning is still subjectively controversial because its members are "forced to carry a

25   message fundamentally at odds with their businesses." Mot. at 22. However, if this

26   _____

27   Dr. Lipworth, CalChamber's expert epidemiologist, does not conduct hazard assessments, and did not
     evaluate whether acrylamide is a cancer hazard. DF 45. Moreover, she provides no opinion as to the
     validity of EPA's, IARC's, or NTP's determinations. DF 45.

28

22

1  argument had merit, then no health warnings could be featured on any consumer

2  products because such warnings could always be construed as "at odds" with the

3  speaker's desire to sell more products. *Cf. NAWG*, 85 F.4th at 1279 n.12 ("We did not

4  hold [the warning] controversial simply because its message runs counter to Plaintiffs'

5  business interests. Rather, mandating the display of [the warning] is controversial

6  because Plaintiffs do not agree with its message and Plaintiffs' disagreement is currently

7  supported by a majority of the authorities in this as-yet-unresolved scientific debate.").

8      The Attorney General believes that the New Safe Harbor Warning is not

9  controversial. However, at a minimum, there exists a dispute of material fact on this

10  issue that precludes a grant of summary judgment.

11      **D.    The Warning is Neither Unjustified nor Unduly Burdensome**

12      CalChamber appears not to dispute that the State has a sufficient interest in

13  providing Proposition 65 warnings. *See* Mot. at 23. CalChamber's sole argument that

14  Proposition 65 warnings for acrylamide are "unjustified" is that they warn of the

15  "unproven harms" from acrylamide. Mot. at 22. However, this argument has no merit

16  because there is no genuine scientific debate that acrylamide exposure can cause

17  cancer. *See supra* at 12-15.

18      CalChamber's argument regarding "burden," Mot. at 22-23, fares no better.

19  CalChamber cites the "heavy litigation burden" it claims is imposed by Proposition 65,

20  which "compels" them to warn even when a warning is *not legally required* based on the

21  no significant risk level set by OEHHA, based on the Cooking Regulation, or based on

22  any other exemption or no significant risk level a business is able to advance. However,

23  this argument is not based on *Zauderer*. Burdensomeness considerations under

24  *Zauderer* and its progeny relate to the burden of communicating a required disclosure;

25  not to the burden of deciding whether a disclosure is required. *See Zauderer*, 471 U.S.

26  at 651; *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 757 (9th Cir.

27  2019) (compelled warning was unduly burdensome because it occupied 20% of product

28  label, and "the record here shows that a smaller warning—half the size—would

1  accomplish Defendant's stated goals."); *CTIA II*, 928 F.3d at 849 (ordinance requiring

2  retailers to provide notice to customers was not unduly burdensome because it could be

3  satisfied with a single 8.5 by 11 inch posted notice or a 5 by 8 inch handout.").

4    In any event, any burden associated with providing a Proposition 65 warning, is

5  minimal here. The shortest safe-harbor warning permitted by the New Safe Harbor

6  Warning regulation is 22 words. *See* Cal. Code Regs. tit. 27, § 25607.2(b)(ii)(2). This is

7  shorter than the general safe harbor warning for food. *See* Cal. Code Regs. tit. 27, §§

8  25607.2(a)(1), (a)(2). Businesses may include additional language to the required

9  statements in the New Safe Harbor Warning; however, they are not required to do so.

10  Cal. Code Regs. tit. 27, § 25607.2(b)(ii)(2)(C).

11    The Attorney General believes that the New Safe Harbor Warning is neither

12  unjustified nor unduly burdensome. However, at a minimum, there is a dispute of

13  material fact on these issues that precludes summary judgment.

14  **III.    CALCHAMBER'S MOTION SHOULD BE DENIED BECAUSE THE NEW SAFE HARBOR**
   **WARNING COMPLIES WITH *CENTRAL HUDSON***

15

16    Even if the New Safe Harbor Warning were held not to comply with *Zauderer*, it

17  would nonetheless be constitutional under the more stringent standard of *Central*

18  *Hudson Gas & Elec. Corp. v. Public Service Commission of New York,* 447 U.S. 557

19  (1980). The Supreme Court has developed a four-part test for evaluating whether

20  commercial speech is constitutional: "it at least must concern lawful activity and not be

21  misleading. Next, we ask whether the asserted governmental interest is substantial. If

22  both inquiries yield positive answers, we must determine whether the regulation directly

23  advances the governmental interest asserted, and whether it is not more extensive than

24  is necessary to serve that interest." *Cent. Hudson*, 447 U.S. at 566. The Supreme Court

25  has rejected the contention that "no more extensive than reasonably necessary" equals

26  the "least-restrictive-means" standard. *Bd. of Trs. Of State Univ. of N.Y. v. Fox*, 492 U.S.

