**HOGAN LOVELLS US LLP**
Trenton H. Norris (CA Bar 164781)
David M. Barnes (CA Bar 318547)
Alexander Tablan (CA Bar 346309)
4 Embarcadero Center, Suite 3500
San Francisco, CA 94111
Telephone: (415) 374-2300
Facsimile: (415) 374-2499
trent.norris@hoganlovells.com
david.barnes@hoganlovells.com
alexander.tablan@hoganlovells.com

Attorneys for Plaintiff

CALIFORNIA CHAMBER OF COMMERCE

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **CALIFORNIA CHAMBER OF COMMERCE**, | |
| Plaintiff, | Civil Action 2:19-cv-02019−DJC−JDP |
| v. | **PLAINTIFF CALIFORNIA CHAMBER OF COMMERCE'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| **ROB BONTA**, In His Official Capacity As Attorney General Of The State Of California, | |
| Defendant; | Judge:          Hon. Daniel J. Calabretta |
| and | Hearing:        January 23, 2025 |
| **COUNCIL FOR EDUCATION AND RESEARCH ON TOXICS**, | Time/Room:  1:30 pm in Courtroom 10 |
| | Action Filed:  October 7, 2019 |
| Defendant-Intervenor. | |

1

2

**TABLE OF CONTENTS**

Page

I.   THE COMPELLED WARNING SHOULD BE ENJOINED IN ITS ENTIRETY. ................2

     A.   Proposition 65 Compels Businesses to Share the State's Message. ...............2

     B.   The State Must Prove The Warning Is Constitutional For All Foods................7

II.  THE NEW SAFE HARBOR ("MULTIPLEX WARNING") FAILS *ZAUDERER*.................9

     A.   No Iteration Of The Multiplex Warning Is "Purely Factual."..............................9

     B.   The Multiplex Warning Remains Controversial.................................................12

     C.   The AG Fails To Show That A Warning Is Not Unjustified Or Unduly
          Burdensome. .....................................................................................................13

III. THE WARNING CANNOT WITHSTAND HEIGHTENED SCRUTINY. ..........................14

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Beverage Ass'n v. City & Cnty. of S.F.*,
    916 F.3d 749 (9th Cir. 2019) (en banc) ............................................................. 1, 10, 14

*Baxter Healthcare Corp. v. Denton*,
    120 Cal. App. 4th 333 (2004) ............................................................................... 5, 6

*Cal. Chamber of Com. v. Ctr. for Rsch. on Toxics*,
    29 F.4th 468 (9th Cir. 2022) ............................................................................... *passim*

*Commc'ns Maint., Inc. v. Motorola, Inc.*,
    761 F.2d 1202 (7th Cir. 1985) ............................................................................... 3

*Consumer Advocacy Grp., inc. v. ExxonMobil*,
    168 Cal. App. 4th 675 (2008) ............................................................................... 6

*CTIA-The Wireless Ass'n v. City & Cnty. of S.F.*,
    827 F. Supp. 2d 1054 (N.D. Cal. 2011), *aff'd* 494 F.App'x. 752
    (9th Cir. 2012) ............................................................................................... 11

*CTIA-The Wireless Ass'n v. City of Berkeley*,
    928 F.3d 832 (9th Cir. 2019) ............................................................................... 9, 14

*People ex rel. Lungren v. Super. Ct.*,
    14 Cal. 4th 294 (1996) ..................................................................................... 13

*Illinois ex rel. Madigan v. Telemktg. Assocs., Inc.*,
    538 U.S. 600 (2003) ....................................................................................... 4

*Nat'l Ass'n of Wheat Growers v. Bonta*,
    85 F.4th 1263 (9th Cir. 2023) ............................................................................. *passim*

*Pac. Gas & Elec. Co. v. Pub. Util. Com'n of Cal.*,
    475 U.S. 1 (1986) ......................................................................................... 11

*Personal Care Products Council v. Bonta*,
    No. 2:23-cv-01006-TLN, 2024 WL 3011011 (E.D. Cal. June 12, 2024) ................... 1, 11, 14

*Riley v. Nat'l Fed. of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ....................................................................................... 7, 8

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ....................................................................................... 2

*Zauderer v. Office of Disciplinary Counsel*,
    471 U.S. 626 (1985) ....................................................................................... *passim*

-ii-

1    The Attorney General's Opposition (ECF 282 ("Opp.")) to California Chamber of

2   Commerce's ("CalChamber") Motion for Summary Judgment (ECF 280 ("Mot.")) does not

3   create a genuine dispute of material fact that the Proposition 65 cancer warnings the State

4   prescribes for acrylamide in food fail the test for government-compelled commercial speech

5   under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985). The AG bears the

6   burden of proving that the State's warnings satisfy each element of the *Zauderer* test. *Am.*

7   *Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc) ("*ABA*").

