UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CALIFORNIA CHAMBER OF
COMMERCE,

               Plaintiff,

    v.

ROB BONTA, in his Official Capacity as
Attorney General of the State of
California,

               Defendant;

    and

COUNCIL FOR EDUCATION AND
RESEARCH ON TOXICS,

               Defendant-Intervenor.

No. 2:19-cv-02019-DJC-JDP

ORDER

California's Proposition 65 ("Prop 65") is a "right to know" statute requiring companies that expose consumers to carcinogens or reproductive toxins to provide a reasonable and clear warning.  At issue in this case is whether, under Prop 65, California may compel businesses to display warnings about the dangers of dietary acrylamide, a "probable" or "likely" human carcinogen found in certain foods, consistent with the First Amendment of the United States Constitution.  Plaintiff

1  California Chamber of Commerce ("CalChamber"), which represents businesses

2  selling foods containing dietary acrylamide, has moved for summary judgment

3  arguing the warnings are unconstitutional as a matter of law as they convey the

4  message that those foods will cause cancer in humans despite a lack of scientific

5  consensus supporting that conclusion.  Defendant California Attorney General Rob

6  Bonta ("State") opposes, arguing that the warnings pass constitutional muster as there

7  is no legitimate scientific debate that dietary acrylamide is a likely or probable human

8  carcinogen and the warnings communicate that stance accurately.

9         For the reasons set forth below, the Court will grant summary judgment in

10  CalChamber's favor.  The Court finds that the Prop 65 warnings for dietary acrylamide

11  are misleading and controversial as they state that dietary acrylamide is carcinogenic

12  to humans despite vigorous scientific debate concerning that conclusion and compel

13  CalChamber's members to espouse that view despite their disagreement.  Thus, the

14  Court finds the State's Prop 65 warnings as to dietary acrylamide are unconstitutional

15  and will grant CalChamber's request for declaratory relief and a permanent injunction

16  enjoining enforcement of the Prop 65 warning requirements as to dietary acrylamide.

17                                              **BACKGROUND**

18  **I.     Overview of Prop 65**

19         Prop 65, also known as the Safe Drinking Water and Toxic Enforcement Act,

20  was enacted by California voters as a ballot initiative on November 4, 1986.  *See* Cal.

21  Health & Safety Code §§ 25249.5–25249.14.  Among other things, it requires the

22  Governor of California to publish a "list of those chemicals known to the state to cause

23  cancer or reproductive toxicity within the meaning of this chapter" at least once per

24  year.  *Id.* § 25249.8(a).  Under Prop 65, businesses must not knowingly or intentionally

25  expose people to chemicals "known to the state to cause cancer or reproductive

26  toxicity" without a "prior clear and reasonable warning."  *AFL-CIO v. Deukmejian*, 212

27  Cal. App. 3d 425, 431 (1989) (citing Health & Safety Code § 24249.6).

28  ////

1          The California Office of Environmental Health Hazard Assessment ("OEHHA") "is

2    the lead agency designated by the Governor to implement and enforce Prop[] 65."

3    *Cal. Chamber of Com. v. Brown*, 196 Cal. App. 4th 233, 242 n.5 (2011).  OEHHA must

4    list a chemical as "known to the state to cause cancer" if it meets one of three statutory

5    criteria: (1) the state's qualified experts believe "it has been clearly shown through

6    scientifically valid testing according to generally accepted principles to cause cancer";

7    (2) "a body considered to be authoritative by such experts has formally identified it as

8    causing cancer"; or (3) "an agency of the state or federal government has formally

9    required it to be labeled or identified as causing cancer."  Health & Safety Code

10   § 25249.8(b).  The state's qualified expert, here the Carcinogen Identification

11   Committee, has designated five agencies as "authoritative bodies" for carcinogen

12   identification.  Cal. Code Regs. tit. 27, § 25306(m).  These agencies are the United

13   Nations World Health Organization's International Agency for Research on Cancer

14   ("IARC"), the National Institute for Occupational Safety and Health, the National

15   Toxicology Program ("NTP"), the U.S. Environmental Protection Agency ("EPA"), and

16   the U.S. Food and Drug Administration ("FDA").  *Id.*

17         Initially, when publishing the list of chemicals known to cause cancer, OEHHA

18   "listed only chemicals that had been identified as carcinogens . . . based on human

19   epidemiological studies.  It did not include chemicals identified as carcinogens . . .

20   based on animal studies."  *Brown*, 196 Cal. App. 4th at 242 (citation omitted).

21   However, a few years after Prop 65 was passed, a California Court of Appeal

22   interpreted Health and Safety Code section 25249.8, Labor Code section 6382, and

23   the regulations they cite as requiring the list of chemicals to include "not only those

24   chemicals that are known to cause cancer in humans, but also those that are known to

25   cause cancer in experimental animals."  *Baxter Healthcare Corp. v. Denton*, 120 Cal.

26   App. 4th 333, 345 (2004).  Thus, now, a chemical "must be listed even if it is known to

27   be carcinogenic or a reproductive toxin only in animals."  *Am. Chemistry Council v.*

28   *Off. Envt'l Health Hazard Assessment*, 55 Cal. App. 5th 1113, 1142 (2020).

Once a chemical is placed on the Prop 65 list, businesses are generally required to give a "clear and reasonable warning" before exposing individuals to a listed chemical unless an exemption applies. Health & Safety Code §§ 25249.6, 25249.10. As is relevant here, "a business can obtain an exemption from [this] requirement[] if it can demonstrate . . . the exposure to the chemical poses no significant risk at specified exposure levels." *Am. Chemistry Council*, 55 Cal. App. 5th at 1142 (citing Health & Safety Code § 25249.10(c)). The no significant risk safe harbor means no more than 1 in 100,000 people are calculated to get cancer assuming lifetime exposure. Health & Safety Code § 25249.10(c); Code Regs. tit. 27, § 25703(b). Businesses can either rely on the safe harbor established by OEHHA or can attempt to prove that exposure at an alternative level similarly poses no significant risk by employing their own experts. *See* Health & Safety Code § 25249.10(c); Code Regs. tit. 27, § 25705.

Where a warning is required, the statute requires any business with 10 or more employees to provide a "clear and reasonable" warning before it "knowingly and intentionally expose[s] any individual [in California] to a chemical known to the state to cause cancer . . . ." Health & Safety Code § 25249.6. To assist businesses, OEHHA has developed, and adopted by regulation, optional "safe harbor" language for a variety of types of exposures. Code Regs. tit. 27, § 25601 *et seq*. One such warning is the general safe harbor warning for food, which states (for carcinogens): "**WARNING**: Consuming this product can expose you to [name of chemical], which is known to the State of California to cause cancer. For more information go to www.P65Warnings.ca.gov/food." *See id.* § 25607.2(a)(1), (2).

While use of a safe harbor warning is optional, "electing to do so has significant benefits because it shields the business from exposure to potential private enforcement lawsuits." *Nat'l Ass'n Wheat Growers v. Bonta* ("*NAWG*"), 85 F.4th 1263, 1268 (9th Cir. 2023). In the event that a business chooses to utilize its own Prop 65 warning, whether that formulation is clear and reasonable is normally a "question of

4

1   fact to be determined on a case by case basis." *Ingredient Commc'n Council, Inc. v.*

2   *Lungren*, 2 Cal. App. 4th 1480, 1485 & n.3 (1992), *as modified* (Feb. 14, 1992)

3   (quoting OEHHA's explanation in a Final Statement of Reasons on the interpretation of

4   non-safe harbor warnings).