27  469, 477-481 (1989). *Central Hudson* simply requires a "'fit' between the legislature's

28  ends and the means chosen to accomplish those ends,' [citation] a fit that is not

24

1   necessarily perfect, but reasonable…." *Id.* at 480 (citation omitted).

2       CalChamber admits that "California unquestionably has an interest in protecting

3   public health[.]" Mot. at 23. Indeed, there "is no question that protecting the health and

4   safety of consumers is a substantial governmental interest." *CTIA II*, 928 F.3d at 845.

5   The New Safe Harbor Warning directly advances this substantial interest by requiring

6   businesses that expose consumers to levels of acrylamide above the applicable no

7   significant risk level to warn consumers of the hazard. This requirement fits squarely with

8   Californians' declared right "[t]o be informed about exposures to chemicals that cause

9   cancer[.]" *Deukmejian*, 212 Cal. App. 3d at 431. Thus, there is a "reasonable" fit between

10  the required disclosure and California's interest in providing consumers with the ability to

11  make informed choices. *Fox*, 492 U.S. at 480.

12  **IV.   CALCHAMBER'S REQUEST FOR INJUNCTIVE RELIEF IS OVERBROAD AND
13        UNSUPPORTED BY THE EVIDENCE**

14      CalChamber seeks a permanent injunction that would bar enforcement of the

15  Proposition 65 warning requirement for acrylamide as to all foods, Mot. at 25, which is

16  overbroad and unsupported by the evidence in the record. The Court should not

17  summarily enjoin the warning requirement as to *any* food products, for the reasons

18  discussed above. However, the complete lack of proof as to CalChamber's members'

19  products and their associated acrylamide levels certainly fails to justify enjoining the

20  warning requirement for acrylamide in *all* foods—including foods that contain very high

21  levels of acrylamide.

22                            **CONCLUSION**

23      CalChamber's motion for summary judgment should be denied.

24

25

26

27

28

1    Dated:  November 18, 2024             Respectfully submitted,

2                                       ROB BONTA
Attorney General of California

3                                       LAURA J. ZUCKERMAN
Supervising Deputy Attorney General

4

5                                       */s/ Megan K. Hey*

6

7                                       MEGAN K. HEY
RAFAEL J. HURTADO

8                                       ELIZABETH SONG
Deputy Attorneys General

9                                       *Attorneys for Rob Bonta, in his Official Capacity as Attorney General of the State of California*

10

11    LA2023950048

12    67239879.docx

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTORNEY GENERAL'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
(Case No. 2:19-cv-02019-DJC-JDP)

# CERTIFICATE OF SERVICE

Case Name:   **California Chamber of**          No.   **2:19-cv-02019-DJC-JDP**
              **Commerce v. Rob Bonta**

I hereby certify that on <u>November 18, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1. **ATTORNEY GENERAL ROB BONTA'S OPPOSITION TO THE CALIFORNIA CHAMBER OF COMMERCE'S MOTION FOR SUMMARY JUDGMENT**

2. **ATTORNEY GENERAL ROB BONTA'S RESPONSE TO PLAINTIFF'S SEPARATE STATEMENT OF ALLEGEDLY UNDISPUTED MATERIAL FACTS**

3. **ATTORNEY GENERAL ROB BONTA'S OBJECTIONS TO THE DECLARATION OF TRENTON H. NORRIS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

4. **ATTORNEY GENERAL ROB BONTA'S OBJECTIONS TO THE DECLARATION OF STEPHEN M. NOWLIS, PH.D., ECF NO. 280-42, CITED IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

5. **DECLARATION OF MEGAN K. HEY IN SUPPORT OF THE ATTORNEY GENERAL'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

6. **DECLARATION OF KURT STRAIF, M.D., MPH, Ph.D., IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

7. **DECLARATION OF DR. GINA SOLOMON IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

8. **DECLARATION OF JOSEPH L. ÁRVAI, Ph.D., IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>November 18, 2024</u>, at Los Angeles, California.

|                          |                          |
|--------------------------|--------------------------|
| J. Sissov                | */s/ J. Sissov*          |
| Declarant                | Signature                |

SD2019300528
67240751.docx