8   Far from carrying this burden, the AG's Opposition shows he cannot do so.

9    Expert discovery has concluded. Both the evidence and arguments raised in the

10   Opposition are remarkably similar to what the AG presented when opposing CalChamber's

11   motion for preliminary injunction. ECF 101 ("Opp. to Prelim. Inj."). That failed to convince

12   Judge Mueller that the Proposition 65 warning could withstand CalChamber's First

13   Amendment challenge. ECF 114. It also failed to save the warning on appeal, when the Ninth

14   Circuit unanimously affirmed Judge Mueller's order. *Cal. Chamber of Com. v. Ctr. for Rsch.*

15   *on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) ("*CERT*").

16    Since then, however, the AG's case has only become weaker. Affirming this Court's

17   judgment and permanent injunction against enforcement of Proposition 65 cancer warnings

18   for glyphosate, the Ninth Circuit issued an opinion that vitiates practically every legal position

19   the AG has taken in his Opposition. *See Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th

20   1263 (9th Cir. 2023) ("*NAWG*"), *aff'g Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp.

21   3d 1247 (E.D. Cal. 2020) ("*Wheat Growers*"). And more recently, Chief Judge Nunley

22   preliminarily enjoined another Proposition 65 warning as applied to titanium dioxide,

23   reasoning that the challenger was likely to prevail on the merits of its First Amendment claim

24   under the *Zauderer* test. *See Personal Care Products Council v. Bonta*, No. 2:23-cv-01006-

25   TLN, 2024 WL 3011011, at *9 (E.D. Cal. June 12, 2024) ("*PCPC*"). The AG cannot escape

26   the weight of this authority.[1] CalChamber is entitled to summary judgment.

27

28   _____
[1] Neither can Intervenor-Defendant CERT, who joined in the AG's Opposition in full. ECF No. 281.
This reply addresses both defendants' failures to raise a genuine dispute of material fact.

I.     **THE COMPELLED WARNING SHOULD BE ENJOINED IN ITS ENTIRETY.**

For the first time in this case's five-year odyssey, the AG questions whether Proposition 65 warnings for acrylamide are "in fact, compelled." Opp. at 10:21. To make this argument, the AG depicts CalChamber's initial burden of proof as requiring that it demonstrate "based on concentrations of acrylamide" in its members' products that warnings are required. *Id.* at 11:17-20. The AG uses this same line of reasoning to contend that the purported "lack of proof as to CalChamber's members' products and their associated acrylamide levels . . . including foods that contain very high levels of acrylamide" renders CalChamber's request for injunctive relief overbroad. *Id.* at 25:18-21.

Both arguments are misplaced because the First Amendment does not require those who may be held liable for refusing to spread the State's message to prove that they are required to do so in order to challenge its constitutionality. The opposite is true. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for that threat.").

As discussed below, the AG's argument is not only inconsistent with longstanding First Amendment precedent, it contravenes the findings of Judge Shubb in *Wheat Growers* and Judge Mueller in this case. What's more, the AG directly contradicts representations he made to this Court multiple times, both here and in *Wheat Growers*. The Court should look at the AG's eleventh-hour change of heart on this issue with the high degree of skepticism warranted for arguments that appear to be asserted as litigation tactics.

**A.     Proposition 65 Compels Businesses to Share the State's Message.**

At the outset—and as the AG candidly acknowledges (Opp. at 11 n.16)—the AG's current argument that Proposition 65's warning requirement for dietary acrylamide is not compelled speech is inconsistent with the position he took at the preliminary injunction stage. Opp. to Prelim. Inj. at 9 n.4 ("It is undisputed in this matter that Proposition 65 warnings for acrylamide involve compelled commercial speech."). The AG further recognizes that neither Judge Mueller nor the Ninth Circuit questioned whether these warnings are compelled. At

1  present, however, the AG contends that CalChamber has merely made an "*assumption* that

2  its members were compelled to provide warnings," (Opp. at 11:15-16), citing in support a

3  Seventh Circuit case for the unremarkable proposition that "differences between preliminary

4  injunction and summary judgment can lead to different outcomes." *Id.* at 12:24-25 (citing

5  *Commc'ns Maint., Inc. v. Motorola, Inc.*, 761 F.2d 1202, 1205 (7th Cir. 1985)).[2] The AG's

6  reversal on this point is wrong for several reasons.

7      It bears further mention as a threshold matter that the preliminary injunction stage is

8  not the only instance where the AG acknowledged that Proposition 65 warnings are compelled

9  speech. Indeed, when he moved the Court this spring to stay this action pending OEHHA's

10 adoption of the Multiplex Warning regulation, the AG opined that this rulemaking "reflects

11 OEHHA's consideration of new guidance by the Ninth Circuit Court of Appeals regarding

12 compelled commercial speech." ECF 268-1 at 4:22-23.[3] Similarly, in *Wheat Growers*—where

13 the Proposition 65 warning requirement for glyphosate was challenged before it went into

14 effect and plaintiff could reference no prior enforcement history—the AG asserted that "the

15 compelled speech here is a fact-based health and safety warning," going as far as asserting

16 that "the same warning does not contain compelled and non-compelled portions: the same

17 warning is intended to be provided in its entirety." Reply in Support of Cross-Motion for