5       A party that fails to provide a required warning or otherwise establish an

6   exemption may be enjoined, and "is liable for a civil penalty not to exceed two

7   thousand five hundred dollars ($2,500) per day for each violation in addition to any

8   other penalty established by law."  Health & Safety Code § 25249.7(a), (b)(1).  Prop 65

9   features both public and private enforcement mechanisms.  Enforcement actions "may

10  be brought by the Attorney General in the name of the people of the State of

11  California, by a district attorney," by a city attorney or city prosecutor, or "by a person

12  in the public interest."  *Id.* § 25249.7(c), (d).  Before suing, a private enforcer must

13  provide a sixty-day notice of the alleged violation to the Attorney General, other local

14  prosecutors with jurisdiction, and the alleged violator.  *Id.* § 25249.7(d)(1).  The private

15  enforcer can only bring suit if "[n]either the Attorney General, a district attorney, a city

16  attorney, nor a prosecutor has commenced and is diligently prosecuting an action

17  against the violation."  *Id.* § 25249.7(d)(2).  Successful private enforcers can recover a

18  quarter of the civil penalty imposed and reasonable attorneys' fees.  *See id.*

19  § 25249.12(d); Cal. Civ. Proc. Code § 1021.5.

20  **II.    Dietary Acrylamide and Prop 65**

21      This Court has previously explained dietary acrylamide, its addition to the Prop

22  65 list, and the scientific controversy surrounding its carcinogenicity to humans in

23  thorough detail.  (*See* Prelim. Inj. Order (ECF No. 114) at 2–8.)  In the interests of

24  judicial economy, the Court incorporates those facts here and will only retread them

25  as needed.

26      As is relevant, acrylamide was historically used industrially as a chemical in

27  plastics and grouting agents.  (Plaintiff's Statement of Undisputed Material Facts ("Pl.'s

28  SUF") (ECF No. 280-2) ¶ 46.)  In 1986, IARC determined that acrylamide represented a

5

1   carcinogenic hazard to humans. (Defendant's Statement of Additional Material Facts

2   ("Def.'s SUF") (ECF No. 282-1) ¶ 12.) In 1994, after considering new supporting

3   evidence, IARC revised its classification to "probably carcinogenic to humans." (Pl.'s

4   SUF ¶ 29; Def.'s SUF ¶ 12.) EPA likewise classified acrylamide as a "probable

5   carcinogen in humans" in 1988, although in 2010, it revised its hazard determination

6   to state that acrylamide is "likely to be carcinogenic to humans." (Pl.'s SUF ¶ 21; Def.'s

7   SUF ¶ 13.) In 1990, OEHHA listed acrylamide as a chemical "known to the State of

8   California to cause cancer" based on the determinations by IARC and EPA that

9   acrylamide was a carcinogen. (Joint Statement of Undisputed Material Facts ("JUF")

10  (ECF No. 280-2) ¶ 1.) Following OEHHA's addition of acrylamide to the Prop 65 list,

11  NTP also listed acrylamide as "reasonably anticipated to be a human carcinogen."

12  (Def.'s SUF ¶ 14.)

13         At the time it was added to the Prop 65 list, acrylamide had not yet been

14  discovered in foods. In 2002, however, researchers discovered that acrylamide can

15  form in certain, primarily plant-based, foods such as potato products, grain products,

16  and coffee during high-temperature cooking processes such as frying, roasting, and

17  baking. (Pl.'s SUF ¶¶ 2–5.) In light of this discovery, OEHHA in 2003 sought to "clarify

18  the application of Proposition 65 to foods containing acrylamide," and eventually

19  considered exempting from the warning requirement exposures to chemicals "formed

20  from natural constituents as a result of cooking or heat processing" like acrylamide.

21  (*Id.* ¶¶ 47–48.) OEHHA acknowledged two unintended consequences of requiring

22  warnings for acrylamide in food: (1) consumer avoidance of foods that are "necessary

23  for a balanced diet"; and (2) "warning fatigue." (*Id.* ¶ 49.) Ultimately, however, no

24  exemption was adopted.

25         Since its discovery in 2002, the carcinogenic risk of dietary acrylamide to

26  humans has been the subject of debate. (*See* Prelim. Inj. Order at 3–8.) IARC, EPA,

27  and NTP have each judged acrylamide to be a carcinogenic hazard; in other words,

28  they have determined acrylamide is capable of causing cancer under some

1    circumstances.  (Def.'s SUF ¶¶ 1, 6.)  However, a hazard determination is distinct from

2    a risk determination, which evaluates the numerical probability that cancer will occur

3    depending on the cancer potency of the chemical as well as the amount of exposure.

4    (*Id.* ¶¶ 2, 5.)  Health and scientific agencies such as IARC, EPA, and NTP identify

5    carcinogens by conducting hazard assessments based on the evaluation of three

6    "streams" of scientific evidence: epidemiological data, cancer bioassay data (animal

7    studies), and mechanistic data.  (Def.'s SUF ¶¶ 6–8.)  In the case of dietary acrylamide,

8    numerous animal studies have shown that when mice and rats eat or drink food or

9    water containing acrylamide, they develop cancerous tumors.  (*See* Solomon Decl.

10    (ECF No. 282-4) ¶¶ 38–40; *see also* Prelim. Inj. Order at 3–4.)  IARC, EPA, and NTP

11    based their acrylamide hazard determination primarily on animal studies, as well as

12    mechanistic data.[1]  (Pl.'s SUF ¶¶ 21–29, 62–63; Def.'s SUF ¶ 15.)  For example, IARC's

13    1994 classification of acrylamide as "probably carcinogenic to humans" was based on

14    IARC's findings of "inadequate" evidence of carcinogenicity in humans, "sufficient"

15    evidence of carcinogenicity in experimental animals, and "strong" mechanistic data.

16    (Straif Decl. (ECF No. 282-2) ¶ 59.)

17          However, as this Court has previously acknowledged, the implications of these

18    animal studies and mechanistic data for assessing dietary acrylamide's cancer *risk* are

19    uncertain.  (Prelim Inj. Order at 4–5.)  Dr. Andrew Maier,[2] a toxicologist retained by

20    CalChamber, opines that mechanisms that drive tumor formation in experimental

21

22    [1] As the State's expert Dr. Kurt Straif explains, "[i]ncreasing insights into cancer development over
      recent decades and potential limiting factors of epidemiological studies and cancer bioassays have led
23    to an increased use of mechanistic data, or data other than that obtained from classical toxicity testing,
      in identifying human carcinogens.  For chemical agents, mechanistic data may include data on
24    absorption, distribution, metabolism and excretion; data on toxic effects; data on reproductive and
      developmental effects; and genetic and related effects."  (Straif Decl. (ECF No. 282-2) ¶ 49.)
25    [2] Dr. Andrew Maier is a toxicologist with a Ph.D. in molecular toxicology retained to offer opinions on
      CalChamber's behalf.  (Maier Decl. (ECF No. 280-40) ¶¶ 3–10, 12.)  As the State notes, in the interest of
26    unveiling potential bias, Dr. Maier is a longstanding member and former director of Toxicology
      Excellence for Risk Assessment, an organization underwritten by industry trade and lobbying groups.
27    (Def.'s SUF ¶ 28.)  Dr. Maier also worked as an advisor for the Institute for the Advancement of Food
      and Nutrition Sciences, which, along with food industry members, has funded Dr. Maier's published
28    articles on acrylamide.  (*Id.* ¶ 34.)