18 Summary Judgment, 2:17-cv-02401, ECF 150 at 13:21-27.

19     This Court's decisions here and in *Wheat Growers*, as well as the Ninth Circuit's

20 opinion in *CERT*, rebut the AG's new position. In *CERT*, the Ninth Circuit observed that this

21 Court properly shifted the burden of proof to the AG based on the common understanding

22 that "Proposition 65 compels commercial speech." 29 F.4th at 478. Absent from this Court's

23

24 [2] In *Motorola*, the Seventh Circuit observed that findings of law at the preliminary injunction stage
   "are often based on incomplete evidence and a relatively hurried consideration of the issue," while

25 citing the difference between the "reasonable likelihood" and "material fact" standards for motions for
   preliminary injunctions and motions for summary judgment, respectively. This 49-year-old, out-of-

26 circuit decision is unpersuasive here, where the AG himself conceded that Proposition 65 warnings
   are compelled speech, and this Court's determination on preliminary injunction, in addition to the

27 Ninth Circuit's affirmance of that decision, were anything but hurried.

   [3] OEHHA expressed this same sentiment in its Initial Statement of Reasons. ECF 280-33 at 8

28 (observing that "the Ninth Circuit [in *Wheat Growers*] provided additional guidance regarding
   Proposition 65 and **compelled** commercial speech under the First Amendment") (emphasis added).

and the Ninth Circuit's opinions was any indication of a need to consider whether CalChamber's members' products, or a subset of them, exposed individuals to acrylamide at levels requiring warnings. This is not surprising because in the First Amendment context, the Supreme Court "has long cautioned that, to avoid chilling protected speech, the government must bear the burden of proving that the speech it seeks to prohibit [or compel] is unprotected [or permissible]." *Illinois ex rel. Madigan v. Telemktg. Assocs., Inc.*, 538 U.S. 600, 620 n.9 (2003) (citations omitted); *Wheat Growers*, 468 F. Supp. 3d at 1261-62 (citing same).

Here, the AG attempts to move the goalpost by claiming that CalChamber has a purported lack of "injury-in-fact." In his view, to "establish that there is any compelled speech at all," (Opp. at 12:2) CalChamber must first demonstrate that its members' products expose individuals to actionable levels of acrylamide, based on calculations that consider Proposition 65's cooking regulation with its "lowest level currently feasible" standard.[4] Opp. at 8:15-21. Stated differently, the AG contends that a party that could be sued for not providing a Proposition 65 warning must incur the burden, expense, and risk of proving that it is required to warn before it can challenge the constitutionality of that warning. The AG failed previously with a similar version of this argument, and he fails again here.

In *Wheat Growers*, the AG argued that he was entitled to summary judgment because plaintiffs did not establish injury in fact, which purportedly made the case unripe. Among other contentions, the AG claimed that plaintiffs' declarations contained no evidence of any concrete plans to violate the law or any intention to provide warnings, or any proof that enforcement actions by private or public enforcers were imminent. 2:17-cv-02401, ECF 150 at 4:8-5:7. Moreover, the AG emphasized that enforcement actions for glyphosate were unlikely because his Office "has seen no evidence of levels of glyphosate in food products" that would result in actionable exposures. *Id.* at 38:18-39:1. Indeed, in light of his review of glyphosate levels in food products, and because the AG has the authority to send "no merit letters" to the private enforcers he supervises, the AG characterized the risk of a single

---

[4] The AG does not explain how the cooking regulation, Cal. Code Regs., tit. 27, § 25506, would be applied.  Indeed, no court has ever done so.

1    enforcement action for glyphosate as "highly speculative." *Id.* at 49:27-50:5.

2            Judge Shubb rejected all these arguments. In so doing, he focused on the nature of

3    Proposition 65's compelled speech requirement, pursuant to which, "to bring suit and avoid

4    sanctions, a private plaintiff need only credibly allege that a product has <u>some</u> of the chemical

5    at issue, not that the amount of the chemical is harmful or that it exceeds this level." *Wheat*

6    *Growers*, 468 F. Supp. 3d at 1256; *see also id.* ("Notwithstanding these purported barriers,

7    one California Court of Appeal has explained that the instigation of Proposition 65

8    enforcement actions is 'easy – and almost absurdly easy at the pleading and pretrial stages.'")

9    (citing *Consumer Def. Grp. v. Rental Hous. Indus. Members*, 137 Cal. App. 4th 1185, 1215

10   (2006)); *see also Baxter Healthcare Corp. v. Denton*, 120 Cal. App. 4th 333, 344 (2004)

11   (business that could prove its products did not require Proposition 65 warning was faced with

12   a "Hobson's choice"). Judge Shubb reasoned that the availability of a safe harbor defense

13   offered no reprieve, because "in order to take advantage of the safe harbor, plaintiffs would

14   be required to test their products to determine whether the products exceeded the safe harbor

15   level, incurring the attendant costs, which is in itself a cognizable injury." *Wheat Growers*, 468

16   F. Supp. 3d at 1256 (citation omitted).[5] Indeed, "[f]acing enforcement actions, or even the

17   possible risk of enforcement actions, are cognizable injuries, even if a business can prove

18   that its product is not a cancer risk." *Id.* (citing *Susan B. Anthony*, 573 U.S. at 158-59).