1    animals are not relevant to humans at real-world levels of exposure to acrylamide

2    through the diet because, for example, humans process acrylamide differently than

3    rodents and in ways that detoxify acrylamide more readily than in rodents.  (Maier

4    Decl. (ECF No. 280-40) ¶¶ 1–2, 82–85, 139–145, 149.)  The National Cancer Institute

5    has offered comparable cautions about animal experiments, stating that while

6    "[s]tudies in rodent models have found that acrylamide exposure increases the risk for

7    several types of cancer . . . toxicology studies have shown that humans and rodents

8    not only absorb acrylamide at different rates, they metabolize it differently as well."

9    (Nat'l Cancer Inst., *Acrylamide and Cancer Risk* (Dec. 5, 2017), Norris Decl., Ex. I (ECF

10   No. 280-13).)

11         Similarly, the FDA stated in 2024 that it is "not clear exactly what risk

12   acrylamide poses to humans," noting that "[i]n research studies, high levels of

13   acrylamide caused cancer in laboratory animals, but the levels of acrylamide used in

14   these studies were much greater than those found in human food."  (U.S. Food & Drug

15   Admin., *Acrylamide* (Mar. 5, 2024), Norris Decl., Ex. D (ECF No. 280-8).)  The FDA has

16   been reticent to advise consumers against consuming foods containing acrylamide in

17   recognition of the health benefits these foods may offer (*see* Pl.'s SUF ¶¶ 7–14),

18   although it has provided recommendations for food providers to reduce the level of

19   acrylamide in their products and for consumers to reduce their acrylamide exposure

20   in foods in light of the studies showing cancer in laboratory animals at high acrylamide

21   doses (Def.'s SUF ¶¶ 42–43).

22         Epidemiological studies have also been inconclusive as to the carcinogenicity

23   of dietary acrylamide.  (Prelim. Inj. Order at 5–7.)  For example, Dr. Loren Lipworth,[3] an

24   epidemiologist retained by CalChamber, reviewed 62 epidemiological studies

25   conducted in Europe, the United States, and Asia investigating whether acrylamide in

26

27   ───────────────

     [3] Dr. Lauren Lipworth is an epidemiologist and professor at the Vanderbilt University
     School of Medicine retained to offer opinions on CalChambers's behalf.  (Lipworth Decl. (ECF No. 280-
28   41) ¶¶ 5–10, 15.)

1   food causes cancer in humans.  (Lipworth Decl. (ECF No. 280-41) ¶¶ 42–159, 169,

2   173.)  She found none showing that eating food with acrylamide increases the risk of

3   cancer, stating "there is no consistent or reliable epidemiologic evidence to support a

4   finding that dietary exposure to acrylamide increases the risk of any type of cancer in

5   humans, either overall or among non-smokers."  (*Id.* ¶ 173.)  "In fact," she concluded,

6   "most cancer-specific relative risks have been close to or below the null value,"

7   indicating no increase in cancer risk among people who report greater consumption

8   of acrylamide in food and drinks.  (*Id.* ¶ 170.)  The National Cancer Institute has

9   reported a similar assessment of epidemiological research, stating "a large number of

10  epidemiologic studies (both case-control and cohort studies) in humans have found

11  no consistent evidence that dietary acrylamide exposure is associated with the risk of

12  any type of cancer."  (Nat'l Cancer Inst., *Acrylamide and Cancer Risk* (Dec. 5, 2017),

13  Norris Decl., Ex. I.)  The National Cancer Institute further stated that "[a]dditional

14  epidemiologic studies in which acrylamide adduct or metabolite levels are serially

15  measured in the same individuals over time (longitudinal cohorts) are needed to help

16  determine whether dietary acrylamide intakes are associated with increased cancer

17  risks in people."  (*Id.*)  The American Cancer Society has also acknowledged the limits

18  of available epidemiological data, explaining that "reviews of studies done in groups

19  of people (epidemiologic studies) suggest that dietary acrylamide isn't likely to be

20  related to risk for most common types of cancer," and recognizing that further

21  research is needed on this topic.  (Am. Cancer Soc'y, *Acrylamide and Cancer Risk*

22  (Feb. 11. 2019), Norris Decl., Ex. J (ECF No. 280-14).)

23          However, other experts have pushed back on these findings.  For example, Dr.

24  Gina Solomon,[4] a medical doctor retained by the State, argues that animal studies and

25  mechanistic data is strong evidence that acrylamide is a human carcinogen because

26  there is clear evidence that acrylamide is a carcinogen for rodents, humans and

27  _____

28  [4] Dr. Gina Solomon is a medical doctor and professor at the University of California San Francisco
    Medical School retained to offer opinions on the State's behalf.  (Solomon Decl. ¶¶ 5–16.)

1    rodents metabolize acrylamide in similar ways, and recent genetic analysis of human

2    cancers reveals a potentially large contribution from acrylamide.  (Solomon Decl. ¶¶ 4,

3    20–30, 38–63.)  Dr. Solomon argues this conclusion is bolstered by the numerous

4    scientific agencies that have considered whether acrylamide causes cancer in humans

5    and come to the same essential conclusion: it does.  (*Id.* ¶¶ 31–37.)  In particular, the

6    IARC has concluded that acrylamide is "probably carcinogenic to humans"; the EPA

7    has concluded acrylamide is "likely to be carcinogenic to humans"; the NTP has

8    concluded acrylamide is "reasonably anticipated to be a human carcinogen"; the

9    European Food Safety Authority has concluded acrylamide is "both genotoxic and

10    carcinogenic"; and the Joint Food and Agriculture Organization/World Health

11    Organization has concluded that levels of exposure to dietary acrylamide indicate a

12    human health concern.  (*Id.*)

13    Dr. Solomon also explains that epidemiological studies are generally ineffective

14    for studying cancer caused by acrylamide as these studies must be conducted over at

15    least 30 years given that cancer has a long and variable latency period; individuals

16    have significant differences in their diets, environment, personal habits, and biological

17    responses; and an individual's extent of exposure will often vary over time.  (*Id.* ¶¶ 64–

18    88.)  Thus, Dr. Solomon opines that any null results from epidemiological studies do

19    not necessarily prove the absence of acrylamide's carcinogenic effects.  (*Id.*)

20    Dr. Kurt Straif,[5] an epidemiologist and medical doctor retained by the State,

21    goes even further, opining that new epidemiological data about dietary acrylamide

22    supports a conclusion it is carcinogenic to humans.  (Straif Decl. (ECF No. 282-2) ¶ 28.)

23    Reviewing recent epidemiological studies on the association between dietary

24    exposure to acrylamide and cancer, Dr. Straif finds that the studies "do report results

25    of an association between dietary exposures to acrylamide and some cancers and

26    cancer subtypes, including ovarian, breast, and endometrial cancer."  (*Id.* ¶¶ 60–78.)

27    

28    [5] Dr. Kurt Straif is an epidemiologist, medical doctor, and previous Head of the IARC Monographs
Programme retained to offer opinions on the State's behalf.  (Straif Decl. (ECF No. 282-2) ¶¶ 1–14, 17.)

1   As with Dr. Solomon, he acknowledges the limitations of epidemiological studies

2   assessing human exposures to acrylamide from dietary sources due to factors such as

3   acrylamide levels fluctuating based on types of food and their preparation, and

4   individuals' fluctuating diets. (*Id.* ¶¶ 88–101.) However, Dr. Straif ultimately concludes

5   that, when assessing animal studies and mechanistic data in conjunction with

6   epidemiological studies, there is no debate that dietary acrylamide is "probably

7   carcinogenic to humans." (*Id.* ¶¶ 102–18.)