19           The same analysis applies, and is even more compelling, here. The threat of an

20   enforcement action under the not-yet-effective warning requirement for glyphosate, by itself,

21   was sufficient to establish injury in fact at the summary judgment stage in *Wheat Growers*.

22   Here, by contrast, CalChamber submitted evidence demonstrating a prolific history of

23   enforcement of Proposition 65's warning requirement for acrylamide, including against its

24   members. *See, e.g.*, Decl. of Trenton H. Norris, ECF 280-4 ¶ 42 (issuance of 686 notices of

25   violation, entry of 90 settlements, and filing of 92 lawsuits concerning acrylamide since the

26

27   [5] *Cf.* ECF 114 at 28:13-15 ("If a business decides not to use the safe harbor warning, it risks
     expensive and lengthy litigation against private enforcers or the State, and defendants carry heavy
28   evidentiary burdens if they attempt to show their products contain permissibly small quantities of
     acrylamide.")

1  filing of this lawsuit); *id.* ¶ 43 (issuance of 120 notices of violation during the less than 10

2  months the preliminary injunction was stayed); *id.* ¶ 44 (issuance of 29 notices of violation in

3  2024 after proposal of Multiplex Warning regulation); *id.* ¶ 45 (CalChamber's members sell

4  products containing acrylamide and have been sued in connection with notices of violation).

5        Moreover, unlike *Wheat Growers*—where the AG claimed that he would "likely inform

6  the private enforcer" that enforcement actions for glyphosate lacked merit, 468 F. Supp. 3d at

7  1256—the AG has never expressed an intention to issue blanket no merits letters for

8  acrylamide. To the contrary, not only did he decline to issue these letters for thousands of the

9  notices of violation that led CalChamber to file this suit, the AG himself has actively enforced

10  Proposition 65's warning requirement for acrylamide and has obtained consent judgments

11  that require companies to either reformulate their products or warn. *See* Norris Decl. ¶ 37

12  (incorporating declaration from preliminary injunction motion, ECF 95-2); ECF 95-2 ¶¶ 4-5

13  (describing the AG's enforcement actions against major restaurants and food manufacturers

14  for failing to provide acrylamide warnings). Regarding these consent judgments, and those

15  obtained by the private enforcers he supervises, the AG pleaded to this Court that the

16  "Attorney General and the State have an interest in the continuing vitality of prior acrylamide

17  settlements." Opp. to Prelim. Inj. at 20:1-2. As CalChamber emphasized in its present Motion

18  (25:15-20) and earlier opposition to the AG's motion to stay (ECF 270), these settlements

19  continue to harm businesses, including CalChamber's members, by forcing them either to

20  disparage their products with alarmist warnings or needlessly reformulate them at great

21  expense. *Baxter*, 120 Cal. App. 4th at 344 (describing the "Hobson's choice"). And as a matter

22  of law, the AG is estopped from arguing that settling defendants who are bound by Proposition

23  65 consent judgments are not subject to "any compelled speech at all." Opp. at 12:2;

24  *Consumer Advocacy Grp., inc. v. ExxonMobil*, 168 Cal. App. 4th 675, 694 (2008) ("A court

25  approved [consent judgment] acts a final judgment on the merits for the purposes of res

26  judicata.").

27        Lastly, the AG's emphasis that OEHHA has calculated a safe harbor No Significant

28  Risk Level ("NSRL") for acrylamide, adopted a "Cooking Regulation," and allows businesses

1    to try to prove that they employed "best practices for reducing acrylamide in their products"

2    (Opp. at 10:24-11:7) carries as little weight here as similar arguments did in *Wheat Growers*.

3    CalChamber's members who wish to assert these defenses would need to incur heavy costs

4    to do so, while facing the continued uncertainty of litigation brought under the statute's flipped

5    burden of proof. *Wheat Growers*, 468 F. Supp. 3d at 1256 ("[I]n order to take advantage of

6    the safe harbor, plaintiffs would be required to test their products to determine whether their

7    products exceeded the safe harbor level, including the attendant costs, which is itself a

8    cognizable injury."); *cf. Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 794 (1988)

9    (the "risk of a mistaken adverse finding by the factfinder" chills First Amendment rights).

10            In sum, case law and decisions in this case itself show that CalChamber need not

11   provide "case by case" evidence regarding the concentrations of acrylamide in its members'

12   products for the warning requirement to qualify as compelled speech. Furthermore, the AG's

13   claim that the request for injunctive relief is overbroad fails for the same reasons.

14           **B.        The State Must Prove The Warning Is Constitutional For All Foods.**

15           The AG summarily contends (Opp. at 25:14-21) that CalChamber's request for

16   injunctive relief is overbroad because the purported "lack of proof as to CalChamber's

17   members' products and their associated acrylamide levels certainly fails to justify enjoining

18   the warning requirement for acrylamide in *all* foods—including foods that contain very high

19   levels of acrylamide." (emphasis in original). This argument, like its predecessor, reflects a

20   fundamental misunderstanding of the State's burden of proof in First Amendment cases.