8   **III.    Procedural History**

9        CalChamber filed this action in 2019 alleging that requiring a Prop 65 warning

10  for acrylamide in food violates its members' and other entities' First Amendment rights

11  because, given the scientific debate discussed above, the State does not "know" that

12  acrylamide in food causes cancer in humans. (*See* ECF No. 1.) At the time, OEHHA's

13  regulations deemed warnings for foods containing acrylamide to be "clear and

14  reasonable" (i.e., the safe harbor warning) if they stated: "**WARNING: / CA**

15  **WARNING: / CALIFORNIA WARNING:** Consuming this product can expose you to

16  acrylamide, which is known to the State of California to cause cancer. For more

17  information go to www.P65warnings.ca.gov/food." Code Regs. tit. 27, § 25607.2(a)(1),

18  (2) ("Original Warning").

19       In 2020, CalChamber moved for a preliminary injunction to prohibit all

20  prospective enforcement of the acrylamide warning requirement. (ECF No. 95.)

21  Based on the record at that stage, the Court found there was an "unresolved scientific

22  debate" about the carcinogenicity of acrylamide in food, and therefore held the State

23  had not shown the Original Warning was "purely factual and uncontroversial" under

24  *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651

25  (1985). (*See* Prelim Inj. Order at 22–28.) As a result, the Court issued a preliminary

26  injunction in March 2021. (*Id.*) The State did not appeal the preliminary injunction

27  ruling. However, Defendant-Intervenor Council for Education and Research on Toxics

28  appealed, and the Ninth Circuit Court of Appeals held that the Court had not abused

1    its discretion in granting the motion for preliminary injunction.  *Cal. Chamber of Com.*

2    *v. Council for Educ. & Rsch. on Toxics* ("*CERT*"), 29 F.4th 468, 474 (9th Cir. 2022).

3      Six months after the Court issued its preliminary injunction, OEHHA issued a

4    new safe harbor warning specific to acrylamide in food that read: "**WARNING: / CA**

5    **WARNING: / CALIFORNIA WARNING:** Consuming this product can expose you to

6    acrylamide, a probable human carcinogen formed in some foods during cooking or

7    processing at high temperatures.  Many factors affect your cancer risk, including the

8    frequency and amount of the chemical consumed.  For more information including

9    ways to reduce your exposure, see www.P65Warnings.ca.gov/acrylamide."  Code

10   Regs. tit. 27, § 25607.2(c)(1) ("Alternative Warning").  The Alternative Warning has

11   been in effect since January 1, 2023.  (JUF ¶ 5.)

12     In November 2023, the Ninth Circuit Court of Appeals issued an opinion in

13   *NAWG*, 85 F.4th 1263, a First Amendment challenge to the Prop 65 warning

14   requirement for glyphosate, the primary ingredient in Monsanto Company's Roundup

15   weedkiller.  Subsequently, OEHHA issued a new regulation, effective January 1, 2025,

16   that provides an additional safe harbor warning for acrylamide in food.  (*See* ECF No.

17   264; JUF ¶ 6.)  The new warning consists, in pertinent part, of the following:

18     (A) "**WARNING: / CA WARNING: / CALIFORNIA WARNING:**" and

19      "Consuming this product can expose you to acrylamide" or "Consuming this

20      product can expose you to acrylamide, a chemical formed in some foods

21      during cooking or processing at high temperatures."

22     (B) At least one of the following sentences:

23      (a) "The International Agency for Research on Cancer has found that

24       acrylamide is probably carcinogenic to humans."

25      (b) "The United States Environmental Protection Agency has found that

26       acrylamide is likely to be carcinogenic to humans."

27      (c) "The United States National Toxicology Program has found that

28       acrylamide is reasonably anticipated to cause cancer in humans."

1      (C) The content in (A) and (B) may be followed by one or more of the following

2              sentences:

3                  (a) "Acrylamide has been found to cause cancer in laboratory animals."

4                  (b) "Many factors affect your cancer risk, including the frequency and

5                      amount of the chemical consumed."

6                  (c) "For more information including ways to reduce your exposure, see

7                      www.P65Warnings.ca.gov/acrylamide."

8      Code Regs. tit. 27, § 25607.2(c)(2) ("New Warning").

9          CalChamber now seeks declaratory relief and a permanent injunction barring

10     enforcement of the Prop 65 warning requirement as to acrylamide in food, arguing

11     none of the safe harbor warnings (the Original, Alternative, or New Warning) pass

12     constitutional muster.  (Mot. Summ. J. ("MSJ") (ECF No. 280).)  The Court held a

13     hearing on February 12, 2025, with Trenton Norris and Alex Tablan appearing for

14     CalChamber, and Megan Hey and Laura Zuckerman appearing for the State.  The

15     matter was taken under submission.

16                          **SUMMARY JUDGMENT STANDARD**

17         Summary judgment may be granted when the evidence shows that there is no

18     genuine issue as to any material fact and the moving party is entitled to a judgment as

19     a matter of law.  Fed. R. Civ. P. 56(c).  The principal purpose of summary judgment is

20     to dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477

21     U.S. 317, 325 (1986).  Therefore, the "threshold inquiry" is whether there are any

22     factual issues that could reasonably be resolved in favor of either party, or conversely,

23     whether the facts are so one-sided that one party must prevail as a matter of law.

24     *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52 (1986).  "Only disputes over facts

25     that might affect the outcome of the suit under the governing law will properly

26     preclude the entry of summary judgment."  *Id.* at 248.

27         In a summary judgment motion, the moving party must inform the court of the

28     basis for the motion and identify the portion of the record which it believes

1  demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at

2  323. If the moving party meets its initial burden, the burden then shifts to the

3  opposing party, which must establish that there is a genuine issue of material fact.

4  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574. 585 (1986). To meet

5  their burden, parties must either cite to materials in the record supporting their

6  position or show that the materials cited do not establish the absence or presence of a

7  genuine dispute. Fed. R. Civ. P. 56(c)(1).

8      For the opposing party to succeed and avoid summary judgment, they "must

9  do more than simply show that there is some metaphysical doubt as to the material

10  facts*." Matsushita*, 475 U.S. at 586. Rather, the opposing party must produce enough

11  evidence such that the specific facts set forth by the nonmoving party, coupled with

12  undisputed background or facts, are such that a reasonable jury might return a verdict

13  in their favor. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631

14  (9th Cir. 1987). In other words, for the moving party to succeed, the court must

15  conclude that no rational trier of fact could find for the opposing party. *Matsushita*,

16  475 U.S. at 587. However, so as not to usurp the role of the jury, "[c]redibility

17  determinations, the weighing of the evidence, and the drawing of legitimate

18  inferences from the facts are jury functions," and so the court draws all reasonable

19  inferences and views all evidence in the light most favorable to the opposing party.

20  *Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587–88.