21           The Supreme Court's decision in *Riley* is illustrative. There, a state statute prohibited

22   professional fundraisers from retaining an "unreasonable" fee, and created a rebuttable prima

23   facie presumption that any fee above 35% was unreasonable. 487 U.S. at 785; *id.* at 793

24   ("[O]nce a prima facie showing of unreasonableness is made, the fundraiser must rebut the

25   showing."). Finding that "the solicitation of charitable contributions is protected speech," *id.* at

26   789, the Court held that "[e]ven if we agreed that some form of a percentage-based measure

27   could be used . . . we could not agree to a measure that requires the speaker to prove

28   'reasonableness' case by case based upon what is at best a loose inference that the fee might

-7-

1  be too high." *Id.* at 793. The Court concluded that this burden-shifting framework operated in

2  "direct contravention of the First Amendment's dictates," *id.* at 794.  Noting the time and risk

3  of litigation, the Court reasoned:

> 4  Speakers [ ] cannot be made to wait for 'years' before being able to speak with a
> measure of security. In the interim, fundraisers will be faced with the knowledge that
> 5  every campaign incurring fees above 35% . . . will subject them to litigation over the
> 'reasonableness' of the fee. And, of course, in every such case the fundraiser must
> 6  bear the costs of litigation and the risk of a mistaken adverse finding by the
> factfinder . . . .
> 7

8  *Id.* at 793-94. The Court accordingly struck down the provision in its entirety. *Id.* at 803.

9         The instant case presents the same situation as in *Riley*. Proposition 65 requires

10  businesses to warn based on what is, at best, a "loose inference" that acrylamide in food

11  poses a risk of cancer in humans. Under Proposition 65, like in *Riley*, "the burden is placed

12  on the [defendant] in such cases to rebut the presumption of [*prima facie* liability]." *Id.* at 793;

13  *Wheat Growers*, 468 F. Supp. 3d at 1256 ("[T]o bring suit and avoid sanctions, a private

14  plaintiff need only credibly allege that a product has <u>some</u> amount of the chemical . . . ."

15  (emphasis in original)). The existence of a numeric "safe harbor" or level, like the 35% level

16  in *Riley*, does not save the scheme.  "[E]ven if" warnings could be required only above some

17  hypothetical "no significant risk level," CalChamber's members should not be forced to wait

18  for "years before being able to speak with a measure of security" after a court adjudicates the

19  issue. *See Riley*, 487 U.S. at 793-94. It follows that, like in *Riley*, where the Court did not

20  attempt to define a "reasonableness" standard but instead struck down the provision at issue

21  in its entirety, an injunction barring the enforcement of the acrylamide warning requirement

22  for all foods is appropriate, unless the AG has evidence proving otherwise.

23         But the AG has failed to make this showing for any food product, including those he

24  purports "contain very high levels of acrylamide" (Opp. at 25:20-21). Although this burden is

25  the AG's, CalChamber, for its part, submitted ample evidence establishing that acrylamide is

26  not associated with human carcinogenic effects at levels consumed in the diet. *See, e.g.,*

27  Maier Decl. ¶¶ 89-91 (threshold level of exposure to acrylamide at which carcinogenic effects

28  begin in animals is higher than the typical dietary levels of exposure in humans); *id.* ¶ 114

1  (toxicological studies have shown that tumors have been observed in rodents only when

2  exposed to acrylamide at approximately 500 times the daily amount consumed by humans);

3  *see also CERT*, 29 F.4th at 473 n.4 (citing same). As such, and as discussed in more detail

4  below, the injunctive relief sought by CalChamber is appropriate.

5  **II.   THE NEW SAFE HARBOR ("MULTIPLEX WARNING") FAILS *ZAUDERER*.**

6           Abandoning the Original and Alternative Warnings, the AG in his Opposition chooses

7  instead to champion only the New Safe Harbor Warning (the "Multiplex Warning"), which—

8  despite being portrayed as a fountain of "choice"—suffers from the same constitutional flaws

9  as its predecessors, and then some.[6]

10          **A.    No Iteration Of The Multiplex Warning Is "Purely Factual."**

11          The AG's defense of the Multiplex Warning begins by rehashing the flawed reasoning

12  that hazard classifications by a handful of agencies are factually accurate. CalChamber,

13  however, is not contesting these classifications. It is of course true that IARC, for instance,

14  has "opined that [acrylamide] poses a potential cancer 'hazard,' meaning that at some

15  theoretical level of exposure, it could cause cancer." *See NAWG*, 85 F.4th at 1281. But

16  average consumers who read a weighty-sounding statement like "The International Agency

17  for Research on Cancer has found that acrylamide is probably carcinogenic to humans" will

18  tend naturally to question the food's safety, believing that its consumption increases their risk

19  of cancer. By using this type of language, the Multiplex Warning is "factually misleading