21                                    **DISCUSSION**

22  **I.    CalChamber has Standing to Challenge Prop 65's Compelled Government**

23         **Speech**

24      As a threshold issue, the State argues that CalChamber has failed to show the

25  State requires any of its members to warn about dietary acrylamide in their products, a

26  necessary element of any First Amendment compelled speech claim. (Opp'n MSJ

27  (ECF No. 282) at 10.) The State argues that there is no legal obligation to provide a

28  warning under Prop 65 when a business can establish that exposure to acrylamide

1   from its product falls below the no significant risk level under Health and Safety Code

2   section 25249.10(c); thus, CalChamber's members are required to warn for exposures

3   to acrylamide only if their food products exceed that level.  (*Id.* at 10–11.)  The State

4   argues CalChamber cannot show any member was compelled to provide Prop 65

5   warnings because it has failed to provide any evidence about its members' food

6   products.  (*Id.* at 11.)  In the absence of this proof, the State argues the Court cannot

7   infer that any Prop 65 warnings were *compelled* by the State; to the extent any

8   CalChamber member placed a Prop 65 warning on their products without a legal

9   obligation to do so, that speech is not compelled.  Thus, the State argues that

10  CalChamber "falls short of its summary judgment burden to establish standing (since

11  it has established no member's injury-in-fact) and to establish that there is any

12  compelled speech at all."  (*Id.* at 11–12.)

13          The Court disagrees.  There is a presumptive burden on all businesses who sell

14  foods containing dietary acrylamide to include a Prop 65 warning unless they can

15  affirmatively establish their product falls below the no significant risk level.  *See* Health

16  & Safety Code § 25249.10(c).  Even if a business attempts to exempt their product by

17  proving it contains acrylamide levels below the no significant risk level,[6] incurring

18  attendant costs to do so, there is no guarantee they will then be free from litigation

19  challenging their compliance with Prop 65's warning requirements.  As other courts in

20  this district have observed, the nature of Prop 65's enforcement scheme creates a

21  constant, credible threat of enforcement by private enforcers because "to bring suit

22  . . . a private plaintiff need only credibly allege that a product has some of the

23  chemical at issue, not that the amount of the chemical is harmful or that it exceeds this

24  level."  *National Ass'n of Wheat Growers v. Becerra* ("*Wheat Growers*"), 469 F. Supp. 3d

25  1247, 1256 (E.D. Cal. 2020).  Indeed, as "one California Court of Appeal has

26  explained," the "instigation of Proposition 65 enforcement actions is 'easy – and

27  ───────────────────

28  [6] OEHHA has calculated a no significant risk level for acrylamide of 0.2 micrograms (μg)/day.  (Def.'s SUF ¶ 18.)

1    almost absurdly easy at the pleading and pretrial stages.'"  *Id.* (quoting *Consumer Def.*

2    *Grp. v. Rental Hous. Indus. Members*, 137 Cal. App. 4th 1185, 1215 (2006)).  Thus, the

3    availability of a no significant risk level exemption effectively offers businesses no

4    reprieve from Prop 65's warning requirement, as businesses risk "[f]acing enforcement

5    actions . . . even if a business can prove that its product is not a cancer risk."  *Id.*

6    Businesses must either utilize a Prop 65 warning on their products or run the risk of

7    incurring substantial costs in defending against enforcement actions.  Given Prop 65's

8    enforcement scheme, a business's decision to adopt a Prop 65 warning is compelled

9    by the State whether or not their product exceeds the no significant risk level.

10         Further, CalChamber has provided evidence demonstrating a history of Prop

11    65 acrylamide enforcement actions, including actions brought against its members

12    who sell products containing dietary acrylamide.  (*See* Norris Decl. (ECF 280-4) ¶ 42

13    (issuance of 686 notices of violation, entry of 90 settlements, and filing of 92 lawsuits

14    concerning acrylamide since the filing of this lawsuit); *id.* ¶ 43 (issuance of 120 notices

15    of violation during the less than 10 months the preliminary injunction was stayed); *id.*

16    ¶ 44 (issuance of 29 notices of violation in 2024 after proposal of New Warning

17    regulation); *id.* ¶ 45 (CalChamber's members sell products containing acrylamide and

18    have been sued in connection with notices of violation).)  This evidence is sufficient to

19    establish a credible threat of enforcement against CalChamber's members such that

20    they have standing to challenge the constitutionality of Prop 65's compelled warning.

21    *See, e.g., Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014) (threatened

22    enforcement of a law creates a cognizable Article III injury); *see also Italian Colors Rest.*

23    *v. Becerra*, 878 F.3d 1165, 1173 (9th Cir. 2018) (party had standing because "even if

24    the Attorney General would not enforce the law," private citizens had a right of action

25    to sue for damages).

26         Accordingly, CalChamber has satisfactorily demonstrated that its members

27    have standing to challenge Prop 65's compelled speech requirements.

28    ////

1 **II.    Constitutionality of Prop 65 Safe Harbor Warnings for Dietary Acrylamide**

2 A core purpose of the First Amendment is "to preserve an uninhibited

3 marketplace of ideas in which truth will ultimately prevail." *McCullen v. Coakley*, 573

4 U.S. 464, 476 (2014) (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364,

5 377 (1984)). "The commercial marketplace, like other spheres of our social and

6 cultural life, provides a forum where ideas and information flourish." *Sorrell v. IMS*

7 *Health Inc.*, 564 U.S. 552, 578–79 (2011) (quoting *Edenfield v. Fane*, 507 U.S. 761, 767

8 (1993)). While the First Amendment typically protects against speech restrictions, the

9 "'right to speak and the right to refrain from speaking are complimentary components'

10 of free speech principles." *NAWG*, 85 F.4th at 1275 (quoting *Wooley v. Maynard*, 430

11 U.S. 705, 714 (1977)). Indeed, the First Amendment's guarantee of free speech makes

12 no significant distinction between compelled speech and compelled silence. *Id.*

13 "Although commercial speech is afforded less protection than private,

14 noncommercial speech, it is still entitled to the protections of the First Amendment."

15 *Id.* In the commercial speech context, the Supreme Court has articulated two tests for

16 determining the constitutionality of governmental action. First is the test set forth in

17 *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447

18 U.S. 557 (1980). Under that test, the government may restrict or prohibit commercial

19 speech that is not misleading or related to illegal activity as long as the restriction or

20 prohibition directly advances a substantial governmental interest and is not more

21 extensive than necessary. *Id.* at 564. Second, there is the less stringent test set forth

22 in *Zauderer*, 471 U.S. 626. *Zauderer* is an "exception for compelled speech," *CTIA–*

23 *The Wireless Ass'n v. City of Berkeley* ("*CTIA II*"), 928 F.3d 832, 843 (9th Cir. 2019),

24 *cert. denied*, 140 S. Ct. 658 (2019), and is only available in certain contexts. *See Nat'l*

25 *Inst. of Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), 585 U.S. 755, 768–69 (2018). Under

26 *Zauderer*, the government may compel commercial speech so long as it is reasonably

27 related to a substantial governmental interest, and the compelled speech is (1) purely

28 factual, (2) noncontroversial, and (3) not unjustified or unduly burdensome. *Am.*

17

1   *Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 755–56 (9th Cir. 2019)

2   (en banc).

3          To determine if the Prop 65 warnings at issue qualify for the more permissive

4   *Zauderer* test, the Court first must determine whether the warnings concern "purely

5   factual and uncontroversial information" before considering whether they are

6   reasonably related to a substantial governmental interest and are not "unjustified or

7   unduly burdensome." *NAWG*, 85 F.4th at 1275. If the Prop 65 warnings do not qualify

8   for review under *Zauderer*, then the Court will evaluate if they meet the more stringent

9   *Central Hudson* test. *See id.* at 1282–83 ("Because no version of the Prop 65

10  glyphosate warning comes within the scope of the exception found in *Zauderer*, we

11  consider whether it passes intermediate scrutiny under *Central Hudson*.").