20  because a reasonable person reading it would understand this to mean that [dietary

21  acrylamide] poses a *risk* not a *hazard*." *Id.* (emphasis in original). That every iteration of the

22  Multiplex Warning requires the recitation of at least one viewpoint like this renders it

23  misleading in its entirety.[7]

---

24  [6] Only in the Opposition's twenty-second footnote does the AG spend a moment addressing just part
of CalChamber's argument (Mot. at 16:26-19:5) for why the Original and Alternative Warnings are

25  also misleading. The AG's objections to Dr. Nowlis's consumer surveys rest on opinions from Dr.
Arvai's declaration, which CalChamber addresses in its Motion (18:1-19:5), Responses to the AG's

26  Objections to the Declaration of Dr. Stephen Nowlis, and Dr. Nowlis's Declaration (¶¶ 55-64).

27  [7] The AG's analogy (Opp. at 14:19-15:7) to *CTIA-The Wireless Ass'n v. City of Berkeley*, 928 F.3d
832 (9th Cir. 2019) ("*CTIA II*") is unavailing. The Ninth Circuit rejected this poor comparison in
*NAWG*, where the AG similarly cited *CTIA II*. *See* 85 F.4th at 1279 ("While the Attorney General

28  argues that this case bears 'no meaningful distinction' from *CTIA II*, we disagree."). Here, as in
*NAWG*, the "totality of the warning" is still misleading because it "convey[s] the same message that

The AG contends that, because the Multiplex Warning "does not require a reference to risk," (Opp. at 15:12-13) the warning is not misleading to consumers. But whether a compelled warning is misleading does not turn on the use of magic words; rather, what matters is the core message that the average consumer takes away from reading the warning as a whole. Indeed, the Original Warning, which was held "likely unconstitutional," never uses the word "risk." *CERT*, 29 F.4th at 482. It does, however, "still convey[] the overall message" that consuming food containing acrylamide "is unsafe, which is, at best, disputed." *See NAWG*, 85 F.4th at 1281. So too does the Multiplex Warning.

Notably absent from the Opposition is any evidence of how consumers interpret the Multiplex Warning. This is fatal to the AG's defense because the *State* "has the burden" of proving that its compelled disclosure is not misleading. *ABA*, 916 F.3d at 756. In its Final Statement of Reasons for the regulation, without producing any consumer survey, OEHHA simply asserts its "experience with Proposition 65, . . . [and] science communication more broadly" when responding to one criticism that the agency lacks evidence of consumers' understanding of the warning.[8] While that is certainly insufficient to carry the State's burden, it is also an exceptional case of an agency thumbing its nose at the requirement to show how consumers interpret a State-compelled disclosure. Government rulemaking is replete with examples of agencies conducting extensive consumer research to assess how average people interpret proposed warnings, and applying that data inform to how best to calibrate the government's communication of risk.[9] Having done none of this work, the State has no basis for assuming how California consumers will interpret the Multiplex Warning.

The AG contends further that the Multiplex Warning is "materially different" from the

---

[acrylamide] [i]s a known carcinogen when the weight of the evidence suggest[s] that it is not." *Id.* at 1274, 1279.

[8] FSOR, Proposed Amendments to Section 25607.2 (Aug. 22, 2024), available at https://oehha.ca.gov/media/downloads/crnr/fsoracrylamide101524.pdf.

[9] For instance, before finalizing a rulemaking that required certain warnings on tobacco products, FDA "undertook a rigorous science-based, iterative research process to developing and testing cigarette health warnings," which included two large consumer research studies. 85 Fed. Reg. 15658, available at https://tinyurl.com/58duyabb**.** *See also, e.g.*, 73 Fed. Reg. 46303 (explaining that FDA "conduct[ed] its own consumer research" to learn "how consumers perceive particular advisory statements" about food allergens), available at https://tinyurl.com/3xy78zft.

1  Original Warning requirement that Judge Mueller preliminarily enjoined. Opp. at 17:13. But
2  the State's latest mutation only makes the compelled warnings *more* constitutionally
3  offensive. As CalChamber explained in its Motion (at 15:8-21), the Multiplex Warning now
4  compels businesses to parrot the controversial and unfalsifiable statements of opinion from
5  third parties. The Multiplex Warning also misleads consumers because it "fail[s] to explain the
6  limited significance" of the hazard classification, which the "uninitiated will tend to
7  misunderstand [] as more dangerous than it really is because they will be uninformed that
8  [acrylamide] falls short of the 'carcinogenic to humans' category." *See CTIA-The Wireless*
9  *Ass'n v. City & Cnty. of S.F.*, 827 F. Supp. 2d 1054, 1063 (N.D. Cal. 2011), *aff'd* 494 F.App'x.
10  752 (9th Cir. 2012) ("*CTIA I*"). The AG's attempt to downplay the *CTIA I* decision cannot be
11  squared with *NAWG*, in which the Ninth Circuit specifically "agree[d] with the reasoning
12  expressed in that decision." 85 F.4th at 1280.[10]