12         As discussed further below, the Court finds that the Prop 65 warnings for

13  dietary acrylamide fail to satisfy either standard. First, under *Zauderer*, the Court finds

14  that the Prop 65 warnings are neither uncontroversial nor purely factual as the

15  warnings espouse a one-sided view that dietary acrylamide poses a human cancer risk

16  despite a lack of scientific consensus on that point. While each sentence of the new

17  warning may be factual in a strict sense of the word, under Ninth Circuit case law the

18  Court does not take such a narrow view of the warning. Rather, the Court looks to the

19  meaning of the warning in context, which clearly communicates the message that

20  dietary acrylamide poses a risk of cancer. Second, under *Central Hudson*, the Court

21  finds that misleading statements about acrylamide's carcinogenicity do not advance

22  the State's interests in protecting the health of its citizens and that the State has less

23  burdensome alternatives to achieve its goals. Accordingly, the Court holds that Prop

24  65's warning requirement as applied to dietary acrylamide violates the First

25  Amendment and will grant summary judgment in CalChamber's favor.

26  ////

27  ////

28  ////

**A.    No Prop 65 Safe Harbor Warning for Dietary Acrylamide is "Purely Factual and Uncontroversial" under *Zauderer***

This Court previously found that the Prop 65 warning requirement for dietary acrylamide was not "purely factual and uncontroversial" given the weight of scientific authority showing that acrylamide was not "known" to cause cancer.  (Prelim. Inj. Order at 20-28, 31.)  The question, then, is whether developments in the evidentiary record and to the warning language since the Court's preliminary injunction order change the conclusion that the warning requirement for dietary acrylamide is misleading and not purely factual and uncontroversial.  The Court finds they do not.

As discussed above, *Zauderer* applies where the government requires disclosure of "purely factual and uncontroversial information" about commercial products or services.  *Zauderer*, 471 U.S. at 651; *NIFLA*, 585 U.S. at 768.  The State has the burden of demonstrating that the applicable Prop 65 safe harbor warnings for acrylamide in food meet this standard.  *See Zauderer*, 471 U.S. at 641.  As the Ninth Circuit has explained, "[i]nformation that is purely factual is necessarily 'factually accurate,' but that alone is not enough to qualify for the *Zauderer* exception."  *NAWG*, 85 F.4th at 1276.

By way of illustration, in *CTIA II*, the City of Berkeley had an ordinance requiring cell phone retailers to inform prospective cell phone purchasers of the risks of radiofrequency radiation from carrying cell phones on their person.  928 F.3d at 836-38.  This warning was required as part of the FCC's regulatory scheme in order for cell phone manufacturers to obtain FCC device approval.  *Id.* at 840-41.  The Ninth Circuit, in reviewing this ordinance, found that *Zauderer* review was appropriate because, examining the warning sentence-by-sentence, each sentence was factually accurate and none contained an "inflammatory warning."  *Id.* at 838, 846-48.  However, the Ninth Circuit noted that, of course, "a statement may be literally true but nonetheless misleading and, in that sense, untrue."  *Id.* at 847.  Judge Friedland, who dissented in part, echoed this admonition, observing that by parsing the sentences individually

19

1   and concluding that each was literally true, the court had "misse[d] the forest for the

2   trees" because the overall message conveyed by the ordinance was that carrying a

3   cell phone was not safe, which was untrue and misleading, and ordering the cell

4   phone retailers to convey such a message they disagreed with was unconstitutional.

5   *Id.* at 853.  Since *CTIA II*, the Ninth Circuit has adopted Judge Friedland's approach—

6   i.e., requiring that courts consider the overall impression delivered by a compelled

7   warning in evaluating whether it meets *Zauderer*'s "purely factual" requirement.  *See*

8   *NAWG*, 85 F.4th at 1279.

9        *Zauderer* also requires that commercial speech be "uncontroversial" to pass

10  constitutional scrutiny.  "[T]he topic of the disclosure and its effect on the speaker is

11  probative of determining whether something is subjectively controversial."  *NAWG*, 85

12  F.4th at 1277.  For example, in *NIFLA*, a group of medical providers and crisis

13  pregnancy centers challenged a California statute requiring "licensed" abortion clinics

14  to notify women that California provides "immediate free or low-cost access" to family

15  planning services (including abortion) and provide a phone number.  585 U.S. at 760–

16  65.  The Supreme Court held that the notice was controversial because, while factual,

17  "the compelled statement took sides in a heated political controversy, forcing the

18  clinic to convey a message fundamentally at odds with its mission."  *CTIA II*, 928 F.3d

19  at 845.  Thus, "[w]hile the effect on the speaker is one part of the equation, an

20  objective evaluation of 'controversy' is also an important consideration."  *NAWG*, 85

21  F.4th at 1277.  However, not every factual statement that can be tied in some way to a

22  controversial issue is, in fact, controversial.  *Id.*

23       CalChamber argues that, under the *Zauderer* standard, none of the dietary

24  acrylamide safe harbor warnings are "purely factual and uncontroversial" because, at

25  their core, they convey the scientifically contested message that consuming foods

26  containing acrylamide increase a consumer's risk of cancer and force CalChamber's

27  members to espouse this disputed viewpoint.  (MSJ at 12–22.)  In opposition, the State

28  effectively concedes the Original and Alternative Warnings are unconstitutional,

1   instead focusing on the New Warning.  (Opp'n MSJ at 12–23.)  The State argues that

2   every required sentence of the New Warning is purely factual, as the warning

3   includes: (1) a statement that consuming the product can expose you to acrylamide;

4   and (2) a statement concerning the findings of an authoritative scientific agency on

5   acrylamide's carcinogenicity which recites the agency's findings verbatim.  (*Id.* at 12.)

6   Additionally, the State argues that the New Warning is not misleading because only

7   foods that will expose consumers to a risk of cancer are subject to the warning

8   requirement; foods whose acrylamide concentrations fall below the no significant risk

9   level are excused.  (*Id.* at 15–19.)  Finally, the State argues the New Warning is not

10  controversial because there is consensus in the scientific community that acrylamide is

11  a probable or likely human carcinogen.  (*Id.* at 19–23.)

12       The State's new summary judgment evidence fails to change the Court's

13  conclusion that the Prop 65 safe harbor warnings for dietary acrylamide are

14  controversial.  As the Ninth Circuit has explained, from "the standpoint of an average

15  consumer, saying that something is carcinogenic or has serious deleterious health

16  effects—without a strong scientific consensus that it does—remains controversial."

17  *NAWG*, 85 F.4th at 1278.  "It is also controversial from the subjective standpoint of the

18  speakers," who are "forced 'to convey a message fundamentally at odds' with their

19  businesses."  *Id.*  Here, while the science is clear that dietary acrylamide can cause

20  cancer when administered to mice and rats in large doses, the Parties' experts

21  strongly disagree that the results of these animal studies can be extrapolated to

22  humans based on epidemiological studies and mechanistic data.  The State points out

23  that numerous scientific authorities, including the IARC, EPA, and NTP, agree that

24  acrylamide is a probable or likely carcinogenic hazard to humans.  (Opp'n MSJ at 13.)

25  However, while a hazard indicates that at some theoretical level of exposure the

26  chemical is capable of causing cancer, by contrast, a cancer risk is the likelihood that

27  cancer will occur at a real-world level of exposure (because risk depends not only on

28  the cancer potency of the chemical, but also on the dose).  The distinction here is a

1    meaningful one.  As the Ninth Circuit has explained, "[a]t its core, the function of Prop

2    65 is to inform consumers of risks, not hazards."  *NAWG*, 85 F.4th at 1269.