13  And, contrary to the AG's suggestion (at 17:22-24), the option to add one of three
14  sentences from the "Context Tier" does not afford CalChamber's members the ability to
15  "explain[] their views" on the purported dangers of dietary acrylamide. Forcing a speaker "to
16  tailor its speech to [the State's] agenda" and respond to a one-sided message when it would
17  "prefer to be silent" still burdens the First Amendment. *See Pac. Gas & Elec. Co. v. Pub. Util.*
18  *Com'n of Cal.*, 475 U.S. 1, 10 (1986). The Multiplex Warning merely offers an *illusion* of
19  choice, and the AG fails to present a single case where a court has approved a government-
20  compelled disclosure that permits the speaker to offer limited context, from a short menu of
21  approved sentences, for a misleading message.[11] After all, the AG's own regulations prohibit
22  warnings containing "additional words or phrases that contradict or obfuscate otherwise
23  acceptable warning language."  Cal. Code Regs., tit. 11, § 3202(b).

24

25  [10] That *CTIA I* and *PCPC* concerned "possible" rather than "probable" human carcinogens is a
26  difference with no distinction, as *NAWG* also dealt with a "probable" human carcinogen but still held that compelling a warning based on a "potential cancer 'hazard'" was misleading. 85 F.4th at 1282.

27  [11] In his Opposition (at 17:20-26), the AG twists Judge Mueller's ruling to argue that the Multiplex Warning is an improvement, which it is not. Her ruling did not greenlight warnings that feed
28  businesses a circumscribed menu of "optional" sentences. As to her remark about what the State could allow businesses to say, such dicta does not erase the fact that the Multiplex Warning still flunks each *Zauderer* element, which is the AG's burden to prove.

1    **B.    The Multiplex Warning Remains Controversial.**

2       As in *NAWG*, while the Multiplex Warning "changes the wording" of earlier safe

3    harbors, "it does not change the fact that a deep scientific debate *still exists*." 85 F.4th at 1282.

4    Whether dietary acrylamide is carcinogenic to humans remains a "hotly disputed" issue, *see*

5    *id.* at 1279, which is why the Ninth Circuit agreed with this Court and ruled that a cancer

6    warning for acrylamide "easily meets the definition" of "controversial." *CERT*, 29 F.4th at 478,

7    n.10. As CalChamber explained in its Motion (at 3:22-4:28), the American Cancer Society,

8    the National Cancer Institute, European public health authorities, and the FDA have

9    expressed the view that dietary acrylamide's association with cancer risk in humans is weak.

10   The very agencies whose tepid *hazard* classifications appear in the Multiplex Warning have

11   also admitted that the evidence in humans is inadequate, which explains their refusal to

12   classify acrylamide as a human carcinogen. *See* Mot. at 19:7-14.

13      Striving to diminish the chorus of scientists and public health agencies that disagree

14   with the State's view, the AG squeezes in his twenty-fifth and -sixth footnotes conspiratorial

15   theories about two of these scientific authorities—despite Judge Mueller flatly ignoring similar

16   cries when the AG opposed CalChamber's motion for preliminary injunction. ECF 101 at

17   11:25-28. But even if this Court were to now credit such conjecture, that would not eliminate

18   the "unresolved scientific debate about whether eating foods and drinks [with] acrylamide

19   increases the risk of cancer." ECF 114 at 23:8-10. By failing to even mention the contrary

20   views of the FDA or others, the Multiplex Warning "implies misleadingly that the science about

21   the risks of food-borne acrylamide is settled." *Id.* at 28:10-11.

22      At one point in the Opposition (at 22:22), the AG states that there is a "scientific

23   consensus concerning acrylamide's status as a carcinogen." This imprecise language should

24   not mislead the Court. The only "consensus" here is that very high doses of acrylamide are

25   carcinogenic to *animals*, specifically lab rats and mice. As to whether acrylamide causes

26   cancer in humans, controversy abounds.  The AG has nothing to say about the expert opinion

27   of Dr. Lipworth, who concluded from a review of 62 published studies that "there is no

28   consistent or reliable epidemiologic evidence to support a finding that dietary exposure to

1    acrylamide increases the risk of any type of cancer in humans." Lipworth Decl. ¶ 173.[12]

2    To be sure, CalChamber has never argued that the science definitively proves

3    acrylamide is *not* a human carcinogen. That is a higher bar that virtually no chemical has met,

4    and it certainly is not probative in determining whether there exists a bona fide scientific

5    disagreement (i.e., a "controversy"). But multiple scientific authorities and sources of evidence

6    *do* show one thing: whether consumption of dietary acrylamide increases a person's risk of

7    cancer is far from settled. And contrary to the AG's suggestion, epidemiological data is not

8    the "singular" basis for this conclusion; it is also buttressed by toxicological studies. In Dr.