3        Moreover, whatever the risk of cancer from acrylamide in industrial sources,

4    authorities such as the FDA, National Cancer Institute, and American Cancer Society

5    have questioned whether there is sufficient scientific proof *dietary* acrylamide is a

6    cancer risk to humans.  For example, the National Cancer Institute has cautioned that

7    "[a]dditional epidemiologic studies in which acrylamide adduct or metabolite levels

8    are serially measured in the same individuals over time (longitudinal cohorts) are

9    needed to help determine whether dietary acrylamide intakes are associated with

10   increased cancer risks in people."  (Nat'l Cancer Inst., *Acrylamide and Cancer Risk*

11   (Dec. 5, 2017), Norris Decl., Ex. I.)  The American Cancer Society has similarly

12   acknowledged that "reviews of studies done in groups of people (epidemiologic

13   studies) suggest that dietary acrylamide isn't likely to be related to risk for most

14   common types of cancer."  (Am. Cancer Soc'y, *Acrylamide and Cancer Risk* (Feb. 11.

15   2019), Norris Decl., Ex. J.)  This uncertainty is bolstered by CalChamber's experts, who

16   opine that there is insufficient or inconsistent evidence to support a finding that

17   dietary exposure to acrylamide increases the risk of any type of cancer in humans.

18       The Ninth Circuit, in affirming the Court's prior preliminary injunction order,

19   evaluated substantially the same evidence CalChamber has presented here, and

20   concluded those "opinions weigh[ed] against the conclusions of" IARC, EPA, and NTP.

21   *CERT*, 29 F.4th at 478.  Characterizing this as a "robust disagreement" by "reputable

22   scientific sources," the Ninth Circuit concluded the "[C]ourt did not abuse its

23   discretion in concluding that the warning is controversial."  *Id.*  While the State has

24   provided stronger scientific evidence that dietary acrylamide is a human carcinogen at

25   this stage, the Court does not find this evidence sufficient to overcome judgment in

26   CalChamber's favor.  "However controversial is defined, the acrylamide Prop 65

27   warning easily meets the definition because of the scientific debate."  *Id.* at 478 &

28   n.10.  In other words, there is no scientific consensus that *dietary* acrylamide is

carcinogenic *risk* to *humans*.  Thus, the New Warning is controversial both as to

consumers, who will read the warning and necessarily conclude that the food

containing acrylamide they will be consuming poses a cancer risk, and as to

CalChamber's members, who are forced to espouse a viewpoint they vigorously

disagree with.

The State's argument that the New Warning is factually true, because it repeats

statements of various advisory bodies and states the fact of acrylamide exposure,

ignores the reality that it conveys the "core message" that consuming a food

containing acrylamide poses a risk of cancer.  Under the New Warning, taking one of

the more benign statements permitted, a business could state:

> **WARNING**: Consuming this product can expose you to
> acrylamide.  The International Agency for Research on
> Cancer has found that acrylamide is probably carcinogenic
> to humans.  Many factors affect your cancer risk, including
> the frequency and amount of the chemical consumed.

Code Regs. tit. 27, § 25607.2(c)(2).  While all factually true, this warning is again

misleading as it conveys the message that dietary acrylamide increases a consumer's

risk of cancer even though this is an unsettled question in the scientific community.

This conclusion is bolstered by the Ninth Circuit's opinion in *NAWG*, in which the

Ninth Circuit considered a similar Prop 65 warning for glyphosate:

> **CALIFORNIA PROPOSITION 65 WARNING**: Using this
> product can expose you to glyphosate.  The International
> Agency for Research on Cancer classified glyphosate as
> probably carcinogenic to humans.  US EPA has determined
> that glyphosate is not likely to be carcinogenic to humans;
> other authorities have made similar determinations.  A wide
> variety of factors affect your potential risk, including the level
> and duration of exposure to the chemical.  For more
> information, including ways to reduce your exposure, go to
> www.P65Warnings.ca.gov/glyphosate.

85 F.4th at 1280 (quoting Code Regs. tit. 27, §§ 25607.48, 25607.49(a)).  *NAWG* held

that the warning, while factually true, did not qualify for *Zauderer* review because it still

23

1    "convey[ed] the overall message that glyphosate is unsafe which is, at best, disputed,"

2    and elevated one side of "a legitimately unresolved scientific debate" over the other.

3    *Id.* at 1281.  As the court clarified, whether "each sentence" in a compelled warning "is

4    entirely and literally true" is insufficient to satisfy *Zauderer*, as "the totality of the

5    warning may be 'nonetheless misleading.'"  *Id.* at 1279.  Thus, even if "purely factual,"

6    the disclosure remained controversial and misleading.  *Id.* at 1281.  A similar

7    conclusion is compelled here.

8    In addition, the State attempts to rely on the Ninth Circuit's decision in *CTIA II* to

9    support its contention that the New Warning is purely factual and not misleading

10   because it merely restates findings by leading scientific agencies.  (Opp'n MSJ at 14–

11   15.)  *CTIA II* is distinguishable.  In *CTIA II*, the court approved a warning stating:

12

13   > To assure safety, the Federal Government requires that cell
     > phones meet radio-frequency (RF) exposure guidelines.  If

14   > you carry or use your phone in a pants or shirt pocket or
     > tucked into a bra when the phone is ON and connected to a

15   > wireless network, you may exceed the federal guidelines for
     > exposure to RF radiation.  Refer to the instructions in your

16   > phone or user manual for information about how to use your
     > phone safely.

17

18   928 F.3d at 838 (quoting Berkeley Mun. Code § 9.96.030(A) (2015)).  However, rather

19   than implicating that cell phones cause cancer, the *CTIA II* warning only pointed to

20   federal guidelines regarding radiofrequency exposure and stated that certain uses of

21   cell phones would cause the user to exceed those guidelines.  The disclosure did not

22   make any claims that failure to comply with those guidelines would cause any

23   particular effect, other than implying that compliance with the guidelines was

24   necessary for safety.  That is not the case here.  Rather, people who read the safe

25   harbor warning will likely believe that eating the food increases their personal risk of

26   cancer.  Stating that a food contains a chemical that is "probably," "likely," or

27   "reasonably anticipated" to be carcinogenic heavily implies that, by ingesting that

28

1    food, the consumer will increase their risk of cancer.  Thus, the Ninth Circuit's approval

2    of the warning in *CTIA II* is inapposite.

3           That the consumer receives this intended message is necessary to meet the

4    State's declared goals behind Prop 65's warning requirements.  As the State admits,

5    the "New Safe Harbor Warning directly advances" the State's "substantial

6    governmental interest" in "protecting the health and safety of consumers" by

7    "requiring businesses that expose consumers to levels of acrylamide above the

8    applicable no significant risk level to warn consumers of the hazard." (Opp'n MSJ at

9    25.)  This "requirement fits squarely with Californians' declared right '[t]o be informed

10   about exposures to chemicals that cause cancer[.]'" (*Id.* (quoting *Deukmejian*, 212 Cal.

11   App. 3d at 431).)  In other words, the intent behind the New Warning is to inform

12   California consumers they run the risk of developing cancer if they ingest dietary

13   acrylamide.  The State cannot have it both ways by focusing myopically on the

14   individual words in the New Warning and also justifying the regulation by the

15   importance of warning consumers about cancer risk.