9    Maier's opinion from reviewing the toxicological data, the mechanisms that drive tumor

10   formation in rodents are not relevant to humans at real-world levels of exposure to acrylamide

11   through the diet. Maier Decl. ¶ 149; UMF 89-105.[13]

12   Like its failed predecessors, the Multiplex Warning still forces businesses to "state[]

13   without qualification" that acrylamide is "probably" (or "likely") carcinogenic to humans. ECF

14   114 at 26:22. Such a cancer warning with the imprimatur of authority still improperly "elevates

15   one side of a legitimately unresolved scientific debate" over the risks of dietary acrylamide.

16   *CERT*, 29 F.4th at 478. And "forc[ing] [CalChamber's members] to carry a message

17   fundamentally at odds with their businesses" only exacerbates the controversy. *See NAWG*,

18   85 F.4th at 1279 (striking down a similar warning in part because it was subjectively

19   controversial). That much is undisputed, and for this reason alone, the warning fails *Zauderer*.

20   **C.    The AG Fails To Show That A Warning Is Not Unjustified Or Unduly**
21        **Burdensome.**

22   Turning to the State's justification for compelling speech, the Opposition leaves

23

---

24   [12] Dr. Straif's opinion is not contrary to this conclusion. In fact, his declaration talks past the most salient points supporting CalChamber's challenge. The opinion can be summed up in his concluding
25   paragraph: "IARC's evaluation of acrylamide as 'probably carcinogenic to humans' (Group 2A) is strongly supported." ECF 282-2 ¶ 164. But IARC's hazard assessment is not in dispute. It is the
26   State's compelled warning—which conveys to average consumers that eating food with acrylamide in fact increases their *risk* of cancer—that is being challenged.

27   [13] The AG's hairsplitting retorts to CalChamber's statement of material facts are simply attempts to manufacture disputes of fact. Most of them simply shoehorn the same select few paragraphs from
28   Dr. Solomon's opinion. These points are sufficiently addressed in the rebuttal sections of the declarations by Drs. Lipworth (¶¶ 160-68) and Maier (¶¶ 122-146).

unaddressed the critical point that the purpose of Proposition 65 is to inform Californians about exposures that are "scientifically known—not merely suspected" to cause cancer in humans. *People ex rel. Lungren v. Sup. Ct.*, 14 Cal. 4th 294, 307 (1996); *see also NAWG*, 85 F.4th at 1269 ("[T]he function of Prop 65 is to inform consumers of *risks*, not hazards."); Mot. at 12:5-19. While extremely high doses of acrylamide are known to cause cancer in laboratory rodents, a person's cancer risk from real-world, dietary exposure to acrylamide is "purely hypothetical," and therefore any cancer warning here is "unjustified." *See CTIA II*, 928 F.3d at 844 (citing *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 585 U.S. 755, 776 (2018)).

Next, the Opposition fumbles the burdensome prong of *Zauderer* by ignoring the most relevant and binding decision on this issue. In *CERT*, the Ninth Circuit affirmed this Court's preliminary injunction order—which held that "only the safe harbor warning is actually useable in practice," ECF 114 at 24:27—for three independent reasons, including that CalChamber's members face a "heavy litigation burden" if they use alternative warnings. 29 F.4th at 479-80. The physical space a compelled warning takes up on a label is but one example of how a disclosure law can be unduly burdensome. With no genuine dispute that there is an undue burden, the State's compelled-disclosure "fails for that reason alone." *ABA*, 916 F.3d at 757.[14]

## III. THE WARNING CANNOT WITHSTAND HEIGHTENED SCRUTINY.

"Logically, [] if the warning does not meet [*Zauderer*'s] lower standard, it necessarily does not meet [*Central Hudson*'s] higher standard." *Id.* at 756 n.5; *accord PCPC*, 2024 WL 3011001 at *8. The Opposition (at 25:3-11) oversimplifies things by merely asserting that the Multiplex Warning is a "reasonable fit" with the State's interest. But once again, the AG overlooks the Ninth Circuit's holding in *NAWG*, which made two points that are decisive here. First, "compelling sellers to warn consumers of a potential 'risk' never confirmed by any regulatory body . . . does not directly advance [California's] interest." 85 F.4th at 1283. Second, because California has "various other means to promote its (minority) view that

---

[14] If the AG suggests that the availability of "options" reduces the burden, that argument should be rejected out of hand. CalChamber's members are still prevented from citing contradictory findings from other scientific authorities. And as Judge Mueller explained, since departure from the State's prescribed safe harbors remains "perilous," the regulations "impose an undue burden." ECF 114 at 25:4-5. The Multiplex Warning merely cloaks a terminally burdensome law with a veneer of choice.

[acrylamide] puts humans at risk of cancer without burdening [businesses] with unwanted speech," the warning requirement here is not "narrowly drawn to advancing California's interest." *See id.* Thus, the Multiplex Warning and its earlier versions fail the *Central Hudson* test, and the warning requirement as applied to acrylamide in food must be held unconstitutional and its enforcement permanently enjoined.


Dated: December 10, 2024                    Respectfully submitted,

                                            By: */s/ Trenton H. Norris*
                                            Trenton H. Norris
                                            *Attorneys for Plaintiff*
                                            *California Chamber of Commerce*