16          In short, while the law does not require the Prop 65 warning to disclose the full

17   debate regarding acrylamide's carcinogenicity, and while there need not be complete

18   consensus among the scientific community before a warning may be required, given

19   the evidence in the record the Court finds the New Warning is not purely factual and

20   uncontroversial.  It conveys the one-sided message that people who consume dietary

21   acrylamide will increase their risk of cancer without sufficient scientific consensus to

22   support that message.  Accordingly, *Zauderer*'s lower scrutiny does not apply, and the

23   Prop 65 warning as to dietary acrylamide must satisfy intermediate scrutiny.

24      **B.**     **No Prop 65 Safe Harbor Warning for Dietary Acrylamide Satisfies**

25              ***Central Hudson*'s Heightened Scrutiny**

26          Having determined that *Zauderer*'s lower standard does not apply to the New

27   Warning because it is not purely factual and uncontroversial, the Court turns to

28   whether the warning requirement satisfies intermediate scrutiny under *Central*

1  *Hudson*.  Under intermediate scrutiny, the law must "directly advance the

2  governmental interest asserted and must not be more extensive than is necessary to

3  serve that interest."  *Am. Beverage*, 916 F.3d at 755 (internal quotation marks

4  omitted).  The government has the burden to "demonstrate that the harms it recites

5  are real and that its restriction will in fact alleviate them to a material degree."  *Ibanez*

6  *v. Fla. Dep't of Bus. & Prof'l Regulation, Bd. of Accountancy*, 512 U.S. 136, 136 (1994).

7        Here, the State has neither shown that the New Warning directly advances the

8  asserted government interest, nor that it is not more extensive than necessary to

9  achieve that interest.  "California unquestionably has a substantial interest in

10  preserving the health of its citizens," *NAWG*, 85 F.4th at 1283, and the purpose of

11  Prop 65's warning requirement is to inform the people of California "about exposures

12  to chemicals that cause cancer," *see Brown*, 196 Cal. App. 4th at 258.  However,

13  misleading statements about acrylamide's carcinogenicity do not directly advance that

14  interest.  California has options available to inform consumers of its determination that

15  acrylamide in food is a carcinogen without burdening the free speech of businesses,

16  including advertising campaigns or posting information on the Internet.  *See, e.g.,*

17  *NAWG*, 85 F.4th at 1283 ("[T]he State could reasonably post information about

18  glyphosate on its own website or conduct an advertising campaign."); *NIFLA*, 585 U.S.

19  at 775 (even assuming an advertising campaign would be less effective at

20  broadcasting California's message than mandated disclosures, the state may not "co-

21  opt" businesses "to deliver its message for it," because "[t]he First Amendment does

22  not permit the State to sacrifice speech for efficiency").

23        Accordingly, Prop 65's warning requirement as to acrylamide in food fails

24  intermediate scrutiny under the First Amendment, and the Court will grant summary

25  judgment in CalChamber's favor.

26  **III.    Permanent Injunction and Declaratory Relief**

27        Having determined that Prop 65's warning requirement as to dietary acrylamide

28  violates the First Amendment, the Court turns to whether a permanent injunction and

1   declaratory relief are appropriate.  To obtain a permanent injunction, a plaintiff "must

2   demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available

3   at law, such as monetary damages, are inadequate to compensate for that injury;

4   (3) that, considering the balance of hardships between the plaintiff and defendant, a

5   remedy in equity is warranted; and (4) that the public interest would not be disserved

6   by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391

7   (2006).  The standard for a permanent injunction is essentially the same as for a

8   preliminary injunction, with the exception that the plaintiff must show actual success,

9   rather than a likelihood of success.  *See Amoco Prod. Co. v. Village of Gambell*, 480

10  U.S. 531, 546 n.12 (1987).  In addition, under 28 U.S.C. § 2201, this Court "may

11  declare the rights and other legal relations of any interested party seeking such

12  declaration, whether or not further relief is or could be sought."

13          Here, the Court's analysis of the permanent injunction factors is largely the

14  same as in its order granting a preliminary injunction.  Because "[t]he loss of First

15  Amendment freedoms, for even minimal periods of time, unquestionably constitutes

16  irreparable injury," *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 828 (9th Cir. 2013)

17  (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)), and CalChamber has prevailed on

18  their First Amendment claim, they have established that they will likely suffer

19  irreparable harm for which there are no adequate legal remedies if Prop 65's warning

20  requirement is not enjoined as to acrylamide in food.  When the government is a

21  party, the balance of equities and public interest factors merge.  *Drakes Bay Oyster*

22  *Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418,

23  435 (2009)).  To determine the balance of equities, the court must "balance the

24  interests of all parties and weigh the damage to each."  *Stormans, Inc. v. Selecky*, 586

25  F.3d 1109, 1138 (9th Cir. 2009) (citation omitted).  The Court recognizes that the State

26  has a significant interest in protecting its citizens and informing them of possible

27  health risks, but the Ninth Circuit has "consistently recognized the significant public

28  interest in upholding First Amendment principles."  *Doe v. Harris*, 772 F.3d 563, 583

1   (9th Cir. 2014) (quoting *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir.

2   2002)).  Further, the State "has no legitimate interest in enforcing an unconstitutional"

3   law.  *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

4   Providing misleading or false labels to consumers also undermines California's

5   interest in accurately informing its citizens of health risks at the expense of

6   CalChamber's First Amendment rights.  Accordingly, the balance of equities and

7   public interest weigh in favor of permanently enjoining Prop 65's warning requirement

8   for dietary acrylamide.  The Court will grant CalChamber's requested injunction.

9        CalChamber also argues they are entitled to a declaration that Prop 65's

10  warning requirement as to dietary acrylamide violates the First Amendment because

11  existing consent judgments concerning acrylamide in food continue to force

12  businesses, including CalChamber's members, to either "disparage their products

13  with alarmist warnings or needlessly reformulate their products," and a declaration is

14  needed to relieve the hundreds of businesses that were wrongly sued pursuant to an

15  unconstitutional warning requirement and pressured into burdensome settlements.

16  (MSJ at 25.)  The Court finds such declaratory relief is warranted and will grant

17  CalChamber's request.

18                              **CONCLUSION**

19       As Plaintiff California Chamber of Commerce has prevailed on the merits of its

20  First Amendment claim, is likely to suffer irreparable harm absent an injunction, and

21  has shown that the balance of equities and public interest favor an injunction, the

22  Court will grant its request for injunctive and declaratory relief to permanently enjoin

23  Proposition 65's warning requirement as to acrylamide in food.  It is therefore

24  ORDERED that California Chamber of Commerce's Motion for Summary Judgment

25  (ECF No. 280) is GRANTED.

26       It is further ORDERED that California Chamber of Commerce's request for a

27  permanent injunction enjoining the warning requirement of Proposition 65 as to

28  dietary acrylamide is GRANTED.  Defendant Rob Bonta, in his official capacity as

1    Attorney General of the State of California, the State of California's agents and

2    employees, all persons or entities in privity with them, and anyone acting in concert

3    with them are hereby ENJOINED from enforcing as against California Chamber of

4    Commerce, its members, and all persons its represents, Proposition 65's warning

5    requirement with respect to dietary acrylamide, including California Health and Safety

6    Code section 25249.6's requirement that any person in the course of doing business

7    provide a clear and reasonable warning before exposing any individual to dietary

8    acrylamide.  The Court further DECLARES that Proposition 65's warning requirement

9    is unconstitutional as applied to dietary acrylamide.

10

11          IT IS SO ORDERED.

12    Dated:   **May 2, 2025**

13                                                    Hon. Daniel J. Calabretta
                                                      UNITED STATES DISTRICT JUDGE

14

15

16    DJC4 – CalChamber19cv2019.MSJ

17

18

19

20

21

22

23

24

25

26

27

28

29